**Case No. 24-2038**
[Consolidated with Case No. 24-2135 & 24-2144]

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

JOHNATHAN TALBOT,

*Plaintiff-Appellant,*

v.

MANOAH AINUU, and THE NORTH FACE APPAREL CORP.,

*Defendant-Appellees.*

On Appeal from a Final Judgment of
The United States District Court for the District of Montana
Case No. CV-00066-BMM
Hon. Brian M. Morris, Presiding

_____

**EXCERPTS OF RECORD**
Volume 1 of 1

_____

Matthew Monforton (MT Bar No. 5245)
Monforton Law Offices
32 Kelly Ct.
Bozeman, MT 59718
(406) 570-2949
matthewmonforton@yahoo.com

Ian Prior*
Nicholas Barry*
America First Legal Foundation
611 Pennsylvania Ave., SE #231
Washington, D.C. 20003
(571) 639-6711
Ian.Prior@aflegal.org
*Pro hac vice

*Attorneys for Plaintiff-Appellant Johnathan Talbot*

## **<u>INDEX</u>**

I.    Order of Judgement by the United States District Court for the District of Montana .................................................................. ER-3

II.   Opinion of the United States District Court for the District of Montana ........................................................................... ER-5

III.  Complaint and Exhibits ............................................................. ER-29

IV.   Notice of Appeal ...................................................................... ER-115

V.    Docket Report ........................................................................... ER-120

UNITED STATES DISTRICT COURT
DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JOHNATHAN TALBOT, | Case No. CV-23-66-BU-BMM |
| Plaintiff, | JUDGMENT IN A CIVIL CASE |
| vs. | |
| MANOAH AINUU, and THE NORTH FACE APPAREL CORP., a Delaware Company, | |
| Defendant. | |

**Jury Verdict.** This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

**X** **Decision by Court.** This action came before the Court for bench trial, hearing, or determination on the record. A decision has been rendered.

IT IS ORDERED AND ADJUDGED: TNT's Motion to Dismiss [25] is GRANTED. TNF's request for costs and fees related to the motion is DENIED. Ainuu's Motion to Dismiss [27] is GRANTED. Ainuu's request for costs and fees related to the motion is DENIED. Talbot's claims against TNF and Ainuu are hereby DISMISSED with prejudice.

Dated this 13th day of March, 2024.

TYLER P. GILMAN, CLERK

By: /s/ M. Stewart
M. Stewart, Deputy Clerk

ER-3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# BUTTE DIVISION

JOHNATHAN TALBOT,

                        Plaintiff,

vs.

MANOAH AINUU, and THE
NORTH FACE APPAREL CORP., a
Delaware Company,

                        Defendants.

**CV-23-66-BU-BMM**

**ORDER**

## INTRODUCTION

Plaintiff Johnathan Talbot ("Talbot") filed this action against Defendants Manoah Ainuu ("Ainuu") and The North Face Apparel Corporation ("TNF"). (Doc. 1.) Talbot asserts claims for defamation and tortious interference against both Ainuu and TNF. (*Id.* at 35–48.) TNF and Ainuu filed motions to dismiss the claims against them for failure to state a claim. (Doc. 25; Doc. 27.) Talbot opposes the motions. (Doc. 34.) The Court held a hearing on the motion on February 1, 2024. (Doc. 37.)

## BACKGROUND

Talbot is a resident of Washington who worked for Outdoor Research LLC ("Outdoor Research"), a competitor of TNF. (Doc. 1, ¶ 8.) Ainuu resides in Bozeman, Montana and works as a professional mountain climber. (*Id.*, ¶ 9.) Ainuu

1

serves as a sponsored athlete for TNF and promotes TNF's brand and products on his social media. (Doc. 26 at 13–14.) TNF promotes diversity in the outdoor industry and has taken on initiatives to increase equity in outdoor recreation. (Doc. 1-7.)

Talbot's employer, Outdoor Research, sent Talbot to Bozeman, Montana to conduct a focus group. (Doc. 1, ¶ 54.) Talbot encountered Ainuu outside a bar in downtown Bozeman and engaged in conversation on the evening of June 20, 2023. (*Id.*, ¶¶ 55, 57.) The accounts of the conversation differ, but Ainuu became upset with Talbot at some point and called him "racist and entitled." (*Id.*, ¶ 58.) The argument carried into a nearby bar where the allegations again diverge. Talbot contends that he tried to speak to Ainuu to understand his allegations of racism. (Doc. 26 at 15.) Ainuu asserted later in social media posts that Talbot squared up to him, got in Ainuu's face, and seemed to be challenging Ainuu to a fight. (*Id.*)

Ainuu posted a video to Instagram and seven written statements about the incident. (*Id.* at 16.) These statements alleged that Talbot made racist remarks and tried to fight Ainuu. (Doc. 1-9 at 1–3.) Ainuu called for Outdoor Research to take action and make Talbot face consequences for his statements and conduct. (*Id.*) Dave Burleson, a Global Senior Athlete Coordinator for TNF, shared the statements on his personal social media account. (Doc. 26 at 16.) Social media users began commenting on Outdoor Research's social media page, tagging the social media page, and demanding that Outdoor Research take action against Talbot. (Doc. 1-11.)

2

Outdoor Research placed Talbot on administrative leave on June 23, 2023, and indicated its intent to terminate Talbot's employment on June 29, 2023. (Doc. 1, ¶¶ 74, 77.) Outdoor Research noted that Talbot "showed poor judgment, in [his] actions in Bozeman, both prior to and during [the] incident at the bar" as the reason for Talbot's termination. (*Id.*, ¶ 77.) Ainuu made a series of posts again on July 4, 2023, that targeted Outdoor Research for their failure to reprimand Talbot. Talbot's termination became effective on July 14, 2023. (*Id.*, ¶ 78.) Talbot filed this action on October 2, 2023, alleging libel and tortious interference against Ainuu. (*Id.*, ¶¶ 83–98.) Talbot's complaint also alleges libel and tortious interference against TNF under a theory of respondeat superior. (*Id.*, ¶¶ 99–121.)

## STANDARD OF REVIEW

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires claimants to include in their complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint under the plausibility pleading standard of Rule 8(a)(2). *See Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Dismissal proves appropriate under Rule 12(b)(6) where the complaint fails to state a claim upon which relief can be granted. *Mendiondo v. Centinela Hospital Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). A court may dismiss a complaint "based on the lack of a cognizable legal theory or the absence of sufficient facts

alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

A complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim proves plausible on its face when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. The plausibility standard does not require probability, but "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* The Court must "take[] as true and construe[] in the light most favorable to plaintiffs" all factual allegations set forth in the complaint. *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (internal quotation marks omitted).

## DISCUSSION

TNF argues that Talbot's claims against TNF fail because TNF did not publish any of the challenged statements and because the challenged statements represent matters of opinion that cannot support a claim for defamation. (Doc. 26 at 18.) TNF also notes that punitive damages prove unavailable under the applicable law. (*Id.*) Ainuu contends that Talbot's claims against him fail because his statements represented subjective opinions that are not "provably false." (Doc. 28 at 4–12.) Both Ainuu and TNF contend that the tortious interference claims duplicate Talbot's

4

defamation claims and must be dismissed given the subjective, opinion-like nature of Ainuu's statements. (*Id.* at 12–15.) The Court will address these arguments in turn, but the Court first must determine which state's law applies to the claims.

## I. Whether Montana law or Washington law applies.

A federal court exercising diversity jurisdiction applies the choice of law rules of the forum state. *Aqua-Marine Constructors v. Banks*, 110 F.3d 663, 670 (9th Cir. 1997). The Court exercises jurisdiction over this case by virtue of diversity of citizenship among the parties. (Doc. 1, ¶ 12.) Montana represents the forum state. Accordingly, the Court must apply Montana's choice of law rules. Montana uses the approach from the Restatement (Second) of Conflict of Laws to resolve disputes over which state's substantive law applies to a particular action. *Buckles v. BH Flowtest, Inc.*, 476 P.3d 422, 424 (Mont. 2020).

The Court first must determine "whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action." *Id.* (internal quotations omitted). If no statutory directive exists, the Court considers the principles set forth in § 6(2) of the Restatement along with the specific considerations identified by the Restatement for the alleged claim. *Id.* Talbot contends that a statutory directive exists that requires the Court to submit the choice of law question to the jury. Talbot notes that Montana's Constitution contains a provision that provides the following: "[i]n all suits and prosecutions for libel or

slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts." Mont. Const. Art. II, § 7.

The Montana Supreme Court has interpreted this provision as "plac[ing] the heart of any determination regarding defamatory libel directly within the province of the jury." *Lee v. Traxler*, 384 P.3d 82, 86 (Mont. 2016). The Montana Supreme Court recognized that "'there is no absolute prohibition against granting summary judgment in libel cases.'" *Id.* (quoting *Hale v. City of Billings*, 986 P.2d 413, 417 (Mont. 1999) (internal quotation omitted). The Montana Supreme Court cautioned, however, that "due to the unique nature of cases involving libel, a district court should take particular care when evaluating such motions." *Lee*, 384 P.3d at 86 (citing *Hale*, 986 P.2d at 417).

The Court disagrees with Talbot's contention that Mont. Const. Art. II § 7 provides a directive as to what law to apply to a defamation claim. The constitutional provision delineates the role of the jury and the court in a defamation case. The Montana Supreme Court has clarified, however, that "the function of the court and jury is not greatly different in the trial of libel from what it is in other cases." *Kurth v. Great Falls Tribune Co.*, 804 P.2d 393, 395 (Mont. 1991). The Montana Supreme Court has determined that most questions of law remain in the province of the Court despite Mont. Const. Art. II § 7: "it is for the court and not the jury to pass upon demurrers to the complaint; upon the admissibility of the evidence; upon motions

6

for nonsuit; upon motions for a directed verdict; upon motions for a new trial and upon motions to set aside verdicts or vacate judgments." *Id.* The Court finds no directive in Montana law as to which law should be applied to defamation cases. The Court will apply the principles set forth in § 6(2) of the Restatement along with the specific considerations identified by the Restatement for defamation.

Section 6(2) of the Restatement provides the following factors that prove relevant to the choice of law:

> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability, and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Restatement 2d of Conflict of Laws, § 6(2). Section 149 and Section 150 of the Restatement provide specific guidance on the choice of law for defamation claims. Section 150 proves most relevant where, as here, publication of the alleged defamatory statements occurred on the Internet and thus across multiple states. Section 150 of the Restatement provides that in an action alleging multistate defamation, "the state of most significant relationship will usually be the state where the person [claiming defamation] was domiciled at the time." Restatement 2d of Conflict of Laws, § 150(2). The Restatement recognizes, however, that "[a] state,

7

which is not the state of the plaintiff's domicil [sic], may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his reputation." *Id.*, cmt. e.

A Hawaii district court addressed a similar choice of law issue in *Ratner v. Kohler*. Civ. No. 17-00542 HG-KSC, 2018 U.S. Dist. LEXIS 30761 (D. Haw. Feb. 26, 2018). The claimant filed a defamation suit in Hawaii although the claimant lived and worked in California. *Id.* at *12. A woman located in Hawaii posted the allegedly defamatory statements on Facebook. The conduct cited in the Facebook post allegedly occurred in California. *Id.* at *12–14. Hawaii's choice of law provisions, like Montana's, applied the most significant relationships test from the Restatement (Second) of Conflict of Laws. *Id.* at *13. The Hawaii district court rejected the claimant's attempts to apply Hawaii's law. *Id.* at *12–15. The Hawaii district court instead applied California law when it emphasized that "purported damages would most likely occur in California where [the claimant] resides and conducts his business." *Id.* at *13–14.

The Court finds that Washington represents the state with the most significant relationship to this case. Talbot resided and worked in Washington at the time that Ainuu made the allegedly defamatory statements. Talbot alleges that Ainuu's statements caused him to lose his employment in Washington. Talbot argues that he suffered the greatest reputational harm in Bozeman, Montana, as he had just recently

8

moved from there. (Doc. 34 at 16.) Talbot failed to set forth any facts concerning this other reputational harm, however, that he experienced in Montana.

Talbot also highlights that the encounter about which Ainuu posted took place in Bozeman, Montana. (*Id.*) Talbot further claims that Ainuu targeted a Montana audience with his posts. (*Id.*) Ainuu lived in Montana and made the Instagram post from Montana. Ainuu's statements emphasized, however, Talbot's employment with Outdoor Research in Washington. (*See* Doc. 1, ¶¶ 66–68.) Ainuu's statements tagged Outdoor Research's Instagram account and called for Outdoor Research to take action, presumably by disciplining or discharging Talbot. (*Id.*) Talbot alleges the loss of employment as the primary harm caused to him by the posts. Talbot's loss of employment occurred in Washington. Talbot has failed to demonstrate that more significant consequences arose from his ties to Montana.

Furthermore, Washington possesses a strong interest in the issues in this case where one of its residents lost employment due to allegedly defamatory statements made by a Montana resident. Washington also maintains relevant policies pertaining to alleged defamation, including the Washington Anti-SLAPP statute. The Court finds that under § 150 and the factors set forth in § 6(2) of the Restatement (Second) of Conflict of Law, Washington has the most significant relationship to the case. The Court will apply Washington law.

9

## II.    Whether Washington's Anti-SLAPP statute applies.

Washington adopted its Uniform Public Expression Act (UPEA) in 2021 as a successor to its anti-SLAPP statute. *Jha v. Khan*, 520 P.3d 470, 476 (Wash. App. 2022). The UPEA, like its predecessor, seeks to provide protection against lawsuits based on a citizen's exercise of free speech. *Id.* A party seeking to dismiss an action pursuant to the UPEA bears the burden of proving that the UPEA applies. *Jha*, 520 P.3d at 477. Washington's UPEA statute "applies to a cause of action asserted in a civil action against a person based on the person's . . . [e]xercise of the right of freedom of speech or of the press . . . guaranteed by the United States Constitution or Washington state Constitution, on a matter of public concern." Rev. Code. Wash. § 4.105.010(2)(c).

Washington patterned its initial anti-SLAPP statute after California's anti-SLAPP statute. Washington courts "look[ed] to California cases for aid in interpreting the [statute]." *Spratt*, 324 P.3d, 707, 712 (Wash. App. 2014). Washington courts still rely on cases interpreting the predecessor anti-SLAPP statute in applying the UPEA. *Jha*, 520 P.3d at 478 (quoting *Spratt*, 324 P.3d at 712). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." *Spratt*, 324 P.3d at 713 (Wash. App. 2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)) (internal quotation marks omitted); *Jha*, 520 P.3d at 478.

10

Ainuu's statements contained allegations of racism. Racism constitutes a matter of public concern. *Dodge v. Evergreen Sch. Dist. No. 114*, 56 F.4th 767, 777 (9th Cir. 2022). The Court must analyze, however, more than just the content of the speech. The Court also must consider the context and form to determine whether speech pertains to a matter of public or private concern. *Snyder*, 562 U.S. at 453. A California court addressed a similar case in interpreting its anti-SLAPP statue, the predecessor of Washington's statutes. A California court of appeals determined in *Bernstein v. LaBeouf* that the anti-SLAPP statute did not apply to an action in which the defendant had called the plaintiff "racist" in a crowded bar. 43 Cal. App. 5th 15, 23–24 (Cal. App. 2019). The California court recognized that "[w]hile racism is undoubtedly an issue of public interest, a defendant cannot convert speech that would otherwise not be entitled to anti-SLAPP protection into protected activity by 'defining the[] narrow dispute by its slight reference to the broader public issue.'" *Id.* at 24.

The context and form of Ainuu's posts suggest that Ainuu spoke on a matter of private concern. Ainuu posted the comments to his Instagram a few hours after the interaction with Talbot. Ainuu specifically referenced the encounter with Talbot and called out Talbot's employer to notify them of the encounter. TNF contends that Ainuu's statements concerned racism and diversity in the outdoor industry. (Doc. 35 at 10.) Ainuu's posts make few references to the outdoor industry. Ainuu briefly

11

references his "role" in trying to change the outdoor industry. Ainuu's posts primarily emphasize, however, wanting Talbot to be held accountable and to face consequences for his "racist" and "aggressive" actions. (Doc. 1-9; Doc. 1-14.) Ainuu's statements focused on a personal interaction. The statements failed to contribute to or further any public debate or conversation on race or diversity. *See Bernstein*, 43 Cal. App. 5th at 24.

Ainuu made posts to Instagram late at night that predominantly referred to Talbot and Ainuu's encounter with Talbot. Ainuu's posts used emojis, selfies, hashtags, and animated language. The context and form of these statements support a finding that the statements concerned a matter of private concern rather than public concern. Ainuu's statements fail to trigger the protections contained in Rev. Code. Wash. § 4.105.010(2)(c).

### III.   Defamation Claims

The Court turns to the question of whether Ainuu's posts can serve as the basis for a defamation claim.

### A. Whether TNF constitutes the "publisher" of the challenged statements or can be held vicariously liable for those statements

Talbot concedes that Ainuu serves as an independent contractor rather than an employee of TNF. Talbot argues, however that TNF can be held liable for Talbot's statements because TNF gave apparent authority to Ainuu to make the allegedly defamatory statements. Talbot relies on TNF's initiative for its athletes to "bring

12

social justice activism 'not only within the Company, but within the communities where we live and work.'" (Doc. 34 at 39 (quoting Doc. 1 at ¶¶ 16–17).) Talbot also relies on TNF's alleged failure to reprimand its athletes, including Ainuu, on two prior occasions where its athletes "called out" others for being racist. Talbot argues that TNF implicitly encouraged Ainuu's actions by failing to address and remedy similar behavior in the past.

The Fourth Circuit addressed the issue of apparent authority under similar facts in *Lokhova v. Halper*. 995 F.3d 134, 146–47. The claimant in *Lokhova* sued an independent contractor for MSNBC for tweets posted on the independent contractor's Twitter account. *Id.* at 139–40. The claimant also sued MSNBC on the basis that MSNBC proved vicariously liable for the independent contractor's statements. *Id.* at 140–41, 147. The Fourth Circuit determined that allegations that "MSNBC" appeared in the independent contractor's twitter bio proved insufficient to establish apparent authority. *Id.* at 147.

The same reasoning applies here. Ainuu's Instagram bio links to TNF's Instagram account. (Doc. 1-5.) Ainuu's bio likewise links to a company called Smart Wool and his posts link to many different companies from REI to Clif Bar to Patagonia. (Doc. 26-8 at 2.) Talbot makes no argument that those companies likewise should be held liable for statements made on Ainuu's personal Instagram account. TNF apparently supports social justice activism, but no facts exist in the

record to suggest that TNF encourages its athletes to "call out" individuals on social media for perceived racist behavior. More importantly, no facts in the record suggest that Ainuu posted on behalf of TNF. None of Ainuu's comments mentioned TNF products, his position as a TNF sponsored athlete, or TNF. Talbot's allegations fail to demonstrate apparent authority. *Lokhova*. 995 F.3d at 146–47.

TNF's prior failures to reprimand its athletes also prove insufficient to establish apparent authority. The incidents cited by Talbot resemble the present case only in their racial/ethnic justice component. It remains unclear whether TNF's athletes were representing TNF at the time that they allegedly took the actions. "It would hardly be possible for an employer to successfully police all employee interactions." *Garnett v. Remedi Seniorcare of Va., LLC*, 892 F.3d 140, 144 (4th Cir. 2018). It remains unclear whether TNF had authority to censor their sponsored athlete's conduct.

"Apparent authority 'depend[s] upon objective manifestations made by the principal.'" *T-Mobile USA, Inc. v. Selective Ins. Co. of Am.*, 450 P.3d 150, 154 (Wash. 2019) (quoting *King v. Riveland*, 886 P.2d 160, 165 (Wash. 1994)). The manifestations by the principal "'must cause the [third party] to actually, or subjectively, believe that the agent has authority to act for the principal' and '*be such that the [third party's] actual, subjective belief is objectively reasonable*.'" *Id.* (quoting *King*, 886 P.2d at 165) (alterations and emphasis in original). TNF's

14

mission statement and conduct committed by their independent contractors outside promotional TNF activities proves insufficient to establish apparent authority. Talbot has failed to plead sufficient facts to support a claim for relief against TNF for the statements made by Ainuu.

### B. Whether Ainuu's statements constitute statements of facts that can support a claim for defamation

TNF and Ainuu argue that Ainuu's statements concerned facts that are not "provably false." (Doc. 28 at 4; Doc. 26 at 29–30.) TNF and Ainuu argue that whether something or someone is racist cannot be proved because the term "racist" lacks a clearly identifiable definition. (Doc. 26 at 29.) TNF and Ainuu note that Ainuu's statements expressed his perception of the encounter with Talbot. (Doc. 35 at 14–17; Doc. 36 at 12–14.) TNF and Ainuu further argue that the context of Ainuu's statements, in the form of postings on social media, indicated that the statements represented expressions of opinions. (Doc. 35 at 13.) Talbot contends that Ainuu's statements—whether Talbot made racist remarks or attempted to fight Ainuu—remain provably false. Talbot further argues that even if the statements constitute opinions, the "opinions" were based on undisclosed facts that invite the reasonable inference of defamatory facts. (Doc. 34 at 27–28.)

For a statement to be actionable as defamation, the statement "must be capable of being proven true or false." *Dodge v. Evergreen Sch. Dist. No. 114*, CASE NO. 3:20-cv-05224-RBL, 2020 U.S. Dist. LEXIS 135581, at *17 (W.D. Wash. July 30,

15

2020) (citing *Lewis v. Time Inc.*, 710 F.2d 549, 555 (9th Cir. 1983)). Statements of opinion accordingly generally prove non-actionable. *Lewis*, 710 F.2d at 553. The U.S. Supreme Court has recognized, however, that "expressions of 'opinion' may often imply an assertion of objective fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18 (1990).

Washington law requires the Court to "'examin[e] a statement in the totality of the circumstances in which it was made . . . to determine whether a statement should be characterized as nonactionable opinion.'" *Miller v. Sawant*, 660 F. Supp. 3d 1015, 1027 (W.D. Wash. 2023) (quoting *Dunlap v. Wayne*, 716 P.2d 842, 848 (Wash. 1986)). The Court must consider the following factors: "(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap*, 716 P.2d at 848.

Multiple district courts have addressed whether a statement that someone is "racist" or "made racist remarks" constitutes a statement of fact actionable as defamation. The Western District of Washington determined in *Dodge* that "[w]hether someone is racist, bigoted, and hateful in general is not a factual question." *Dodge*, 2020 U.S. Dist. LEXIS 135581, at *17. "[A] term like racist, while exceptionally negative, insulting, and highly charged—is not actionable under defamation-type claims because it is a word that lacks precise meaning." *Skidmore*

16

*v. Gilbert*, Case No. 20-cv-06415-BLF, 2022 U.S. Dist. LEXIS 27239, at *30 (N.D. Cal. Feb. 15, 2022). The District of Nebraska recognized that "calling an individual a 'racist' or characterizing a person's statements as being 'racist' or 'hateful,' standing along [sic], is not 'capable of proof or disproof.'" *Starks v. Tula Life, Inc.*, 8:23-CV-4, 2023 U.S. Dist. LEXIS 128760, at *9 (D. Neb. July 26, 2023)); *see also Tannous v. Cabrini Univ.*, No. 23-1115, 2023 U.S. Dist. LEXIS 179616, at *22 (E.D. Pa. Oct. 4, 2023) ("[a] statement characterizing someone as racist, like a non-actionable opinion, is a 'subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation.'")

Several circuits similarly have concluded that allegations that someone is a "racist" represent non-actionable opinions. The Seventh Circuit has noted that "[i]n daily life 'racist' is hurled about so indiscriminately that it is no more than a verbal slap in the face . . . [i]t is not actionable unless it implies the existence of undisclosed, defamatory facts." *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) The Second Circuit determined in *Rapaport v. Barstool Sports Inc.*, that the accusations of racism and fraud that the defendant had posted to Twitter proved "non-actionable because they lack a clearly defined meaning." 22-2080-cv, 2024 U.S. App. LEXIS 556, at *7 (2d Cir. Jan. 9, 2024). The Second Circuit recognized that "no reasonable reader could find that the statements alleging racism or fraud" on Twitter conveyed facts as opposed to reflecting the opinion of the poster. *Id.*

The medium and audience of Ainuu's statements support a finding that Ainuu's statements constituted non-actionable opinion. Ainuu posted the statements to his social media followers via his social media page. Courts have recognized that "readers [] give less credence to allegedly defamatory remarks published on the Internet than to similar remarks made in other contexts" due to the "informal and unedited nature" of statements made on the Internet. *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553 (S.D.N.Y. Aug. 20, 2020). Other courts have found that social media pages like Twitter and Instagram represent "forums that welcome opinions," *Jevremovic v.* Courville, No. 22-4969 (ZNQ) (RLS), 2023 U.S. Dist. LEXIS 139440, at *17 (D.N.J. Aug. 10, 2023) and "vehicles for the expression of individual opinion rather than the rigorous and comprehensive presentation of factual matter." *AG v. Polis*, 21-2108-cv, 2022 U.S. App. LEXIS 7992, at *4 (2d Cir. Mar. 28, 2022). The medium and audience of the publication supports a finding that a reasonable social media user would likely have interpreted the statements as opinion and perception rather than fact. *Ganske*, 480 F. Supp. 3d at 553.

The context of Ainuu's statements also proves important. Ainuu posted the comments around 2:00 a.m. after an encounter at a downtown bar. Ainuu's posts used hashtags and emojis. (Doc. 1-9 at 1–2.) The posts followed a picture of Tupac Shakur's album for the song "Hit 'Em Up." (*Id.* at 1.) Ainuu wrote his statements across Ainuu's late night selfies. (*Id.* at 1–2.) Ainuu's later posts used profanity and

18

indicated a desire for payback with statements like "he's lucky to have not learned physically" and "#telljohnathancomebacktobozemanIgothimthistime." (Doc. 1-14 at 1.) A reasonable reader would understand these statements as the opinionated rants of an upset person. A reasonable reader would not interpret Ainuu's statements made in this context as "a comprehensive presentation of factual matter." *AG*, 2022 U.S. App. LEXIS 7992, at *4. "[T]he context and tone of the post itself suggest[s] [a] snarky opinion, which is further bolstered by the fact that it appears in a social media post featuring a string of hashtags, colorful emojis, and snarky writing." *Pelkowski v. Hovermann*, 20-CV-1845 (ENV) (RLM), 2021 U.S. Dist. LEXIS 259784, at *12–13 (E.D.N.Y. Sept. 9, 2021).

Talbot argues that whether he tried to fight Ainuu, as alleged in Ainuu's statements, remains provably false. The Sixth Circuit's decision in *Sandmann v. N.Y. Times Co.* proves instructive here. 78 F.4th 319 (6th Cir. 2023). A member of the Indigenous Peoples March had attempted to move through the crowd towards the Lincoln Memorial. *Id.* at 322. The member came face to face with the claimant, leading to a tense encounter subject to substantial media coverage. *Id.* The member of the Indigenous Peoples March later made statements to the media that the claimant had "blocked [his] way and wouldn't allow [him] to retreat." *Id.* at 323. The Sixth Circuit determined that it remained provably false whether the member of the Indigenous Peoples March physically could have moved past the claimant. The

19

member's statements, nevertheless, "expressed his subjective understanding of the situation" and "ascribed subjective intent to [the claimant's] conduct." *Id.* at 331–33. The Sixth Circuit concluded that the statement represented a non-actionable opinion. *Id.* at 333.

Ainuu's statements alleged that Talbot "tried to fight [him]" and "[got] in [his] face." (Doc. 1-9 at 1.) Like the statements in *Sandmann*, Ainuu's statements ascribe subjective intent to Talbot's actions. The statements represent Ainuu's perception of the encounter. *Sandmann*, 78 F.4th at 333. A reasonable reader would understand Ainuu's statements as an expression of Ainuu's feelings that Talbot wanted to fight him rather than a narration of facts. The context, audience, and form of the statements, as described above, further support the conclusion that a reasonable reader would interpret Ainuu's statements as his opinions/perception rather than facts.

The Court similarly rejects Talbot's argument that Ainuu's statements implied undisclosed facts. Talbot argues that Ainuu's statements left readers to speculate as to what Talbot could have said or done that could have been perceived as racist. An opinion may imply undisclosed defamatory facts. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990). For example, "[t]o say of a person that he is a thief without explaining why, may, depending upon the circumstances, be found to imply the assertion that he has committed acts that come within the common connotation of

thievery." Rest. 2d of Torts § 566. Ainuu's statements do not imply defamatory facts. The assertion that someone is a thief implies the provably false statement that the person stole something. The assertion that someone is a racist, on the other hand, at most implies that the person made racist remarks or engaged in racist conduct. Neither of these implications represent provably false statements because both still depend on the interpretation of the term "racist," which attaches no clearly defined meaning. *Rapaport*, 2024 U.S. App. LEXIS 556, at *7.

Moreover, even if Ainuu's statements did imply defamatory facts, Ainuu disclosed the facts on which he based his opinion. Ainuu's posts outlined the facts on which his opinions relied including the following: "[Talbot] incessantly trying to shake my hand;" "[Talbot] asking questions – very directly – about diversity . . . and [Talbot] kept cutting [Ainuu] off" when Ainuu answered those questions; "[a]n apology followed by an invitation to fight;" and "[Talbot] squared up to [Ainuu] got right in [his] face." (Doc. 1, ¶¶ 65–66.)

Ainuu's statements represent his perception that Talbot's remarks proved racist and that Talbot wanted to fight Ainuu. A reasonable reader would not interpret Ainuu's remarks as factual statements, or infer factual statements therefrom, in light of the content, context, and form of Ainuu's statements. *Rapaport*, 2024 U.S. App. LEXIS 556, at *7; *Ganske*, 480 F. Supp. 3d at 553. Ainuu's statements represent

21

non-actionable opinions. Accordingly, Talbot's claims for defamation against TNF and Ainuu fail as a matter of law.

## IV.    Tortious Interference

TNF and Ainuu contend that Talbot's tortious interference claim duplicates his defamation clam. TNF and Ainuu argue that Talbot, because he cannot show defamation, cannot show wrongful or tortious conduct that interfered with Talbot's employment. (Doc. 26 at 35–36; Doc. 28 at 12–15.) Talbot has admitted that his claim for tortious interference depends on his claim for defamation such that if the claim for defamation fails the claim for tortious interference likewise would fail. (Doc. 34 at 36–37.)

The Court has determined that Talbot's claim for defamation against TNF fails because TNF had not published the statements and Ainuu had not acted with apparent authority in publishing the statements. *Lokhova*. 995 F.3d at 146–47. The defamation claims against TNF and Ainuu further fail because Ainuu's statements constituted opinions, the falsity of which cannot be conclusively established. *Sandmann*, 78 F.4th at 333. Talbot's tortious interference claims against Ainuu and TNF also must fail.

## V.    Punitive Damages

Talbot's punitive damages claim must be dismissed given the dismissal of his other claims. Further, even had Talbot's claims for defamation or tortious interference survived the Defendants' motions to dismiss, punitive damages remain

22

unavailable under Washington law. "In a Washington defamation case, the plaintiff can recover compensatory damages, but 'under no circumstances will [the Washington Supreme Court] allow a jury to award punitive damages.'" *Schmalenberg v. Tacoma News*, 943 P.2d 350, 363 (Wash. Ct. App. 1997) (alteration in original). Talbot's punitive damages claim must be dismissed.

## VI. Leave to Amend

The Court will dismiss Talbot's claims for failure to state a claim under Fed. R. Civ. P. 12(b)(6). "'Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1072 (9th Cir. 2011) (quoting *Krainski v. Nev. ex rel. Bd. of Regents of Nev. System of Higher Educ.*, 616 F.3d 963, 972 (9th Cir. 2010)); *Smith v. Johnson*, No. 22-35766, 2023 U.S. App. LEXIS 27560, at *1 (9th Cir. Oct. 17, 2023) (remanding to correct judgment to dismissal without prejudice) (unpublished).

The claimant in *Dodge* sought leave to amend deficiencies in his complaint. 2020 U.S. Dist. LEXIS 135581, at *17–18. The Washington district court noted after finding the allegedly defamatory statements non-actionable that the "alleged statements could not support a defamation claim even if adequately pled." *Id.* The Washington district court determined that amendment would be futile because "[t]he

23

entire basis of [the claimant's] defamation claim is flawed and allowing him to amend would essentially allow him to assert a whole new claim." *Id.* at *18.

*Pelkowski* addressed a similar question regarding amendment. 2021 U.S. Dist. LEXIS 259784, at *28. The New York district court dismissed the claimant's defamation claims after determining that the allegedly defamatory statements constituted protected opinion. *Id.* at *15. The district court concluded that any attempt to amend [the claimant's] libel/defamation claim[] would be futile as a matter of law." *Id.* at *28. The district court allowed amendment of the claimant's tortious interference with contract claim. *Id.* at *28. The district court denied, however, leave to amend the claimant's tortious interference with business relations claim. *Id.* Importantly, the district court acknowledged that "having dismissed [the claimant's] defamation cause of action for failure to state a claim, defamation cannot form the basis of [the claimant's] tortious interference with business relations claim." *Id.* at *21.

Amendment cannot fix the deficiencies with Talbot's defamation claims where the Court has determined, as a matter of law, that the statements of which Talbot complains constitute opinions that cannot serve as a basis for a defamation claim. *Dodge*, 2020 U.S. Dist. LEXIS 135581, at *17–18; *Pelkowski*, 2021 U.S. Dist. LEXIS 259784, at *28. The Court also finds that given Talbot's admission at the hearing that the tortious interference claim would stand or fall with the defamation

24

claim, amendment likewise cannot fix the deficiencies with Talbot's tortious interference claim. The Court will dismiss this action with prejudice.

## CONCLUSION

The Court determines that Talbot has failed to state a claim upon which relief can be granted. Talbot's claims for defamation against Ainuu and TNF fail because the statements made by Ainuu represent opinions protected by the First Amendment and Ainuu's conduct cannot be attributed to TNF. Talbot's claims for tortious interference also fail due to their reliance on Talbot's claims for defamation.

## ORDER

Accordingly, **IT IS ORDERED:**

1.) TNF's Motion to Dismiss (Doc. 25) is **GRANTED**. TNF's request for costs and fees related to the motion is **DENIED**.

2.) Ainuu's Motion to Dismiss (Doc. 27) is **GRANTED**. Ainuu's request for costs and fees related to the motion is **DENIED**.

3.) Talbot's claims against TNF and Ainuu are hereby **DISMISSED** with prejudice.

DATED this 1st day of March, 2024.

Brian Morris, Chief District Judge
United States District Court

25

Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org
*(pro hac vice forthcoming)

*Attorneys for Plaintiff Johnathan Talbot*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| JOHNATHAN TALBOT, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. CV 23-66-BU-BMM |
| | ) | |
| | ) | |
| | ) | **COMPLAINT** |
| MANOAH AINUU, and THE | ) | |
| NORTH FACE APPAREL | ) | |
| CORP., a Delaware Company. | ) | |
| | ) | |
| *Defendants* | ) | |

# INTRODUCTION

1.    Defendant Manoah Ainuu is a paid climber and brand ambassador for Defendant The North Face Apparel Corp. ("North Face").

2.    Supported and assisted by North Face, Ainuu intentionally, maliciously, and repeatedly defamed Plaintiff Johnathan Talbot, calling him a violent "racist" on social media and accused him of making racist comments.

3.    Defendant Ainuu intentionally and recklessly made these false and defamatory statements to destroy Mr. Talbot's reputation and career, thereby both increasing his own fame and serving North Face's commercial interests by promoting its cynically false "social justice mission."

4.    Ainuu repeated his false and defamatory claims online, solicited others to republish it, and repeatedly directed the defamatory statements to Mr. Talbot's employer, a North Face competitor, to harm Mr. Talbot.

5.    North Face's Global Senior Athlete Coordinator, Dave Burleson, endorsed Aniuu's defamatory statements.

6.     The result of Ainuu's actions, all encouraged and supported by North Face, was not merely the destruction of Mr. Talbot's reputation, but even after Ainuu later admitted to Mr. Talbot's employer that the latter did not say anything racist or offensive, Mr. Talbot's employer still buckled under the pressure of the Ainuu's vicious viral campaign and terminated Mr. Talbot, leaving him with no job and a besmirched reputation, and unable to secure work in his chosen profession.

7.     Ainuu remains a paid climber and brand ambassador for North Face.

## PARTIES

8.     Plaintiff Johnathan Talbot ("Plaintiff" or "Mr. Talbot") is a resident of Shelton, Washington. He was employed by a competitor of The North Face in the outdoor business, Outdoor Research, LLC, during the events giving rise to this complaint.

9.     Defendant Manoah Ainuu ("Ainuu" or "Defendant Ainuu") is a resident of Bozeman, Montana, and is presently a sponsored climber for North Face. Ainuu was acting within the scope of his employment during all times relevant.

10.    Defendant North Face is a Delaware company, and a wholly owned subsidiary of V.F. Corporation.

11.    Defendant North Face sells outdoor apparel and recreational equipment, as well as products designed for "extreme winter sport activities, such as high-altitude mountaineering, skiing, snowboarding, and ice and rock climbing." V.F. Corporation, Annual Report (Form 10-K) (May 25, 2023), attached as Ex. 1, at 5. "The North Face products are marketed globally through specialty outdoor and premium sporting goods stores, department stores, independent distributors, independently-operated partnership stores, concession retail stores, approximately 230 VF-operated stores, on websites with strategic digital partners, and online at www.thenorthface.com." *Id.* at 2. North Face products are sold online and at authorized dealers in Bozeman, Montana.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction under 28 U.S.C. §§ 1332 as there is complete diversity and the amount in controversy exceeds $75,000.

13.    Venue is appropriate under 28 U.S.C. § 1391(b)(2) as the events giving rise to this complaint occurred in Bozeman, Montana,

Defendant Ainuu is a resident of Bozeman, and North Face products are sold online and at authorized dealers in Bozeman, Montana.

## FACTS

14. V.F. Corporation (the parent corporation of North Face) claims that the people who work for North Face and its other subsidiaries "are a force for good in the world, sparking global movements that genuinely make a difference." Ex. 1, at 9.

15. V.F. Corporation also states that "inclusion, diversity, equity, action" is fundamental to its business and that it "strives to provide an environment that allows our associates to bring their authentic selves to work every day" and that it is "determined to foster a workplace that is free of discrimination and harassment, and promotes allyship, advocacy, and belonging." Ex. 1, 10.

16. V.F. Corporation also requires its subsidiaries to take social justice beyond the workplace walls and into the communities: "VF is committed to maximizing inclusion, diversity, and equity not only within the Company, but within the communities where we live and work." Ex. 1, at 10.

17. To help execute the mission of its parent company, Defendant North Face sponsors athletes who lend credibility to its products and serve as brand ambassadors.

18. North Face publicly announced in 2020 that it would pull all of its Facebook advertising "in the hopes that Facebook will improve its policies against racist, violent or hateful content and misinformation spreading" and that North Face hoped that Facebook "will reconsider their policies and will reevaluate [their] position in the next thirty days." Jessica Guyunn, *Facebook Boycott: North Face is First to Join Civil Rights Group in Demand to End to [sic] Hate Speech*, USA TODAY (June 19, 2020), https://bit.ly/3EDr55W.

19. The accomplishments, personalities, and causes of these sponsored athletes are central to Defendant North Face's identity and mission.

20. Defendant North Face's sponsored athletes have the ability to propose outdoor sporting events that are consistent with the athlete's interests, causes, and goals.

21.  These events, if approved, are paid for by Defendant North Face when they meet certain criteria, including generating buzz and media coverage within the sport.

22.  Defendant North Face's sponsored athletes are prominently featured on a dedicated "About Us" page at https://www.thenorthface.com/en-us/about-us, with the tagline: "A higher calling. Our athletes' stories are diverse, but they all share a calling to push the limits of human potential."

23.  Defendant North Face's sponsored athletes have previously used their public platform for the tactic of defaming their competitors while promoting the North Face brand.

24.  In April of 2020, North Face sponsored skier Vasu Sojitra ("Sojitra") used Instagram to attack the directors, producers, and sponsors of the 2019 film "Himalayan Ice: Adventures in India's Most Remote Valley." The film documented the Piti Dharr ice climbing festival and the exploration of remote valley in the Indian Himalaya with La Sportiva climbers Ari Novak ("Novak"), Karsten Delap ("Delap"), and local climber Karn Kowshik ("Kowshik"). Declaration of Ari Novak, attached as Ex. 2, at ¶14..

25.    On April 29, 2020, Sojitra began using his Instagram account to try and cancel those associated with the film, claiming it exhibited a "white saviour complex, white complacency and indigenous erasure." He also compared the film and its treatment of Indians to Christopher Columbus and the European Colonization of America. Ex. 2, at ¶15.

26.    In the following days, Sojitra continued his attacks and broadened them to include La Sportiva, posting "@lasportivana you're the main culprits of this. Given these are both your athletes and you're the title sponsor." He posted a question asked by La Sportiva on its Instagram ("Who's got a question for Karsten or Ari about the film or ice climbing?") and added his own response: "How much do you know about the white saviour complex and its negative impacts on the film?" Sojitra continued for days, harassing and taunting Novak and Delap, as well as La Sportiva, by accusing them of racism and causing him "trauma." Ex. 2, at ¶15.

27.    Sojitra then threatened Petzl, of which Karsten Delap was also a team member. He stated that he started a boycott Petzl campaign to encourage people from communities of color to stop buying gear from

the company unless the movie was pulled from all its marketing platforms. Ex. 2, at ¶16.

28.    Kowshik, an Indian alpinist and co-founder of the Piti Dharr festival, told Outdoor Journal that Sojitra's actions were hurtful and false: "By doing what he did, he robs us of our voice and our agency. We have problems and we're aware of them and we have our own strategies to combat them and take them on. Whether they've worked or not so far, they are our strategies. So where we want to go, what we want to do, that's our call to take and not his. Another concern is that many of the facts he states are not true. He starts by saying the film didn't show what really happened. That's not true. What happened was a wonderful experience and the film aims to show that. In fact, on his post in the La Sportiva page he asks why I was left out of the film. That's not true—I have more screen time than both Ari and Karsten combined. So, that's a fact. It's also a fact that in the opening credits of the film, it says 'featuring Karn Kowshik, Prerna Dangi, Bharat Bhushan'. So it doesn't place us in the background but talks about us as featured climbers. It shows Prerna's climbing, it shows Bharat's climbing journey. It's not accurate to say that we didn't get enough time." Ex. 2, at ¶¶17-18.

29.     Ultimately, Kowshik, along with the two other founders of the festival – Bharat Bhusan and Prerna Dani – were so disturbed by Vasu's actions that all three sent a letter complaining to North Face. Ex. 2, at ¶19.

30.     North Face has taken no apparent action with respect to Sojitra's actions, and he remains a sponsored athlete highlighted on its website.

31.     Since at least 2018, Defendant Ainuu has been a North Face sponsored "athlete" highlighted on North Face's website.

32.     Since becoming sponsored by North Face, Defendant Ainuu has developed a significant social media following. His Instagram account (@adreadedclimber) has over 15,000 followers, among them North Face's own Instagram account. Manoah Ainuu (@adreadedclimber),                                INSTAGRAM, https://www.instagram.com/adreadedclimber/ (attached as Ex. 3).

33.     Defendant Ainuu links to North Face's Instagram account in his profile and uses that account to post photographs of his activities as a North Face-sponsored athlete and to make statements about "social justice" and "systemic racism."

34.  In his position as a North Face-sponsored athlete, Ainuu has generated significant media attention that allows him to highlight his personality and causes, all to the benefit of Defendant North Face's mission.

35.  In 2021, he starred in a film entitled "Black Ice," which CNN described as a film about "climbers aiming to boost diversity." Ben Church, *'It Was Super Cool Just Having That Much Melanin in Montana': The Climbers Aiming to Boost Diversity,* CNN (March 19, 2021), https://bit.ly/3r2KJoU.

36.  In that film, Defendant Ainuu could not recall being the victim of overt racism but cited "microaggressions" and "compliments" as sources of frustration that he sees as "racist."

37.  Defendant Ainuu has been featured in the following media stories:

   a.  Michael Easter, *Learn Functional Fitness from Ice Climber Manoah Ainuu*, MEN'S HEALTH (March 2, 2022), https://tinyurl.com/4a3ejbvt.

   b.  Daniel Duane, *Up, Up and Away from It All*, NEW YORK TIMES MAGAZINE (Sept. 23, 2020), https://tinyurl.com/28xjbzd7.

c. Felicia Radel, *"I Don't Think It Has Really Set In": First All-Black Team to Summit Everest Talk Historic Trek,* USA TODAY (June 13, 2022), https://tinyurl.com/2z22crz9.

d. Topher Gauk-Roger*, Meet the First All-Black Group of Climbers Attempting to Summit Mount Everest: "It's Really Powerful,"* PEOPLE MAGAZINE (Feb. 22, 2022), https://tinyurl.com/3j4jw6ys.

38. This extensive media coverage not only describes Defendant Ainuu's mountain climbing exploits but also highlights his position with Defendant North Face and his use of that position to publish and amplify his statements.

39. Defendants North Face and Ainuu have also collaborated on specific initiatives related to their joint mission of bringing social justice to communities.

40. Following the death of George Floyd, Defendant North Face issued a press release on October 15, 2020, announcing its "Reset Normal" initiative, which was centered around a $7 million donation to organizations "with the goal of building equity in the outdoors and creating opportunities for all." Press Release, The North Face, The North

Face Addresses Inequity in the Outdoors and Pledges to RESET Exploration with Upcoming Fellowship Program (Oct. 15, 2020) at 4, (attached as Ex. 4).

41.　As part of the initiative, Defendant North Face announced that its "athletes and ambassador partners will also be tasked with creating personal pledge videos that share their individual stories and aspirations about how they would like to reset their normal in 2020." Ex. 4, at 4.

42.　Defendant North Face published Defendant Ainuu's "Reset Normal" video pledge on its YouTube channel on October 27, 2020. North Face's YouTube channel currently has 489,000 subscribers. The North Face, *Reset Normal: Manoah Ainuu*, YOUTUBE (Oct. 27, 2020), https://bit.ly/3sY0KN8.

43.　The video highlighted Defendant Ainuu's position as "a full-time professional climber on the North Face team" whose role includes "participating in photo shoots, instructing at ice festivals and climbing clinics, and attending events like Color the Crag, an annual festival celebrating diversity in climbing." The North Face, *Reset Normal: Manoah Ainuu*, YOUTUBE (Oct. 27, 2020), https://bit.ly/3sY0KN8.

44.     The video also discussed Defendant Ainuu's upcoming "all Black and Brown expedition to attempt Mount Everest," an expedition that was completed in May of 2022.

45.     Defendant Ainuu's philosophy of using his public platform to speak out against what he defines as racism aligns with North Face's use of its public platform to speak out against what it defines as racism.

46.     To that end, Defendant Ainuu frequently uses his North Face-branded Instagram account to make claims like the following, "In this House We Believe: The American Dream is a scam. Policing Originates From Runaway Slave Patrols. Capitalism Exploits. Colonialism Is Evil. The Founding Fathers Were Racist. American Imperialism Must End. America Was Built On Genocide & Slavery. We Are On Stolen Indigenous Land." Manoah Ainuu (@adreadedclimber), INSTAGRAM (Jun. 19, 2023), attached as Ex. 5.

47.     In February of 2020, La Sportiva-sponsored climber and Michigan Ice Festival instructor Ari Novak ("Novak") invited Defendant Ainuu to the Michigan Ice Festival, an annual climbing event that includes instruction and presentations and is sponsored by several

outdoor industry companies, including North Face. Declaration of Ari Novak, Ex. 2, at ¶12.

48.    Defendant Ainuu arrived during Novak's speech and appeared to Novak to be intoxicated and under the influence. Ex. 2, at ¶12.

49.    Defendant Ainuu told Novak that he was going night climbing and Novak's 16-year-old female student/mentee would be joining him. Ex. 2, at ¶12.

50.    Novak told him that night climbing in his condition was reckless and he ultimately had to protect his student from Defendant Ainuu's reckless behavior. Ex. 2, at ¶12.

51.    Defendant Ainuu stated that Novak's actions to prevent Defendant Ainuu and Novak's student from night climbing were racist. Ex. 2, at ¶12.

52.    Novak informed Dave Burleson, the Global Senior Athlete Coordinator for North Face, of Defendant Ainuu's conduct but North Face appears to have taken no disciplinary action. Ex. 2, at ¶12.

53.     While a North Face-sponsored athlete, Defendant Ainuu met Mr. Talbot on the street outside of a bar in Bozeman, Montana, on June 20, 2023. Declaration of Johnathan Talbot, attached as Ex. 6, at ¶6.

54.     Mr. Talbot was in Bozeman to conduct a focus group for Outdoor Research, his Seattle-based employer that manufactures and sells apparel and gear for outdoor sports, including alpinism, rock and ice climbing, backpacking, skiing, and snowboarding. Ex. 6, at ¶¶4-5.

55.     Mr. Talbot's title was Product Manager Gloves, in the OR Pro section, which develops, designs, and manufactures products for the U.S. military and first responders. Ex. 6, at ¶4.

56.     Mr. Talbot began working for Outdoor Research on March 20, 2023, at a base salary of $115,000 per year, with a signing bonus of $3,000. Ex. 6, at ¶3.

57.     Upon leaving the building where the focus group had been held, Mr. Talbot saw Defendant Ainuu and introduced himself, explained that he worked for Outdoor Research, shared his background, and engaged in light conversation with Defendant Ainuu. Ex. 6, at ¶6.

58. During this brief conversation, Defendant Ainuu got upset and yelled at Mr. Talbot, telling him he was "racist and entitled." Ex. 6, at ¶7.

59. Defendant Ainuu then walked into a nearby bar where Mr. Talbot was also going. Ex. 6, at ¶7.

60. Once both men were in the bar, Defendant Ainuu started pointing at Mr. Talbot, repeatedly called him a racist, and encouraged other patrons to take out their phones and record the scene. Ex. 6, at ¶8.

61. The bartender asked what was going on, and Mr. Talbot told him that Defendant Ainuu was upset about something Mr. Talbot had said, but he did not know why. Ex. 6, at ¶8.

62. While Mr. Talbot attempted to speak with Ainuu to understand Ainuu's anger and allegations of racism, at no point did Mr. Talbot attempt to provoke a physical confrontation. Ex. 6, at ¶9.

63. Mr. Talbot was never asked to leave the premises. Ex. 6, at ¶10.

64. Early the next morning at approximately 3 a.m. local time, Defendant Ainuu started posting on his Instagram account ("@adreadedclimber") to his 15,000 followers (which includes North

Face's Instagram account), allegations that Mr. Talbot had made racist comments to him.

65. Defendant Ainuu's first post to Instagram was a video, in which he said the following: "Hey yo, Outdoor Research, I'm not even playing man. This guy John, he came up to me, introduced himself and said 'you look like someone I should know.' It was at a bar at the Crystal, which I often frequent. A lot of my friends are there, or work there. And this guy came up to me and started talking all this stuff, started asking questions – very directly – about diversity. And I answered honestly, and he kept cutting me off, didn't want to hear what he was wanting to hear, but what he was asking for, which is very, very obvious. So, when I started to check him on it and correct him and direct him and educate his ass for free – for free, free, free, free, free – he got very defensive. So, I said yo, we're done talking – this conversation is over bro. I told you the truth, don't cut me off while I'm talking if you're asking. You're not listening, and you're asking, very big red flag – back up. I went inside, he came inside and tried to shake my hand and I was like 'yo you're apologizing,' he just started apologizing over and over again and I'm like 'if you're apologetic buy me a beer at least. That's the minimum you can

do.' And right after that, he squared up to me got right in my face like this, and he's like 'I didn't do anything wrong.' How do you apologize and say you don't do anything wrong within like five seconds? Oh, because you're not truly apologetic. So, this guy John who designs product or something for you guys OR, please fucking check him. This guy's tripping, he's racist." Ex. 6, at ¶12.

66.    Immediately after his initial video post, Defendant Ainuu continued to attack Mr. Talbot with a series of false and defamatory publications, made explicitly and/or by implication, that Mr. Talbot had made racist comments and had assaulted him. Manoah Ainuu (@adreadedclimber), INSTAGRAM (Jun. 21, 2023), https://www.instagram.com/adreadedclimber/ (attached as Ex. 7).

      a. "@outdoorresearch John, product designer or something, is not a good representation of your great brand. I hope there are repercussions, or at least a corporate talk . . . **ideally an extermination**. The amount (hot words incoming) of gaslighting, toxic masculinity, and white guilt were drowning. An apology followed by an invitation to fight?" "Also, he didn't get kicked oht[sic] of bar after getting in my face. He followed

with incessantly trying to shake my hand. [emojis]," and "Pls

share, in case OR doesn't respond." Ex. 7 (emphasis added).



b. "John who works for @outdoorresearch just tried to fight me

after saying racist things. I tried to de-escalate the

'conversation' (he kept cutting me off after asking questions)

and then he flipped." Ex. 7.

67. Dave Burleson, the Global Senior Athlete Coordinator for

North Face (Dave Burleson, LinkedIn, https://bit.ly/46hw8EJ (attached

as Ex. 8)), posted Ainuu's false and defamatory comment, and Ainuu then

reposted Burleson's implications, adding: "@outdoorresearch please hold

your employee John that is in Bozeman right now accountable" and "To

the racists in outdoor industry, we will find you and we will remove you."

Ex. 7.



68.    Defendant Ainuu continued to defame Talbot with the following posts:

   a. "@outdoorresearch full internet call out– waiting on response," and "Aye all my (majority) white followers/allies [emoji]. This is your call out. My flesh really wanted to educate jon. Self-control is draining and exercised too often. Please help me take care of this boy. I can see if you watch and don't share, whether from uncomfortability or apathy. Much love." Ex. 7.



b. "If you follow my internet-visible life and care – reshare something and tag OR so this boy has consequences for his actions. Our outdoor industry microcosm can't have people like this," and "Don't know last name. OR knows who John is. Visiting Bozeman and yelling at me that he's from there. #whitelocalismMT [emojis]." Ex. 7.



c. "Also, if anyone thinks I'm being extra, check your thoughts. My work is to change the outdoor industry—the old white men that show Hate after one shows Love should be held accountable. #johnatOR." Ex. 7.



d. "Johnathan Talbot, Product manager of Gloves. @outdoorresearch you now have 0 excuse. We know who your employee is. To reiterate, OR is a fine company – a lot of my friends climb or work with OR. This isn't a boycott lol." Ex. 7.



69. Defendant Ainuu's call to his followers to republish these false and defamatory statements in an effort to get Outdoor Research to fire Mr. Talbot soon gained steam, with many of them directly responding to Outdoor Research's Instagram posts with false and defamatory accusations based on Defendant Ainuu's original publications. Defendant Ainuu would often republish these comments on his own page to reward his followers and keep the momentum of his smear campaign against Mr. Talbot moving. Replies to Manoah Ainuu's June 21, 2023 Instagram Posts, attached as Ex. 9. The following comments were made, of and concerning Mr. Talbot, by Ainuu's followers:

    a. Instagram user reply to Outdoor Research: "Ok but what are you gonna do about John is gloves on this summer solstice? Seems like a perfect time to fire an aggressive racist white man and get a new start with a POC." Ex. 9.

b. Instagram user reply to Outdoor Research: "Our Ethiopian/Samoan brother Manoah @adreadedclimber shared a story this week: He's hanging at a bar in Bozeman MT when a white guy questions his right to be there. Then picks a fight with him *** Brands that knowingly employ individuals with racist tendencies - are enablers. But OR I am sure you're not ok with this, I see you have a diversity statement on your website." Ex. 9.

c. "US mountain towns can be very difficult to live in for a person of color. *** Yeah the blame can be pointed at the individual. The Jonathan's of the world. But I really want us to be critical of how these Jonathan's have been created." Ex. 9.

d. Instagram user reply to Outdoor Research: "How have y'all still not attempted to make things right with Manoah? Be transparent about your timeline and actions or at least be transparent about your choice to endorse your employee's racism." Ex. 9.

e. Instagram user reply to Outdoor Research: "@outdoorresearch this is your two week notice. No public

response regarding your racist employee Jon Talbot? Time is up OR, you did @adreadedclimber so wrong & I've lost any confidence in your company actually practicing what it preaches [emojis]." Ex. 9.

f.  Instagram user reply to Outdoor Research: "Hold your employees accountable and do the right thing!! The outdoor community and the world are looking at you. Be the change!! Set the standard that bigotry and hatred is not tolerated!!" Ex. 9.

g.  Instagram user reply to Outdoor Research: "Lightweight? Sounds like OR's commitment to making the outdoors and it's gateway communities a friendly environment for everyone. OR gear is trash, as are OR employees who assault people of color in small towns." Ex. 9.

h.  Instagram user reply to Outdoor Research: "Comms person to comms person, it's really not a good idea to delete comments where folks are generously letting you know that a white employee is attacking a Black climber for his work on diversity and inclusion in the outdoor industry." Ex. 9.

70. At approximately 8:00 a.m. on June 21, 2023, Mr. Talbot received a call from Amy McCanless ("McCanless") of Outdoor Research's Human Resources Department, who informed him that Ainuu had been making accusations against him on social media, told him to look at Ainuu's posts, and instructed him to leave Bozeman and return to Seattle until Outdoor Research could get a handle on the situation. Ex. 6, at ¶11.

71. On June 21 or 22, 2023, Outdoor Research released a statement on Instagram that read: "Through direct messages and story tagging today, it came to our attention that there was a verbal exchange in Bozeman, MT between @adreadedclimber and an OR employee. For those that have messaged our social accounts, emailed us, or contacted customer service, you are heard. OR does not support discriminatory conduct based on race or any other reason, and we take these matters very seriously. We hope to get the chance to speak to Manoah directly about what transpired." Outdoor Research (@outdoorresearch), INSTAGRAM (Instagram story attached as Ex. 10).



72.     On or about June 22, 2023, Outdoor Research spoke to Defendant Ainuu about his allegations. Ex. 6, at ¶13. He posted on Instagram about that discussion on June 23, 2023, writing: "Talked with @outdoorreseach yesterday. Felt heard. Still awaiting further response. This is not just for me, it's for Us. Overwhelmed and drained – but hopeful of mellower times for Us all. Thank you to all who spoke up and came together. This is where its at. Better together," and "Vagueness because of vagueness. Hoping for action and clarity. There are legal obligations to employees – but need something." Manoah Ainuu (@adreadedclimber) Instagram, (Jun. 23, 2023) (Instagram story, attached as Ex. 11).



73.     McCanless emailed Mr. Talbot on June 23, 2023, asking him to take administrative leave while things were sorted out. Ex. 6, at ¶14.

74.     Mr. Talbot was placed on administrative leave on June 23, 2023 and remained on administrative leave until June 30, 2023. Ex. 6, at ¶14.

75.     During a telephone conference on June 27, 2023, Mr. Talbot and McCanless discussed Ainuu's accusations. Ex. 6, at ¶15.

76.     McCanless told Mr. Talbot that Ainuu could not point to any racist or offensive statement. Ex. 6, at ¶15.

77.     Two days later, on June 29, 2023, McCanless and Mr. Talbot spoke again, at which time McCanless informed Mr. Talbot that Outdoor Research was terminating him because he "showed poor judgment, in

[his] actions in Bozeman, both prior to and during [the] incident at the bar." Ex. 6, at ¶16.

78.    Outdoor Research followed up this conversation with a letter, informing Mr. Talbot that his termination was effective on July 14, 2023. Ex. 6, at ¶17.

79.    On July 4, 2023, Defendant Ainuu resumed his attacks on Mr. Talbot. Manoah Ainuu (@adreadedclimber), INSTAGRAM (Jul. 4, 2023) (Instagram stories, attached as Ex. 12).

80.    This included a new Instagram video post, which began with the following captions on screen: "@outdoorresearch Hi remember me?" and "John too far Gone – give this 'grown' man his consequences. **He's lucky to not have learned physically**." Ex. 12 (emphasis added).



Behind the captions, Defendant Ainuu delivered the following remarks on video: "What the fuck are you talking about? So say that, say that, say that to people and the thing is like, no he's not." Ex. 12. After Defendant Ainuu finished speaking to the camera, the video showed a screenshot of a post from his supporter, Curtis Irion, who indicated that he was repeatedly emailing Outdoor Research and posted one such email, which was met with approval from Ainuu: "From a long-time customer. There has still been no resolution with Manoah and your Director of gloves. This man should have been fired immediately. You are now officially on blast from the outdoor community and friends. You run a professional company and have left this completely unresolved. Your silence states that Manoah was lying, or that your company is racist and only use Black/Brown people as needed. My 4 climbing friends and I spend 75,000 $ a year from your company. This racist move of yours just lost you millions, from 5 people alone. I am sure you can appreciate your bottom line. Do the right thing and make amends with [Ainuu] soon before the rage against your company really hurts your brand, image, and income." Ex. 12. Ainuu reposted this to his own Instagram page and

added: "Don't ask what to do, do . . . Curtis is my man. Emailing every

day for weeks whilst we're ignored." Ex. 12.



81. Defendant Ainuu continued to attack Mr. Talbot on July 4,

2023, with the following Instagram posts:

a. "Those o yall asking about OR. I ain't forget. Again, if y'all

think I'm aggressive, what about their employee? Initiated a

fight with me. Update waiting but of course not expected

#corporatemarketing Fuck being nice" and "@outdoorresearch

July Fourth Bish wtatcyal saying?? ?????!!!! Juneteenth

obviously don't matter To y'all. Nor does a public call out.

#telljonathancomebacktobozemanIgot him this time . . ." Ex.

12.



b. "Here I go again fk or fk jonathan hi or thanks for not communicating. Don't market diversity. First time going out in weeks since this. Y'all don't hear this perspective often." Ex. 12.



c. "@outdoorresearch [emojis] happy 4th mfers. Ppl forget - I don't. Jon fck you. Come back to bzn.. OR useless. Shoot fireworks and celebrate 4th July - don't celebrate Juneteenth, why? Independence from what? White colonists from England?!?! How bout Indigenous and Black peoples??!?" Ex. 12.



82. Mr. Talbot is currently unemployed following his termination from Outdoor Research and has been unable to secure employment because of Defendant Ainuu's false and defamatory attacks, who was acting as an agent of North Face, whose social media attacks were known, permitted, and shared by North Face, and who continues to be an agent of North Face. Ex. 6, at ¶18.

## CLAIMS FOR RELIEF

### Count I: Libel by Manoah Ainuu

83.   Mr. Talbot repeats paragraphs 1–82.

84.   Defendant Manoah Ainuu made the following string of false statements, all within the same general time frame and to the same audience of 15,000 followers, that were either explicitly defamatory or were defamatory in the context in which they were made:

    a. "So, this guy John who designs product or something for you guys OR, please fucking check him. This guy's tripping, he's racist."

    b. "John who works for @outdoorresearch just tried to fight me after saying racist things. I tried to de-escalate the 'conversation' (he kept cutting me off after asking questions) and then he flipped."

    c. "@outdoorresearch please hold your employee John that is in Bozeman right now accountable. To the racists in outdoor industry, we will find you and we will remove you."

    d. "If you follow my internet-visible life and care – reshare something and tag OR so this boy has consequences for his

actions. Our outdoor industry microcosm can't have people like this. Don't know last name. OR knows who John is. Visiting Bozeman and yelling at me that he's from there. #whitelocalismMT [emojis]."

e. "Also, if anyone thinks I'm being extra, check your thoughts. My work is to change the outdoor industry – the old white men that show Hate after one shows Love should be held accountable. #johnatOR."

f. "Jonathan Talbot, Product manager of Gloves. @outdoorresearch you now have 0 excuse. We know who your employee is. To reiterate, OR is a fine company – a lot of my friends climb or work with OR. This isn't a boycott lol."

g. "@outdoorresearch Hi remember me?" and "John too far Gone – give this 'grown' man his consequences. He's lucky to not have learned physically."

h. "Those o yal asking about OR. I ain't forget. Again, if y'all think I'm aggressive, what about their employee? Initiated a fight with me. Update waiting but of course not expected #corporatemarketing Fuck being nice"

     i.   "@outdoorresearch July Fourth Bish wtatcyal saying?? ?????!! Juneteenth obviously don't matter To y'all. Nor does a public call out. #telljonathancomebacktobozemanIgot him this time . . ."

     j.   "Here I go again fk jonathan hi or thanks for not communicating. Don't market diversity. First time going out in weeks since this. Y'all don't hear this perspective often."

     k.   "@outdoorresearch [emojis] happy 4th mfers. Ppl forget - I don't. Jon fck you. Come back to bzn.. OR useless. Shoot fireworks and celebrate 4th July - don't celebrate Juneteenth, why? Independence from what? White colonists from England?!?! How bout Indigenous and Black peoples??!?"

85.    These false and defamatory statements are of and concerning Mr. Talbot; in each post Defendant Ainuu either explicitly tagged or named Mr. Talbot and/or his employer, Outdoor Research. Moreover, Defendant Ainuu intended to refer to Mr. Talbot in these statements and Mr. Talbot, his employer Outdoor Research, and Defendant Ainuu's followers understood these statements to be about Mr. Talbot.

86.    These statements, which communicate to an average reader that Mr. Talbot assaulted an African-American man and made racist comments, are false and defamatory.

87.    The injury to Mr. Talbot's reputation from Defendant Ainuu's statements is readily apparent. Such statements tend to disgrace and degrade the reputation of another and would cause him to be shunned and avoided by the community. Further, the court can presume as a matter of law, without extrinsic evidence, that these statements will tend to disgrace or degrade the Plaintiff or cause him to be shunned and avoided. As such, Defendant Ainuu's statements are defamatory *per se*.

88.    By publishing these false and defamatory statements, Defendant Ainuu caused harm to Mr. Talbot's reputation.

89.    At the time of these false and defamatory statements, Defendant Ainuu knew that his statements were false - Mr. Talbot did not make any racist comments to Defendant Ainuu nor try to fight him.

90.    The natural and probable consequence of Defendant Ainuu's false and defamatory statements and requests for his followers to amplify the substance of those statements and direct them to Mr. Talbot's employer, Outdoor Research, resulted in the following additional false

and defamatory statements by Defendant Ainuu's followers, attached at
Ex. 9:

a. Instagram user reply to Outdoor Research: "Ok but what are
   you gonna do about John is gloves on this summer solstice?
   Seems like a perfect time to fire an aggressive racist white
   man and get a new start with a POC."

b. Instagram user reply to Outdoor Research: "Our
   Ethiopian/Samoan brother Manoah @adreadedclimber
   shared a story this week: He's hanging at a bar in Bozeman
   MT when a white guy questions his right to be there. Then
   picks a fight with him *** Brands that knowingly employ
   individuals with racist tendencies - are enablers. But OR I am
   sure you're not ok with this, I see you have a diversity
   statement on your website."

c. "US mountain towns can be very difficult to live in for a person
   of color. *** Yeah the blame can be pointed at the individual.
   The Jonathan's of the world. But I really want us to be critical
   of how these Jonathan's have been created."

d. Instagram user reply to Outdoor Research: "How have y'all still not attempted to make things right with Manoah? Be transparent about your timeline and actions or at least be transparent about your choice to endorse your employee's racism."

e. Instagram user reply to Outdoor Research: "@outdoorresearch this is your two week notice. No public response regarding your racist employee Jon Talbot? Time is up OR, you did @adreadedclimber so wrong & I've lost any confidence in your company actually practicing what it preaches [emojis]."

f. Instagram user reply to Outdoor Research: "Hold your employees accountable and do the right thing!! The outdoor community and the world are looking at you. Be the change!! Set the standard that bigotry and hatred is not tolerated!!"

g. Instagram user reply to Outdoor Research: "Lightweight? Sounds like OR's commitment to making the outdoors and it's gateway communities a friendly environment for everyone.

OR gear is trash, as are OR employees who assault people of color in small towns."

h. Instagram user reply to Outdoor Research: "Comms person to comms person, it's really not a good idea to delete comments where folks are generously letting you know that a white employee is attacking a Black climber for his work on diversity and inclusion in the outdoor industry."

91. As a direct and proximate result of these false and defamatory statements by Defendant Ainuu and his supporters who republished those statements, Mr. Talbot has suffered damages, including *inter alia*, injury to his reputation, loss of his job, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

92. Defendant Ainuu's actions were negligent, malicious, willful and wanton, and evidenced a conscious disregard for Mr. Talbot's rights.

93. Defendant Ainuu's tortious actions were within the scope of his role as a sponsored athlete for Defendant North Face, were expressly or impliedly authorized by Defendant North Face, or were motivated by Defendant Ainuu's purpose to serve Defendant North Face's interests.

## Count II: Tortious Interferences with Prospective Economic Advantage by Manoah Ainuu

94.    Mr. Talbot repeats paragraphs 1–93.

95.    Defendant Ainuu knowingly made false and defamatory statements that Mr. Talbot had made racist comments to him and tried to fight him, published those defamatory statements on Instagram, directed those statements to Outdoor Research, and encouraged his followers to do the same for the intended purpose of interfering with Mr. Talbot's economic relationship with his employer without justifiable cause.

96.    As a direct and proximate result of Defendant Ainuu's wrongful actions to interfere with Mr. Talbot's economic relationship with Outdoor Research, Mr. Talbot has suffered damages, including *inter alia*, injury to his reputation, loss of his job, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

97.    Defendant Ainuu's actions were negligent, malicious, willful, and wanton, and evidenced a conscious disregard for Mr. Talbot's rights.

98.    Defendant Ainuu's tortious actions were within the scope of his role as a sponsored athlete for Defendant North Face, were expressly

42

or impliedly authorized by Defendant North Face, or were motivated by Defendant Ainuu's purpose to serve Defendant North Face's interests.

**Count III: Libel by North Face (Respondeat Superior)**

99.  Mr. Talbot repeats paragraphs 1–98.

100.  Defendant North Face sponsors athletes who become brand ambassadors, whose accomplishments, personalities, and causes are central to North Face's identity.

101.  Further, Defendant North Face encourages its sponsored athletes to bring their authentic selves to work and to develop relationships in the community to advocate for social justice and against what it believes to be systemic racism.

102.  Defendant North Face helps set its philosophical expectations for its sponsored athletes by encouraging them to take part in diversity, equity, and inclusion initiatives.

103.  Defendant North Face further sets those expectations for sponsored athletes by North Face's direct use of public pronouncements and financial punishment against companies for alleged racism.

104. Defendant Ainuu, using his North Face-branded Instagram account, was acting at all times as an Agent and Representative of Defendant North Face.

105. Using that medium, Defendant Ainuu falsely alleged that Mr. Talbot made racist comments to Ainuu, an African American man, and that Mr. Talbot tried to fight him.

106. Such false and defamatory accusations of misconduct tend to disgrace and degrade Mr. Talbot and/or cause him to be shunned and avoided, as evidenced by Mr. Talbot being the target of a successful campaign by Ainuu and his followers that caused Outdoor Research to terminate Mr. Talbot's employment.

107. Global Senior Athlete Coordinator for Defendant North Face Dave Burleson endorsed Ainuu's false and defamatory statements when he published them to his own Instagram page.

108. Several others did the same, often in reply to Outdoor Research's Instagram posts. Such republications were the natural, probable, and intended consequence of Ainuu's original false and defamatory statements.

109. As a direct and proximate result of these false and defamatory statements by Defendant Ainuu and his supporters, Mr. Talbot has suffered damages, including *inter alia*, injury to his reputation, loss of his job, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

110. Because Defendant Ainuu was acting on behalf of and with the approval of Defendant North Face, or to further Defendant North Face's interest, it is vicariously liable for Defendant Ainuu's original publication of false and defamatory statements as well as the subsequent republication of those statements.

## Count IV: Tortious Interference with Prospective Economic Advantage by North Face (Respondeat Superior)

111. Mr. Talbot repeats paragraphs 1–110.

112. Defendant North Face sponsors athletes who become brand ambassadors, whose accomplishments, personalities, and causes are central to The North Face identity.

113. Further, Defendant North Face encourages its sponsored athletes to bring their authentic selves to work and to develop

relationships in the community to advocate for social justice and against what it believes to be systemic racism.

114.  Defendant North Face helps set its philosophical expectations for its sponsored athletes by encouraging them to take part in diversity, equity, and inclusion initiatives.

115.  Defendant North Face further sets those expectations for sponsored athletes by North Face's direct use of public pronouncements and financial punishment against companies for what North Face perceives as racism.

116.  Defendant Ainuu, using his Defendant North Face-branded Instagram account, was acting at all times as an Agent and Representative of North Face Apparel Corp. Using that medium, Defendant Ainuu falsely alleged that Mr. Talbot made racist comments to Ainuu, an African American man, and that he tried to fight him. Such false and defamatory accusations of misconduct tend to disgrace and degrade Mr. Talbot and/or cause him to be shunned and avoided, as evidenced by Mr. Talbot being the target of a successful campaign by Ainuu and his followers, that caused Outdoor Research to terminate Mr. Talbot's employment.

117. Global Senior Athlete Coordinator for North Face Dave Burleson endorsed Ainuu's false and defamatory statements when he published them to his own Instagram page.

118. Defendant Ainuu knowingly made false and defamatory statements that Mr. Talbot had made racist comments to him and tried to fight him, he published those false and defamatory statements on Instagram, he directed those statements to Outdoor Research, and encouraged his followers to do the same for the intended purpose of interfering with Mr. Talbot's economic relationship to cause him loss without justifiable cause.

119. As a direct and proximate result of Defendant Ainuu's wrongful actions to interfere with Mr. Talbot's economic relationship with Outdoor Research, Mr. Talbot has suffered damages, including *inter alia*, injury to his reputation, loss of his job, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

120. Defendant Ainuu's actions were negligent, malicious, willful, and wanton, and evidenced a conscious disregard for Mr. Talbot's rights.

121. Because Defendant Ainuu was acting on behalf of and with the approval of Defendant North Face, or to further Defendant North Face's interest, it is vicariously liable for Defendant Ainuu's wrongful actions to interfere with Mr. Talbot's economic relationship with Outdoor Research.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff Johnathan Talbot respectfully requests that the Court enter an Order against Manoah Ainuu and The North Face Apparel Corp.:

a. Awarding Plaintiff Johnathan Talbot damages, including any presumed, actual, and/or compensatory, in an amount greater than $75,000 or in such amount as proven at trial;

b. Awarding Plaintiff Johnathan Talbot punitive damages;

c. Awarding Plaintiff Johnathan Talbot his costs, including attorneys' fees arising from this action, including any appeals; and

d. Award such other and further relief as may be just and appropriate.

## **JURY DEMAND**

Plaintiff Johnathan Talbot hereby demands a trial by Jury on all matters for which a Jury trial is permitted or allowed under applicable law.


DATED: October 2, 2023


Respectfully Submitted,

/s/ Matthew Monforton

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org
*(pro hac vice forthcoming)

Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry
Ian Prior
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

*Attorneys for Plaintiff Johnathan Talbot*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| Johnathan Talbot | ) | |
| | ) | |
| *Plaintiff,* | ) | Cause No. CV-23-66-BU-BMM |
| | ) | |
| v. | ) | **NOTICE OF APPEAL** |
| | ) | |
| | ) | |
| Manoah Ainuu, and The North | ) | |
| Face Apparel Corp., a Delaware | ) | |
| Company. | ) | |
| | ) | |
| *Defendants.* | ) | |

TO THE CLERK OF COURT:

PLEASE TAKE NOTICE THAT Plaintiff Johnathan Talbot

appeals to the United States Court of Appeals for the Ninth Circuit

from the final judgment entered in this case on March 13, 2024.  Doc.

39.

Plaintiff's Representative Statement is attached to this Notice as

required by Ninth Circuit Rule 3-2(b).

DATED: March 29, 2024

Respectfully submitted,

Monforton Law Offices, PLLC

By:  /s/ Matthew G. Monforton
     Matthew G. Monforton
     Attorney for Plaintiffs

2

## REPRESENTATION STATEMENT

Pursuant to Ninth Circuit Rule 3-2(b), Plaintiffs identify the following parties to this action, as well as their counsel of record.

**1.** Appellant Johnathan Talbot:

Counsel: Matthew G. Monforton, Mont. Bar No. 5245
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Telephone: (406) 570-2949
Facsimile: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry
Ian Prior
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue
S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

**2.** Appellee Manoah Ainuu

Counsel: James H. Goetz
Jeffrey J. Tierney
GOETZ, GEDDES & GARDNER, P.C.
35 North Grand Ave.
P.O. Box 6580

Bozeman, MT 59771-6580
Ph: 406-587-0618
Fax: 406-587-5144
Email: jim@goetzlawfirm.com
jtierney@goetzlawfirm.com

3. Appellee The North Face:

Peter Michael Meloy
MELOY LAW FIRM
P.O. Box 1241
Helena, MT 49624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

Leita Walker
Isabella Salomão Nascimento
BALLARD SPAHR LLP
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Email:walkerl@ballardspahr.com
salomaonascimentoi@ballardspahr.com

Seth D. Berlin
BALLARD SPAHR LLP
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: berlins@ballardspahr.com

4

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on March 29, 2024, I electronically filed the foregoing paper with the Clerk of Court using the ECF system which will send notification to counsel for all parties.

DATED: March 29, 2021

Respectfully submitted,

Monforton Law Offices, PLLC

By:   <u>/s/ Matthew G. Monforton</u>
        Matthew G. Monforton
        Attorney for Plaintiff

5

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended April 1, 2023

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number: 1-5256



# V. F. CORPORATION

*(Exact name of registrant as specified in its charter)*

| Pennsylvania | 23-1180120 |
|---|---|
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. employer identification number)* |

**1551 Wewatta Street**
**Denver, Colorado 80202**
*(Address of principal executive offices)*

**(720) 778-4000**
*(Registrant's telephone number, including area code)*

**Securities registered pursuant to Section 12(b) of the Act:**

| *(Title of each class)* | *(Trading Symbol(s))* | *(Name of each exchange on which registered)* |
|---|---|---|
| **Common Stock, without par value, stated capital $.25 per share** | **VFC** | **New York Stock Exchange** |
| **0.625% Senior Notes due 2023** | **VFC23** | **New York Stock Exchange** |
| **4.125% Senior Notes due 2026** | **VFC26** | **New York Stock Exchange** |
| **0.250% Senior Notes due 2028** | **VFC28** | **New York Stock Exchange** |
| **4.250% Senior Notes due 2029** | **VFC29** | **New York Stock Exchange** |
| **0.625% Senior Notes due 2032** | **VFC32** | **New York Stock Exchange** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes ☑   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑            Accelerated filer ☐
Non-accelerated filer ☐            Smaller reporting company ☐

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☑

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. ☐

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act).     Yes ☐     No ☑

The aggregate market value of Common Stock held by non-affiliates of V.F. Corporation on October 1, 2022, the last day of the registrant's second fiscal quarter, was approximately $10,438,000,000 based on the closing price of the shares on the New York Stock Exchange.

As of April 29, 2023, there were 388,677,307 shares of Common Stock of the registrant outstanding.

**Documents Incorporated By Reference**

Portions of the definitive Proxy Statement for the Annual Meeting of Shareholders to be held on July 25, 2023 (Item 1 in Part I and Items 10, 11, 12, 13 and 14 in Part III), which definitive Proxy Statement shall be filed with the Securities and Exchange Commission within 120 days after the end of the fiscal year to which this report relates.

This document (excluding exhibits) contains 106 pages.

TABLE OF CONTENTS

|  |  | PAGE NUMBER |
|---|---|---|
| **FORWARD-LOOKING STATEMENTS** |  | 1 |
| **PART I** |  |  |
| ITEM 1. | Business | 1 |
| ITEM 1A. | Risk Factors | 10 |
| ITEM 1B. | Unresolved Staff Comments | 21 |
| ITEM 2. | Properties | 22 |
| ITEM 3. | Legal Proceedings | 22 |
| ITEM 4. | Mine Safety Disclosures | 22 |
| **PART II** |  |  |
| ITEM 5. | Market for VF's Common Equity, Related Stockholder Matters and Issuer Purchase of Equity Securities | 23 |
| ITEM 6. | [Reserved] | 24 |
| ITEM 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 24 |
| ITEM 7A. | Quantitative and Qualitative Disclosures about Market Risk | 43 |
| ITEM 8. | Financial Statements and Supplementary Data | 43 |
| ITEM 9. | Change in and Disagreements with Accountants on Accounting and Financial Disclosures | 43 |
| ITEM 9A. | Controls and Procedures | 44 |
| ITEM 9B. | Other Information | 44 |
| ITEM 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 44 |
| **PART III** |  |  |
| ITEM 10. | Directors, Executive Officers and Corporate Governance | 45 |
| ITEM 11. | Executive Compensation | 45 |
| ITEM 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters | 45 |
| ITEM 13. | Certain Relationships and Related Transactions, and Director Independence | 45 |
| ITEM 14. | Principal Accounting Fees and Services | 45 |
| **PART IV** |  |  |
| ITEM 15. | Exhibits and Financial Statement Schedules | 46 |
| ITEM 16. | 10-K Summary | 49 |
|  | Signatures | 50 |

Table of Contents

## FORWARD-LOOKING STATEMENTS

Certain statements contained herein, as well as in other filings that VF makes with the Securities and Exchange Commission ("SEC") and other written and oral information VF releases, regarding VF's future performance constitute "forward-looking statements" within the meaning of the safe harbor provisions of the Private Securities Litigation Reform Act of 1995. Forward-looking statements are made based on VF's current expectations and beliefs concerning future events impacting VF and therefore involve risks and uncertainties. You can identify these statements by the fact that they use words such as "will," "anticipate," "estimate," "expect," "should," and "may," and other words and terms of similar meaning or use of future dates. However, the absence of these words or similar expressions does not mean that a statement is not forward-looking. All statements regarding VF's plans, objectives, projections and expectations relating to VF's operations or financial performance, and assumptions related thereto are forward-looking statements. VF undertakes no obligation to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law. Known or unknown risks, uncertainties or other factors that could cause the actual results of operations or financial condition of VF to differ materially from those expressed or implied by such forward-looking statements include, but are not limited to, those described as "Risk Factors" in Item 1A of this Annual Report on Form 10-K and other reports VF files with the SEC.

## PART I

## ITEM 1.  BUSINESS.

V.F. Corporation, founded in 1899, is one of the world's largest apparel, footwear and accessories companies connecting people to the lifestyles, activities and experiences they cherish most through a family of iconic outdoor, active and workwear brands. Unless the context indicates otherwise, the terms "VF," the "Company," "we," "us," and "our" used herein refer to V.F. Corporation and its consolidated subsidiaries. All references to "Fiscal 2023" relate to VF's current fiscal year which ran from April 3, 2022 through April 1, 2023.

Unless otherwise noted, all discussion below, including amounts and percentages for all periods, reflect the results of operations and financial condition of VF's continuing operations. As such, the Occupational Workwear business that was sold on June 28, 2021 has been excluded.

VF's diverse portfolio meets consumer needs across a broad spectrum of activities and lifestyles. Our ability to connect with consumers creates a unique platform for sustainable, long-term growth. Our long-term growth strategy is focused on four strategic choices:

- **Find and amplify consumer tailwinds.** Innovate within our existing brand portfolio while also strategically expanding into adjacencies that complement our current brands and tap into consumer growth spaces.

- **Build brands on multiple growth horizons.** Gain market share through building and managing our brands at different stages of growth across the portfolio, as well as through mergers and acquisitions and business development to benefit both individual brands and the enterprise.

- **Leverage platforms for speed to scale and efficiency.** Leveraging our strategic platforms, which provide a unique set of large-scale capabilities to enable our brands to connect more directly with consumers and operate more efficiently, including consumer data and analytics, direct-to-consumer centric supply chain, digitally-enabled seamless consumer experience and international platforms.

- **Resource for portfolio agility and performance.** Managing our business with organizational agility and dynamically

allocate capital and deploy people to drive our highest-priority strategic and growth-focused initiatives.

VF is diversified across brands, product categories, channels of distribution, geographies and consumer demographics. We own a broad portfolio of brands in the outerwear, footwear, apparel, backpack, luggage and accessories categories. Our largest brands are *Vans*®, *The North Face*®, *Timberland*® and *Dickies*®.

Our products are marketed to consumers through our wholesale channel, primarily in specialty stores, national chains, mass merchants, department stores, independently-operated partnership stores and with strategic digital partners. Our products are also marketed to consumers through our own direct-to-consumer operations, which include VF-operated stores, concession retail stores, brand e-commerce sites and other digital platforms. Revenues from the direct-to-consumer business represented 45% of VF's total Fiscal 2023 revenues. In addition to selling directly into international markets, many of our brands also sell products through licensees, agents and distributors. In Fiscal 2023, VF derived 58% of its revenues from the Americas, 29% from Europe and 13% from Asia-Pacific.

To provide diversified products across multiple channels of distribution in different geographic areas, we rely on our global sourcing of finished goods from independent contractors. Our highly sophisticated and diversified supply chain utilizes leading technologies for inventory replenishment that enable us to match our assortment of products to consumer demand. Through an increasingly localized approach, we have established three main regional sourcing hubs which has led to reduced lead times by moving production closer to end consumption.

VF's chief operating decision maker allocates resources and assesses performance based on a global brand view which represents VF's operating segments. Global brands have been combined into reportable segments based on similar economic characteristics and qualitative factors. The reportable segments for financial reporting purposes have been identified as: Outdoor, Active and Work.

Table of Contents

The following table summarizes VF's brands by reportable segment:

| REPORTABLE SEGMENT | BRANDS | PRIMARY PRODUCTS |
|---|---|---|
| Outdoor | The North Face® | High performance outdoor apparel, footwear, equipment, accessories |
| | Timberland® | Outdoor, adventure-inspired lifestyle footwear, apparel, accessories |
| | Smartwool® | Performance merino wool and other natural fibers-based apparel and accessories |
| | Altra® | Performance-based footwear |
| | Icebreaker® | High performance apparel and accessories based on natural fibers |
| Active | Vans® | Youth culture/action sports-inspired footwear, apparel, accessories |
| | Supreme® | Streetwear apparel, footwear, accessories |
| | Kipling® | Handbags, luggage, backpacks, totes, accessories |
| | Napapijri® | Premium outdoor-inspired apparel, footwear, accessories |
| | Eastpak® | Backpacks, luggage |
| | JanSport® | Backpacks, luggage |
| Work | Dickies® | Work and work-inspired lifestyle apparel and footwear |
| | Timberland PRO® | Protective work footwear, work and work-inspired lifestyle apparel |

Financial information regarding VF's reportable segments is included in Note 20 to the consolidated financial statements.

## OUTDOOR SEGMENT

Our Outdoor segment is a group of authentic outdoor-based lifestyle brands. Product offerings include performance-based and outdoor apparel, footwear and equipment.

The North Face® is the largest brand in our Outdoor segment. The North Face® brand features performance-based apparel, outerwear, sportswear and footwear for men, women and children. Its equipment line includes tents, sleeping bags, backpacks and accessories. Many of The North Face® products are designed for extreme winter sport activities, such as high altitude mountaineering, skiing, snowboarding, and ice and rock climbing. The North Face® products are marketed globally, primarily through specialty outdoor and premium sporting goods stores, department stores, independent distributors, independently-operated partnership stores, concession retail stores, approximately 230 VF-operated stores, on websites with strategic digital partners and online at www.thenorthface.com.

The Timberland® brand offers outdoor, adventure-inspired lifestyle footwear, apparel and accessories that combine performance benefits and versatile styling for men, women and children. We sell Timberland® products globally through chain, department and specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 170 VF-operated stores, on websites with strategic digital partners and online at www.timberland.com.

The Smartwool® brand offers active outdoor consumers a premium, technical layering system of merino wool socks, apparel and accessories that are designed to work together in fit, form and function. Smartwool® products are sold globally through specialty outdoor and premium sporting goods stores, independent distributors, on websites with strategic digital partners and online at www.smartwool.com.

Altra® is a performance-based footwear brand primarily in the road and trail running categories. Altra® products are sold globally through premium outdoor and specialty stores, independent distributors, on websites with strategic digital partners and online at www.altrarunning.com.

The Icebreaker® brand specializes in performance apparel and accessories based on natural fibers, including merino wool and plant-based fibers. Icebreaker® products are sold globally through specialty outdoor and premium sporting goods stores, concession retail stores, independent distributors, approximately 25 VF-operated stores, on websites with strategic digital partners and online at www.icebreaker.com.

Key drivers of long-term growth in our Outdoor segment are expected to be a continued focus on product innovation, extension of our brands into new product categories, profitable growth in our direct-to-consumer business including our digital presence, expansion of wholesale channel partnerships, geographical diversification and development, as well as the potential for the acquisition of additional brands.

Table of Contents

## ACTIVE SEGMENT

Our Active segment is a group of activity-based lifestyle brands. Product offerings include active apparel, footwear, backpacks, luggage and accessories.

*Vans*® is the largest brand in our Active segment. The *Vans*® brand offers performance and casual footwear and apparel targeting younger consumers that sit at the center of action sports, art, music and street fashion. *Vans*® products are available globally through chain stores, specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 750 VF-operated stores, on websites with strategic digital partners and online at www.vans.com.

*Supreme*® is a leading streetwear brand that offers apparel, accessories and footwear. *Supreme*® products are available globally through approximately 15 VF-operated stores, select partner retail stores and online at www.supremenewyork.com.

*Kipling*® branded handbags, luggage, backpacks, totes and accessories are sold globally through department, specialty and luggage stores, independently-operated partnership stores, independent distributors, concession retail stores, approximately 40 VF-operated stores, on websites with strategic digital partners and online at www.kipling.com.

The *Napapijri*® brand offers outdoor-inspired casual outerwear, sportswear and accessories at a premium price with a focus on marketing to men, women and children in Europe. Products are sold in department and specialty stores, independently-operated partnership stores, concession retail stores, independent distributors, approximately 25 VF-operated stores, onwebsites with strategic digital partners and online at www.napapijri.com.

*Eastpak*® backpacks, travel bags and luggage are sold primarily through department and specialty stores across Europe, on websites with strategic digital partners, throughout Asia by distributors and online at www.eastpak.com.

*JanSport*® backpacks and accessories are sold primarily in North America, through department, office supply and chain stores, as well as sports specialty stores and independent distributors. *JanSport*® products are also sold on websites with strategic digital partners and online at www.jansport.com.

Key drivers of long-term growth in our Active segment are expected to be our continued focus on product innovation, extension of our brands into new product categories, profitable growth of our direct-to-consumer business including our digital presence, enhancement of wholesale channel partnerships, geographical diversification and development, as well as the potential for the acquisition of additional brands.

## WORK SEGMENT

Our Work segment consists of work and work-inspired lifestyle brands with product offerings that include apparel, footwear and accessories.

*Dickies*® is the largest brand in our Work segment. The *Dickies*® brand is a leader in authentic, functional, durable and affordable workwear and has expanded to produce work-inspired, casual-use products. *Dickies*® products are available globally through mass merchants, specialty stores, independent distributors and licensees, independently-operated partnership stores, concession retail stores, approximately 15 VF-operated stores, on websites with strategic digital partners and online at www.dickies.com.

The *Timberland PRO*® brand offers work and work-inspired products that provide comfort, durability and performance. *Timberland PRO*® products are available through specialty stores, chain stores, independent distributors, on websites with strategic digital partners and online at www.timberland.com. *Timberland PRO*® products are also available in most U.S. VF-operated *Timberland*® stores.

We believe there is a strategic opportunity for growth in our Work segment in both existing and future markets, and in all channels and geographies. We expect growth will be driven by an increased presence in the retail workwear market, additional work-inspired lifestyle product offerings and by continuing to innovate products that address workers' desires for increased comfort and performance.

## DIRECT-TO-CONSUMER OPERATIONS

Our direct-to-consumer business includes VF-operated retail stores, brand e-commerce sites, concession retail locations and other digital platforms. Direct-to-consumer revenues were 45% of total VF revenues in Fiscal 2023.

Our full-price retail stores allow us to display a brand's full line of products with fixtures and imagery that support the brand's positioning and promise to consumers. These experiences provide high visibility for our brands and products and enable us to stay close to the needs and preferences of our consumers. The complete and impactful presentation of products in our stores also helps to increase sell-through of VF products at our wholesale customers due to increased brand awareness, education and visibility. VF-operated full-price stores generally provide gross margins that are well above other channels.

In addition, VF operates outlet stores in both premium outlet malls and more traditional value-based locations. These outlet stores carry merchandise that is specifically designed for sale in our outlet stores and serve an important role in our overall inventory management and profitability by also allowing VF to sell a significant portion of excess, discontinued and out-of-season products at better prices than otherwise available from outside parties, while maintaining the integrity of our brands.

Our global direct-to-consumer operations included 1,265 stores at the end of Fiscal 2023. We operate retail store locations for the following brands: *Vans*®, *The North Face*®, *Timberland*®, *Kipling*®, *Icebreaker*®, *Napapijri*®, *Dickies*® and *Supreme*®. Approximately 60% of our stores are located in the Americas (53% in the U.S.), 25% in Europe and 15% in Asia-Pacific. Additionally, we sell certain of our branded products through

Table of Contents

approximately 900 concession retail stores located principally in Europe and Asia.

E-commerce represented approximately 43% of our direct-to-consumer business and 19% of total VF revenues in Fiscal 2023. All VF brands are marketed online. We continue to expand our omni-channel approach and integrated marketplace strategies in the Europe and Asia-Pacific regions, in order to engage with consumers at every touch point with innovative assets and by focusing on local relevance. We also continue to increase focus on digital innovation and growth across other third-party digital platforms that are reported within our direct-to-consumer business.

We expect our direct-to-consumer business to gain share in our revenue mix as we leverage strategic platforms that enable our brands to more directly connect with consumers.

In addition to our direct-to-consumer operations, independent parties own and operate approximately 2,400 partnership stores. Sales to these partners are reported in our wholesale channel. These are primarily mono-brand retail locations selling VF products that have the appearance of VF-operated stores. Most of these partnership stores are located in Europe and in Asia, and are concentrated amongst *The North Face*®, *Timberland*®, *Vans*®, *Dickies*®, *Kipling*® and *Napapijri*® brands.

## LICENSING ARRANGEMENTS

As part of our strategy of expanding market penetration of VF-owned brands, we enter into licensing agreements with independent parties for specific apparel and complementary product categories when such arrangements provide more effective sourcing, distribution and marketing than could be achieved internally. We provide support to these business partners and ensure the integrity of our brand names by taking an active role in the design, quality control, advertising, marketing and distribution of licensed products.

Licensing arrangements relate to a broad range of VF brands and are for fixed terms of generally 3 to 5 years, with conditional renewal options, outside of certain licensing arrangements for the *Dickies*® brand that have longer terms. Each licensee pays royalties to VF based on its sales of licensed products, with most agreements providing for a minimum royalty requirement. Royalties generally range from 4% to 10% of the licensing partners' net licensed product sales. Royalty income was $75.0 million in Fiscal 2023 (less than 1% of total revenues), primarily from the *Vans*®, *Dickies*® and *Timberland*® brands.

## SOURCING AND DISTRIBUTION

Product design and innovation, including fit, fabric, finish and quality, are important elements across our businesses. These functions are performed by employees located in our global supply chain organization and our branded business units across the globe.

VF's centralized global supply chain organization is responsible for procuring and delivering products to support our brands and businesses. VF is skilled in managing the complexities associated with our global supply chain. In Fiscal 2023, VF sourced approximately 362 million units spread across our brands. Our products were primarily obtained from approximately 340 independent contractor manufacturing facilities in approximately 35 countries. Additionally, we operate 21 distribution centers and 1,265 retail stores across the globe. We also utilize distribution centers managed by third parties, as necessary, for certain brands and locations. Managing this complexity is made possible by the use of a network of information systems for product development, forecasting, order management and warehouse management, along with our core enterprise resource management platforms.

Products obtained from contractors in the Western Hemisphere generally have a higher cost than products obtained from contractors in Asia. However, contracting in the Western Hemisphere gives us greater flexibility, shorter lead times and allows for lower inventory levels for the U.S. market. The use of contracted production with different geographic regions and cost structures, provides a flexible approach to product sourcing. We will continue to manage our supply chain from a global perspective and adjust as needed to changes in the global production environment.

Independent contractors generally own the raw materials and ship finished, ready-for-sale products to VF. These contractors are engaged through VF's sourcing hub in Singapore (with

satellite offices across Asia), and to a lesser extent, VF's sourcing hubs in Panama and Switzerland. These hubs are responsible for managing the procurement of product, supplier oversight, product quality assurance, sustainability within the supply chain, responsible sourcing and transportation and shipping functions. In addition, our hubs leverage proprietary knowledge and technology to enable certain contractors to more effectively control costs and improve labor efficiency.

Management continually monitors political risks and developments related to duties, tariffs and quotas. We limit VF's sourcing exposure through, among other measures: (i) diversifying production among countries and contractors, (ii) sourcing production to merchandise categories where product is readily available, and (iii) sourcing from countries with tariff preference and free trade agreements. VF does not directly or indirectly source products from suppliers in countries that are prohibited by the U.S. State Department.

No single supplier represented more than 6% of our total cost of goods sold during Fiscal 2023.

All independent contractor facilities that manufacture VF products, are subject to VF's Global Compliance Principles. These principles, consistent with international labor standards, are a set of strict standards covering legal and ethical business practices, worker age, work hours, health and safety conditions, environmental standards and compliance with local laws and regulations.

VF, through its contractor monitoring program, audits the activities of the independent businesses and contractors that produce VF products at locations across the globe. Independent contractor facilities, including those serving our independent licensees, are subject to pre-certification before producing VF products. This pre-certification includes passing a factory

Table of Contents

inspection and signing a VF Terms of Engagement agreement. We maintain an ongoing audit program to ensure compliance with these requirements by using dedicated internal staff and externally contracted firms. Additional information about VF's Code of Business Conduct, Global Compliance Principles, Terms of Engagement and Environmental Compliance Guidelines, along with a Global Compliance Report, is available on the VF website at www.vfc.com.

COVID-19 has impacted some of VF's suppliers, including the resurgence of COVID-19 lockdowns in key sourcing countries that resulted in additional manufacturing constraints and logistical challenges during Fiscal 2023. VF has worked with its suppliers to minimize disruption and employed expedited freight as needed. VF has and will continue to work to offset any increases in product costs through (i) the continuing shift in the mix of its business to higher margin brands, geographies and channels of distribution, (ii) increases in the prices of its

products, and (iii) cost reduction efforts. The loss of any one supplier or contractor would not have a significant adverse effect on our business.

Product is shipped from our independent suppliers to distribution centers around the world. In some instances, product is shipped directly to our customers. Most distribution centers are operated by VF, and most support more than one brand.

Our largest distribution centers by region are located in Visalia, California, Prague, Czech Republic and Kunshan, China. In total, we operate 21 owned or leased distribution centers primarily in the U.S., but also in the Czech Republic, United Kingdom, the Netherlands, China, Canada, Mexico, Belgium, Israel and France. In addition, VF leases a distribution center in Ontario, California, that will be operational in early-Fiscal 2024 and will become VF's largest distribution center.

## SEASONALITY

VF's quarterly operating results vary due to the seasonality of our individual brands, and are historically stronger in the second half of the calendar year. This variation results primarily from the seasonal influences on revenues of our Outdoor segment, where revenues are historically weighted towards the second and third fiscal quarters. On a quarterly basis in Fiscal 2023, revenues ranged from a low of 19% of full year revenues in the first fiscal quarter to a high of 30% in the third fiscal quarter, with corresponding operating margins of 3% in the first fiscal quarter and 15% in the third fiscal quarter. This variation results primarily from the seasonal influences on revenues of our Outdoor segment, where 14% of the segment's revenues occurred in the first fiscal quarter compared to 35% in the third

fiscal quarter of Fiscal 2023. With changes in our mix of business and the growth of our retail operations, historical quarterly revenue and profit trends may not be indicative of future trends.

Working capital requirements vary throughout the year. Working capital typically increases early in the calendar year as inventory builds to support peak shipping periods and then moderates later in the calendar year as those inventories are sold and accounts receivable are collected. Historically, cash provided by operating activities is substantially higher in the second half of the calendar year due to higher net income during that period and reduced working capital requirements, particularly during the fourth quarter of the calendar year.

## ADVERTISING, CUSTOMER SUPPORT AND COMMUNITY OUTREACH

During Fiscal 2023, our advertising and promotion expense was $861.8 million, representing 7% of total revenues. We advertise in consumer and trade publications and through digital initiatives, including social media and mobile platforms on the Internet. We also participate in cooperative advertising on a shared cost basis with major retailers in print and digital media, radio and television. We sponsor sporting, musical and special events, as well as athletes and personalities who promote our products. We employ marketing sciences to optimize the impact of advertising and promotional spending, and to identify the types of spending that provide the greatest return on our marketing investments.

We provide advertising support to our wholesale customers, including independent partnership stores, in the form of point-of-sale fixtures and signage to enhance the presentation and brand image of our products. We also participate in shop-in-shops and concession retail arrangements, which are separate sales areas dedicated to a specific VF brand within our customers' stores and other locations, to help differentiate and enhance the presentation of our products.

We contribute to incentive programs with our wholesale customers, including cooperative advertising funds, discounts and allowances. We also offer sales incentive programs directly to consumers in the form of discounts, rebates and coupon offers that are eligible for use in certain VF-operated stores, brand e-commerce sites and concession retail locations. VF also offers loyalty programs for certain brands that provide a range of benefits to consumers.

In addition to sponsorships and activities that directly benefit our products and brands, VF and its associates actively support our communities and various charities. For example, *The North Face*® brand has committed to programs that encourage and enable outdoor participation, such as *The North Face Explore Fund*™ program, and provide trailblazing athletes with funding, gear, education and mentorship to accelerate their progress through its "Athlete Development Program". The *Timberland*® brand has a strong heritage of volunteerism, including the *Path of Service*™ program, which celebrated its 30-year anniversary in Fiscal 2023, offering full-time employees paid time off to serve their local communities through global service events such as Earth Day in the spring and "Serv-a-palooza" in the fall. In Fiscal 2023, the *Vans*® brand supported programs and nonprofits committed to equality, mental health support and empowering everyone to use creativity to discover themselves.

Table of Contents

## SUSTAINABILITY AND RESPONSIBILITY

VF and our portfolio of brands strive to be more than just an apparel and footwear company. Collectively, we work to be a leading global citizen, setting a high bar for corporate sustainability and responsibility. Our enterprise-wide sustainability and responsibility strategy focuses on key areas including people, the planet and our products.

**People**

- VF is a people-focused company. Our associates are a force for good in the world, sparking global movements that genuinely make a difference. We have a responsibility to protect and lift-up all who work across our operations and supply chain.

**Planet**

- The well-being of people and the planet are inextricably connected. Through our sustainability efforts, we are taking bold action on climate change to protect the planet for generations to come.

**Product**

- VF brands touch millions of lives every year – from the people that design and make apparel and footwear to the consumers who purchase them. Innovation and responsible product stewardship is infused at every step.

VF prioritizes sustainable materials, circularity, and sustainable packaging to drive scalable change by working to reduce our environmental impact. Other critical components of our sustainability strategy include reducing greenhouse gas ("GHG") emissions, increasing responsible sourcing of materials, reducing waste, implementing green building design, increasing renewable energy use and improving operational efficiency across both our direct operations and supply chain.

VF's President and Chief Executive Officer, as well as the Company's Executive Leadership Team ("ELT") and Board of Directors are responsible for the oversight of VF's sustainability and responsibility strategies and targets. VF's ELT Corporate Responsibility Working Group, comprised of executive leaders and subject matter experts from across the enterprise, address salient environmental and social issues. Progress updates and key outcomes of the ELT Corporate Responsibility Working Group are presented to the Governance and Corporate Responsibility Committee of the Board of Directors on a biannual cadence.

In alignment with the Taskforce on Climate-Related Financial Disclosures ("TCFD"), VF has completed an analysis of potential climate-related risks and opportunities. 'Climate Change & Sustainability' has been established as a VF enterprise risk and embedded in our enterprise risk management framework. Updates on enterprise risks, and progress towards associated targets, are provided to the Audit Committee of the Board of Directors quarterly.

VF's science-based targets include the following:

- Reduce absolute Scope 1 and 2 GHG emissions 55% by 2030 from a Fiscal 2017 baseline; and
- Reduce absolute Scope 3 GHG emissions from purchased goods and services and upstream transportation 30% by 2030 from a Fiscal 2017 baseline.

Other planet- and product-related goals include the following:

- Utilize 100% renewable energy across our owned-and-operated facilities by Fiscal 2026, to be primarily achieved through off-site renewable energy investments, including renewable energy credits.
- Source 50% of our polyester from recycled materials by Fiscal 2026.
- Key packaging materials shall be reduced and originate from more sustainable sources by Fiscal 2031.

VF is currently on course with its internal milestones, tracking progress towards these targets and goals.

In Fiscal 2023, VF issued its second €500.0 million green bond; the inaugural green bond was issued in Fiscal 2020. VF has dedicated an amount equivalent to the green bond net proceeds to support projects that align with key United Nations' Sustainable Development Goals, deliver meaningful environmental benefits and drive progress toward its science-based targets.

Additional information regarding VF's sustainability and responsibility strategy and actions can be found within our latest sustainability and responsibility report within our "Responsibility" page on www.vfc.com. Also included on that webpage are downloads of our Sustainability Accounting Standards Board ("SASB") and Global Reporting Initiative ("GRI") indices. Information contained on our website or in our sustainability and responsibility reports or related supplemental information is not incorporated by reference into this or any other report we file with the SEC.

## HUMAN CAPITAL MANAGEMENT

As a performance-driven company that is committed to its purpose, VF leverages the strength of our business and the capabilities of our people to drive profitable growth and create value for shareholders and stakeholders. Our purpose is to power movements of sustainable and active lifestyles for the betterment of people and our planet. This purpose, combined with a laser focus on performance and delivering on our commitments, allows us to offer a unique value proposition to our associates – a place where you can do well and do good at the same time.

We consider the talent and capabilities of our people as essential to our business strategy and execution, and, as such, put in place strategies to acquire, develop and retain highly diverse talent with the skills and passion to build our brands for our consumers around the globe. Our Human Capital Management ("HCM") practices are designed to promote inclusion, diversity and equity; provide development opportunities for associates across the organization; offer competitive rewards and benefits; and sponsor programs that support wellbeing in an engaging work environment built on enduring guiding principles and longstanding values.

Table of Contents

We believe that having an engaged, diverse and committed workforce not only enhances our business performance but also our culture. Initiatives to promote overall alignment with our performance, purpose, guiding principles, and strategy are therefore important and include internal communications and education about our programs, townhalls across various parts of our business, and a listening strategy that engages associates in providing input and feedback on a variety of topics.

Our Board of Directors and its Committees provide governance and oversight on a broad range of VF's human capital management efforts. The Board's oversight includes review of CEO and executive officer performance, compensation and succession planning and inclusion, and diversity and belonging programs and initiatives. The Talent and Compensation Committee works with management on executive compensation and compensation risks, and regularly reviews our progress on company-wide HCM priorities, including inclusion, diversity and equity, benefits, wellbeing, succession planning and talent development strategies. VF's Audit Committee monitors current and emerging risks, including HCM risks, and VF's health and safety program. The Governance and Corporate Responsibility Committee is responsible for conducting Board succession planning and the selection of nominees to the Board, and reviews VF's Code of Business Conduct and VF's sustainability policies, goals and programs. These Committees provide recommendations to the Board and are part of the broader framework that guides how VF acquires, develops, and retains a workforce that aligns with VF's values and supports its business strategies and performance objectives. In addition, VF's ELT is regularly engaged in the development and management of key talent systems, guiding our culture, employee value proposition and talent development programs. The sections that follow provide further background on our associate base, as well as examples of our key programs and initiatives that are focused on the achievement of our objectives.

### Associate Base

VF had approximately 33,000 employees at the end of Fiscal 2023. Of VF's total employees, approximately 60% were full-time and approximately 57% were located in the U.S. In international markets, certain employees are covered by trade-sponsored or governmental bargaining arrangements. Employee relations are considered to be good.

### Inclusion, Diversity, Equity, Action ("IDEA")

IDEA is fundamental to our business as we aim to sustain a workplace that celebrates the diversity of our associates. We strive to provide an environment that allows our associates to bring their authentic selves to work every day, and we're determined to foster a workplace that is free of discrimination and harassment, and promotes allyship, advocacy and belonging. Our Global Inclusion, Diversity and Equity Council sets global goals and strategic direction in alignment with VF's global IDEA strategy. Our Council to Advance Racial Equity ("CARE") oversees our commitments on actions that promote: increasing Black, Indigenous and People of Color ("BIPOC") representation at the director and above population in the U.S.; diverse candidate slates; pay equity; leader compensation tied to successful implementation of our IDEA strategy; mentorship and sponsorship of BIPOC employees and members of the community; and elevating our commitment to education, listening and learning.

These actions are consistent and aligned with VF's IDEA Statement, committing to equal opportunity for all employees and candidates. At the end of Fiscal 2023, approximately 19% of our U.S. director and above workforce self-identified as BIPOC.

VF is a member of the Paradigm for Parity coalition, which has pledged to promote organizational gender parity globally in leadership roles by 2030. At the end of Fiscal 2023, approximately 53% of the overall VF workforce and approximately 42% of director and above roles self-identified as women. VF aims to remove barriers to uplifting women and has added and expanded resources to support women in the workplace, including career advancement workshops, community building activities through our Employee Resource Groups ("ERGs"), and a suite of benefits designed to promote wellbeing and provide support for parents and families, including paid parental leave.

Our dedication to inclusion and diversity is further reflected in programs sponsored by our ERGs. Our ERGs enhance our culture of belonging by creating a safe space for learning and dialogue for underrepresented groups, establishing a sense of community among associates and providing platforms to collect and share insights to support business imperatives. We currently have various ERGs for women, BIPOC, Veterans and LGBTQ+ communities. VF is committed to maximizing inclusion, diversity and equity not only within the Company, but within the communities where we live and work, while also being a positive influence within the apparel and footwear sector, and society at large.

### Culture and Engagement

Our culture is built on our five Guiding Principles: Live with Integrity, Act with Empathy, Be Curious, Persevere, and Act Courageously. We have codified this culture through the lens of "what we do", "what we see" and "how we feel", and we measure our culture and Employee Net Promoter Score ("eNPS") via semiannual surveys. Results are evaluated, shared with associates and used to guide management focus and attention. Recent actions have included our Workplace Next initiative, which is focused on 1) driving flexibility for associates where they work, 2) creating engaging work environments that bring associates together to collaborate and innovate, and 3) equipping leaders to manage in a complex, hybrid environment. VF also conducts periodic pulse check surveys for interim feedback on specific topics such as ethics and compliance, safety, communications, and related topics.

### Talent Management

Talent Management includes the acquisition, development, skilling and upskilling, and deployment of our talent. We utilize a range of tools and programs including diverse candidate slates, talent reviews, performance coaching and development, succession planning, access to volunteering opportunities, IDEA training and hundreds of online learning modules that are available to all associates.

### Associate Wellbeing and Safety

VF endeavors to support the diverse wellbeing needs of our associates and their families. We define wellbeing as not only physical health, but also mental, emotional, social, financial and career wellbeing. We offer a comprehensive and competitive benefits program to our full-time associates that is designed to provide choices and flexibility to meet their needs now and in the

8/8/23, 4:24 PM

# adreadedclimber



## adreadedclimber

Follow    **Message**    +⚇    ⋯

**106** posts    **15K** followers    **2,918** following

**Manoah Ainuu**
💚 💛 🖤 Ethiopian&Samoaᴇᴛᴀs 🦍 Vegan-Animals=friends not food 🌱 Music is a beautiful thing-Mac Miller. Bzn, MT @thenorthface @smartwool @fullcircleverest

     

⊞ POSTS    ▷ REELS    ⊡ TAGGED



    

# The North Face Addresses Inequity in the Outdoors and Pledges to RESET Exploration with Upcoming Fellowship Program

The world's largest outdoor brand commits to donating $7 million and joins with passionate experts across industries, including Lena Waithe and Jimmy Chin, to help develop scalable solutions that support access to exploration



NEWS PROVIDED BY

**The North Face** ➞

15 Oct, 2020, 10:00 ET

---

DENVER, Oct. 15, 2020 /PRNewswire/ -- The North Face today launched "Reset Normal," a global initiative encouraging people everywhere to reset their lives through exploration in the hope of progress and discovery that is so needed in today's challenging environment.

Continue Reading

⌄





The North Face Joins with Emmy Award-Winning Screenwriter Lena Waithe to Address Inequity in the Outdoors with New Global Initiative "Reset Normal"

As part of this initiative, the brand will be launching the Explore Fund Council, a global fellowship with the goal of bringing together passionate experts across culture, entertainment, academia and the outdoors to develop ideas and potential scalable solutions to help support access to exploration. The learnings, findings and recommendations from this expert group will be used to help guide how The North Face directs a new, significant financial commitment - $7 million - to organizations with the goal of building equity in the outdoors and creating opportunities for all.

The program will launch with the help of two experts who have been resetting their own industries for years, and who will bring unique perspectives and expertise to tackling the obstacles that currently prevent equitable exploration for all. These experts include Lena Waithe, an Emmy Award-winning screenwriter, producer and actor who has devoted her career to championing underrepresented artists and communities through her production company Hillman Grad, and Jimmy Chin, The North Face Global athlete, climber, and Academy Award-winning director.

"For me, exploration has always been a mindset. As a creative I see myself as a constant, curious explorer and I believe everyone can have and should have access to this right," said Lena Waithe. "The only real way to see change happen is by helping to create it yourself. I'm excited to work with The North Face and all of the Explore Fund Council members so our collective perspectives can help diversify the outdoors and make it a more equal place for all."

"Throughout my life, exploration has been a constant source of positivity. I truly believe it is part of what makes us all human, and that exploration can bring people together and change lives," said Jimmy Chin, The North Face Global athlete. "Not everyone has the same access to or opportunity for outdoor adventure. This is an issue I'm excited to take on alongside The North Face and the other Explore Fund Council members."

Waithe and Chin will work alongside additional creatives, academic experts, outdoor industry partners and more, so that collectively they can develop ideas to help create meaningful change. Together, this group will bring new perspective and input for how The North Face develops, selects and funds organizations through The Explore Fund. The plan is to have the full Explore Fund Council group of fellows in place and announced in Spring 2021.

Currently, communities of color are three times more likely to live in nature-deprived places[1] and often face racism and other systemic challenges when they do explore. In its first year, the goal is for the Explore Fund Council to focus on how to create more culturally relevant exploration opportunities and connect diverse communities to the benefits of exploration.

"For ten years, we've been working to reset the barriers to exploration and make it more accessible for all through our Explore Fund," said Steve Lesnard, Global VP of Marketing and Product for The North Face. "But 2020 has proven we need to radically accelerate that work and collaborate with a broad-reaching community to help us do so. We're really excited to work alongside changemakers like Lena and Jimmy, and I believe the Explore Fund Council will help us foster a new, more equitable era for the outdoor industry."

The North Face plans to address the need for equity and opportunity in the outdoor industry via additional programs, as well. This includes working to facilitate new and additional mentorship opportunities that would help empower future explorers who are curious, interested and passionate about the outdoors – but may not have access to equipment, adventures or outdoors experts they can look up to and learn from.

The Reset Normal campaign will launch with a video anthem film by Sid Lee that brings to life the crucial turning point we are experiencing culturally in 2020 and shows how people can reset through the power of exploration. Lena Waithe will conduct the voiceover for this powerful film alongside music by Aloe Blacc. Blacc's new single, 'My Way', the lead track off his first album in seven years, reflects the campaign's motivational tone of inspiring others in a challenging time.

The North Face athletes and ambassador partners will also be tasked with creating personal pledge videos that share their individual stories and aspirations about how they would like to reset their normal in 2020. The brand plans to release easily sharable Instagram AR lenses and TikTok filters to encourage people everywhere to get involved and share how they pledge to reset their normal in 2020.

Learn more about The North Face call to "Reset Normal" and the new Explore Fund Council at www.thenorthface.com.

**About The North Face®**

The North Face, a division of VF Outdoor, LLC, was founded in 1966 with the goal of preparing outdoor athletes for the rigors of their next adventure. Today we are the world's leading outdoor brand, creating athlete-tested, expedition-proven products that help people explore and test the limits of human potential. We protect our outdoor playgrounds and minimize our impact on the planet through programs that encourage sustainability. The North Face products are available at premium and specialty retail sporting goods stores globally and is headquartered in Denver, Colorado. For more information, please visit www.thenorthface.com.

**Agency Credits:**

Reset Normal creative, including a campaign anthem spot, digital shorts and advertising across print, digital and social media was supported by The North Face agency of record Sid Lee. United Entertainment Group supported as The North Face consumer communication and influencer agency. Essence Global supported the campaign as the media agency.

**U.S. Media Contacts:**

Samantha Wannemacher, Senior Communications Manager, The North Face
Samantha_wannemacher@vfc.com

Katie Tufts, United Entertainment Group (UEG) for The North Face
Katie.Tufts@uegworldwide.com

1 *The Nature Gap: Confronting Racial and Economic Disparities in the Destruction and Protection of Nature in America* By Jenny Rowland-Shea, Sahir Doshi, Shanna Edberg, and Robert Fanger, July 2020

SOURCE The North Face

Related Links

https://www.thenorthface.com



PRN Top Stories Newsletters

Sign up to get PRN's top stories and curated news delivered to your inbox weekly!

Enter Your Email

Select Country

Submit

By signing up you agree to receive content from us.
Our newsletters contain tracking pixels to help us deliver unique content based on each subscriber's engagement and interests. For more information on how we will use your data to ensure we send you relevant content please visit our PRN Consumer Newsletter Privacy Notice. You can withdraw your consent at any time in the footer of every email you'll receive.





## DECLARATION OF JOHNATHAN TALBOT

I, Johnathan Talbot, under penalties of perjury, declare and state the following in support of the Complaint filed on my behalf in the above-captioned matter:

1.  I am a resident of Shelton, Washington.

2.  I have spent the last 17 years in various Design, Product Development, and Product Management roles for 3 major companies: American Greetings (Cleveland, OH), Mr. Heater (Enerco Group Inc, Cleveland, OH) and Mystery Ranch Backpacks (Bozeman, MT). Throughout this time, I have managed many people and important innovation projects for commercial, US and NATO military special forces, and wildland firefighters. I've supervised the Design, Marketing, and Commercialization of millions of dollars of products for some of the largest retailers in America, including Target, Walmart, Lowes, The Home Depot, and Tractor Supply Company among many, many others.

3.  I began working for Outdoor Research on March 20, 2023, at a base salary of $115,000 per year, with a signing bonus of $3,000. My title was Product Manager Gloves, and OR Pro, which develops, designs, and manufactures products for the U.S. military and first responders. As required by Outdoor Research, I moved from my home in Bozeman, Montana to Shelton, Washington in June of 2023.

4.  My job responsibilities at Outdoor Research included the following:

The Product Manager (PM) of Gloves/Pro is responsible for the overall direction, planning, and financial success of the Glove and Pro business at Outdoor Research. The Gloves/Pro PM has a unique opportunity to lead two different segments of our

business, each critical to our long-term growth. As an industry leader in gloves, the focus will center on scaling the business and distribution. In Pro, the opportunity draws on your passion for start-ups and will require extensive industry and competitive research, line planning, and consensus building. They will strive to increase the profitability of existing products while also helping to develop new products in partnership with their Design and Development counterparts. The Glove/Pro PM will work across two sectors of our company, the Pro and Commercial sides, as well as the cross-functional departments of the company, including sourcing, materials, sales, operations, design, tech design, innovation, marketing, and manufacturing associated with both. They must be able to effectively collaborate and communicate with these departments to meet company expectations and account for consumer demands. The Gloves/Pro PM must possess mathematical and analytical abilities to develop pricing models and forecast product profitability, requiring the product manager to analyze technical, financial, marketing, and sales information. Using this data, they must prepare product development objectives and schedules for all product development and product launch strategy phases. To ensure the success of various product lines, the product manager must use a combination of marketing data analysis, personal experience, and customer/athlete/influencer input. In addition, the product line manager must stay updated with market changes and current market perceptions. They must then be able to communicate these results to cross-functional counterparts, which may include executive members of the company,

making suggestions on how to improve current product lines and/or how Outdoor Research can enter underdeveloped market segments.

5. On June 20, 2023, I was in Bozeman, Montana to conduct a focus group on behalf of Outdoor Research. Specifically, I was included to lead the focus group around exploring a new product line tentatively called, "Rugged Outdoor." This was to engage with professional users that I had helped to select to discuss outdoor products, feature sets, and retailers.

6. On June 20, 2023, upon leaving our team dinner, I encountered Manoah Ainuu across the street and introduced myself. I explained that I worked for Outdoor Research, shared my background in the industry, and engaged in a brief and light conversation with him.

7. At some point during that conversation, Ainuu yelled at me that I was "racist and entitled." Ainuu then walked into the nearby bar where I was also going.

8. Once we were in the bar, Ainuu started pointing at me, repeatedly calling me a racist, and effectively encouraging other patrons to take out their phones and start recording the scene. He paraded through the bar several times while taking time to berate me at each completed lap. After I said to Ainuu, "I didn't do anything wrong," the bartender asked what was going on, and I told him that Ainuu was upset about something I had said, but I did not know what upset him. I believe Ainuu was trying to instigate a physical confrontation with me to gain social media followers.

9.  While I attempted to speak with Ainuu to understand his allegations of racism, why he was angry, and what he believed was racist, at no point did I attempt to provoke a physical confrontation.

10. At no point was I asked to leave the premises.

11. I eventually went back to the hotel and went to bed. At approximately 8:00 a.m. on June 21, 2023, I received a call from Amy McCanless ("McCanless") of Outdoor Research's Human Resources Department, who informed me that overnight, Ainuu had been making accusations against me on social media, she asked me to provide a brief explanation, which I did, and told me not engage at all with any of the comments around the incident. She told me I was not to conduct the focus group, and I then arranged my return to Washington until Outdoor Research could get a handle on the situation.

12. Following that call, I looked at Ainuu's Instagram account and saw that he had made several posts describing his encounter with me, including a video in which he stated as follows: Ainuu's first post to Instagram was a video, in which he said the following: "Hey yo, Outdoor Research, I'm not even playing man. This guy John, he came up to me, introduced himself and said 'you look like someone I should know.' It was at a bar at the Crystal, which I often frequent. A lot of my friends are there, or work there. And this guy came up to me and started talking all this stuff, started asking questions – very directly – about diversity. And I answered honestly, and he kept cutting me off, didn't want to hear what he was wanting to hear, but what he was asking for, which is very, very obvious. So, when I started to check him on it and

correct him and direct him and educate his ass for free – for free, free, free, free, free – he got very defensive. So, I said yo, we're done talking – this conversation is over bro. I told you the truth, don't cut me off while I'm talking if you're asking. You're not listening, and you're asking, very big red flag – back up. I went inside, he came inside and tried to shake my hand and I was like 'yo you're apologizing,' he just started apologizing over and over again and I'm like 'if you're apologetic buy me a beer at least. That's the minimum you can do.' And right after that, he squared up to me got right in my face like this, and he's like 'I didn't do anything wrong.' How do you apologize and say you don't do anything wrong within like five seconds? Oh, because you're not truly apologetic. So, this guy John who designs product or something for you guys OR, please fucking check him. This guy's tripping, he's racist."

13. On or about June 22, 2023, Outdoor Research spoke to Defendant Ainuu about his allegations.

14. McCanless emailed me on June 23, 2023 and instructed me that I would be on administrative leave while things were sorted out with Ainuu. I was placed on leave from June 23, 2023 to June 30, 2023.

15. During a telephone conference on June 27, 2023, McCanless and I discussed Ainuu's accusations. During that conversation, McCanless told me that Ainuu could not point to any racist or offensive statement I had made.

16. Two days later, on June 29, 2023, McCanless and I spoke again, at which time McCanless informed me that Outdoor Research was terminating me because I

"showed poor judgment, in [my] actions in Bozeman, both prior to and during [the] incident at the bar."

17. Outdoor Research followed up this conversation with a letter, informing me that my termination was effective on July 14, 2023.

18. At some point after the conversations with McCanless and further review of Ainuu's social media attacks, I came to believe that the "racist statement" Ainuu believes that I made was simply telling him during our brief conversation that I had been on the diversity, equity, and inclusion committee at my previous job.

19. I am currently unemployed following my termination from Outdoor Research and have been unable to secure employment because of Ainuu's defamatory attacks against me amongst peers and companies in the outdoor products space.

Dated this 27th day of September, 2023, in Seattle, Washington.

_____
JOHNATHAN TALBOT



















  

Articles    People    Learning



## Dave Burleson

Athlete Manager, Reppa, Talent Agency

Salt Lake City, Utah, United States

657 followers · 500+ connections

See your mutual connections

**Join to view profile**

REPPA

Poquoson High School

   

Articles   People   Learning

## Experience


**Athlete/Talen Manager**
REPPA
Aug 2023 - Present · 2 months
North Carolina, United States


**Global Senior Athlete Coordinator**
The North Face, a VF Company
May 2018 - Aug 2023 · 5 years 4 months
Denver, Colorado, United States


**Athlete and Event Coordinator**
Petzl America
Jun 2009 - May 2018 · 9 years






ER-113

## Screen 1 (left)

5:36 · 5G

**adreadedclimber** · 2h · ··· · ✕

**vasu_sojitra** ✓

**FWIW:**

US mountain town are very difficult to live in for a person of color.

We don't see ourselves in so many situations. Our food, our languages, our clothing, our art, our people, our culture. So much so that many of us move out. It's this paradox where many of these town need more cultural diversity or they're gonna boom and bust, but they also push cultural diverse folks out due to a limited knowledge around race and ethnicity (gender, sexuality, ability also fall into this). Not knowing what to say or how to work together with someone with a completely different lives experience.

Yeah the blame can be pointed at the individual. the Johnatan's of the world. But I really want us to be critical of how these Johnathan's have been created. Our education systems, our policies, our media, our books. What info are we intaking to help build communities that welcomes the few or excluded the many. Because hate is taught and love is natural.

I deeply appreciate everyone that's messaged me about Manoah's (@adreadedclimber) story and Mika's story (#MikaMatters). These are just one of a the few very hateful things that have surfaced, but please know you're not alone in this. It is a constant and many of us know we're in it for the long haul. It's not about "me" it's about "we". ✊🏾

Send message   ♡  ➤

## Screen 2 (middle)

**Comments**

Y'all posted a story, publicly, that it was being handled. You felt the need to let your customer base know that you had started a process to rectify this. Why do you not feel the need to follow up?

4 likes    Reply

 **adreadedclimber** · 8h
@vandeventer ^ lip service is worse than nothing. We're all very disappointed OR. Next time (there probably will be since y'all obviously don't care) don't post a vague story meaning nothing.

1 like    Reply

 **jay_b1008** · 10h
@outdoorresearch it's your turn to do the right thing. #byejohn

5 likes    Reply

     

 Add a comment for out...   GIF

## Screen 3 (right)

5:35 · 5G

**Comments**

 **hillaryannec** · 8h
How have y'all still not attempted to make things right with Manoah? Be transparent about your timeline and actions or at least be transparent about your choice to endorse your employee's racism.

3 likes    Reply

 **skyestoury** ✓ · 1w
Loving all the spring and summer colors!

5 likes    Reply

 **jenssog** · 12h
@skyestoury I don't know, @outdoorresearch has been very white lately.

2 likes    Reply

 **em.boman** · 1w
Really troubling to not see a response regarding the

      

 Add a comment for out...   GIF

**5:01** ... 5G

## Comments



**sarahferocity** 7h
@outdoorresearch this is your two week notice. No public response regarding your racist employee Jon Talbot? Time is up OR, you did @adreadedclimber so wrong & I've lost any confidence in your company actually practicing what it preaches 🧹🌍🪵

1 like    Reply



**andeewaslike** 1w
Ok but what are you going to do about John in gloves on this summer solstice? Seems like the perfect time to fire an aggressive racist white man and get a new start with a POC.

20 likes    Reply

View 2 more replies

**hugo.uno** 1w

❤️ 🙌 🔥 👏 😢 😍 😮 😂


Add a comment for out...    GIF

---

**4:59** ... 5G

## Comments

**adreadedclimber** 14h
Happy 4th of juley! Remember when Johnathan, your director of gloves, assaulted me last month?!? Still awaiting any sort of communication! Thanks for nothing but pain and trouble so far!!!

16 likes    Reply

**g.i._jenna** 4h
@adreadedclimber was just about to ask! We certainly haven't forgotten over here!!!

Reply

**samsaraexperience** 2h
@outdoorresearch we are still waiting

Reply

Hide replies



❤️ 🙌 🔥 👏 😢 😍 😮 😂


Add a comment for out...    GIF

ER-115

---

**4:28** ... 📶 🔋

OUTDOORRESEARCH
**Posts**

< 

## Comments    ✈️

is attacking a Black climber and community member for his work on diversity and inclusion in the outdoor industry. Best practice is to say thanks and then pass these tips on to leadership

56 likes    Reply

**_._here.there.everywhere_._** 6w
@hillaryannec clearly, accountability is not part of @outdoorresearch corporate values

Reply

❤️ 🙌 🔥 👏 😢 😍 😮 😂


Add a comment for out...    GIF





ER-116



6:21 · LTE

adreadedclimber · 2h
From Create Mode >

**Talked with
@outdoorresearch
yesterday. Felt heard.
Still awaiting further
response. This is not
just for me, it's for Us.
Overwhelmed and
drained—but hopeful
of mellower times for
Us all.
Thank you to all who
spoke up and came
together. This is where
its at.  Better together.**

Send message

6:20 · LTE

adreadedclimber · 1h
From Create Mode >

**Vagueness because of
vagueness. Hoping for
action and clarity.
There are legal
obligations to
employees—but need
something.**

Send message

ER-118



APPEAL,CROSSAPPEAL

# U.S. District Court
## District of Montana (Butte)
## CIVIL DOCKET FOR CASE #: 2:23-cv-00066-BMM

Talbot v. Ainuu et al
Assigned to: Judge Brian Morris
Demand: $75,000
Case in other court:  Ninth Circuit, 24-02135 and 24-02038
                     Ninth Circuit, 24-02144 and 24-02038
Cause: 28:1332 Diversity-Libel,Assault,Slander

Date Filed: 10/02/2023
Date Terminated: 03/01/2024
Jury Demand: Plaintiff
Nature of Suit: 320 Assault Libel & Slander
Jurisdiction: Diversity

**Plaintiff**

**Johnathan Talbot**

represented by **Ian Prior**
America First Legal Foundation
611 Pennsylvania Ave SE
Ste 231
Washington, DC 20003
571-639-6711
Email: ian.prior@aflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew G. Monforton**
MONFORTON LAW OFFICES
32 Kelly Court
Bozeman, MT 59718
406-570-2949
Fax: 406-551-6919
Email: matthewmonforton@yahoo.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Nicholas Barry**
America First Legal Foundation
611 Pennsylvania Ave SE #231
Washington, DC 20003
615-431-9303
Email: nicholas.barry@aflegal.org
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Manoah Ainuu**

represented by **James H. Goetz**
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand

ER-120

PO Box 6580
Bozeman, MT 59771-6580
406-587-0618
Fax: 587-5144
Email: jim@goetzlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey J. Tierney**
GOETZ, BALDWIN & GEDDES, P.C.
35 North Grand
PO Box 6580
Bozeman, MT 59771-6580
406-587-0618
Fax: 406-587-5144
Email: jtierney@goetzlawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter M. Meloy**
MELOY LAW FIRM
PO Box 1241
80 South Warren
Helena, MT 59624
406-442-8670
Fax: 442-4953
Email: mike@meloylawfirm.com
*TERMINATED: 12/11/2023*

**Defendant**

**The North Face Apparel Corp.**          represented by    **Isabella Salomao Nascimento**
*a Delaware Company*                                        Ballard Spahr LLP
                                                           Ballard Spahr LLP
                                                           2000 IDS Center
                                                           80 South 8th Street
                                                           Minneapolis, MN 55402
                                                           612-371-3281
                                                           Email:
                                                           salomaonascimentoi@ballardspahr.com
                                                           *ATTORNEY TO BE NOTICED*

**Leita Walker**
Ballard Spahr LLP
80 S 8th Street
Suite 2000
Minneapolis, MN 55402
612-371-6222
Email: walkerl@ballardspahr.com
*ATTORNEY TO BE NOTICED*

**Peter M. Meloy**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Seth D Berlin**
Ballard Spahr LLP
1909 K Street, NW
12th Floor
Washington, DC 20006-1157
202-508-1122
Fax: 202-661-2299
Email: berlins@ballardspahr.com
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/02/2023 | 1 | COMPLAINT against Manoah Ainuu, The North Face Apparel Corp., filed by Johnathan Talbot. (Attachments: # 1 Civil Cover Sheet, # 2 Proposed Summons, # 3 Exhibit VF Corp Form-10K, # 4 Exhibit Novak Decl, # 5 Exhibit Ainuu Instagram Profile, # 6 Exhibit North Face Press Release, # 7 Exhibit Ainuu Stolen Land Post, # 8 Exhibit Talbot Decl, # 9 Exhibit Ainuu June 21 Post, # 10 Exhibit Burelson Linkedin, # 11 Exhibit Republications, # 12 Exhibit Outdoor Research Instagram, # 13 Exhibit Ainuu June 23 Instagram Post, # 14 Exhibit Ainuu July 4 Posts) (SAJ) (Entered: 10/02/2023) |
| 10/02/2023 | | Filing fee: $ 402, receipt number AMTDC-3136790 (SAJ) (Entered: 10/02/2023) |
| 10/02/2023 | 2 | Summons Issued as to All Defendants. **Issued summons may be downloaded and printed by counsel for service.** (SAJ) (Entered: 10/02/2023) |
| 10/28/2023 | 3 | UNOPPOSED MOTION for Extension of Time to File Answer . Peter M. Meloy appearing for Defendant The North Face Apparel Corp.. (Attachments: # 1 Text of Proposed Order) (Meloy, Peter) Modified on 10/30/2023 to add unopposed(ACC). (Entered: 10/28/2023) |
| 10/30/2023 | 4 | ORDER granting 3 Motion for Extension of Time to Answer re 3 MOTION for Extension of Time to File Answer The North Face Apparel Corp. answer due 12/19/2023. Signed by Judge Brian Morris on 10/30/2023. (MMS) (Entered: 10/30/2023) |
| 10/31/2023 | 5 | First MOTION Seth Berlin to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152246.). Peter M. Meloy appearing for Defendant The North Face Apparel Corp.. (Attachments: # 1 Affidavit) (Meloy, Peter) (Entered: 10/31/2023) |
| 10/31/2023 | 6 | First MOTION Leita Walker to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152300.). Peter M. Meloy appearing for Defendant The North Face Apparel Corp.. (Attachments: # 1 Affidavit) (Meloy, Peter) (Entered: 10/31/2023) |
| 10/31/2023 | 7 | First MOTION Isabella Naciamento to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152314.). Peter M. Meloy appearing for Defendant The North Face Apparel Corp.. (Attachments: # 1 Affidavit) (Meloy, Peter) (Entered: 10/31/2023) |
| 10/31/2023 | 8 | Submission of Proposed Order re: 6 First MOTION Leita Walker to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152300.), 7 First MOTION Isabella Naciamento to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152314.), 5 First MOTION Seth Berlin to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3152246.). (Attachments: # 1 Text of Proposed Order, # 2 Text of Proposed Order) (Meloy, Peter) (Entered: 10/31/2023) |
| 10/31/2023 | 9 | ORDER granting 5 Motion to Appear Pro Hac Vice for Attorney (Seth Berlin) **NOTE: Instructions to request Montana CM/ECF registration through PACER are found here.** ; granting 6 Motion to Appear Pro Hac Vice for Attorney (Leita Walker) **NOTE: Instructions to request Montana CM/ECF registration through PACER are** |

| | | |
|---|---|---|
| | | found **here**.<br>; granting **7** Motion to Appear Pro Hac Vice for Attorney (Isabella Naciamento)<br>**NOTE: Instructions to request Montana CM/ECF registration through PACER are found here.**<br>Acknowledgment of PHV Order due by 11/15/2023. Signed by Judge Brian Morris on 10/31/2023. (MMS) (Entered: 10/31/2023) |
| 11/03/2023 | 10 | NOTICE of Acknowledgment of Pro Hac Vice Order by The North Face Apparel Corp. re 9 Order on Motion to Appear Pro Hac Vice,,,,,,,,,,,,, (Berlin, Seth) (Entered: 11/03/2023) |
| 11/03/2023 | 11 | NOTICE of Acknowledgment of Pro Hac Vice Order by The North Face Apparel Corp. re 9 Order on Motion to Appear Pro Hac Vice,,,,,,,,,,,,, (Walker, Leita) (Entered: 11/03/2023) |
| 11/03/2023 | 12 | NOTICE of Acknowledgment of Pro Hac Vice Order by The North Face Apparel Corp. re 9 Order on Motion to Appear Pro Hac Vice,,,,,,,,,,,,, (Salomao Nascimento, Isabella) (Entered: 11/03/2023) |
| 11/03/2023 | | Terminate Deadlines as to 9 Pro Hac ddl; acknowledgments filed 11/2/23. (ACC) (Entered: 11/03/2023) |
| 11/09/2023 | 13 | AFFIDAVIT of Service for Proof of Service. Served on Manoah Ainuu on 11/07/2023, filed by Johnathan Talbot. Manoah Ainuu answer due date 11/28/2023. (Monforton, Matthew) (Entered: 11/09/2023) |
| 11/09/2023 | 14 | Corporate Disclosure Statement by The North Face Apparel Corp. identifying Corporate Parent V.F. Corporation, Corporate Parent VF Outdoor, LLC for The North Face Apparel Corp... (Salomao Nascimento, Isabella) (Entered: 11/09/2023) |
| 11/21/2023 | 15 | MOTION Nicholas Barry to Appear Pro Hac Vice ( Filing fee $ 262 receipt number AMTDC-3163972.). Matthew G. Monforton appearing for Plaintiff Johnathan Talbot. (Attachments: # 1 Affidavit Affidavit in Support of PHV Mtn) (Monforton, Matthew) (Entered: 11/21/2023) |
| 11/21/2023 | 16 | MOTION Ian Prior to Appear Pro Hac Vice ( Filing fee $ 262 receipt number BMTDC-3163991.). Matthew G. Monforton appearing for Plaintiff Johnathan Talbot. (Attachments: # 1 Affidavit Affidavit in Support of PHV Mtn) (Monforton, Matthew) (Entered: 11/21/2023) |
| 11/27/2023 | 17 | NOTICE of Appearance by Peter M. Meloy on behalf of Manoah Ainuu (Meloy, Peter) (Entered: 11/27/2023) |
| 11/27/2023 | 18 | MOTION for Extension of Time to File Answer . Peter M. Meloy appearing for Defendant Manoah Ainuu. (Attachments: # 1 Text of Proposed Order) (Meloy, Peter) (Entered: 11/27/2023) |
| 11/27/2023 | 19 | ORDER: Upon the Unopposed 18 Motion for Extension of Time in Which to Answer or Otherwise Respond to Complaint, and with good cause shown, IT IS HEREBY ORDERED that the deadline by which Defendant Manoah Ainuu must answer or otherwise respond to the Complaint is extended until December 19, 2023. Signed by Judge Brian Morris on 11/27/2023. (ACC) (Entered: 11/27/2023) |

| | | |
|---|---|---|
| 11/27/2023 | 20 | ORDER granting 15 Motion to Appear Pro Hac Vice for Attorney Nicholas Barry. **NOTE: Instructions to request Montana CM/ECF registration through PACER are found here.** ; granting 16 Motion to Appear Pro Hac Vice for Attorney Ian Prior. **NOTE: Instructions to request Montana CM/ECF registration through PACER are found here.** Acknowledgment of PHV Order due by 12/12/2023. Signed by Judge Brian Morris on 11/27/2023. (ACC) (Entered: 11/27/2023) |
| 11/30/2023 | 21 | NOTICE of Acknowledgment of Pro Hac Vice Order by Johnathan Talbot re 20 Order on Motion to Appear Pro Hac Vice,,,,,, *Nicholas Barry* (Monforton, Matthew) (Entered: 11/30/2023) |
| 11/30/2023 | 22 | NOTICE of Acknowledgment of Pro Hac Vice Order by Johnathan Talbot re 20 Order on Motion to Appear Pro Hac Vice,,,,, *Ian Prior* (Monforton, Matthew) (Entered: 11/30/2023) |
| 12/08/2023 | 23 | NOTICE of Appearance by Jeffrey J. Tierney on behalf of Manoah Ainuu (Tierney, Jeffrey) (Entered: 12/08/2023) |
| 12/11/2023 | 24 | NOTICE of Withdrawal of Counsel: Peter M. Meloy withdrawing from the case, filed by Manoah Ainuu (Meloy, Peter) (Entered: 12/11/2023) |
| 12/18/2023 | 25 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief*. Leita Walker appearing for Defendant The North Face Apparel Corp.. (Walker, Leita) (Entered: 12/18/2023) |
| 12/18/2023 | 26 | Brief/Memorandum in Support re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief* filed by The North Face Apparel Corp.. (Attachments: # 1 Decl. of Leita Walker in Support, # 2 Exhibit A - Ainuu TNF profile, # 3 Exhibit B - CNN article, # 4 Exhibit C - Men's Health article, # 5 Exhibit D - NYT Magazine article, # 6 Exhibit E - USA Today article, # 7 Exhibit F - People article, # 8 Exhibit G - Instagram post, # 9 Exhibit H - Instagram Community Guidelines, # 10 Exhibit I - 10-27-23 notice letter) (Walker, Leita) (Entered: 12/18/2023) |
| 12/19/2023 | 27 | MOTION to Dismiss *and Special Motion for Expedited Relief*. Jeffrey J. Tierney appearing for Defendant Manoah Ainuu. (Tierney, Jeffrey) (Entered: 12/19/2023) |
| 12/19/2023 | 28 | Brief/Memorandum in Support re 27 MOTION to Dismiss *and Special Motion for Expedited Relief* filed by Manoah Ainuu. (Tierney, Jeffrey) (Entered: 12/19/2023) |
| 12/19/2023 | 29 | Disclosure Statement by Manoah Ainuu. (Tierney, Jeffrey) (Entered: 12/19/2023) |
| 12/21/2023 | 30 | TEXT ORDER Setting Hearing on Motion 27 MOTION to Dismiss *and Special Motion for Expedited Relief*, 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief* : Motion Hearing is set for 2/1/2024 at 09:00 AM in Butte, MT before Judge Brian Morris. Signed by Judge Brian Morris on 12/21/2023. (SLL) (Entered: 12/21/2023) |
| 12/26/2023 | 31 | MOTION for Extension of Time to File Response/Reply . Matthew G. Monforton appearing for Plaintiff Johnathan Talbot. (Attachments: # 1 Exhibit Email Chain, # 2 Text of Proposed Order) (Monforton, Matthew) (Entered: 12/26/2023) |
| 12/28/2023 | 32 | ORDER granting 31 Motion for Extension of Time to File Response/Reply re 27 MOTION to Dismiss *and Special Motion for Expedited Relief*, 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief*. Responses due by 1/25/2024. Replies due by 1/30/2024. Motions ripe 2/1/2024. Signed by Judge Brian Morris on 12/28/2023. (MMS) (Entered: 12/28/2023) |

| 01/23/2024 | 33 | TEXT Order Re-Setting Time of Motion Hearing: IT IS HEREBY ORDERED that the Motion Hearing reset for 2/1/2024 at 10:00 AM in Butte, MT before Judge Brian Morris. Signed by Judge Brian Morris on 1/23/2024. (SLL) (Entered: 01/23/2024) |
| --- | --- | --- |
| 01/25/2024 | 34 | RESPONSE to Motion re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief*, 27 MOTION to Dismiss *and Special Motion for Expedited Relief* filed by Johnathan Talbot. (Monforton, Matthew) (Entered: 01/25/2024) |
| 01/30/2024 | 35 | REPLY to Response to Motion re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief* filed by The North Face Apparel Corp.. (Walker, Leita) (Entered: 01/30/2024) |
| 01/30/2024 | 36 | REPLY to Response to Motion re 27 MOTION to Dismiss *and Special Motion for Expedited Relief* filed by Manoah Ainuu. (Tierney, Jeffrey) (Entered: 01/30/2024) |
| 02/01/2024 | 37 | MINUTE ENTRY for proceedings held before Judge Brian Morris: Counsel Matthew Monforton and Nicholas Barry present on behalf of Plaintiff Johnathan Talbot; Counsel Jeffrey Tierney present on behalf of Defendant Manoah Ainuu; Counsel Leita Walker present on behalf of Defendant The North Face. Motion Hearing held on 2/1/2024 re 25 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM *and Special Motion for Expedited Relief* filed by The North Face Apparel Corp., 27 MOTION to Dismiss *and Special Motion for Expedited Relief* filed by Manoah Ainuu. Parties with argument. Matter submitted and a written order will follow. Hearing commenced at 9:56 am and concluded at 11:05 am. (Court Reporter Y. Heinze.) (Law Clerk: D. LaFontaine), (Hearing held in Butte, MT) (SMS) (Entered: 02/01/2024) |
| 02/14/2024 | | Terminate Deadlines as to 25 & 27 Reply ddls; replies filed 1/30/24. (ACC) (Entered: 02/14/2024) |
| 03/01/2024 | 38 | IT IS ORDERED: 1.) TNFs Motion to Dismiss (Doc. 25) is GRANTED. TNFs request for costs and fees related to the motion is DENIED. 2.) Ainuus Motion to Dismiss (Doc. 27) is GRANTED. Ainuus request for costs and fees related to the motion is DENIED. 3.) Talbots claims against TNF and Ainuu are hereby DISMISSED with prejudice. Signed by Judge Brian Morris on 3/1/2024. (KAH) (Entered: 03/01/2024) |
| 03/13/2024 | 39 | CLERK'S JUDGMENT. (MMS) (Entered: 03/13/2024) |
| 03/29/2024 | 40 | NOTICE OF APPEAL by Johnathan Talbot. Filing fee $ 605, receipt number BMTDC-3235891. (Monforton, Matthew) (Entered: 03/29/2024) |
| 04/03/2024 | 41 | NOTICE OF CROSS APPEAL as to 38 Order on Motion to Dismiss for Failure to State a Claim,,, by The North Face Apparel Corp.. Filing fee $ 605, receipt number AMTDC-3238072. (Walker, Leita) (Entered: 04/03/2024) |
| 04/03/2024 | 42 | NOTICE OF CROSS APPEAL as to 38 Order on Motion to Dismiss for Failure to State a Claim,,, by Manoah Ainuu. Filing fee $ 605, receipt number AMTDC-3238108. (Tierney, Jeffrey) (Entered: 04/03/2024) |
| 04/03/2024 | 43 | USCA Case Number 24-2038 and Time Scheduling Order for 40 Notice of Appeal filed by Johnathan Talbot. (MMS) (Entered: 04/03/2024) |
| 04/08/2024 | 44 | USCA Case Number 24-2135 and 24-2038 and Time Scheduling Order for 40 Notice of Appeal filed by Johnathan Talbot. (MMS) (Entered: 04/08/2024) |
| 04/08/2024 | 45 | USCA Case Number 24-2144 and 24-2038 and Time Scheduling Order. (MMS) (Entered: 04/08/2024) |

ER-125

| 04/16/2024 | 46 | TRANSCRIPT ORDER FORM by The North Face Apparel Corp. for proceedings held on 2/1/2024 before Judge Hon. Brian Morris. Court reporter Yvette Heinze. Type of transcript: 14-Day. Transcript due by 5/13/2024. (Salomao Nascimento, Isabella) (Entered: 04/16/2024) |
|---|---|---|
| 04/29/2024 | 47 | TRANSCRIPT of Motion Hearing held on 02/01/2024 before Judge Morris. Transcript may be viewed at the court public terminal or purchased through the court reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER, the clerks office, or the court reporter. NOTICE: A NOTICE OF INTENT TO REQUEST REDACTION MUST BE FILED WITHIN 7 DAYS OF THIS FILING. Contact court reporter Yvette Heinze, 406-422-8619, yvettecsrrpr@gmail.com. For further information, please see the Transcript Redaction Procedure and Schedule on the Court Reporters page of our website.. Redaction Request due 5/20/2024. Redacted Transcript Deadline set for 5/30/2024. Release of Transcript Restriction set for 7/29/2024. (YMH) (Entered: 04/29/2024) |
| 05/14/2024 | | Terminate Deadlines as to 46 Transcript; filed 4/29/24. (ACC) (Entered: 05/14/2024) |
| 05/21/2024 | | Terminate Deadlines as to 47 Redaction request ddl 5/20/24. (ACC) (Entered: 05/21/2024) |
| 07/30/2024 | | Terminate Deadlines as to 47 Release of Transcript ddl 7/29/24. (ACC) (Entered: 07/30/2024) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/04/2024 09:34:18 | | |
| **PACER Login:** | iprior62077 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:23-cv-00066-BMM |
| **Billable Pages:** | 6 | **Cost:** | 0.60 |

ER-126