**Nos. 24-2038, 24-2135**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

———————————————

JOHNATHAN TALBOT,

*Plaintiff-Appellant,*

v.

MANOAH AINUU and THE NORTH FACE APPAREL CORP.,

*Defendant-Appellees.*

———————————————

On Appeal From The United States District Court
for the District of Montana
No. 2:23-cv-00066-BMM
Hon. Brian M. Morris, Chief Judge

---

**SUPPLEMENTAL EXCERPTS OF RECORD**
Volume 1 of 1

---

Seth D. Berlin
**BALLARD SPAHR LLP**
1909 K Street, NW, 12th
Floor
Washington, DC 20006-1157
Tel: (202) 508-1122
berlins@ballardspahr.com

Leita Walker
Isabella Salomão Nascimento
**BALLARD SPAHR LLP**
2000 IDS Center, 80 S Eighth Street
Minneapolis, MN 55402-2119
Tel: (612) 371-3211
walkerl@ballardspahr.com
salomaonascimentoi@ballardspahr.com

*Counsel for Defendant-Appellee and Cross-Appellant
VF Outdoor, LLC d/b/a The North Face*

# INDEX

Page

Memorandum of Law in Support of Combined Motion to
    Dismiss and Special Motion for Expedited Relief by
    Defendant VF Outdoor, LLC d/b/a The North Face
    (Dkt. 26) (Dec. 18, 2023) ......................................................... SER-003

Declaration of Leita Walker in Support of Combined Motion to
    Dismiss and Special Motion for Expedited Relief
    (Dkt. 26-1) (Dec. 18, 2023) ..................................................... SER-042

Ex. A to the Decl. of L. Walker (Dkt. 26-2) (Dec. 18, 2023) ......... SER-047

Ex. B to the Decl. of L. Walker (Dkt. 26-3) (Dec. 18, 2023) ......... SER-050

Ex. C to the Decl. of L. Walker (Dkt. 26-4) (Dec. 18, 2023) ......... SER-058

Ex. D to the Decl. of L. Walker (Dkt. 26-5) (Dec. 18, 2023) ......... SER-064

Ex. E to the Decl. of L. Walker (Dkt. 26-6) (Dec. 18, 2023) ......... SER-069

Ex. F to the Decl. of L. Walker (Dkt. 26-7) (Dec. 18, 2023) ......... SER-084

Ex. G to the Decl. of L. Walker (Dkt. 26-8) (Dec. 18, 2023) ......... SER-089

Ex. H to the Decl. of L. Walker (Dkt. 26-9) (Dec. 18, 2023) ........ SER-091

Ex. I to the Decl. of L. Walker (Dkt. 26-10) (Dec. 18, 2023) ........ SER-096

Plaintiff's Response to Defendants' Motions to Dismiss (Dkt.
    34) (Jan. 25, 2024) ............................................................... SER-0100

Reply Brief in Support of Combined Motion to Dismiss and
    Special Motion for Expedited Relief by Defendant VF
    Outdoor, LLC d/b/a The North Face (Dkt. 35)
    (Jan. 30, 2024) ...................................................................... SER-144

Transcript of the Feb. 1, 2024 Hearing on Defendants' Motion
    to Dismiss and Special Motion for Expedited Relief.............. SER-165

MELOY LAW FIRM

Peter Michael Meloy
P.O. Box 1241
Helena, MT 49624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

BALLARD SPAHR LLP

Leita Walker
Isabella Salomão Nascimento
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Email:walkerl@ballardspahr.com
Email:salomaonascimentoi@ballardspahr.com

Seth D. Berlin
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: berlins@ballardspahr.com

*Attorneys for Defendant VF Outdoor, LLC d/b/a The North Face*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

---

| | |
|---|---|
| **JOHNATHAN TALBOT,** | |
| **Plaintiff**, | |
| **v.** | **Case No. 2:23-cv-00066-BMM** |
| **MANOAH AINUU,** *et al.*, | |
| **Defendants**. | |

---

## MEMORANDUM OF LAW IN SUPPORT OF COMBINED MOTION TO DISMISS AND SPECIAL MOTION FOR EXPEDITED RELIEF BY DEFENDANT VF OUTDOOR, LLC d/b/a THE NORTH FACE

---

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................... iii

EXHIBIT INDEX .................................................................................. viii

INTRODUCTION ................................................................................... 1

FACTS ............................................................................................... 3

I.    THE PARTIES ............................................................................ 3

    A.    The Plaintiff ........................................................................ 3

    B.    The Defendants ................................................................... 3

II.    THE EVENTS AT THE CRYSTAL BAR ....................................... 5

III.    THE EVENTS AFTER THE BARROOM INCIDENT ................... 7

IV.    TALBOT'S LAWSUIT ............................................................... 8

ARGUMENT ....................................................................................... 8

I.    CHOICE OF LAW ...................................................................... 9

    A.    Talbot's State of Residence—Washington—Has the Most
        Significant Relationship with This Multistate Defamation
        Case .................................................................................. 10

    B.    Washington's Anti-SLAPP Act Governs This Action ...................... 10

    C.    Governing Legal Standard ..................................................... 12

II.    TALBOT'S DEFAMATION CLAIM FAILS AS A MATTER OF
    LAW ....................................................................................... 13

    A.    TNF Is Not The "Publisher" Or Otherwise Vicariously
        Liable For The Challenged Speech ......................................... 13

    B.    The Challenged Statements are Absolutely Protected
        Expressions of Opinion ....................................................... 18

i

1.      The Content: Courts routinely treat allegations such as those here as protected expressions of opinion ...................20

2.      The Context: The use of Instagram underscores that the Challenged Statements are non-actionable expressions of opinion ............................................................24

III.   TALBOT'S TORTIOUS INTERFERENCE CLAIMS SIMILARLY FAIL AS A MATTER OF LAW..............................................26

IV.   TALBOT'S PUNITIVE DAMAGES CLAIM ALSO FAILS AS A MATTER OF LAW...................................................................27

V.   THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE ......................................................................28

CONCLUSION ..........................................................................28

ii

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                    **Page(s)**

*Albert v. Loksen*,
    239 F.3d 256 (2d Cir. 2001) ................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................12, 14, 15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..........................................................12, 14, 15, 18

*Bose Corp. v. Consumers Union*,
    466 U.S. 485 (1984) ................................................................................22

*Bretz v. United States*,
    2020 U.S. Dist. LEXIS 166772 (D. Mont. Aug. 12, 2020) ...................3

*Camer v. Seattle Post-Intelligencer*,
    723 P.2d 1195 (Wash. 1986) ........................................................18, 19

*Clark v. Viacom Int'l*,
    617 F. App'x 495 (6th Cir. 2015) ........................................................14

*Clifford v. Trump*,
    339 F. Supp. 3d 915 (C.D. Cal. 2018) ................................................22

*Clifford v. Trump*,
    818 F. App'x 746 (9th Cir. 2020) ......................................11, 23, 28

*Connick v. Myers*,
    461 U.S. 138 (1983)................................................................................12

*Cort v. St. Paul Fire & Marine Ins.*,
    311 F.3d 979 (9th Cir. 2002) ................................................................13

*Crosswhite v. Reuters News & Media*,
    2021 U.S. Dist. LEXIS 246628 (W.D. Va. Dec. 28, 2021)................14

*Dodge v. Evergreen Sch. Dist. #114*,
    56 F.4th 767 (9th Cir. 2022) ................................................................11

iii

*Dodge v. Evergreen Sch. Dist. No. 114*,
    2020 U.S. Dist. LEXIS 135581 (W.D. Wash. July 30, 2020) ............................20

*Duc Tan v. Le*,
    300 P.3d 356 (Wash. 2013) ................................................................13

*Dunlap v. Wayne*,
    716 P.2d 842 (Wash. 1986) ...........................................................19, 24

*Edelman v. Croonquist*,
    2010 U.S. Dist. LEXIS 43399 (D.N.J. Apr. 30, 2010) ......................................20

*Forte v. Jones*,
    2013 U.S. Dist. LEXIS 39113 (E.D. Cal. Mar. 19, 2013) ...................................20

*Gardner v. Martino*,
    563 F.3d 981 (9th Cir. 2009) .......................................................25, 28

*Garnett v. Remedi Seniorcare of Va.*,
    892 F.3d 140 (4th Cir. 2018) ..............................................................18

*Garnier v. O'Connor-Ratcliff*,
    41 F.4th 1158 (9th Cir. 2022) ...........................................................12

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974) .........................................................................27

*Green v. Miss USA*,
    52 F.4th 773 (9th Cir. 2022) ...........................................................8, 9

*Greensun Grp. v. City of Bellevue*,
    436 P.3d 397 (Wash. Ct. App. 2019) ....................................................26

*Herring Networks v. Maddow*,
    8 F.4th 1148 (9th Cir. 2021) ......................................................19, 22, 28

*Hoffer v. State*,
    755 P.2d 781 (Wash. 1988) ...............................................................26

*Hunt v. Liberty Lobby*,
    720 F.2d 631 (11th Cir. 1983) ...........................................................27

iv

*Hunter v. Hartman*,
545 N.W.2d 699 (Minn. Ct. App. 1996)......................................................22, 25

*Hustler Magazine v. Falwell*,
485 U.S. 46 (1988)................................................................................26

*Jankovic v. Int'l Crisis Grp.*,
494 F.3d 1080 (D.C. Cir. 2007).........................................................14

*Jevremovic v. Courville*,
2023 U.S. Dist. LEXIS 139440 (D.N.J. Aug. 10, 2023) ..................25

*Jha v. Khan*,
520 P.3d 470 (Wash. 2022) ...............................................................11

*Kelley v. Howard S. Wright Constr.*,
582 P.2d 500 (Wash. 1978) ...............................................................16

*Knievel v. ESPN*,
223 F. Supp. 2d 1173 (D. Mont. 2002)..........................................3, 22

*Koch v. Goldway*,
817 F.2d 507 (9th Cir. 1987) .............................................................24

*Lokhova v. Halper*,
995 F.3d 134 (4th Cir. 2021) .........................................14, 15, 16, 17

*Maison de France v. Mais Oui!*,
108 P.3d 787 (Wash. Ct. App. 2005).................................................27

*Makaeff v. Trump Univ.*,
736 F.3d 1180 (9th Cir. 2013) ...........................................................11

*McConkey v. Flathead Elec. Coop.*,
2005 MT 334, 330 Mont. 48, 125 P.3d 1121 ....................................19

*McFarlane v. Esquire Magazine*,
74 F.3d 1296 (D.C. Cir. 1996).........................................................27

*Milkovich v. Lorain Journal*,
497 U.S. 1 (1990) .........................................................................18, 22

*Openiano v. Hartford Life & Annuity Ins.*,
    829 F. App'x 829 (9th Cir. 2020) ................................................................12, 16

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ......................................................*passim*

*Pelkowski v. Hovermann*,
    2021 U.S. Dist. LEXIS 259784 (E.D.N.Y. Sept. 9, 2021) ................................25

*Phillips v. GMC*,
    2000 MT 55, 298 Mont. 438, 995 P.2d 1002 .....................................................10

*Price v. Viking Penguin*,
    881 F.2d 1426 (8th Cir. 1989) .........................................................................27

*Ratajack v. Brewster Fire Dep't*,
    178 F. Supp. 3d 118 (S.D.N.Y. 2016) ..............................................................20

*Robel v. Roundup Corp.*,
    59 P.3d 611 (Wash. 2002) ................................................................................19

*Sandmann v. N.Y. Times Co.*,
    78 F.4th 319 (6th Cir. 2023) ...........................................................................23

*Smith v. Sch. Dist. of Phila.*,
    112 F. Supp. 2d 417 (E.D. Pa. 2000).........................................................20, 21

*Snyder v. Phelps*,
    562 U.S. 443 (2011)..........................................................................................11

*Spratt v. Toft*,
    324 P.3d 707 (Wash. 2014) ..............................................................................11

*Squitieri v. Piedmont Airlines*,
    2018 U.S. Dist. LEXIS 25485 (W.D.N.C. Feb. 16, 2018) ................................20

*St. Amant v. Thompson*,
    390 U.S. 727 (1968)..........................................................................................27

*Steam Press Holdings v. Haw. Teamsters & Allied Workers Union,
Local 996*,
    302 F.3d 998 (9th Cir. 2002) ...........................................................................21

vi

*Taskett v. KING Broad.*,
    546 P.2d 81 (Wash. 1976) ...................................................................27

*Tavoulareas v. Piro*,
    759 F.2d 90 (D.C. Cir. 1985)....................................................13, 14

*Time v. Pape*,
    401 U.S. 279 (1971)...................................................................22

*Wingfield v. Dep't of Pub. Health & Hum. Servs.*,
    2020 MT 120, 400 Mont. 70, 463 P.3d 452 ....................................26

**Statutes**

§ 27-1-802, MCA ...................................................................13

RCW 4.105.010.........................................................*passim*

RCW 4.105.020.........................................................1, 28

RCW 4.105.060.........................................................12, 13, 28

RCW 4.105.090.........................................................13

**Other Authorities**

Fed. R. Civ. P. 12 .................................................*passim*

*Restatement (Second) of Conflict of Laws* § 150 ....................................10

*Restatement (Second) of Torts* § 409 ...................................................17

U.S. Const. amend. I .................................................passim

## EXHIBIT INDEX

*Manoah Ainuu*, The North Face Climber ........................................................ Ex. A

Ben Church, *'It was super cool just having that much melanin in Montana': The climbers aiming to boost diversity*, CNN (Mar. 19, 2021) ..............................................................................................Ex. B

Michael Easter, *Learn Functional Fitness From Ice Climber Manoah Ainuu*, Men's Health (Mar. 2, 2022)..............................................................Ex. C

Daniel Duane, Jimmy Chin & Savannah Cummins, *Up, Up, and Away from It All*, N.Y. Times Magazine (Sept. 23, 2020) ..................................... Ex. D

Felecia Wellington Radel, *'I don't think it has really set in': First all-Black team to summit Everest talk historic trek*, USA Today (June 13, 2022) ..............................................................................................Ex. E

Topher Gauk-Roger, *Meet the First All-Black Group of Climbers Attempting to Summit Mount Everest: 'It's Really Powerful'*, People (Feb. 22, 2022) ...................................................................................Ex. F

Manoah Ainuu (@adreadedclimber), Instagram (June 27, 2023) ..................... Ex. G

*Community Guidelines*, Instagram .................................................................. Ex. H

Letter from Leita Walker to Matthew Monforton, Nicholas R. Berry & Ian Prior (Oct. 27, 2023) ..............................................................................Ex. I

Defendant VF Outdoor, LLC d/b/a The North Face ("TNF"), incorrectly sued as "The North Face Apparel Corporation," respectfully submits this memorandum of law in support of its Combined Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6) and Special Motion for Expedited Relief under Revised Code of Washington ("RCW") Section 4.105.020.

## **INTRODUCTION**

This case arises from statements Defendant Manoah Ainuu made on his personal Instagram account, after a night out at a local bar in Bozeman, Montana, during which he had a heated encounter with Plaintiff Johnathan Talbot. According to Ainuu's social media posts, Talbot treated him in a racist fashion. Then, when Ainuu tried to distance himself from Talbot, Talbot pursued him and got in his face in a manner Ainuu perceived as physically threatening. Talbot denies trying to provoke a fight, and professes ignorance as to why his statements upset Ainuu. But Talbot was subsequently terminated by his employer for "show[ing] poor judgment," "both prior to and during [the] incident at the bar" in Bozeman.

Although none of Ainuu's posts about his encounter with Talbot tag, mention, or promote TNF or its products—TNF only learned of Ainuu's posts after they went live, like everyone else on Instagram—Talbot now sues them both for defamation and tortious interference. He claims that TNF is somehow responsible

1

for Ainuu's speech merely because it sponsors him as a climber to promote its brand and products.

Talbot's attempt to hold TNF liable for the speech of an independent contractor is not viable under hornbook defamation law, which requires publication, or any secondary liability theory. Moreover, Talbot's defamation claim fails for the separate reason that the statements he challenges are protected expressions of opinion under both federal constitutional and state common law. Talbot's tag-along tortious interference and punitive damages claims both also fail as a matter of settled law.

Finally, because this is a multistate defamation claim premised on diversity jurisdiction, the substantive law of Talbot's state of residence—Washington—governs this action. This includes its Anti-SLAPP Act,[1] which, under longstanding Ninth Circuit jurisprudence, is a substantive aspect of state law. The statute shields speech on matters of public concern from protracted litigation, and requires Talbot to pay TNF's attorneys' fees and costs where, as here, he has failed to state a claim.

---

[1] "SLAPP" is an acronym for Strategic Lawsuit Against Public Participation.

2

## FACTS[2]

### I.   THE PARTIES.

#### A. The Plaintiff

Talbot is a Washington state resident, who, at the time of the relevant events, worked for Outdoor Research, LLC ("OR"), a Seattle-based company that manufactures and sells outdoor sports gear and apparel. Compl. ¶¶ 8, 54. Talbot started working for OR in March 2023, *id*. ¶ 56, and was subsequently fired in June 2023, *id*. ¶¶ 77-78, 82.

#### B. The Defendants

TNF is a leading developer of outdoor gear. *Id*., Ex. 1 at 4. Its products include "[h]igh performance outdoor apparel, footwear, equipment, [and] accessories" "designed for extreme winter sport activities." *Id*. at 5. Among other things, to promote its products, TNF enters into "sponsorship contracts with a number of athletes." *Id.* at 14.

---

[2] Facts herein drawn from the Complaint are accepted as true solely for purposes of this motion. In addition to the Complaint, "the Court may also consider documents attached to the pleadings" or "incorporated into the pleadings by reference," without converting the motion into one for summary judgment. *Bretz v. United States*, 2020 U.S. Dist. LEXIS 166772, at *7 (D. Mont. Aug. 12, 2020). "The incorporation by reference doctrine allows a court to consider 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 223 F. Supp. 2d 1173, 1176 (D. Mont. 2002), *aff'd*, 393 F.3d 1068 (9th Cir. 2005). Copies of the documents cited herein are attached as exhibits to the Declaration of Leita Walker ("Walker Decl.").

3

Ainuu is one such sponsored athlete, with whom TNF contracts to promote its brand and its products. *Id.* ¶¶ 22 (referencing "About Us" page on TNF's website), 31 (same). Born in Compton, California, Ainuu is a first-generation American, whose parents immigrated to the U.S. from Samoa and Ethiopia. Walker Decl. Ex. A.

Today, Ainuu is a resident of Bozeman, Montana, and a professional climber who has been featured in major media outlets, including *CNN*, *Men's Health*, *USA Today*, and *People* magazine. Compl. ¶¶ 35-37 (attached to Walker Decl. as Exs. B-F). In May 2022, Ainuu made history as a member of the first all-Black team to summit Mount Everest. *See* Walker Decl. Exs. E, F.

Ainuu maintains a social media presence on Instagram under the handle @adreadedclimber. Compl. ¶ 32 (hyperlinking to https://www.instagram.com/adreadedclimber/). The "bio" section of his Instagram profile states: "🤝🏾♥Ethiopian&SamoanᴇᴛᴀS 🏴 Vegan-Animals=friends not food🦃 Music is a beautiful thing-Mac Miller. Bzn, MT @thenorthface @smartwool @fullcircleeverest." *Id.* Ex. 3. Ainuu uses his Instagram account to document his own thoughts, opinions, and experiences, and even to promote other brands not affiliated with TNF. *See, e.g.*, *id.* Ex. 5; Walker Decl. Ex. G (tagging other outdoor gear companies, such as Patagonia, Yeti, and Arcteryx).

4

On occasion, Ainuu creates content specifically for TNF. For example, in October 2020, in light of the national racial reckoning then underway, TNF asked its sponsored athletes to "creat[e] personal pledge videos that share their individual stories and aspirations," Compl. Ex. 4 at 4, which it then shared on the company YouTube channel, Compl. ¶ 42 (hyperlinking to *Reset Normal: Manoah Ainuu/The North Face*, YouTube (Oct. 27, 2020), https://www.youtube.com/watch?v=wVp09EPN2qE).[3]

## II.   THE EVENTS AT THE CRYSTAL BAR.

This case stems from a late-night dispute between Talbot and Ainuu at a Bozeman bar. Compl. ¶¶ 53, 65.

Over the summer, Talbot's employer, OR, sent him to Bozeman to conduct a focus group on a tentative new product line. *Id*. ¶¶ 54, 55; *id*. Ex. 6 ("Talbot Decl.") ¶ 5. On June 20, 2023, Talbot headed from a team dinner to the Crystal, a nearby bar. Compl. ¶ 59; Talbot Decl. ¶ 6.

According to Talbot, he met Ainuu outside and introduced himself. Compl. ¶ 57; Talbot Decl. ¶ 6. The conversation quickly devolved, with Ainuu becoming upset at something Talbot said to him. Compl. ¶ 58. According to statements

---

[3] The Complaint claims that Ainuu's pledge video "highlighted" his "position as a 'full-time professional climber on the North Face team'" and "discussed [his] upcoming 'all Black and Brown expedition to attempt Mount Everest." Compl. ¶¶ 43, 44. The video, however, does not include any such statements.

5

Ainuu later made on Instagram, and incorporated in the Complaint: Talbot peppered Ainuu with questions "about diversity," but when Ainuu attempted to respond, Talbot repeatedly cut him off and "got very defensive." *Id*. ¶¶ 65, 66(b). Ainuu ended the discussion, telling Talbot he was "racist and entitled." *Id.* ¶¶ 58, 65. Ainuu then walked into the bar to get away from Talbot. *Id*. ¶¶ 59, 65.

Talbot acknowledges that, rather than let the disagreement lie, he pursued Ainuu into the bar. *Id*. ¶¶ 59, 62, 65. According to Talbot, once inside, he approached Ainuu "to speak with [him] to understand his anger and allegations of racism." *Id*. ¶ 62. According to Ainuu, Talbot "came inside and tried to shake [his] hand" and "just started apologizing over and over again." *Id*. ¶¶ 65, 66(a).

The conversation between Talbot and Ainuu again took a turn, and the bartender intervened. *Id*. ¶ 61. According to Ainuu's posts, in the midst of apologizing to him, Talbot "squared up to [him]" and "got right in [Ainuu's] face," claiming he (Talbot) "didn't do anything wrong." Compl. ¶¶ 65, 66(a), 66(b). Ainuu perceived all this as "an invitation to fight," *id*. ¶ 66(a), but he did not engage.

While Talbot denies that he was attempting to provoke a physical confrontation with Ainuu or that his comments could be perceived as racially insensitive, *id*. ¶ 62, he does not actually challenge many of Ainuu's statements, including that Talbot "squared up to" him or "got right in [Ainuu's] face," *see id*.

6

¶¶ 84(a)-(k) (listing the challenged statements). In Talbot's retelling, he admits he told the bartender that "Ainuu was upset about something about something I had said." Talbot Decl. ¶ 8.

## III.   THE EVENTS AFTER THE BARROOM INCIDENT.

In the early morning hours of June 21, Ainuu posted to Instagram a video and seven written statements about his encounter with Talbot. Compl. ¶¶ 64-68. Dave Burleson, who was then a Global Senior Athlete Coordinator for TNF, reposted without any comment one of Ainuu's statements to his personal, non-TNF affiliated Instagram page. *Id*. ¶ 67.

Several hours later, someone from OR, having seen Ainuu's post, called Talbot about the altercation and directed Talbot to return to Seattle. Talbot Decl. ¶ 11. On June 22, at OR's request, Ainuu spoke with OR about the incident with Talbot in Bozeman. Compl. ¶¶ 71-72. The next day, OR placed Talbot on administrative leave. *Id.* ¶ 74. On June 29, OR informed Talbot he was being terminated, effective July 14, for "show[ing] poor judgment, in [his] actions in Bozeman, both prior to and during [the] incident at the bar." *Id*. ¶¶ 77-78.

Unaware of this development, on July 4, Ainuu again took to Instagram over what he perceived to be OR's lack of action. *Id*. ¶¶ 79-81. He posted a video and several written statements directed at OR for its perceived failure to hold Talbot accountable. *Id*.

7

## IV.   TALBOT'S LAWSUIT.

Talbot is suing both Ainuu and TNF, asserting counts against each for defamation and intentional interference with prospective economic advantage. Compl. ¶¶ 83-121. Talbot challenges eleven specific Instagram statements by Ainuu (the "Challenged Statements"). *Id*. ¶¶ 84(a)-(k).

With respect to TNF, Talbot claims the company is somehow responsible for speech that Ainuu, one of its independent contractors, published on his own Instagram account, *id*. ¶¶ 104, 109-110, even though TNF did not author, edit, publish, or republish it. Talbot alleges the Challenged Statements falsely accuse him of making racist comments and trying to fight Ainuu. *Id*. ¶ 105. As a result, he seeks presumed, actual, and punitive damages, all in unspecified amounts. *Id*. at 48.

As explained below, Talbot's claims against TNF are foreclosed by hornbook defamation law since it is not the publisher. And because Ainuu's statements constitute protected expressions of opinion based on his subjective perceptions of events, Talbot cannot state a claim against either defendant. His case should be dismissed with prejudice.

## **ARGUMENT**

"[T]he First Amendment's protections extend to … unnecessary *litigation* that chills speech. This is why federal courts have emphasized the importance of

resolving First Amendment cases at the earliest possible junction." *Green v. Miss USA*, 52 F.4th 773, 800 (9th Cir. 2022). This Court should follow that "well-trodden path," and the Washington Anti-SLAPP Act, by swiftly dismissing this action, so that speech is not unconstitutionally chilled "through unnecessary and protracted litigation." *Id.*

Under applicable law, Talbot cannot state a viable claim against TNF for multiple reasons. *First*, TNF did not "publish," in any sense of the word, the Challenged Statements. *Second*, the challenged speech—essentially, that Talbot "made racist comments to Ainuu" and "tried to fight him," Compl. ¶ 105—are, in context, absolutely protected statements of opinion and therefore not actionable. *Third*, Talbot's tortious interference claim fails both because he has not stated a viable defamation claim and because he has not pleaded facts establishing the elements of that tort. *Fourth*, applicable law does not permit punitive damages. *Finally*, because the Complaint is fatally deficient and amendment would be futile, it must be dismissed with prejudice under both Rule 12 and the Washington Anti-SLAPP Act.

## I.    CHOICE OF LAW.

This defamation case involves the application of both federal constitutional law, governed by Ninth Circuit precedent, and state common and statutory law, governed by Washington law, including its Anti-SLAPP Act.

<div align="center">9</div>

### A.     Talbot's State of Residence—Washington—Has the Most Significant Relationship with This Multistate Defamation Case.

In a "multistate defamation" case, where the parties reside in different states and the speech at issue was published through a mass medium such as Instagram, courts must decide, under the forum state's choice-of-law rules, which state's substantive law governs. For tort claims, Montana follows the "most significant relationship" approach of the *Restatement (Second) of Conflict of Laws* ("*Restatement*"). *See Phillips v. GMC*, 2000 MT 55, ¶ 21, 298 Mont. 438, 995 P.2d 1002. The *Restatement* provides that, in a multistate defamation case, "the state of most significant relationship will usually be the state where the [plaintiff] was domiciled at the time," because that is where he suffers the greatest injury to his reputation. *Restatement* § 150. Here, Talbot was and is a Washington state resident, who was working for a Washington-based company. Compl. ¶¶ 8, 54. He was summoned back to Washington by OR, which terminated his employment there. *Id*. ¶¶ 70, 77. Washington law therefore governs the state law issues in this case.

### B.     Washington's Anti-SLAPP Act Governs This Action.

Washington's Anti-SLAPP Act, the Uniform Public Expression Protection Act, applies to any "cause of action asserted in a civil action against a person based on the person's … [e]xercise of the right of freedom of speech … guaranteed by the United States Constitution or Washington state Constitution, on a matter of

public concern." RCW 4.105.010(2)(c). The Ninth Circuit has long held that anti-SLAPP statutes confer substantive rights and therefore apply in diversity actions, provided they do not conflict (or can be harmonized) with the Federal Rules of Civil Procedure. *See Makaeff v. Trump Univ.*, 736 F.3d 1180, 1184 (9th Cir. 2013) (Wardlaw, J. concurring) (explaining denial of petition for rehearing *en banc* seeking to reverse established Circuit precedent on this issue); *Clifford v. Trump*, 818 F. App'x 746, 750 (9th Cir. 2020) (affirming application of Texas anti-SLAPP law and dismissal of defamation claim with prejudice where tweet at issue was protected opinion). Because Washington's Anti-SLAPP Act relies on the same "failure to state a claim" standard as Rule 12(b)(6), there is no conflict and the statute applies.

Under that law, "[w]hether speech is a matter of public concern is a question of law" determined "by the content, form, and context of a given statement, as revealed by the whole record." *Jha v. Khan*, 520 P.3d 470, 477 (Wash. 2022). "[S]peech involves 'matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Id.* at 478 (quoting *Spratt v. Toft*, 324 P.3d 707, 713 (Wash. 2014); *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).

Allegations of "racism" unquestionably address a "matter[] of public concern." *Dodge v. Evergreen Sch. Dist. #114*, 56 F.4th 767, 777 (9th Cir. 2022);

*see also Connick v. Myers*, 461 U.S. 138, 148 n.8 (1983) (describing "racial discrimination" as "a matter inherently of public concern"). Thus, Washington's Anti-SLAPP Act applies to the Instagram posts at issue. *See Garnier v. O'Connor-Ratcliff*, 41 F.4th 1158, 1162-63 (9th Cir. 2022) ("social media sites can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard[,] … facilitating communication and stirring public debate" (cleaned up)).

### C.  Governing Legal Standard.

Under both Rule 12(b)(6) and the Washington Anti-SLAPP Act, the question is whether the complaint fails to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6); RCW 4.105.060. To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The Court "draw[s] on its judicial experience and common sense," *id.* at 679, and determines whether the factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Where documents properly considered on a motion to dismiss "'contradict' allegations in the complaint, the court need not accept such allegations as true," and the exhibits govern. *Openiano v. Hartford Life & Annuity Ins.*, 829 F. App'x 829, 830 (9th Cir. 2020).

Under the Washington Anti-SLAPP Act, where the moving party has established that (a) the Act applies and (b) the pleading fails to state a cause of action, the action must be dismissed with prejudice, and the prevailing party is entitled to its costs and reasonable attorneys' fees. *See* RCW 4.105.060, 4.105.090.

## II.   TALBOT'S DEFAMATION CLAIM FAILS AS A MATTER OF LAW.

### A.   TNF Is Not The "Publisher" Or Otherwise Vicariously Liable For The Challenged Speech.

Under Washington law, a defamation plaintiff must prove that the defendant actually published the challenged statements. *See Duc Tan v. Le*, 300 P.3d 356, 363 (Wash. 2013); *see also* § 27-1-802, MCA (same under Montana law). Talbot's claim against TNF fails this basic requirement because the speech he challenges is not TNF's, and none of Talbot's theories for holding TNF liable for Ainuu's speech is viable.

***Publication***: In defamation cases, "publication is a term of art." *Cort v. St. Paul Fire & Marine Ins.*, 311 F.3d 979, 985-86 (9th Cir. 2002) (cleaned up); *see also Albert v. Loksen*, 239 F.3d 256, 269 (2d Cir. 2001) (same). To satisfy the requirement, Talbot must show that either TNF *authored* or *edited* the challenged Instagram posts or is the *publisher* of those statements. *See Tavoulareas v. Piro*, 759 F.2d 90, 136-37 (D.C. Cir. 1985) (even individual who "participated in the investigation" of a news report, but who did not take "part in the *actual* writing or editing" of the article, "played no role in the actual preparation of the story," and

13

had no authority over its "*final* publication" was not a "publisher"). TNF did not author, edit, publish, or republish the Challenged Statements—on Instagram or elsewhere. Talbot does not allege that TNF had any authority or control over Ainuu's publication on his Instagram account of statements about his experiences at a bar. The Court need go no further to dismiss Talbot's defamation claim against TNF.[4]

**Respondeat Superior:** Rather than plausibly plead publication, Talbot seeks to hold TNF liable for Ainuu's speech under the doctrine of *respondeat superior*. The Complaint, however, does not allege that Ainuu is a TNF employee. While Talbot makes a single, passing claim that Ainuu was "acting with the scope of his employment," Compl. ¶ 9, he otherwise repeatedly acknowledges that the relationship between TNF and Ainuu is one only of "sponsorship." *See id.* ¶¶ 1, 17, 31, 53, 104, 116. Talbot's sole "[t]hreadbare," "conclusory" statement does not satisfy the Rule 12 plausibility standard, which requires factual allegations to rise

---

[4] Burleson's "re-share" of one of Ainuu's posts, without any commentary, Compl. ¶ 67, is not republication as a matter of law. *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1087 (D.C. Cir. 2007) ("[C]opying [a print] article by a reader—even for wide distribution—does not constitute a new publication. The equivalent occurrence should be treated no differently on the Internet." (cleaned up)); *Clark v. Viacom Int'l*, 617 F. App'x 495, 505 (6th Cir. 2015) (same, citing *Jankovic*); *Crosswhite v. Reuters News & Media*, 2021 U.S. Dist. LEXIS 246628, at *6-7 (W.D. Va. Dec. 28, 2021) (Reuters employee's tweet linking to article *and* adding commentary still not republication (citing *Lokhova v. Halper*, 995 F.3d 134, 142-44 (4th Cir. 2021)).

14

above the "speculative level." *Ashcroft*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555.

In *Lokhova v. Halper*, for example, the plaintiff sought to hold NBC vicariously liable for the speech of one of its contributors, Malcolm Nance, who tweeted the challenged statements on his personal account. 441 F. Supp. 3d 238, 244, 248 (E.D. Va. 2020), *aff'd*, 995 F.3d 134 (4th Cir. 2021). The plaintiff alleged that "at all times relevant …, NBCUniversal/MSNBC acted by and through its authorized agents, including Nance," and that Nance "is the chief terrorism analyst on MSNBC," "a regular contributor to the business of MSNBC," "maintains and operates an official Twitter account on which he conducts the business of NBC/MSNBC," and posted the tweets "during normal business hours." *Id*. at 263-64 (cleaned up). The complaint also cited Nance's Twitter profile biography, which stated "US Intelligence +36 yrs. Expert Terrorist Strategy, Tactics, Ideology. Torture, Russian Cyber! NYT Bestselling Author, Navy Senior Chief/Jedi Master, NBC/MSNBC." *Id*. at 264 (cleaned up). These facts, the district court concluded, at best suggested Nance "holds himself as an agent of MSNBC," but did not establish an employment relationship, leading the Court to dismiss. *Id*.

So too here. At most, Talbot alleges that Ainuu is "a paid climber and brand ambassador" for TNF; TNF's website identifies him as a sponsored athlete; and

Ainuu's Instagram bio tags TNF's account. Compl. ¶¶ 1, 31, 33.[5] Meanwhile, documents attached to and incorporated by reference in the Complaint confirm that Ainuu is an independent contractor. For example, TNF's SEC filing differentiates between employees and sponsored talent with whom the company has "sponsorship contracts," indicating their limited scope. Compl. Ex. 1 at 8, 14. Like MSNBC in *Lokhova*, TNF is just one of several entities tagged in Ainuu's Instagram bio—toward the end of a long list of self-descriptors—and he has published several posts tagging other companies, some of which are TNF competitors. *See, e.g.*, Walker Decl. Ex. G. Finally, one of the articles cited in the Complaint notes that Ainuu works in a local Bozeman restaurant to support himself. *Id.* Ex. D. In other words, Talbot's own pleadings demonstrate Ainuu is an independent contractor. The Court need not accept Talbot's suggestion to the contrary as true. *See Openiano*, 829 F. App'x at 830.

Because Talbot relies on a theory of *respondeat superior*, but Ainuu is not a TNF employee, Talbot's defamation claim against TNF fails. *See Kelley v. Howard S. Wright Constr.*, 582 P.2d 500, 505 (Wash. 1978) ("one who engages an independent contractor" is "not liable for injuries … resulting from their work");

---

[5] While the Complaint also claims that Ainuu is a "full-time professional climber on the North Face team," as explained above, *supra* n.3, the video from which this allegation is purportedly taken does not contain such a statement. As such, the Court properly disregards it.

*Restatement (Second) of Torts* § 409 ("the employer of an independent contractor is not liable for … harm caused to another by an act … of the contractor").

**Agency Theory:** Even assuming *arguendo* that that an agency theory of vicarious liability were viable *and* that Ainuu were deemed TNF's agent for at least some purposes, it simply is not the law that a principal is liable for all speech by its employees or agents, no matter where or how made. *Lokhova*, 441 F. Supp. 3d at 264 ("regardless of … whether Nance is an NBCUniversal employee or agent," holding an employer "liable for every tweet issued by one of its employees or agents," without more, "would lead to undesirable consequences"). Indeed, the Fourth Circuit ruled that, even if acts by one's agent could in theory establish liability, the "only reasonable conclusion is that Nance was operating his Twitter account in his personal capacity and not with the actual or apparent authority of NBCUniversal." *Lokhova*, 995 F.3d at 147. So too here.

Talbot has not alleged—and cannot allege—that Ainuu made the Challenged Statements with TNF's actual or apparent authority. Rather, Ainuu's posts were made well outside of business hours, on his personal account, about his take on a late-night interaction at a bar. *See* Compl. ¶¶ 64-68, 79-81. The Challenged Posts—none of which tag, mention, or promote TNF or its products—do not further TNF's business interests. *See id.* At most, Talbot alleges that Ainuu's comments were consistent with "social justice" views espoused by TNF, but such

parallel conduct does not establish concerted action or agency. *See, e.g.*, *Twombly*, 550 U.S. at 556-57.

As the Fourth Circuit eloquently put it in another case,

> [i]t is difficult to see how employers could prevent all offensive or defamatory speech at the proverbial watercooler without transforming the workplace into a virtual panopticon. For all its undoubted value, *respondeat superior* and the resultant fear of liability should not propel a company deep into the lives of its workers whose speech interests deserve respect.

*Garnett v. Remedi Seniorcare of Va.*, 892 F.3d 140, 144 (4th Cir. 2018). Because Talbot has not and cannot plausibly allege that TNF either published or is somehow vicariously responsible for the posts, his defamation claim against TNF must be dismissed with prejudice.

## B. The Challenged Statements are Absolutely Protected Expressions of Opinion.

Talbot's defamation claims fail against *both* Defendants for the independent reason that the Challenged Statements are protected expressions of opinion. In *Milkovich v. Lorain Journal*, the Supreme Court explained that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." 497 U.S. 1, 20 (1990). Washington courts likewise recognize that "expressions of opinion are protected and thus are not actionable," both "under the First Amendment," *Camer v. Seattle Post-Intelligencer*, 723 P.2d 1195, 1201 (Wash. 1986), and under

18

Washington "[c]ommon law principles," *Dunlap v. Wayne*, 716 P.2d 842, 848 (Wash. 1986); *see also McConkey v. Flathead Elec. Coop.*, 2005 MT 334, ¶ 49, 330 Mont. 48, 125 P.3d 1121 (same under Montana law). As a matter of both federal constitutional and state substantive law, Ainuu's statements were absolutely protected opinion.

Whether a challenged statement is one of fact or opinion is a question of law for the court. *See Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995); *Robel v. Roundup Corp.*, 59 P.3d 611, 621-22 (Wash. 2002). Under the First Amendment, courts must examine the "totality of the circumstances," including: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting objective fact; (2) whether the defendant used figurative or hyperbolic language that negates that impression; and (3) whether the statement in question is susceptible of being proved true or false." *Herring Networks v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021). Washington courts consider similar factors in determining whether a statement is protected opinion under state law. *See Dunlap*, 716 P.2d at 848.

Under both frameworks, the court looks at the ***content*** of the statements, including whether they used loose, figurative language and are susceptible to being proven true or false, and their surrounding ***context***, including the medium used and recipient audience (here, Instagram).

19

### 1.    The Content: Courts routinely treat allegations such as those here as protected expressions of opinion.

Talbot must prove that the Challenged Statements—essentially, that Talbot is a racist who tried to fight with Ainuu, *see* Compl. ¶ 105—are false. But to be false, a statement must be factual. Courts around the country have held that statements like those here are non-actionable statements of opinion. *See Dodge v. Evergreen Sch. Dist. No. 114*, 2020 U.S. Dist. LEXIS 135581, at \*17 (W.D. Wash. July 30, 2020) (dismissing defamation claim and denying leave to amend as futile because "whether someone is racist … is not a factual question," but "a subjective matter not open to conclusive proof one way or the other"); *Squitieri v. Piedmont Airlines*, 2018 U.S. Dist. LEXIS 25485, at \*12-13 (W.D.N.C. Feb. 16, 2018) ("Statements indicating that Plaintiff is racist are clearly expressions of opinion that cannot be proven as verifiably true or false.") (collecting cases); *Ratajack v. Brewster Fire Dep't*, 178 F. Supp. 3d 118, 165 (S.D.N.Y. 2016) (statement "that Plaintiff was a racist … is nonactionable opinion"); *Forte v. Jones*, 2013 U.S. Dist. LEXIS 39113, at \*15 (E.D. Cal. Mar. 19, 2013) ("[T]he allegation that a person is a 'racist' … is not actionable because the term 'racist' has no factually-verifiable meaning."); *Edelman v. Croonquist*, 2010 U.S. Dist. LEXIS 43399, at \*17-18 (D.N.J. Apr. 30, 2010) ("The … characterization of [plaintiffs] as racists is a subjective assertion, not sufficiently susceptible to being proved true or false to constitute defamation."); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429

(E.D. Pa. 2000) (statement that plaintiff was racist was perhaps "unflattering, annoying and embarrassing" but also "non-fact based rhetoric"). This case is no different.

The Complaint all but admits the subjective nature of Ainuu's accusations of "racism," noting, for example, that "Ainuu's philosophy of using his public platform to speak out against *what he defines as racism* aligns with North Face's use of its public platform to speak out against *what it defines as racism*." Compl. ¶ 45 (emphases added). Thus, Talbot himself recognizes there are varying and imprecise definitions about what is "racist." Particularly in circumstances involving one person's judgment surmising another's motivations, such an allegation is not understood as a statement of fact. *See Partington*, 56 F.3d at 1156 ("If it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, … the statement is not actionable.").

Likewise, Ainuu's perception that Talbot "tried to fight him" arose in the context of a heated, charged encounter, laced with perceived racial undertones, and is considered in that light. *See Steam Press Holdings v. Haw. Teamsters & Allied Workers Union, Local 996*, 302 F.3d 998, 1006 (9th Cir. 2002) (In "a heated and volatile setting, even seemingly 'factual' statements take on an appearance more closely resembling opinion than objective fact"). Ainuu's claim that Talbot's statements and demeanor was an invitation to fight is properly understood as

expressing his "interpretation[]" of a situation "that bristled with ambiguities." *See Time v. Pape*, 401 U.S. 279, 290 (1971); *see also Bose Corp. v. Consumers Union*, 466 U.S. 485, 512 (1984) ("description of what [the author] had actually perceived" understood as opinion); *Hunter v. Hartman*, 545 N.W.2d 699, 707 (Minn. Ct. App. 1996) (citing *Time* and *Bose* in finding statements on talk radio show were nonactioanble opinion and stating, "remarks on a subject lending itself to multiple interpretations cannot be the basis of a successful defamation action because as a matter of law no threshold showing of 'falsity' is possible in such circumstances").

This is underscored by Ainuu's use of "loose" or "figurative" language, including emojis, which further "negate[s] the impression" that he was offering a dry recitation of facts. *Milkovich*, 497 U.S. at 21; *Knievel*, 393 F.3d at 1075 (opinion where "the author used 'loose, figurative, and hyperbolic' speech throughout"). Indeed, such loose, emoji-laden language can transform into opinion statements that, in isolation, might sound factual or verifiable. *See Herring*, 8 F.4th at 1160 (statement that network "literally is paid Russian propaganda" was, in context, protected opinion despite use of "literally" and allegation of payment that was otherwise "susceptible of being proven true or false"); *Clifford v. Trump*, 339 F. Supp. 3d 915, 926 (C.D. Cal. 2018) (even though tweet accusing plaintiff of lying was "verifiable as false," in context, its "incredulous tone" which was

"pointed, exaggerated, and heavily laden with emotional rhetoric," made it non-factual), *aff'd*, 818 F. App'x 746 (9th Cir. 2020).

The Sixth Circuit recently followed this approach in affirming a judgment on a defamation claim arising out of an alleged confrontation between a Native American man, Nathan Phillips, and a MAGA-hat-wearing, white student, Nicholas Sandmann. *See Sandmann v. N.Y. Times Co.*, 78 F.4th 319, 321 (6th Cir. 2023). The interaction between Phillips and Sandmann went viral, and several media outlets quoted Phillips' description of the encounter, including that Sandmann "just blocked my way and wouldn't allow me to retreat." *Id*. at 323. The question was whether Phillips' statements, known as the "blocking statements," were verifiable statements of fact or protected opinion. *Id*. at 323, 329-30. The Sixth Circuit ruled that, because "the blocking statements here reflect Phillips's perception of Sandmann's intent," they were pure opinion. *Id*. at 331. The Court emphasized that "there is no bright-line rule that statements based on sensory perceptions are necessarily factual"; indeed, the statements were "all dependent on perspective" and therefore protected opinion. *Id*. at 330, 332.

Ainuu's followers would likewise understand the challenged Instagram posts to convey his perception of Talbot's statements and demeanor. Indeed, both Ainuu's posts themselves and their context (discussed below) confirm that he shared them "to offer [his] personal viewpoint" and that readers would view them

to "learn of [his] personal perspective," rather than to obtain a "dry description of the facts." *Partington*, 56 F.3d at 1153.[6]

In these circumstances, the law is clear that such statements, expressing his perception of Talbot's conduct and motives—including that they were racist and conveyed physical menace—are protected expressions of opinion.[7]

## 2. *The Context: The use of Instagram underscores that the Challenged Statements are non-actionable expressions of opinion.*

As then-Judge Kennedy explained, a statement's context is often "determinative that a statement is opinion and not fact." *Koch v. Goldway*, 817 F.2d 507, 509 (9th Cir. 1987) (asking whether plaintiff was a "Nazi war criminal" was, in context, protected opinion). The medium on which Ainuu posted the Challenged Statements and the audience to whom they were published further compel the conclusion that the statements are non-actionable opinion. *See Dunlap*, 716 P.2d at 848.

---

[6] Talbot does not challenge Ainuu's other subjective characterizations of the encounter—for example, that Talbot "squared up to" him and "got right in [his] face like this," *compare* Compl. ¶ 65 *with id.* ¶ 84 (list of Challenged Statements). Not only are those unchallenged statements protected opinions for the same reason, but they form part of the context for the Challenged Statements and further negate the impression that Ainuu was communicating unvarnished statements of fact.

[7] As explained above, *supra* n.4, Burleson's repost does not constitute republication, but even if it did, it would constitute non-actionable opinion for similar reasons as those applicable to Ainuu's underlying post.

Multiple courts have identified Instagram and similar platforms as fora that "convey[] a strong signal to a reasonable reader that the statements are [a] defendant's opinion." *Jevremovic v. Courville*, 2023 U.S. Dist. LEXIS 139440, at *17 (D.N.J. Aug. 10, 2023); *see also Pelkowski v. Hovermann*, 2021 U.S. Dist. LEXIS 259784, at *12 (E.D.N.Y. Sept. 9, 2021) (collecting cases). Instagram itself describes its platform as a "place for inspiration and expression," where people share their experiences and perspectives, including to "condemn, raise awareness, or educate" about "important" events. Walker Decl. Ex. H. Indeed, social media is the Internet-era equivalent to talk radio, a free-wheeling medium courts have found is rife with "the often exaggerated and uncareful exchange of vehemently held opinions," such that the audience "understand[s] the atmosphere of overstatement and 'take[s] such railings with a grain of salt.'" *Hunter*, 545 N.W.2d at 709; *see also Gardner v. Martino*, 563 F.3d 981, 988 (9th Cir. 2009) (accusation of "lying" was protected opinion in context of "a radio talk show program" that included "drama, hyperbolic language … and heated controversy").

Because both the content and the context of Ainuu's Instagram posts confirm that they are nonactionable expressions of opinion, Talbot's defamation claims should be dismissed with prejudice.

25

## III.   TALBOT'S TORTIOUS INTERFERENCE CLAIMS SIMILARLY FAIL AS A MATTER OF LAW.

Talbot's tortious interference claims are based exclusively on Ainuu's allegedly defamatory statements about him. As the Supreme Court has held, causes of action arising out of speech—however styled—are subject to the panoply of constitutional limits on defamation claims. *See, e.g.*, *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988). In other words, because Talbot has not pleaded (and cannot plead) a plausible defamation claim, his tag-along claims must be dismissed.

His claims also fail on the merits. Under Washington law, tortious interference requires, among other things, "an improper purpose or … means" and "resultant damage." *Greensun Grp. v. City of Bellevue*, 436 P.3d 397, 405 (Wash. Ct. App. 2019) (cleaned up); *see also Wingfield v. Dep't of Pub. Health & Hum. Servs.*, 2020 MT 120, ¶ 8, 400 Mont. 70, 463 P.3d 452 (same under Montana law). *First*, Talbot's failure to state a viable defamation claim necessarily means any interference was neither tortious nor improper.

*Second*, Talbot cannot show that OR fired him *as a result of* Ainuu's speech. The "resultant damage" element requires both factual and legal causation. *Hoffer v. State*, 755 P.2d 781, 791 (Wash. 1988). According to Talbot, OR terminated him "because he 'showed poor judgment, in [his] actions in Bozeman, both ***prior to*** and during [the] incident at the bar." Compl. ¶ 77 (emphasis added); *see* Talbot Decl.

26

¶ 16. Because Talbot declares, under penalty of perjury, that OR terminated him based on conduct "prior to" any encounter with Ainuu, he cannot plausibly allege the required "but for" causation.

## IV.   TALBOT′S PUNITIVE DAMAGES CLAIM ALSO FAILS AS A MATTER OF LAW.

Finally, even if Talbot's tort claims survived, his claim for punitive damages cannot. In Washington, plaintiffs are *squarely foreclosed* from recovering punitive damages. *See Taskett v. KING Broad.*, 546 P.2d 81, 86 (Wash. 1976); *Maison de France v. Mais Oui!*, 108 P.3d 787, 799 (Wash. Ct. App. 2005).

Even if they were not entirely foreclosed by state law, to recover punitive damages Talbot is required under the First Amendment to plead facts that, if proven, would constitute clear and convincing evidence that the challenged statements were published with actual malice. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Actual malice requires that, at the time of publication, the defendant had "knowledge that [the statement] was false" or published it "with a high degree of awareness of [its] probable falsity." *St. Amant v. Thompson*, 390 U.S. 727, 728, 731 (1968). Here, where TNF only learned about the statements after publication, Talbot has not and cannot plead actual malice as to TNF.[8]

---

[8] Nor could any cobbled-together actual malice argument against Ainuu be imputed back to TNF. *See McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1303 (D.C. Cir. 1996); *Price v. Viking Penguin*, 881 F.2d 1426, 1446 (8th Cir. 1989); *Hunt v. Liberty Lobby*, 720 F.2d 631, 649 (11th Cir. 1983).

27

## V.     THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE.

Washington's Anti-SLAPP Act requires dismissal with prejudice. *See* RCW

4.105.060. But even under Rule 12, because no amount of repleading will cure the

Complaint's many deficiencies, dismissal should be with prejudice. *Herring*, 8

F.4th at 1160-61 (affirming order granting anti-SLAPP motion and dismissing with

prejudice where challenged statement was protected opinion); *Clifford*, 818 F.

App'x at 750 (same); *Gardner*, 563 F.3d at 991-92 (affirming denial of leave to

amend); *Partington*, 56 F.3d at 1162 (same). Not only is amendment futile, but

dismissal with prejudice would vindicate the important federal and state interests in

shielding protected speech from protracted and ultimately meritless litigation.[9]

## <u>CONCLUSION</u>

TNF respectfully requests that the Court dismiss the Complaint with

prejudice and award its attorneys' fees and costs under RCW 4.105.090, affording

the parties sixty (60) days to negotiate their amount and, if unsuccessful, directing

TNF to file a statement of them for review by the Court.

---

[9] As required, on October 27, TNF provided Talbot written notice of its intent to move for relief under the Washington Anti-SLAPP Act and would seek recovery of its attorneys' fees and costs. *See* RCW4.105.020; Walker Decl. Ex. I.

Respectfully submitted this 18th day of December, 2023.

By: */s/ Peter Michael Meloy*
Peter Michael Meloy
**MELOY LAW FIRM**
P.O. Box 1241
Helena, MT 59624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

By: */s/ Leita Walker*
Leita Walker*
Isabella Salomão Nascimento*
**BALLARD SPAHR LLP**
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Facsimile: (612) 371-3207
Email: walkerl@ballardspahr.com
Email: salomaonascimentoi@ballardspahr.com

Seth D. Berlin*
**BALLARD SPAHR LLP**
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
Email: berlins@ballardspahr.com

*Admitted *pro hac vice*

*Attorneys for Defendant VF Outdoor, LLC d/b/a The North Face*

29

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing **Memorandum of Law in support of Combined Motion to Dismiss and Special Motion for Expedited Relief** complies with Local Rule 7.1, containing 6,496 words, excluding only those items listed in the rule.

/s/ *Leita Walker*
Leita Walker

## CERTIFICATE OF SERVICE

I hereby certify that on 18 December 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record pursuant to the Local Rules.

/s/ *Leita Walker*
Leita Walker

MELOY LAW FIRM

Peter Michael Meloy
P.O. Box 1241
Helena, MT 49624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

BALLARD SPAHR LLP

Leita Walker
Isabella Salomão Nascimento
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Email:walkerl@ballardspahr.com
Email:salomaonascimentoi@ballardspahr.com

Seth D. Berlin
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: berlins@ballardspahr.com

*Attorneys for Defendant VF Outdoor, LLC d/b/a The North Face*

_____

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| **JOHNATHAN TALBOT,**<br><br>          **Plaintiff**,<br><br>**v.**<br><br>**MANOAH AINUU, *et al.*,**<br><br>          **Defendants**. | **Case No. 2:23-cv-00066-BMM** |

# DECLARATION OF LEITA WALKER IN SUPPORT OF COMBINED MOTION TO DISMISS AND SPECIAL MOTION FOR EXPEDITED RELIEF OF DEFENDANT VF OUTDOOR, LLC d/b/a THE NORTH FACE

_____

I, Mary Andreleita ("Leita") Walker, declare as follows:

1.      I am a partner with the law firm Ballard Spahr LLP, 2000 IDS Center, 80 S. 8th Street, Minneapolis, Minnesota 55402.  I have been admitted *pro hac vice* to practice before this Court on this matter.  I am counsel for Defendant VF Outdoor, LLC d/b/a The North Face ("TNF").

2.      I have personal knowledge of the facts stated in this declaration, and if sworn as a witness, I am competent to testify to them.

3.      Attached hereto as **Exhibit A** is a true and correct copy of the page on TNF's website featuring sponsored athlete Manoah Ainuu, available online at the following link:   https://www.thenorthface.com/en-us/about-us/athletes/manoah-ainuu.  This webpage is referenced in Plaintiff Johnathan Talbot's Complaint at ¶¶ 22, 31.

4.      Attached hereto as **Exhibit B** is a true and correct copy of the March 19, 2021 CNN news report by Ben Church, *'It was super cool just having that much melanin in Montana': The climbers aiming to boost diversity*, referenced in the Complaint at ¶ 35.

5.      Attached hereto as **Exhibit C** is a true and correct copy of the March 2, 2022 Men's Health news report by Michael Easter, *Learn Functional Fitness From Ice Climber Manoah Ainuu*, referenced in the Complaint at ¶ 37(a).

6.     Attached hereto as **Exhibit D** is a true and correct copy of the September 23, 2020 New York Times Magazine news report by Daniel Duane, Jimmy Chin & Savannah Cummins, *Up, Up, and Away from It All*, referenced in the Complaint at ¶ 37(b).

7.     Attached hereto as **Exhibit E** is a true and correct copy of the June 13, 2022 USA Today news report by Felecia Wellington Radel, *'I don't think it has really set in': First all-Black team to summit Everest talk historic trek*, referenced in the Complaint at ¶ 37(c).

8.     Attached hereto as **Exhibit F** is a true and correct copy of the February 22, 2022 People Magazine news report by Topher Gauk-Roger, *Meet the First All-Black Group of Climbers Attempting to Summit Mount Everest: 'It's Really Powerful'*, referenced in the Complaint at ¶ 37(d).

9.     Attached hereto as **Exhibit G** is a true and correct copy of a post from Manoah Ainuu's personal Instagram page, available at https://www.instagram.com/p/CuAHLnyrGAD/.   Ainuu's Instagram page is incorporated by reference in the Complaint at ¶¶ 32, 33, 46, 65, 66, and 68, and several screenshots of it are attached to the Complaint as Exhibits 3, 5, 7, 11, and 12.

3

10.     Attached hereto as **Exhibit H** is a true and correct copy of Instagram's Community Guidelines, available at https://help.instagram.com/477434105621119?helpref=faq_content.

11.     Attached hereto as **Exhibit I** is a true and correct copy of the October 27, 2023 correspondence notifying Talbot of TNF's intent to move under Washington's Anti-SLAPP Act, informing him of his right to withdraw or amend his Complaint, and stating that TNF would seek to recover its attorneys' fees and costs, if successful.

I declare under penalty of perjury that the foregoing is true and correct.


DATED this 18th day of December, 2023.

Respectfully submitted,

*/s/ Leita Walker*
Leita Walker
**BALLARD SPAHR LLP**
2000 IDS Center
80 S. 8th St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Facsimile:  (612) 371-3207
Email:walkerl@ballardspahr.com

*Counsel for VF Outdoor, LLC d/b/a The North Face*

4

## CERTIFICATE OF SERVICE

I hereby certify that on 18 December 2023, I electronically filed the foregoing Declaration (and exhibits thereto) with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record pursuant to the Local Rules.

/s/ *Leita Walker*
Leita Walker

5

SER-046

# Exhibit A



For gifts you can wrap by 12.24, order with Standard Shipping by 1 PM EST on 12.17.

🇺🇸 English | Order Status | ⟳ Live chat | Join XPLR Pass™ | Find a Store | Gift Cards | Help | Sign In

**THE NORTH FACE**

Sale   Men's   Women's   Kids'   Footwear   Bags & Gear   Renewed   About Us        Search...



**CLIMBER**
## MANOAH AINUU
**BOZEMAN, MONTANA**

Climbing wasn't the obvious path for 25-year-old Manoah Ainuu. Born in Compton, California to first-generation immigrants from Samoa and Ethiopia, Manoah's childhood was surrounded by concrete and congested freeways. Now, his everyday views include vertical blue ice, pocketed limestone crags and the high peaks of six mountain ranges in a 1.8-million-acre forest.

But before Big Sky, there was Big Bear, the ski area two hours from Los Angeles where Manoah's dad would take him skiing once a year. "It was the first thing we did outside," says Manoah. Manoah's parents recognized the positive influence of the outdoors and the need for a better education, and moved a nine-year-old Manoah and his sister from Los Angeles to Spokane, Washington.

He skied at Idaho's Schweitzer Mountain and dabbled in climbing, but it wasn't until he moved to Bozeman to attend Montana State University, that he fell hard for the mountains. Freshman year, Manoah started spending time at the bouldering wall. Then, he got a membership at the local climbing gym. He started climbing trad and ice in 2013 and started lead climbing in 2015—usually listening to music, and often rocking a speaker off his harness. Manoah met future TNF teammate Conrad Anker at Bozeman's Spire climbing gym. "I recognized a gentle soul, a happy person and someone dedicated to the craft of climbing," says Conrad. The two climbed together and Conrad talked Manoah, still a die-hard skier, into trying ice climbing. "After the first time I went out, I was hooked on it," says Manoah. He went out 40 or 50 more times that winter, which was still a couple dozen fewer days on skis. Every year after that, says Manoah, the ratio switched.

"There's a brute sense to it," says Manoah. "I'm super mellow and gentle—that's my personality. Swinging tools into ice and snow gives you a feeling of power and strength." Manoah says it's that combined with the pure aesthetics of climbing ice in Hyalite Canyon —a stunning mountain valley near Bozeman with more than 150 ice and mixed routes condensed in three-square miles.

Manoah has climbed routes like The Rostrum and Lurking Fear in Yosemite, Liberty Ridge on Mt. Rainier and the Regular Northwest Face of Half Dome (the first Grade VI climb in the U.S.). He wants to climb in the Wind Rivers this summer, Yosemite this fall and Alaska next spring, but what he loves most is introducing people to the sport. Manoah has led a climbing clinic with kids in Atlanta and Memphis. He's invited urban climbers to Bozeman and connected with a 15-year-old boulderer who Manoah says is going to be a much better climber than him. "It's the cycle of mentorship that has me most excited about being in this position," says Manoah.

It all ties to connection—Manoah's driving force.

"Partnerships through climbing have succeeded any other relationships," says Manoah. "Tying in together or being in an uncomfortable spot where you have to make a lot of decisions quickly really makes you get to know your climbing partners well. It promotes a bigger sense of family."

Manoah's father has seven siblings, but Manoah calls any older relative "uncle" or "auntie". In Samoa, the greeting extends to unrelated elders. It's a nod to Samoan culture, which places kin before all else. Multigenerational households are the norm. Manoah guesses there are more than one dozen family members living in their former Los Angeles home. Manoah hopes to travel to his mother's native Ethiopia to climb and connect with family.

Document title: Manoah Ainuu - The North Face Climber
Capture URL: https://www.thenorthface.com/en-us/about-us/athletes/manoah-ainuu
Capture timestamp (UTC): Tue, 12 Dec 2023 15:55:22 GMT



next spring, but what he loves most is introducing people to the sport. Manoah has led a climbing clinic with kids in Atlanta and Memphis. He's invited urban climbers to Bozeman and connected with a 15-year-old boulderer who Manoah says is going to be a much better climber than him. "It's the cycle of mentorship that has me most excited about being in this position," says Manoah.

It all ties to connection—Manoah's driving force.

"Partnerships through climbing have succeeded any other relationships," says Manoah. "Tying in together or being in an uncomfortable spot where you have to make a lot of decisions quickly really makes you get to know your climbing partners well. It promotes a bigger sense of family."

Manoah's father has seven siblings, but Manoah calls any older relative "uncle" or "auntie". In Samoa, the greeting extends to unrelated elders. It's a nod to Samoan culture, which places kin before all else. Multigenerational households are the norm. Manoah guesses there are more than one dozen family members living in their former Los Angeles home. Manoah hopes to travel to his mother's native Ethiopia to climb and connect with family. And someday, he hopes to open an Ethiopian restaurant in Bozeman like his mother did in Spokane.

"Through climbing, I want to make connections and foster relationships with people," says Manoah. "Since joining The North Face, I've had the opportunity to meet and connect with so many different people—whether it's fellow athletes or younger Black kids living in places without climbing. That's where I'm most focused right now. I hope to make a difference to those communities and those kids by being one of the few people like me who are able to do this."

## Shop
Women's
Men's
Kids'
Footwear
Equipment
By Activity
Gift Cards

## Help
Live Chat
Help Center
Order Status
Size Chart
Returns & Warranty
Contact Us
Accessibility Statement

## About TNF
About Us
Sustainability
TNF Renewed
Technology & Innovation
Explore our Stories
Athletes
Explore Fund
Careers

## Discover
Men's Winter Coats
Women's Winter Coats
Kids' Snow
Winter Gloves
Fleece Jackets
Toddler Coats
Holiday Gift Guide

## Explore
XPLR Pass
Events
TNF Pro Program
Student Discount
Military Discount
Healthcare Worker Discount
First Responder Discount

### Store Locator
Explore a retail store or outlet near you.

**Find a Store**

### Follow The North Face

### Enter Your Email
Adventure is everywhere. Even in your inbox.

Email Address

I agree to the Privacy Policy & Terms of Use

☐ The North Face, A VF Company
CA Supply Chains Act   UK Slavery Act   Privacy Policy   Your Privacy Choices   Terms of Use   Accessibility Statement

# Exhibit B



☰  CNN  **Sports**   Football   Tennis   Golf   Motorsport   US Sports   Olympics   Climbing   Esports   More          Audio   Live TV   🔍   Log In

# 'It was super cool just having that much melanin in Montana': The climbers aiming to boost diversity

By Ben Church, CNN

Updated 6:56 AM EDT, Fri March 19, 2021





**MORE FROM CNN**

Keanu Reeves' girlfriend Alexandra Grant calls him an...

Gang removed hundreds of kidneys to sell to wealthy...


03:34

'Black Ice': The men and women making climbing more diverse


02:58
Kayaker Dane Jackson descends 300 feet down waterfalls in...


03:01
BMX rider perf tricks on platf suspended fr

**(CNN)** — Whether it's a comment about his hair or questioning his expertise, professional ice climber Manoah Ainuu is aware that people notice the difference.

Born to first-generation immigrants from Samoa and Ethiopia, the 26-year-old grew up in the outskirts of Los Angeles but later moved to Bozeman, Montana, when he went to college.

It was there that he fell in love with the outdoors and the spectacular ice climbing opportunities Montana has to offer.

Document title: Black Ice film aiming to boost diversity in climbing | CNN
Capture URL: https://edition.cnn.com/2021/03/19/sport/black-ice-climbing-diversity-cmd-spt-intl/index.html
Capture timestamp (UTC): Sun, 05 Nov 2023 17:33:50 GMT                                                        Page 1

☰  CNN  **Sports**   Football   Tennis   Golf   Motorsport   US Sports   Olympics   Climbing   Esports   More        Audio   Live TV   🔍   Log In

in the outskirts of Los Angeles but later moved to Bozeman, Montana, when he went to college.

It was there that he fell in love with the outdoors and the spectacular ice climbing opportunities Montana has to offer.



CONTENT BY TOKYO CONVENTION & VISITORS BUREAU

**This shrine with an iconic floating torii gate is both sacred and scenic.**

Discover Chugoku and Shikoku in western Japan, where traditional art and contemporary masterpieces provide a glimpse of the country's creative landscape.

Advertisement          📱 Ad Feedback

Ainuu taught himself how to climb and is now a seasoned professional, embarking on trips across the United States

But he says living in a predominately White area, whilst taking part in a sport with few other Black athletes, weighs heavily on him.

Despite not recalling any overtly racist incidents, the climber says it is more an accumulation of "microaggressions" from both the local and climbing community, such as people commentating on his dreadlocks.

Advertisement          📱 Ad Feedback

"Most people are like 'Oh, it's a compliment, it's kindness,' but what it happens to be is kind of backhanded," Ainuu tells CNN Sport. "They're seeing that you're different and feel like they have to say something about it.

"I'm pretty mellow, so I just ignore a lot of stuff. If someone says some stupid racist thing, I'm like: 'Whatever, I've heard this before.'

"But it really does weigh down on you. It all builds up and whether a person handles that by bottling it up or ignoring it, there's still an effect."

With films such as "Free Solo" making it into the mainstream and with climbing gyms on the rise, the sport has witnessed a boom in recent years.

But the cost of clothing and safety equipment acts as a huge barrier to entry for many

NEWS & BUZZ

US long jumper Tara Davis-Woodhall stripped of national...

Look of the Week: Hunter Schafer's ethereal Oscars...



CNN style

The global view on style & culture

INSPIRE ME ›

Advertisement          📱 Ad Feedback



that by bottling it up or ignoring it, there's still an effect."

With films such as "Free Solo" making it into the mainstream and with climbing gyms on the rise, the sport has witnessed a boom in recent years.

But the cost of clothing and safety equipment acts as a huge barrier to entry for many and the lack of representation amongst the world's top professionals is being recognized more than ever before.

Now a member of The North Face's elite climbing team, Ainuu wants to change the narrative around outdoor adventure sports.

"I don't really like being in the spotlight, having all this attention brought to me, but what I've realized is [...] there are so many people that are looking up to me [...] and all these other Black and African-American climbers or athletes or musicians," he says.

"Just seeing someone that looks like you, doing something and excelling at it is extremely empowering."

READ: Emily Harrington on her after historic El Capitan climb



<span style="font-size:small">Austin Schmitz/ The North Face</span>

Manoah Ainuu is an accomplished ice climber.

## Black Ice

It's why Ainuu was so excited to be part of a new documentary film called "Black Ice" which looks at a collaboration with Memphis Rox – a not-for-profit climbing gym in South Memphis, US.

The center provides a safe haven for people away from the streets; a place to relax and dive into a sport that may at first seem unfamiliar. No one is turned away, regardless of their ability to pay.

Through its inclusivity and caring ethos, the organization has opened up the world of climbing to the local community which suffers from poverty and a lack of opportunity, especially in Black communities.



Paid Content

Beckham Marries The Richest Heiress In The World
Street Insider



The Actual Cost of a New Walk-In Shower May Surprise You
KohlerSafeShowers.com



Roofer: I Use This Trick To Keep My Gutters Clean At All Times
Leaffilterguards.com



and dive into a sport that may at first seem unfamiliar. No one is turned away, regardless of their ability to pay.

Through its inclusivity and caring ethos, the organization has opened up the world of climbing to the local community which suffers from poverty and a lack of opportunity, especially in Black communities.

Elena Delavega, Associate Professor at the University of Memphis, tells CNN Sport that South Memphis is one of the poorest areas of the city which is "underserved and under-resourced."

She also says the area is under threat from encroaching gentrification.

"That is a problem for this neighborhood because there is a desire to remove the traditional residents and to 'improve' the area," she says.

"But no improvements are happening while poor people live there."

According to the 2020 Memphis Poverty fact sheet, the poverty rate for the city is 21.7%, with the percentage higher among minority groups.

The "Black Ice" film documents how members of the gym's staff, many of whom had never been ice climbing before, travel to Montana where they met with Ainuu, fellow ice climber Fred Campbell and climbing legend Conrad Anker.

Learning from the experts, the Memphis Rox team spend time scaling frozen waterfalls and skiing in some of the coldest temperatures they've experienced.

"It was super cool. I mean, just having that much melanin in Montana," Ainuu laughs.

READ: Trailblazing climber Sasha DiGiulian was told 'little girls don't belong'



"Black Ice" documented an ice climbing trip to Montana, US.

## Better representation

Malik Martin, the official photographer at Memphis Rox who worked as a filmmaker on "Black Ice," is acutely aware of the problems presented to young people growing up in Memphis.

Document title: Black Ice film aiming to boost diversity in climbing | CNN
Capture URL: https://edition.cnn.com/2021/03/19/sport/black-ice-climbing-diversity-cmd-spt-intl/index.html
Capture timestamp (UTC): Sun, 05 Nov 2023 17:33:50 GMT
Page 4

## Better representation

Malik Martin, the official photographer at Memphis Rox who worked as a filmmaker on "Black Ice," is acutely aware of the problems presented to young people growing up in Memphis.

"There isn't a lot of sympathy from society for people in my neighborhood, people in our circumstances," Martin tells CNN Sport. "There's a million traps for you to fall into between just trying to live and survive.

"But it's a beautiful place. I love Memphis. I wouldn't want to be anywhere else because being from where I'm from is how we're able to just get up and go to a whole new environment and tough it out.

"It was hard and it sucked but I've been shot at so this is nothing."

Having never previously considered a career photographing and making films about climbing, Martin now finds himself in love with the sport.



**RELATED ARTICLE**
'The Fight of the Century': A divided US nation 50 years on

He says living in Memphis forces you to grow up fast, but that climbing offers you the opportunity to let your guard down.

He also understands the importance of representation in the sport and says stories need to be told by more Black filmmakers.

"Any time I point my cameras to amplify and uplift [...] being a Black filmmaker and connecting with Black people is important," he says.

"There is a difference, we can sit here and act like there isn't. There is a difference when it's based on documentaries, you know what I mean?

"When you're sitting with people and talking with people and just being able to relate."

Martin has been on multiple trips with Ainuu since filming "Black Ice" and his social media feeds are now full of climbing content.

He recalls a moment during a trip with Ainuu last year when the importance of using his camera to inspire others hit home.

The pair were driving when Ainuu noticed a frozen pillar beside the road. Martin watched his friend jump out of the car, run across the road and start climbing it without ropes.

"From the hood, that would be quote-unquote 'White folk stuff,'" Martin says. "And to see a Black dude with dreads, in top peak prowess [...] is like 'wow.'"

READ: Ultrarunner Coree Woltering runs almost 1,200 miles in record time



Document title: Black Ice film aiming to boost diversity in climbing | CNN
Capture URL: https://edition.cnn.com/2021/03/19/sport/black-ice-climbing-diversity-cmd-spt-intl/index.html
Capture timestamp (UTC): Sun, 05 Nov 2023 17:33:50 GMT                                                    Page 5



☰ | CNN | **Sports** | Football | Tennis | Golf | Motorsport | US Sports | Olympics | Climbing | Esports | More | Audio | Live TV | 🔍 | Log in

Austin Schmitz/ The North Face

Fred Campbell was one of the mentors in "Black Ice".

## Allies in the sport

Since the trip to Montana, Martin has also fostered a strong relationship with Anker, who remains one of the world's top explorers and mountaineers.

Anker was one of the driving forces behind the film's conception, having previously visited Memphis Rox, and has long pushed for better diversity in outdoor pursuits.

Both Martin and Ainuu say it's vital to have White allies from within the sport.

"There's one thing for you to put a black square up on Instagram," says Martin.

"Conrad understood for my life to change and for it to have any type of real social impact, he had to bring me into his circle of influence and him being a legend automatically stamps or certifies me to an extent."

Anker acknowledges that not enough has been done in the past to make climbing inclusive but says that things are changing.

Whilst organizations and events such as "Color The Crag" have been promoting diversity for years, Anker says the death of George Floyd in 2020 was a touchpoint for the global climbing community to hold a mirror up against itself.

"It's trying to change the view of how we look at climbing," Anker tells CNN Sport. "From its origin in the mid-1800s, seeing this as an athletic pursuit itself has always been the domain of the white male."

"Now as expeditions go forward, big expeditions, there is more inclusivity from both where one is from and also from a gender standpoint. Recognizing that and working to make it better is the first step."



Document title: Black Ice film aiming to boost diversity in climbing | CNN
Capture URL: https://edition.cnn.com/2021/03/19/sport/black-ice-climbing-diversity-cmd-spt-intl/index.html
Capture timestamp (UTC): Sun, 05 Nov 2023 17:33:50 GMT
Page 6



Sasha DiGiulian battles discrimination after being told "little girls don't belong here"

☐ Video Ad Feedback

02:51 - Source: CNN

## 'Reflection of society'

Anker hopes "Black Ice" will continue to encourage people from all backgrounds to adopt his love for climbing, which he says can be used as a tool to heal the deep divisions and racial tensions in the US.

"We've always revered mountains in all the world's great religions," he says.

"There's always some connection to mountains. And when you're out with someone, then that climbing with them is special.

"It's a healthy way for humans to approach other humans. And so Memphis Rox, yes, it's a climbing gym but, moreover, it's a community center where these people are. It's a really meaningful thing.

"Whilst climbing is a sport about going up mountains, moreover, it's a transformational change in how humans interact with other humans and to foster this [...] is kind of my life's goal."

Campbell, one of the experts leading the team in Montana, echoes Anker's praise of Memphis Rox but says there is no quick way to address the issue of diversity in climbing.

Instead, he calls on everyone from within the community to do their bit.

"Climbing is kind of a reflection of society," Campbell tells CNN Sport.

"No part of society's issues doesn't make its way into climbing and so I think the solution has to be multifaceted."

"Individual climbers have to be supportive of it and work to make the community really inclusive, and I think that's something that we try to do on a personal level.

"Conrad, Manoah, Malik, all of us are really, really, really interested in being inclusive and making the sport accessible to everyone."

Document title: Black Ice film aiming to boost diversity in climbing | CNN
Capture URL: https://edition.cnn.com/2021/03/19/sport/black-ice-climbing-diversity-cmd-spt-intl/index.html
Capture timestamp (UTC): Sun, 05 Nov 2023 17:33:50 GMT                                                    Page 7

# Exhibit C



Fitness

# Learn Functional Fitness From Ice Climber Manoah Ainuu

**How this climber with his eyes on Everest finally blended total-body mobility with his mountain-ready muscle.**



BY **MICHAEL EASTER**   PUBLISHED: MAR 2, 2022

🔖 **SAVE ARTICLE**



NIKKI SMITH



Search for

1. ANTEROLISTHESIS EXERCISES FOR SENIORS  ❯

2. EXERCISE FOREARM PLANK FOR BEGINNERS  ❯

3. VOCAL EXERCISES FOR SINGING  ❯

4. WEEKLY WORKOUT PLAN  ❯

5. EASY HIP EXERCISES FOR SENIORS  ❯

6. UNIVERSAL WEIGHT BENCH  ❯

Ad | Select Searches

"Functional" anything sounds boring—we get it. But in fitness, functional is one of the most exciting adjectives out there. It's a catchall word to describe the moves and exercises that prep your body for real-life activities. The pandemic forced people away from gyms and led to a surge in outdoor exercise. We quickly realized that our workouts hadn't exactly prepared us for wild environments. That extra muscle we'd built in the gym only weighed us down on trail runs and hikes. We rolled ankles and injured knees because we'd only trained on perfect gym surfaces and lacked the right combination of mobility and stability. The 72 degree

Document title: Ice Climber Manoah Ainuu Shares His Mobility Training Tips
Capture URL: https://www.menshealth.com/fitness/a39186492/manoah-ainuu-ice-climber-workout/
Capture timestamp (UTC): Sun, 05 Nov 2023 17:08:24 GMT

The pandemic forced people away from gyms and led to a surge in outdoor exercise. We quickly realized that our workouts hadn't exactly prepared us for wild environments. That extra muscle we'd built in the gym only weighed us down on trail runs and hikes. We rolled ankles and injured knees because we'd only trained on perfect gym surfaces and lacked the right combination of mobility and stability. The 72 degree indoor environment hadn't readied us for temperature swings, the elements, and the general unpredictability of the outdoors. It's time to make your fitness truly functional again by lifting heavy awkward objects, climbing and crawling and jumping more, redlining your cardio, and engaging in other total-body sweat shenanigans. Nobody knows and appreciates this more than Manoah Ainuu. Master his lessons in mobility and you'll have fun getting in the best shape of your life.



.

Indoors in the gym, outdoors on the mountain, or even at home, contorting yourself to crawl under a bed to retrieve a toy, mobility matters. Not sure what "mobility" is? It's your joints' ability to be both flexible and stable at once—and it's a quality that allows you to stay strong no matter how you twist and turn. Without it, everything from catching a football to sitting cross-legged becomes a challenge.

**MORE TIPS FROM ELITE ATHLETES**

 **Learn Functional Fitness From Tom Stoltman**

 **Learn Functional Fitness From UFC Legend Nate Diaz**

 **Learn Functional Fitness From Trainer Da Rulk**

Advertisement - Continue Reading Below



Manoah Ainuu, 26, understands this struggle. A former football player, he took up climbing after moving to Bozeman, Montana. The sport agreed



took up climbing after moving to Bozeman, Montana. The sport agreed with his long, lanky frame. But at the start, he'd climb for days on end without loosening his wrists and ankles. He was soon battling elbow tendinitis.

Ainuu could muscle himself up a wall, but he'd wear himself out more quickly than his less muscular peers. Climbers often rely on a technique called "stemming," which has them splay their legs wide, essentially standing against the wall, giving their upper-body muscles a break. Ainuu could barely do this. "I would pretty much have to pull my groin and hips to get into the stemming position," he says.



DREW SMITH

His fix was a combination of rest and mobility training. Every three climbing days, he took one rest day. And a few times a week, he took a yoga class. Moves like downward dog loosened his hamstrings, and postures like the chair pose relaxed his calves and quads. Soon he could stem. "Being limber is definitely ideal when climbing," Ainuu says. Yes, oversized arms and legs help CrossFitters move big weight, but that muscle does little good during tasks like climbing, which requires you to move quickly, not just be strong. Ainuu arrived in Bozeman weighing 180 pounds; he's down to 160 now. "I didn't necessarily get weaker," he says. "But my endurance definitely went up."

That pound-for-pound strength will aid Ainuu in his next endeavor: In April, as part of the Full Circle Everest Expedition, he'll be one of ten climbers who hope to be the first all-Black team to summit Everest. To train for that, he's been pushing for even more lightweight strength— loading up a heavy backpack, hiking, and searching for new pitches to climb. His goal: gain strength without packing on too much excess muscle.

That pound-for-pound strength will aid Ainuu in his next endeavor: In April, as part of the Full Circle Everest Expedition, he'll be one of ten climbers who hope to be the first all-Black team to summit Everest. To train for that, he's been pushing for even more lightweight strength—loading up a heavy backpack, hiking, and searching for new pitches to climb. His goal: gain strength without packing on too much excess muscle. And keep his mobility gains, too.

# MASTER MOBILITY LIKE AINUU

Battle the wall squat, which demands knee, ankle, and hip stability and flexibility. Stand facing a wall, feet slightly wider than shoulder width, toes a few inches from the wall. Place your palms against the wall, hands far apart. Squat down as low as possible, aiming to let your hamstrings touch your calves. Stand up. Try the move once a week, aiming to improve your performance each time.

### Get an Edge

The wall-facing squat challenges your spine's ability to arch, as well as your shoulder and hip mobility. To address your hips, do 1 minute of Spider-man lunges daily: Start in pushup position, shift your right foot to beside your right arm, then reach your right arm to the ceiling. Repeat on the other side. To improve shoulder and spine mobility, do 1 minute of Superman holds per day.



Document title: Ice Climber Manoah Ainuu Shares His Mobility Training Tips
Capture URL: https://www.menshealth.com/fitness/a39186492/manoah-ainuu-ice-climber-workout/
Capture timestamp (UTC): Sun, 05 Nov 2023 17:08:24 GMT



BEN MOUNSEY-WOOD

---



**MICHAEL EASTER**

Michael Easter is a health and fitness writer and a visiting lecturer at UNLV.

---

## Ready to start your fitness journey?

**Get expert-approved workout moves, weight loss tips, and dieting advice right here.**

| ✉ Enter your email address here. | **LET'S DO THIS.** |

By signing up, I agree to the Terms of Use (including the dispute resolution procedures) and have reviewed the Privacy Notice.

Document title: Ice Climber Manoah Ainuu Shares His Mobility Training Tips
Capture URL: https://www.menshealth.com/fitness/a39186492/manoah-ainuu-ice-climber-workout/
Capture timestamp (UTC): Sun, 05 Nov 2023 17:08:24 GMT

# Exhibit D

# 12,000 Feet Up, With a Storm Coming In

*Jimmy Chin*

## Up, Up and Away From It All

**In early March,** Jimmy Chin, a professional photographer and mountaineer, finished back-to-back work trips — climbing in Antarctica, filming in Chile — and flew home to Wilson, Wyo. He was in the midst of plotting the rest of a typically peripatetic year, with trips to Thailand, New Zealand, London and Mexico, when the pandemic hit. "Longest I've been home in 20 years," Chin, who is 46, said recently. He made do, editing a book of his photographs and running nearby trails, skiing in the backcountry and racing up and down the Grand Teton, a 13,775-foot peak that figures on the life lists of most amateur climbers.

"I was trying to figure it out the other day," Chin said, when asked how many times he'd climbed the Grand. "I've got to be up in like 50, 60, 70 times."

Central to the mountaineer's life — its curse and gift — is an itch for struggle, and a willingness to scratch it that Mo Anthoine, a great British climber, called "feeding the rat." By early September, when Chin still couldn't leave the country, he got to thinking about one of the biggest objectives in his home range. Known as the Grand Traverse, this 17.9-mile romp along the Tetons' most thrilling skyline offers roughly 12,000 cumulative feet of climbing on seven major summits. It takes ultrafit regular folks three days with guides. Elite athletes like Chin do it on the regular as extreme training — current speed record, 6:30:49 — for Alaska and the Himalayas. "I did it a stack of times 20 years ago," Chin told me. Back then, he'd just come home from the Karakoram, a mountain range in Asia, and the Grand Traverse felt surprisingly easy.

Chin is a filmmaker — he and his wife, Elizabeth Chai Vasarhelyi, won an Academy Award in 2019 for directing the documentary "Free Solo," about Alex Honnold's climb of El Capitan in California's Yosemite National Park — and he shoots and climbs for the North Face. He invited three other North Face athletes to join him — to do that thing they all do, for no better reason than the joy it brings — on the Grand Traverse, an

excuse to breathe hard up high, move over stone in the sky, suffer enough to feel good later. Chin's team included Manoah Ainuu, a 25-year-old ice climber originally from Los Angeles who now works in a restaurant in Bozeman, Mont.; Savannah Cummins, who is 28 and climbs full time while living out of a van; and Conrad Anker, an internationally respected 57-year-old mountaineer, also based in Bozeman, who has joined Chin on so many expeditions that, while side by side in a tent recently, Chin on the left and Anker on the right as usual, Anker finally asked, "What side of the bed do you sleep on at home?"

## From Here is a collection of visually immersive stories that explore how communities are gathering in a time of unprecedented change.

[Read more in this series](#)

Everyone committed for Sept. 6 to 10. They gathered at Chin's place and were about to start when forecasters called for a storm on the 7th. Nonpros might have canceled, but, well, "It was the classic thing of like, 'Let's just go up there, and we'll make the right decisions,'" Chin said.

At a trailhead 30 minutes from Chin's home, the four of them hiked and, at times, scrambled with hands and feet up a steep trail 5,593 vertical feet to the summit of Teewinot Mountain, an imposing 12,325-foot granite peak with views north into Yellowstone National Park. (Porters brought tents and cooking gear to the team's first planned campsite to offset the weight of the climbers' camera equipment.) A quick descent off the far side led to what Cummins calls "a really mellow trail" that was "very beautiful for like an hour or so." That trail ran out, unfortunately, in a mazelike realm of shattered cliffs and piled-up boulders where Chin discovered that his memory of the route had, as he put it, "eroded significantly."

Briefly lost among small rock towers, shimmying across ledges, some slick with ice, they walked carefully atop knife-blade ridges. Any given move was easy enough, but steep drop-offs on both sides focused the mind — as did the looseness of nearly every rock they touched.

Cummins found her thoughts swirling: Earlier in the year, her climber boyfriend fell to

his death in Mexico; she flew down to recover his body with the help of a Mexican military helicopter. Speaking of that first day on the Grand Traverse, she said: "We were in terrain where if you pulled a rock out, you would fall and die. I think having gone through that rescue process — I wouldn't want anyone to deal with that."

Next came Mount Owen, a 12,928-foot peak steep enough to demand genuine rock climbing — free solo in this case, unroped in specialized sneakers and backpacks, but mostly on what climbers would describe as "good rock," solid and hard enough that it won't crumble under a climber's body weight — "Way more preferable," as Chin put it, "than scrapping around on what I call vertical kitty litter."

On the steep north ridge of the Grand Teton, on Day 2, everyone roped up and belayed one another. Cold pink fingers gripped hard rock, arms and legs moved precisely without thought, lungs filled and refilled with sky and cloud — each move absorbing enough to silence the mental chatter, never hard enough to frighten, at least not in a bad way.

That's also when foul weather rolled in. But they were 600 feet below the summit when they saw a "sucker hole of sunshine," as Cummins put it — a deceptive patch of blue sky, falsely suggesting that the storm might go easy on them. They kept climbing. But flurries of wet snow soon soaked the rock and all four climbers. Chin and Anker kicked around the idea of leaving their packs and making a dash for the summit. But as brave young climbers are often told, "There are old climbers and bold climbers but no old bold climbers." No need to risk everything at 13,000 feet on rock now icing over. They made a quick retreat off the Grand to the so-called Lower Saddle, 11,600 feet. By the time they got there, Chin said: "It is nuking. Like, properly nuking. Snowing really hard."

They pitched tents while the wind was, as Chin put it, "fully blowing sideways. I would be very comfortable if you said it was gusting 60 because I think it was probably gusting 70."

They were shivering in wet sleeping bags, and ice was forming inside tents. "I know it's a real storm," Chin said, "when I'm falling in and out of sleep and taking stock of, like: 'OK, my headlamp's over here. Gloves are over there. When the tent poles snap, you know where everything is, and it's going to be really unpleasant.'"

It is an oddity of human nature, though, discoverable only through experience, that a

happy, vibrant aliveness comes from what Chin calls "feeling the bite" — titrated danger, discomfort — and Anker, "the anvil," that hard surface against which nature hammers us into a more resilient relationship to our own tenderness.

Morning dawned clear but too cold and with too much snow and ice for climbing. Finishing the Grand Traverse was out of the question. Chin and the others decided to stay put anyway, brew tea and talk. Every climber knows the feeling: Mind and body calm with fatigue, mood light from dabbling in risk and also from the deep play — inventing challenges, tilting at windmills — unique to those whom Lionel Terray, the celebrated French mountaineer, has called "conquistadors of the useless." Also, of course, with nowhere to be and nobody expecting emails, midexpedition down days open wide with hours to talk. "Those kinds of days are precious," Chin said. "There's not much to do, and you get to hang out and catch up, chat about life."

The morning after that, everyone did have places to be. "Coming down the trail, you know, all of a sudden, I remember thinking, Wow, like, this is so pleasant, being on a trail!" Chin said, laughing at the sheer simplicity of that particular pleasure.

Back at Chin's house, everyone packed for long drives ahead. Anker was walking out the door, according to Chin, when "he turned and looked at me and said: 'Oh, man, you got the glow! Isn't it nice to feel the glow?'"

—Text by Daniel Duane

**Jimmy Chin** is a photographer, filmmaker and adventurer. He is a co-director of "Meru" and "Free Solo," which won an Academy Award for best documentary feature. **Daniel Duane** is the author of the climbing memoir "Lighting Out: A Golden Year in Yosemite and the West." He last wrote a feature for the magazine about women and big-wave surfing. **Savannah Cummins** is a photographer, filmmaker and climber known for her expeditions around the world.

Videos by Jimmy Chin and Savannah Cummins.

Additional design and development by Jacky Myint.

# Exhibit E



USA TODAY SPORTS
Home NFL MLB NBA NHL Golfweek Super Bowl NCAAF NCAAB NCAAW Tennis IndyCar Odds

Advertisement - scroll for more content

Advertisement

Share your feedback to help improve our site!

Advertisement

T Mobile

# 'I don't think it has really set in': First all-Black team to summit Everest talk historic trek

*Four members of the Full Circle Everest team spoke with USA TODAY Sports about their expedition, what happened on Mount Everest and what's next. They became the first all-Black team to make the climb.*

FELECIA WELLINGTON RADEL | USA TODAY

Show Caption

With headlamps on, stars above and ice below, they made their way up above the clouds to their goal: a mountain peak covered in flags and mementos. Then they made history. But the journey was only halfway over.

In May, the Full Circle Everest team become the first all-Black expedition to climb to the top of Mount Everest, the highest mountain in the world above sea level.

The team made it safely down the mountain and back home, but the impact of that historic achievement is still taking shape.

"I don't think it has really set in that we actually accomplished this," says team leader Philip Henderson. "It was a three-year process of us starting this project and then completing it. I'm just proud of the team and the time and commitment and sacrifices by everybody on the team."



Advertisement

says team leader Philip Henderson. "It was a three-year process of us starting this project and then completing it. I'm just proud of the team and the time and commitment and sacrifices by everybody on the team."

Seven Full Circle Everest team members — Manoah Ainuu, Eddie Taylor, Rosemary Saal, Demond Mullins, Thomas Moore, James "KG" Kagami, and Evan Green — successfully reached Mount Everest's summit. Along with Henderson, other members of the team include Frederick Campbell and Abby Dione.

Four members of the team — Henderson, Saal, Taylor and Ainuu — sat down with USA TODAY Sports to talk about their expedition, what happened on the mountain and what's next.



The Full Circle Everest team on a training trip to Nepal in 2021, ahead of their expedition to Mount Everest in 2022.
EVAN GREEN, COURTESY OF FULL CIRCLE EVEREST

## Why Everest?

"Everest is an iconic mountain," says Henderson. "Every year, people are paying attention to what's happening on Everest. And when you look at it in terms of representation in high-altitude mountaineering, there had been less than a dozen Black people who had attempted to climb Mount Everest. It was an obvious next step for everybody."



Advertisement



☰  USA TODAY SPORTS  Home  NFL  MLB  NBA  NHL  Golfweek  Super Bowl  NCAAF  NCAAB  NCAAW  Tennis  IndyCar  Odds

Advertisement



The Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

"It's more than just Everest/Sagarmatha," says Ainuu. "It's Nepal. Meeting everyone there and spending time in Nepal. Climbing is just the cherry on top of all that."

Advertisement

STORY FROM AMAZON
Amazon offers customers the lowest prices

Mount Everest sits at the border of Nepal and China (Tibet), and it is also known as Sagarmatha or Chomolungma in those countries, respectively.

**MORE:** Sophia Danenberg, Full Circle Everest take big step for Black climbers on Mount Everest

The first recorded expeditions to Mount Everest were in 1921. In 1953, Tenzing Norgay, a Nepali Sherpa climber, and Edmund Hillary of New Zealand, made the first official successful ascent of Mount Everest. South African Sibusiso Vilane in 2003 became the first Black man to reach the peak, and Sophia Danenberg was the first African American and Black woman to summit in 2006.



South African Sibusiso Vilane in 2003 became the first Black man to reach the peak, and Sophia Danenberg was the first African American and Black woman to summit in 2006.

How was the Full Circle Everest team created?



The Full Circle Everest team
COURTESY THE NORTH FACE AND FULL CIRCLE EVEREST

"We had some mutual friends, and I just happened to stumble upon a couple of the expedition members," Henderson says. "And then other ones like Rosemary and I had a connection for 10 years now, we've been on three or four different continents and three big mountains together now, and some of the other team members as well. We're all really connected in some way, either through climbing or through mentors or through our work in education."

Advertisement

STORY FROM AMAZON
Study finds Amazon has the lowest online prices



Henderson, a California native, has worked in the outdoors industry for more than 30 years as leader, coach and educator. He was a member of a previous expedition to Everest and also climbed Denali and Kilimanjaro.

Saal, who grew up in Seattle and now lives in Tucson, Ariz., started climbing when she was a child. She also was a member of a Denali expedition in 2013.

≡   USA TODAY SPORTS     Home   NFL   MLB   NBA   NHL   Golfweek   Super Bowl   NCAAF   NCAAB   NCAAW   Tennis   IndyCar   Odds

Saal, who grew up in Seattle and now lives in Tucson, Ariz., started climbing when she was a child. She also was a member of a Denali expedition in 2013.

Advertisement





Rosemary Saal, a member of the Full Circle Everest team.
THE NORTH FACE AND FULL CIRCLE EVEREST

Ainuu, a professional climber for The North Face, was born in Compton, Calif., and began climbing while in high school in Spokane, Wash.

Taylor, a Midwest native, began climbing shortly after attending University of Colorado.

"We had a support team, as well," Henderson says. "Once we arrived in Base Camp, we had an additional 25 to 27 people who were a part of our team. They cook, they're putting up the tents and carrying oxygen and so on."

The Full Circle Everest was supported in their climb to the summit by Sherpa guides, including Pasang Nima Sherpa, Lhakpa Sonam Sherpa, Phurtemba Sherpa, Dawa Chhiri Sherpa, Sonam Gaylje Sherpa, Nima Nuru Sherpa, Chopal Sherpa, Chawang Lhendup Sherpa, Tasha Gyalje Sherpa, Amrit Ale, Pemba Sherpa (camera crew) and Nawang Tenji Sherpa (camera crew), according to a release from The North Face. The team also was supported by The North Face and the VF Foundation, among other sponsors.

Advertisement



Document title: Full Circle Everest team talks about historic Mount Everest summit
Capture URL: https://eu.usatoday.com/story/sports/outdoors/2022/06/13/mount-everest-summit-full-circle-everest-black-climbers/7573157001/
Capture timestamp (UTC): Tue, 12 Dec 2023 16:06:09 GMT



The Full Circle Everest team in Nepal.
FULL CIRCLE EVEREST AND THE NORTH FACE

The Sherpa people, who live in the region and are more accustomed to the conditions, often accompany mountaineers on Everest and nearby peaks. Many Sherpa train from a young age as elite climbers and are hired as guides, porters, cooks and fill other roles. Places like the Khumbu Climbing Center were founded to help Nepali workers learn safe and responsible practices for high-altitude climbs. Also, the Jumpier Fund helps the widows and families impacted by the loss of high-altitude workers in the Himalayas.

Advertisement

STORY FROM INTUIT QUICKBOOKS

Need the perfect gift? Start with this gift guide



## The journey

The team arrived in Kathmandu in early April and spent several days organizing. Some friends and family members joined for the beginning of the trek.

After traveling to Lukla, a town on the side of a mountain with an airport (which was once called the most dangerous in the world due to difficult weather and terrain) the group made a 10-day trek to Everest Base Camp, hiking from village to village.



SER-075



The Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

The larger group split up once they reached Base Camp, with family and partners turning around and heading home, and the core team preparing for their Everest ascent.

The team said they chose to climb a nearby peak for further acclimatization, instead of the more common first rotations up to Camps One and Two, climbing back and forth through the Khumbu icefall, a dangerous glacier between Base Camp and Camp One that is constantly shifting and littered with deep crevasses.

 After a few days of recovery at Base Camp, the team's next rotation took them to Camp One, then to Camp Two, continuing to Camp Three and then all the way back down.

"And once we did that, we took five rest days and then we went to the summit," Taylor says.





USA TODAY
SPORTS

Home   NFL   MLB   NBA   NHL   Golfweek   Super Bowl   NCAAF   NCAAB   NCAAW   Tennis   IndyCar   Odds

Advertisement

The Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

"It was a beautiful night," Saal says. "The night before (May 11), we started our climb from Camp Four between 8 and 9 p.m., right as the sun was setting. It was largely clear above us, and we were able to see stars. We were ascending in the dark using headlamps as our guiding light, while we were traveling on the fixed lines. But around us, it was really beautiful because there were a couple of storms in the distance, so it was cool to be climbing above the clouds."

Advertisement

Each team member had a personal Sherpa partner, and there were many other climbers on the mountain at the same time also making their push for the summit.

SER-077

USA TODAY SPORTS

Home   NFL   MLB   NBA   NHL   Golfweek   Super Bowl   NCAAF   NCAAB   NCAAW   Tennis   IndyCar   Odds

Advertisement

Each team member had a personal Sherpa partner, and there were many other climbers on the mountain at the same time also making their push for the summit.

"The number we heard was about 200 people in total, including clients as well as Sherpa and support," Saal says. "So there was some traffic, there were some lines to wait in. Some moments of moving around folks, depending on if you're moving at a different speed."

And one-by-one early May 12, seven members of Full Circle Everest reached the top of the world.

But the trek wasn't finished. They had to safely make it back down the mountain.

"As a leader, I don't get excited until everybody gets down," Henderson says. "It's not over until it's over."

### 'A sigh of relief'

Henderson, whose previous expedition to Everest was about 10 years ago, said the effect global warming has had on the area was significant.

"Things have melted out," Henderson says.

Ainuu's favorite moments during the expedition were hanging out at Base Camp, listening to music and talking with other mountaineers.

"When we came back down from summit, we (had) a little celebration party, and we were dancing around doing the Sherpa dance," Ainuu says.

The final celebration at Base Camp with the entire crew was also one of Saal's favorite moments during the expedition.



Members of the Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

Document title: Full Circle Everest team talks about historic Mount Everest summit
Capture URL: https://eu.usatoday.com/story/sports/outdoors/2022/06/13/mount-everest-summit-full-circle-everest-black-climbers/7573157001/
Capture timestamp (UTC): Tue, 12 Dec 2023 16:06:09 GMT



*USA TODAY SPORTS*

Home   NFL   MLB   NBA   NHL   Golfweek   Super Bowl   NCAAF   NCAAB   NCAAW   Tennis   IndyCar   Odds

Members of the Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

"It was kind of a sigh of relief: the harder part of getting back to this point is over, we're here, we're together as a team," she says. "We had a lot of moments of joy before that celebration. It felt so profound."

Advertisement

A favorite moment during the expedition for Taylor was "climbing the mountain, being there with the team, and the realization that it's something that we can do."

"Most people think going to Everest, even just going to Everest Base Camp, seems like a place that's reserved for the most elite people or the most elite athletes and alpinists," Taylor says. "And no, you can go to Nepal, you can go see this amazing culture. It doesn't have to be this super exclusive club. Yes, maybe it's hard to climb the mountain, but it's an experience that people from all walks of life and from all over the world can have."

SER-079



The Full Circle Everest team on their expedition to Mount Everest in spring 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

The team members spoke about how the expedition has — or hasn't — changed them and its possible impact.

"Standing there in that moment, just adding to what the outdoors and spending time in the mountains and wild spaces has represented for me, which is a sense of empowerment," says Saal. "And so it hasn't necessarily been like a fundamental shift, but just reinforcing that sense of empowerment, that sense of strength. And bigger picture of acknowledging that this is bigger than just that as well. That is why we are here doing this, to inspire folks to hopefully be able to have that same sense of empowerment or joy or just strength in these spaces."

"I honestly don't think summiting Mount Everest has changed me," Taylor says. "But I think that maybe part of the project has changed me. We've seen people reaching out and just so excited and getting motivated. Just being able to do a trip that can inspire other people and have people be excited to do things that are good for them. It's kind of where that change, that change that I've seen in myself."

Advertisement

## Making history, making changes

"Climbing provides perspective," Ainuu says. "And it's really good for the mind and movement, in general. You translate that to the movement outdoors. There are so many studies that show what it does for our brains and for our mental health."

Henderson would also like to see some changes that would better



Advertisement

the mind and movement, in general. You translate that to the movement outdoors. There are so many studies that show what it does for our brains and for our mental health."

Henderson would also like to see some changes that would better encourage access.

**More:**  More Americans than ever enjoying outdoor health benefits. But racial inequities persist.

"There is a climbing gym in Memphis (Memphis Rocks), and that's one climbing gym in one hood in Memphis," Henderson says. "And I'd like to see climbing gyms in so many other neighborhoods outside of the ones that already exist to give people more access to the sport."



The Full Circle Everest team on an expedition to Mount Everest in May 2022.
THE NORTH FACE AND FULL CIRCLE EVEREST

"Indoor climbing can lead to outdoor climbing, which can lead to ice climbing, which can lead to high-altitude climbing. There are so many things here, but that's one of the changes that I think that's well within the reach of the industry and people who could make those things happen as well."

What's next for the team? Henderson says first, some waiting.

"There's been a lot of people who have shown interest in checking out base camp, going to other mountains," says Henderson. "Even some people who say they want to go to Everest. But I can't really put a finger on it right now to say what's next for me. Life continues. Through this process, I also started to develop a nonprofit expedition that hopefully continues to help other folks find their summits."

Ainuu and Taylor both say they are looking forward to summer and spending time with their families, too.

And perhaps a trip back to Nepal awaits some of the team.



Advertisement

Ainuu and Taylor both say they are looking forward to summer and spending time with their families, too.

And perhaps a trip back to Nepal awaits some of the team.

"From just two trips there, I feel like a piece of my heart is there, and like I really want to go back," says Ainuu. "It's a special place."

**Triumph and tragedy on Mount Everest**

Eleven people have died while attempting to summit Mount Everest and world records have been set this climbing season on the world's tallest peak.

AD CONTENT

Sponsored Links by Taboola

You will never turn off your computer, if you have a mouse
Combat Siege

Unsold Prefabricated Cabins With Toilet And Bath Cost Almost Nothing! (Take A Look!)
Unsold Prefabricated Cabins

Early Childhood Education Degree Might Help You To Earn More
Gotolike.com

Crossout: New Apocalyptic MMO

These Automation Tools Might Surprise You

Her Father Is One Of The Richest Men On The Planet



Document title: Full Circle Everest team talks about historic Mount Everest summit
Capture URL: https://eu.usatoday.com/story/sports/outdoors/2022/06/13/mount-everest-summit-full-circle-everest-black-climbers/7573157001/
Capture timestamp (UTC): Tue, 12 Dec 2023 16:06:09 GMT

# Exhibit F



# People

🔍 | Magazine ▾ | Newsletter | Sweepstakes

NEWS   ENTERTAINMENT   ROYALS   LIFESTYLE   STYLEWATCH   SHOPPING   SUBSCRIBE

PODCASTS

# Meet the First All-Black Group of Climbers Attempting To Summit Mount Everest: 'It's Really Powerful'

"It's just really cool to be a part of," climber Manoah Ainuu says about the Full Circle Everest Team's historic trek up the world's highest mountain in a new episode of the *PEOPLE Every Day* podcast

By **Topher Gauk-Roger** | Published on February 22, 2022 12:40PM EST

f  🐦  📌  ✉



Advertisement



**As Cat Chow celebrates its 60th Anniversary,** we want to thank you and the millions of other cat owners who have trusted us to nourish America's cats for the last 60 years.

Veteran climber Manoah Ainuu is gearing up to make history with his latest adventure. The North Face athlete will make the treacherous trek to the top of Most Everest, a harrowing journey that only the most experienced climbers achieve. For the expedition, Ainuu will be joined by six Black men and two Black women, making them the first ever all-Black team to attempt the world's highest mountain.

"We had that shared experience of just standing out and being the only person that was Black, that had dark skin, doing their thing in the outdoors," Ainuu explains in a new episode of the PEOPLE Every Day podcast about diversity in outdoor sports. "It's really powerful to be with other people that have experienced that same thing doing what we love, because we're stronger together with those experiences. It's just really cool to be a part of."

**RELATED:** COVID Outbreak at Mount Everest Leads to Line of Separation

Document title: First All-Black Group of Climbers Attempting To Summit Mount Everest
Capture URL: https://people.com/meet-the-first-all-black-group-of-climbers-attempting-to-summit-mount-everest/
Capture timestamp (UTC): Sun, 05 Nov 2023 17:08:13 GMT

Page 1

have experienced that same thing doing what we love, because we're stronger together with those experiences. It's just really cool to be a part of."

RELATED: COVID Outbreak at Mount Everest Leads to Line of Separation

The Full Circle Everest Team will head to Nepal in April in attempt to add their climbs to the more than 10,000 successful summits, of which only 10 summiteers are Black. For Ainuu, it's an opportunity to enjoy climbing without question.

"Even though I'm confident in climbing and all that, it just doesn't feel comfortable because an old white gentleman might say something or question my knowledge or experience, which happens quite often," he tells host Janine Rubenstein. "I've come to realize through those experiences that having all the newest, nicest gear... people don't even look at that, they just look straight at your skin color and then they start interrogating you."



PHOTO: MANOAH AINUU/ INSTAGRAM

Ainuu is hopeful his team's story "will dispel a lot of that" because he hates seeing his friends experience discrimination while doing the thing they love. "The more of us that can come together and do stuff outside together, the better off we'll be," he adds.



RORSCHACH

"He's a registered therapy cat. He knows who needs love."

READ MORE STORIES

Advertisement

Advertisement

Capital One

Venture X Business:
Earn unlimited double miles.

Learn More

VENTURE X BUSINESS

Advertisement



**People**    NEWS    ENTERTAINMENT    ROYALS    LIFESTYLE    STYLEWATCH    SHOPPING     🔍   |   SUBSCRIBE

Advertisement

Advertisement



Advertisement

Growing up in Spokane, Wash., with an Ethiopian mother and Los Angeles-born father, Ainuu says he got his passion for traveling from his parents.

"They would always tell us stories when we were growing up about the importance of travel and experiencing other cultures, so we always had that foundation from them," he recalls.

Skiing and climbing were common pastimes with his family and friends from a young age: "I used to be really scared of heights, but that's one of the cool things about climbing: you kind of have to force yourself to get past that fear. You're putting yourself outside of your comfort zone to further increase that comfort zone."

**RELATED:** [Explorer Silvia Vasquez-Lavado — Whom Selena Gomez Will Play! — Says Writing Memoir 'Saved My Life'](#)

Because Spokane is predominantly white, Ainuu grew up as "the Black friend" in many of his circles, including the people he climbed with. Lately, he has been grateful to discover a wider circle of like-minded thrill seekers with similar backgrounds.

"I think for a lot of us at Full Circle, our place in the outdoors is usually defined as like, 'Oh yeah, the Black climber, Black skier'," he says. "But one

Advertisement



Advertisement



Advertisement

with similar backgrounds.

"I think for a lot of us at Full Circle, our place in the outdoors is usually defined as like, 'Oh yeah, the Black climber, Black skier'," he says. "But one of the good things about social media, it connected a lot of us."

Though his group does have some "anxiety" over the upcoming trek, Ainuu says extensive planning has gone into it for the past year, leading up to a January trip to Nepal when the team got "on the ground and we all came together.

Advertisement



Advertisement

Advertisement



Advertisement

His wife Rachel is also a key source of support. "Fortunately, she and a lot of our other partners are going to come out with us for the first three weeks," to hang out before the true climbing begins, he says. "We're all really excited for that. That takes a lot of the pressure away, when your significant others can be there with you."

**Check out more episodes of PEOPLE Every Day, airing on Apple podcasts, iHeartMedia, Spotify, Stitcher, Amazon Music or wherever you listen to your podcasts.**

# Exhibit G

Instagram   Log In   Sign Up



**adreadedclimber** • Follow
West Oakland

**adreadedclimber** #WeAreFullCircle event celebrating Black excellence in mountaineering in Oakland was such an amazing time. Sharing time, stories, belays with the family was rejuvenating and very much needed. Many thanks to Scott @wegotnextorg for organizing and bringing the community together. Gratitude to @pacificpipe @touchstoneclimbing @soultrakoutdoors @patagoniasf @patagonia @clifbar @yeti @arcteryx @rei for supporting and sponsoring two days of authentic connections.

23w

**544 likes**
June 27

Log in to like or comment.

Document title: #WeAreFullCircle event celebrating Black excellence in mountaineering in Oakland was such an amazing time. Sharing time, stories, belays… | Instagram
Capture URL: https://www.instagram.com/p/CuAHLnyrGAD/
Capture timestamp (UTC): Tue, 12 Dec 2023 16:11:35 GMT

# Exhibit H



Help Center

Search help articles...                    English (US)

- Instagram Features ⌄
- Manage Your Account ⌄
- Staying Safe ⌄
- Privacy, Security and Reporting ⌄
- Terms and Policies ⌃

  - Dissemination of Terrorist Content Online
  - **Community Guidelines**
  - Privacy Policy
  - Terms of Use
  - Platform Policy
  - Cookies Policy
  - Transparency Center
  - Community Payments Terms
  - Instagram Purchase Protection Policy

Terms and Policies

## Community Guidelines                    📋 Copy link

***COVID-19: Community Guidelines Updates and Protections:*** *As people around the world confront this unprecedented public health emergency, we want to make sure that our Community Guidelines protect people from harmful content and new types of abuse related to COVID-19. We're working to remove content that has the potential to contribute to real-world harm, including through our policies prohibiting coordination of harm, sale of medical masks and related goods, hate speech, bullying and harassment and misinformation that contributes to the risk of imminent violence or physical harm. To learn more about our policies on COVID-19 and vaccines,* see here.

### The Short

We want Instagram to continue to be an authentic and safe place for inspiration and expression. Help us foster this community. Post only your own photos and videos and always follow the law. Respect everyone on Instagram, don't spam people or post nudity.

### The Long

Instagram is a reflection of our diverse community of cultures, ages, and beliefs. We've spent a lot of time thinking about the different points of view that create a safe and open environment for everyone.

We created the Community Guidelines so you can help us foster and protect this amazing community. By using Instagram, you agree to these guidelines and our Terms of Use. We're committed to these guidelines and we hope you are too. Overstepping these boundaries may result in deleted content, disabled accounts, or other restrictions.

In some cases, we allow content for public awareness which would otherwise go against our Community Guidelines – if it is newsworthy and in the public interest. We do this only after weighing the public interest value against the risk of harm and we look to international human rights standards to make these judgments.

- **Share only photos and videos that you've taken or have the right to share.**

  As always, you own the content you post on Instagram. Remember to post authentic content, and don't post anything you've copied or collected from the Internet that you don't have the right to post. Learn more about intellectual property rights.

- **Post photos and videos that are appropriate for a diverse audience.**

  We know that there are times when people might want to share nude images that are artistic or creative in nature, but for a variety of reasons, we don't allow nudity on Instagram. This includes photos, videos, and some digitally-created content that show sexual intercourse, genitals, and close-ups of fully-nude buttocks. It also includes some photos of female nipples, but photos in the context of breastfeeding, birth giving and after-birth moments, health-related situations (for example, post-mastectomy, breast cancer awareness or gender confirmation surgery) or an act of protest are allowed. Nudity in photos of paintings and sculptures is OK, too.

  People like to share photos or videos of their children. For safety reasons, there are times when we may remove images that show nude or partially-nude children. Even when this content is shared with good intentions, it could be used by others in unanticipated ways. You can learn more on our Tips for Parents page.

- **Foster meaningful and genuine interactions.**

  Help us stay spam-free by not artificially collecting likes, followers, or shares, posting repetitive comments or content, or repeatedly contacting people for commercial purposes without their consent. Don't offer money or giveaways of

Document title: Community Guidelines | Instagram Help Center
Capture URL: https://help.instagram.com/477434105621119?helpref=faq_content
Capture timestamp (UTC): Tue, 12 Dec 2023 16:19:53 GMT

Page 1 of 4

Help Center

Search help articles...                                          English (US)

**Instagram Features**          ∨

**Manage Your Account**          ∨

**Staying Safe**          ∨

**Privacy, Security and Reporting**          ∨

**Terms and Policies**          ∧

  Dissemination of Terrorist Content Online

  Community Guidelines

  Privacy Policy

  Terms of Use

  Platform Policy

  Cookies Policy

  Transparency Center

  Community Payments Terms

  Instagram Purchase Protection Policy

- **Foster meaningful and genuine interactions.**

  Help us stay spam-free by not artificially collecting likes, followers, or shares, posting repetitive comments or content, or repeatedly contacting people for commercial purposes without their consent. Don't offer money or giveaways of money in exchange for likes, followers, comments or other engagement. Don't post content that engages in, promotes, encourages, facilitates, or admits to the offering, solicitation or trade of fake and misleading user reviews or ratings.

  You don't have to use your real name on Instagram, but we do require Instagram users to provide us with accurate and up to date information. Don't impersonate others and don't create accounts for the purpose of violating our guidelines or misleading others.

- **Follow the law.**

  Instagram is not a place to support or praise terrorism, organized crime, or hate groups. Offering sexual services, buying or selling firearms, alcohol, and tobacco products between private individuals, and buying or selling non-medical or pharmaceutical drugs are also not allowed. We also remove content that attempts to trade, co-ordinate the trade of, donate, gift, or ask for non-medical drugs, as well as content that either admits to personal use (unless in the recovery context) or coordinates or promotes the use of non-medical drugs. Instagram also prohibits the sale of live animals between private individuals, though brick-and-mortar stores may offer these sales. No one may coordinate poaching or selling of endangered species or their parts.

  Remember to always follow the law when offering to sell or buy other regulated goods. Accounts promoting online gambling, online real money games of skill or online lotteries must get our prior written permission before using any of our products.

  We have zero tolerance when it comes to sharing sexual content involving minors or threatening to post intimate images of others.

- **Respect other members of the Instagram community.**

  We want to foster a positive, diverse community. We remove content that contains credible threats or hate speech, content that targets private individuals to degrade or shame them, personal information meant to blackmail or harass someone, and repeated unwanted messages. We do generally allow stronger conversation around people who are featured in the news or have a large public audience due to their profession or chosen activities.

  It's never OK to encourage violence or attack anyone based on their race, ethnicity, national origin, sex, gender, gender identity, sexual orientation, religious affiliation, disabilities, or diseases. When hate speech is being shared to challenge it or to raise awareness, we may allow it. In those instances, we ask that you express your intent clearly.

  Serious threats of harm to public and personal safety aren't allowed. This includes specific threats of physical harm as well as threats of theft, vandalism, and other financial harm. We carefully review reports of threats and consider many things when determining whether a threat is credible.

- **Maintain our supportive environment by not glorifying self-injury.**

  The Instagram community cares for each other, and is often a place where people facing difficult issues such as eating disorders, cutting, or other kinds of self-injury come together to create awareness or find support. We try to do our part by providing education in the app and adding information in the Help Center so people can get the help they need.

  Encouraging or urging people to embrace self-injury is counter to this environment of support, and we'll remove it or disable accounts if it's reported to us. We may also remove content identifying victims or survivors of self-injury if the content targets them for attack or humor.

- **Be thoughtful when posting newsworthy events.**

  We understand that many people use Instagram to share important and newsworthy events. Some of these issues can involve graphic images. Because so many different people and age groups use Instagram, we may remove videos of intense, graphic violence to make sure Instagram stays appropriate for everyone.

Document title: Community Guidelines | Instagram Help Center
Capture URL: https://help.instagram.com/477434105621119?helpref=faq_content
Capture timestamp (UTC): Tue, 12 Dec 2023 16:19:53 GMT

Help Center

**Search help articles...**    English (US)

- Instagram Features ⌄
- Manage Your Account ⌄
- Staying Safe ⌄
- Privacy, Security and Reporting ⌄
- Terms and Policies ⌃
  - Dissemination of Terrorist Content Online
  - Community Guidelines
  - Privacy Policy
  - Terms of Use
  - Platform Policy
  - Cookies Policy
  - Transparency Center
  - Community Payments Terms
  - Instagram Purchase Protection Policy

We understand that many people use Instagram to share important and newsworthy events. Some of these issues can involve graphic images. Because so many different people and age groups use Instagram, we may remove videos of intense, graphic violence to make sure Instagram stays appropriate for everyone.

We understand that people often share this kind of content to condemn, raise awareness or educate. If you do share content for these reasons, we encourage you to caption your photo with a warning about graphic violence. Sharing graphic images for sadistic pleasure or to glorify violence is never allowed.

Help us keep the community strong:

- Each of us is an important part of the Instagram community. If you see something that you think may violate our guidelines, please help us by using our built-in reporting option. We have a global team that reviews these reports and works as quickly as possible to remove content that doesn't meet our guidelines. Even if you or someone you know doesn't have an Instagram account, you can still file a report. When you complete the report, try to provide as much information as possible, such as links, usernames, and descriptions of the content, so we can find and review it easily. We may remove entire posts if either the imagery or associated captions violate our guidelines.

- You may find content you don't like, but doesn't violate the Community Guidelines. If that happens, you can unfollow or block the person who posted it. If there's something you don't like in a comment on one of your posts, you can delete that comment.

- Many disputes and misunderstandings can be resolved directly between members of the community. If one of your photos or videos was posted by someone else, you could try commenting on the post and asking the person to take it down. If that doesn't work, you can file a copyright report. If you believe someone is violating your trademark, you can file a trademark report. Don't target the person who posted it by posting screenshots and drawing attention to the situation because that may be classified as harassment.

- We may work with law enforcement, including when we believe that there's risk of physical harm or threat to public safety.

For more information, check out our Help Center and Terms of Use.

Thank you for helping us create one of the best communities in the world,

The Instagram Team

### Related Articles

Recommendations on Instagram
About Family Center
How Instagram uses artificial intelligence to moderate content
Guidelines for Content Lowered in Feed and Stories on Instagram
Recommendation eligibility on Instagram
Onboard onto the Meta Collaboration Center

About Us          API          Jobs

Terms          Privacy          Cookie Settings

from Meta          © 2023 Meta

**Help Center**

- **Instagram Features** ⌄
- **Manage Your Account** ⌄
- **Staying Safe** ⌄
- **Privacy, Security and Reporting** ⌄
- **Terms and Policies** ⌃
  - Dissemination of Terrorist Content Online
  - Community Guidelines
  - Privacy Policy
  - Terms of Use
  - Platform Policy
  - Cookies Policy
  - Transparency Center
  - Community Payments Terms
  - Instagram Purchase Protection Policy

English (US)

We understand that many people use Instagram to share important and newsworthy events. Some of these issues can involve graphic images. Because so many different people and age groups use Instagram, we may remove videos of intense, graphic violence to make sure Instagram stays appropriate for everyone.

We understand that people often share this kind of content to condemn, raise awareness or educate. If you do share content for these reasons, we encourage you to caption your photo with a warning about graphic violence. Sharing graphic images for sadistic pleasure or to glorify violence is never allowed.

Help us keep the community strong:

- Each of us is an important part of the Instagram community. If you see something that you think may violate our guidelines, please help us by using our built-in reporting option. We have a global team that reviews these reports and works as quickly as possible to remove content that doesn't meet our guidelines. Even if you or someone you know doesn't have an Instagram account, you can still file a report. When you complete the report, try to provide as much information as possible, such as links, usernames, and descriptions of the content, so we can find and review it quickly. We may remove entire posts if either the imagery or associated captions violate our guidelines.

- You may find content you don't like, but doesn't violate the Community Guidelines. If that happens, you can unfollow or block the person who posted it. If there's something you don't like in a comment on one of your posts, you can delete that comment.

- Many disputes and misunderstandings can be resolved directly between members of the community. If one of your photos or videos was posted by someone else, you could try commenting on the post and asking the person to take it down. If that doesn't work, you can file a copyright report. If you believe someone is violating your trademark, you can file a trademark report. Don't target the person who posted it by posting screenshots and drawing attention to the situation because that may be classified as harassment.

- We may work with law enforcement, including when we believe that there's risk of physical harm or threat to public safety.

For more information, check out our Help Center and Terms of Use.

Thank you for helping us create one of the best communities in the world,

The Instagram Team

## Related Articles

**Recommendations on Instagram**

**About Family Center**

**How Instagram uses artificial intelligence to moderate content**

**Guidelines for Content Lowered in Feed and Stories on Instagram**

**Recommendation eligibility on Instagram**

**Onboard onto the Meta Collaboration Center**

| About Us | API | Jobs |
| Terms | Privacy | Cookie Settings |

from ∞ Meta

© 2023 Meta

# Exhibit I

| | |
|---|---|
| **From:** | Walker, Leita <WalkerL@ballardspahr.com> |
| **Sent:** | Friday, October 27, 2023 4:59 PM |
| **To:** | matthewmonforton@yahoo.com; ian.prior@aflegal.org; nicholas.barry@aflegal.org |
| **Cc:** | Berlin, Seth D.; Salomao Nascimento, Isabella; Mike Meloy |
| **Subject:** | October 27 Letter re Talbot v. Ainuu et al. |
| **Attachments:** | October 27 Letter.pdf |

Counsel, please see attached letter. A hard copy will follow by mail.

Leita

**Leita Walker**

**Ballard Spahr**
LLP

2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
612.371.6222 DIRECT
612.371.3207 FAX

walkerl@ballardspahr.com
VCARD
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
www.ballardspahr.com

1

# Ballard Spahr
LLP

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

2000 IDS Center
80 South 8th Street
Minneapolis, MN 55402-2119
TEL 612.371.3211
FAX 612.371.3207
www.ballardspahr.com

Leita Walker
Tel: 612.371.6222
Fax: 612.371.3207
walkerl@ballardspahr.com

October 27, 2023

*Via Email*

Matthew Monforton
Monforton Law Offices, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry
Ian Prior
America First Legal Foundation
611 Pennsylvania Avenue SE, No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barr@aflegal.org
ian.prior@aflegal.org

Re:   ***Johnathan Talbot v. Manoah Ainuu, et al.***
      **Case No. 2:23-cv-00066-BMM (D. Mont.)**

Dear Counsel:

Along with the Meloy Law Firm, we represent VF Outdoor, LLC d/b/a The North Face ("TNF")**,** incorrectly sued as The North Face Apparel Corporation, and we write in connection with the above-referenced action.  We will shortly be moving for pro hac vice admission.

We wanted to thank you at the outset for your professional courtesy in agreeing to extend the deadline to answer or otherwise respond to Mr. Talbot's complaint until on or before December 19.  The Meloy Law Firm will be filing an opposed motion to that effect with the court in the coming days.

In the meantime, pursuant to Section 4.105.020 of the Revised Code of Washington ("RCW"), TNF hereby provides notice of its intent to file a special motion for expedited relief seeking dismissal of this action for failure to state a claim.  We are providing this notice so that

DMFIRM #409649584 v3

Counsel
October 27, 2023
Page 2

your client has the opportunity now to withdraw or amend his complaint.  Should TNF prevail on its special motion, it will be entitled, and will seek, to recover its attorneys' fees and costs under RCW 4.105.090.

The North Face reserves all of its rights and remedies. If you wish to discuss this matter, please feel free to contact us at your convenience.

Sincerely,

Leita Walker

Cc:     Seth D. Berlin
        Isabella Salomão Nascimento
        Mike Meloy

Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org

*Attorneys for Plaintiff Johnathan Talbot*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

| | | |
|---|---|---|
| Johnathan Talbot | ) | |
| | ) | |
| *Plaintiff,* | ) | Cause No. CV-23-66-BU-BMM |
| | ) | |
| v. | ) | **PLAINTIFF'S RESPONSE TO** |
| | ) | **DEFENDANTS' MOTIONS TO** |
| | ) | **DISMISS** |
| | ) | |
| | ) | |
| Manoah Ainuu, and The North | ) | |
| Face Apparel Corp., a Delaware | ) | |
| Company. | ) | |
| | ) | |
| *Defendants* | ) | |

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................... 7

BACKGROUND ................................................................... 7

   I.   MONTANA LAW GOVERNS THIS CASE ..................................... 10

     A.   The Montana Constitution Requires the Jury to Determine the Choice of Law in Defamation Cases. .................................. 11

     B.   The Restatement Factors Tip Sharply Toward Applying Montana Law to this Case................................................. 15

   II.   WASHINGTON'S ANTI-SLAPP LAW WOULD NOT APPLY TO THIS CASE EVEN IF WASHINGTON LAW GOVERNED .............. 18

   III.   THE ALLEGATIONS IN PLAINTIFF JOHNATHAN TALBOT'S COMPLAINT PLAUSIBLY GIVE RISE TO AN INFERENCE OF UNLAWFUL DEFAMATION ........................................................ 21

     A.   Mr. Ainuu's Defamatory Publications Were False and Defamatory Statements of Fact. ....................................... 22

     B.   Even if Mr. Ainuu's Statements Were "Opinion," They Were Based on Undisclosed and Incomplete Defamatory Facts and Are Thus Actionable. ................................................. 24

   IV.   MR. TALBOT HAS ADEQUATELY PLED FACTS THAT SUPPORTS HIS CLAIMS FOR TORTIOUS INTERFERENCE AND PUNITIVE DAMAGES ........................................................ 36

   V.   MR. TALBOT HAS ADEQUATELY PLED FACTS SUPPORTING A CLAIM AGAINST NORTH FACE FOR VICARIOUS LIABILITY. 37

   VI.   CONCLUSION .......................................................... 42

2

# TABLE OF AUTHORITIES

## US SUPREME COURT CASES

*Snyder v. Phelps*, 562 U.S. 443 (2011).................................................. 19, 19

*Connick v. Myers*, 461 U.S. 138 (1983) .................................................. 19

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 21

*Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................... 24, 25, 28

*Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556 (1982)............................................................................................. 37

## STATE CASES

*Buckles v. BH Flowtest*, 476 P.3d 422 (Mont. 2020) ............................... 10

*Phillips v. General Motors Corp.*, 995 P.2d 1002 (Mont. 2000)........ 11, 15

*Lee v. Traxler*, 384 P.3d 82 (Mont. 2016)................................................. 12

*Madison v. Yunker*, 589 P.2d 126 (Mont. 1978) ...................................... 12

*McLeod v. State ex rel. Dept. of Transportation*, 206 P.3d 956 (Mont. 2009).................................................................................................... 13

*Hale v. City of Billings*, 986 P.2d 413 (Mont. 1999).......................... 13, 27

*Lewis v. Reader's Dig. Ass'n, Inc.*, 512 P.2d 702 (Mont. 1973).............. 22

*Roots v. Mont. Hum. Rights Network*, 913 P.2d 638 (Mont. 1996) ........ 23

3

*Keller v. Safeway Stores*, 108 P.2d 605 (Mont. 1940) ............................. 37

## OTHER CASES

*Prima Exploration, Inc. v. Nova Energy, LLC*, 2023 WL 4872568 (D. Mont., July 12, 2023) ......................................................... 10

*Fields v. Legacy Health Sys.*, 413 F.3d 943 (9th Cir. 2005) .................... 10

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005) ..................................... 13

*Johnson v. Multnomah County*, 48 F.3d 420 (9th Cir. 1995) ................. 19

*La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) ........................................ 30

*Davis v. Cornely*, 2021 WL 4805119 (N.D. Ohio Oct. 14, 2021) ............. 30

*Jorjani v. N.J. Institute of Tech.*, 2019 WL 1125594 (D.N.J. March 12, 2019) ......................................................................... 30

*O'Brien v. City of Saginaw*, 2011 WL 8143 (E.D. Mich. 2011) ............... 30

*Puchalski v. Sch. Dist. of Springfield*, 161 F.Supp.2d 395 (E.D. Pa. 2001) ........................................................................ 31

*Cooper v. Templeton*, 629 F.Supp.3d 223 (S.D.N.Y 2022) ...................... 31

*Rapaport v. Barstool Sports, Inc*, 2021 WL 1178240 (S.D.N.Y, March 29, 2021) ......................................................................... 32

*Cummings v. City of New York*, 2020 WL 882335 (S.D.N.Y. February 24, 2020) ......................................................................... 32

*Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994) ........................................ 32

4

*Brimelow v. New York Times Co.*, 2020 WL 7405261 (S.D.N.Y,
December 16, 2020) ........................................................................ 32

*Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988) ................................... 32

*Edelman v. Croonquist*, 2010 WL 1816180 (D.N.J. May 4, 2010) ......... 32

*Nelsen v. Southern Poverty Law Center*, 2019 WL 12288374 (W.D.
Mo., July 31, 2019) ........................................................................ 32

*Sandmann v. New York Times Company*, 78 F.4th 319 (6th Cir.
2023) ........................................................................................ 33, 33

*Quigley v. Rosenthal*, 43 F.Supp.2d 1163 (D. Colo. 1999) ...................... 35

## STATE CONSTITUTIONAL PROVISIONS

Mont. Const. art. II § 7.................................................... 12, 12, 14

## STATE STATUTES

Wash. RCW 4.105.010........................................................ 18, 20

Wash. RCW 4.105.060............................................................. 18

## OTHER AUTHORITIES

Restatement (Second) of Conflict of Laws (1971) ................. 10, 11, 15, 17

Restatement (Second) of Torts (1977) .............................................. 25, 26

5

Restatement (First) of the Law of Agency (1933) ................................... 38

6

## INTRODUCTION

The Defendants Manoah Ainuu ("Mr. Ainuu") and The North Face ("North Face") (collectively "the Defendants") believe that calling someone a "racist" is categorically protected as opinion under the United States Constitution, even when this slur is used to falsely and maliciously defame someone to over 15,000 people and the speaker admits that he had no objective or subjective basis for doing so. Mr. Ainuu and North Face argue they should face no consequences for branding Mr. Talbot this way, despite their intention to maliciously damage him, destroy his reputation, and cost him his job for the purposes of increasing Mr. Ainuu's fame and credibility as a social activist and to hurt a North Face rival. This is not the law, and the Court should deny the Defendants' motions to dismiss.

## BACKGROUND

North Face is a well-known, international brand that sells outdoor apparel and recreational equipment designed for extreme winter sport activities. Compl. at ¶ 11. As part of its operations, North Face pays athletes to lend credibility to its products and to serve as brand

7

ambassadors to its customer base. Compl. at ¶ 17. North Face also utilizes its brand to insert itself into controversies related to social justice and it encourages its paid athletes and employees to do the same. Compl. at ¶¶ 17-22, 40-42. North Face-sponsored athletes like Mr. Ainuu and others have done just that, often creating controversies under the guise of social justice by attacking companies and individuals that are competitors of North Face and/or its sponsored athletes. Compl. at ¶¶ 23-29, 47-51. Those actions by its sponsored athletes are consistently met with tacit and implied approval from North Face. Compl. at ¶¶ 30, 52.

Since he became a North Face-sponsored athlete in 2018, Mr. Ainuu has gained international fame and a significant social media following, which he frequently utilizes to advocate for social justice and to condemn "systemic racism" in line with the stated mission of North Face. Compl. at ¶¶ 31-46. On June 21, 2023, Mr. Ainuu made the decision to use that North Face platform to ruin the life of a man he had only just briefly met– the Plaintiff, Johnathan Talbot ("Mr. Talbot"). Mr. Ainuu executed this mission by making the false and defamatory statement in an Instagram post that Mr. Talbot "tried to fight [the Defendant] after saying racist

8

things" outside of a bar in Bozeman, Montana. Compl. at ¶ 66. This post was republished by Dave Burleson, the North Face executive charged with managing its sponsored athletes. Compl. at ¶ 67.

Though Mr. Ainuu later admitted to the HR Director of Mr. Talbot's employer, Outdoor Research, that he could not point to any "racist things" that Mr. Talbot said to him, Mr. Ainuu spent weeks maliciously posting additional defamatory statements that Mr. Talbot said racists things to him and was a racist, and that Mr. Talbot's employer, Outdoor Research, needed to "exterminate his employment," all while directing those posts to Outdoor Research and encouraging his followers to pressure Outdoor Research to terminate Mr. Talbot, which it eventually did. Compl. at ¶¶ 65-81.

The Defendants now ask this Court to apply Washington State law to this case and dismiss Mr. Talbot's claims on the grounds that Mr. Ainuu's statements, including that Mr. Talbot "tried to fight [Mr. Ainuu] after saying racist things," are not defamatory, and, even if they are, Mr. Ainuu cannot be liable because they represent his opinion. North Face also seeks dismissal on the grounds that it cannot be held vicariously

9

liable for the actions of its agent, despite encouraging those actions, promoting and benefitting from those actions.

The Defendants are wrong, on all counts. Montana law applies to this case, and Mr. Talbot has more than sufficiently stated a cause of action for defamation and tortious interference against both Defendants.

## I.   MONTANA LAW GOVERNS THIS CASE

It is well-settled that a "'[f]ederal court sitting in diversity cases must apply the forum state's choice of law rules to determine the controlling law.'" *Prima Exploration, Inc. v. Nova Energy, LLC*, 2023 WL 4872568 at *4 (D. Mont., July 12, 2023) (quoting *Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 (9th Cir. 2005). When a potential choice of law issue exists, Montana applies the two-part rule established by the Restatement (Second) of Conflict of Laws (1971). *Buckles v. BH Flowtest*, 476 P.3d 422, 424 (Mont. 2020). The court should first consider "whether the forum state has a statutory directive concerning choice of law applicable to the underlying cause of action." *Id. (*citing Restatement (Second) of Conflict of L. § 6(1)). If such a provision does not exist, a court should consider the factors outlined in Restatement, § 6(2):

10

(a) the needs of the interstate and international systems,
(b) the relevant policies of the forum,
(c) the relevant policies of other interested states and the relative interests of those states in determination of a particular issue,
(d) the protection of justified expectations,
(e) the basic policies underlying the particular field of law,
(f) certainty, predictability, and uniformity of result, and
(g) ease in the determination and application of the law to be applied.

Restatement (Second) of Conflict of L. § 6(2). Additionally, the Montana Supreme Court has emphasized that "[a]ny analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case." *Phillips v. General Motors Corp.*, 995 P.2d 1002, 1007 (Mont. 2000).

A. <u>The Montana Constitution Requires the Jury to Determine the Choice of Law in Defamation Cases.</u>

Under the Restatement, an applicable statutory directive governs a choice of law issue. Restatement (Second) of Conflict of L. § 6(1). Montana has not just a *statutory* directive but a *constitutional* directive concerning the choice of law in defamation cases. Unlike other tort cases, the Montana Constitution requires that "[i]n all suits … for libel or slander… *the jury*, under the direction of the court, shall determine *the law* and *the*

11

_facts_." Mont. Const. art. II, § 7 (emphasis added).[1] This provision "places the heart of any determination regarding defamatory libel directly within the province of the jury, subject only to determinations envisioned by the phrase 'under the direction of the court.'" _Lee v. Traxler_, 384 P.3d 82, 86 (Mont. 2016). Thus, "we emphasize that, due to the unique nature of cases involving libel, a district court should take particular care" before dismissing such cases at the pre-trial stage. _Id._ For example, whether a defamation plaintiff is a "public figure" is "a question for the jury to determine, because of the constitutional provision that the jury under the instructions of the court is the judge of both the law and the fact." _Madison v. Yunker_, 589 P.2d 126, 133 (Mont. 1978) (citing Mont. Const. art. II, § 7). Simply put, a jury's authority under the Montana

---

[1] Article II, § 7, of the Montana Constitution states:

No law shall be passed impairing the freedom of speech or expression. Every person shall be free to speak or publish whatever he will on any subject, being responsible for all abuse of that liberty. In all suits and prosecutions for libel or slander the truth thereof may be given in evidence; and the jury, under the direction of the court, shall determine the law and the facts.

Constitution to "determine the law" in a defamation case necessarily includes authority to determine the choice of law.

Of course, the Montana Constitution does not provide defamation plaintiffs with an absolute right to a jury trial. Judges "may dispose of defamation claims where there are no issues of fact warranting a jury trial." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005) (citing Mont. Const. art. II, § 7). Thus, defamation claims lacking sufficient evidentiary support under Montana law may be dismissed at the pre-trial stage. See, *e.g.*, *McLeod v. State ex rel. Dept. of Transportation*, 206 P.3d 956, 962 (Mont. 2009) (upholding dismissal of defamation claims based upon statements that were privileged under Montana law). Conversely, the Montana Constitution entitles defamation plaintiffs to a jury trial if their claims have adequate evidentiary support under Montana law. *See, e.g.*, *Hale v. City of Billings*, 986 P.2d 413, 417-18 (Mont. 1999) (reversing dismissal of plaintiff's defamation claim because city's allegations that plaintiff was a fugitive and a "most-wanted" suspect were potentially false).

As explained below, Talbot has adequately pled a claim for defamation under Montana law. That is all he is required to do at this stage of the proceedings. He intends to show the jury that Montana law entitles him to damages resulting from Mr. Ainuu's defamatory remarks and North Face's participation in spreading and encouraging those remarks.

If the Defendants want Talbot's claims resolved under Washington law, they must ask the jury to apply Washington law, and "the jury, under the direction of the court, shall determine the law." Mont. Const. art. II, § 7. The Court may fashion instructions to guide the jury in that determination–instructions that would presumably inform the jury to consider the factors in Restatement, § 6(2). But the choice of law is the jury's choice, not the Court's. A pre-trial dismissal, based solely on Washington law, of defamation claims that Talbot has adequately pled under Montana law would deprive him of his constitutional right to have a jury determine whether Washington law should apply in the first place. Therefore, in ruling on Defendants' motions, the Court must limit its review to the application of Montana law to Talbot's defamation claims.

14

B. <u>The Restatement Factors Tip Sharply Toward Applying Montana Law to this Case.</u>

Not only does section 6(1) of the Restatement require the Court to apply Montana law to the Defendants' motions, section 6(2) does as well. Under the latter section, Montana courts turn to Restatement, §§ 145-46 to determine which state has "the most significant relationship to the occurrence and the parties." *Phillips,* 995 P.2d at 1007. This requires courts to analyze the place where the injury occurred, the place where the conduct causing the injury occurred, the domicil and residence of the parties, and the place where the relationship between the parties is centered. Restatement (Second) of Conflict of L. § 145.

Further, according to the Restatement, "[i]n the majority of instances, the actor's conduct, which may consist either of action or non-action, and the personal injury will occur in the same state. In such instances, the local law of this state will usually be applied to determine most issues involving the tort." *Id.* at §146 cmt. d. That is because "the state where the injury occurs will, usually at least, have the dominant interest in determining whether the interest affected is entitled to legal protection."

15

The relationship between Mr. Talbot and Mr. Ainuu is centered in Bozeman, Montana. They met there for the first time, outside of a bar on June 20, 2023, and that is where the conflict occurred. Compl. at ¶¶ 53-63. Additionally, Mr. Ainuu is a resident of Bozeman, Montana, his Instagram highlights his Montana residence, he used that same Instagram account to defame Mr. Talbot while both were physically present in Montana, and he directed his defamatory statements to damage Mr. Talbot to a Montana audience, as demonstrated by the repeated Instagram references Mr. Ainuu made in his posts about Mr. Talbot being from Montana. Compl. at ¶¶ 9, 64-66, 68, 81; Ex. 5 ("Ainuu Instagram Profile"). Mr. Talbot had only recently moved from his home of Bozeman to Washington State in June of 2023 for his new job at Outdoor Research. Compl. at ¶ 56; Ex. 8 ("Talbot Decl.") at ¶ 3.  These facts establish that the state with  most significant relationship to the occurrence and the parties is, therefore, Montana.

Mr. Ainuu claims otherwise by quoting comment (e) of section 150 of the Restatement for the proposition that, in multistate defamation, courts should apply the law of the plaintiff's domicile "even though some

16

or all of the defamer's acts of communication were done in another state." Doc. 28 at 3.  He neglects to mention the next paragraph in comment (e), which reads: "[a] state which is not the state of the plaintiff's domicil, may be that of most significant relationship if it is the state where the defamatory communication caused the plaintiff the greatest injury to his reputation. This may be so, for example, in situations where (a) the plaintiff is better known in this state than in the state of his domicil, or (b) the matter claimed to be defamatory related to an activity of the plaintiff that is principally located in this state, or (c) the plaintiff suffered greater special damages in this state than in the state of his domicil, or (d) the place of principal circulation of the matter claimed to be defamatory was in this state." Restatement (Second) of the Conflict of L. § 150 cmt. e.

In this case, Mr. Talbot had just moved from Bozeman, Montana to Washington State the very same month that Mr. Ainuu defamed him. Clearly, Mr. Talbot was better known in Montana than he was in Washington State, having resided in the latter state a mere matter of days before Mr. Ainuu began defaming him. Further, the defamation

17

related to the activities of Mr. Talbot in Montana—introducing himself to and engaging in conversation with Mr. Ainuu outside of a bar in Bozeman. Finally, given that Mr. Ainuu himself is a Bozeman resident, and that he intentionally directed his posts to a Bozeman audience for the purpose of affecting Mr. Talbot in the place where he had a good reputation, the Court should conclude that the place of principal circulation of Mr. Ainuu's defamatory posts was Montana.

The Defendants's reliance upon Washington law is misplaced. The only tie this case has to Washington appears to be that Mr. Talbot moved from Montana to Washington a few days before Mr. Ainuu began defaming him, ultimately resulting in Mr. Talbot being fired from the job for which he left Montana in the first place.

## II.   WASHINGTON'S ANTI-SLAPP LAW WOULD NOT APPLY TO THIS CASE EVEN IF WASHINGTON LAW GOVERNED

Washington's anti-SLAPP law applies only if (1) the plaintiff's case is dismissed for failure to state a claim, and (2) the defendant was exercising the right to speak "on a matter of public concern." RCW 4.105.010 (2)(c); RCW 4.105.060. Mr. Talbot addresses the substance of his claims in the next section, but Washington's anti-SLAPP statute is

18

not controlling because Mr. Ainuu's speech is not "on a matter of public concern."

Whether or not speech is a matter of public concern turns on whether it can "be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011). To determine whether speech is a matter of public concern, courts must look to the "content, form, and context of a given statement, as revealed by the whole record." *Johnson v. Multnomah County*, 48 F.3d 420, 422 (9th Cir. 1995). Even speech that may broadly involve public matters to society or the community does not always qualify for Constitutional protection as a matter of public concern. *Snyder*, 562 U.S. at 455. Where the speech on a public matter appears instead as a mask to attack an individual over a private matter, the speech does not enjoy Constitutional protection. *Id.*; *see also Connick v. Myers*, 461 U.S. 138, 153 (1983) (speech on a public matter not deemed to be of public concern when its primary purpose was related to a personal grievance).

19

In this case, Mr. Ainuu's defamatory statements arose after a private conversation that took place between him and Mr. Talbot on a street in Bozeman, Montana. Compl. at ¶¶ 57-59. Moreover, the object of Mr. Ainuu's obsessive and defamatory posts was not to engage in a serious discussion with the community on the issue of race, but rather to punish and destroy Mr. Talbot's reputation because of a personal grievance,, then to use this fabricated feud to raise his personal profile, burnish North Face's "social justice" credentials, and injure the reputation of North Face's competitor, Outdoor Research.

Consequently, even if the Court were to find that Washington Law controls, and that Mr. Talbot has failed to state a claim, Mr. Ainuu's speech is not "on a matter of public concern" and the Defendants should not be awarded relief under RCW 4.105.010 (2)(c).[2]

---

[2] Defendants' anti-SLAPP motions are based upon a statute that "creates no substantive rights; it merely provides a procedural mechanism for vindicated existing rights." *Klocke v. Watson*, 936 F.3d 240, 247 (5th Cir. 2019), quoting *Makaeff v. Trump Univ.*, 715 F.3d 254, 273 (9th Cir. 2013) (Kozinski, C.J., concurring). Mr. Talbot recognizes that the Ninth Circuit has subsequently made clear that anti-SLAPP

20

## III.  THE ALLEGATIONS IN PLAINTIFF JOHNATHAN TALBOT'S COMPLAINT PLAUSIBLY GIVE RISE TO AN INFERENCE OF UNLAWFUL DEFAMATION

The facts and allegations pleaded in the Complaint are more than adequate to create a plausible inference that Mr. Ainuu unlawfully defamed Mr. Talbot.

A court must deny a Defendants' Rule 12(b)(6) motion when a complaint "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, in analyzing a Rule 12(b)(6) motion, a court must accept as true the factual allegations made by a plaintiff in the complaint. *Id*. Therefore, in this case, the Court must accept as true the facts alleged in Mr. Talbot's Complaint and determine whether those alleged facts state a plausible claim for relief pursuant to Montana defamation law.

The Montana Supreme Court has held that "[t]he underlying purpose of libel law is to furnish a means of redress for defamation. Every

───────────────

motions can be applied in federal diversity cases. *CoreCivic, Inc. v. Candide Group*, 46 F.4th 1136, 1143 (9th Cir. 2022). Mr. Talbot further recognizes that this Court is bound by *CoreCivic* – he simply desires to preserve this issue for appeal.

21

person is entitled to enjoy his reputation unimpaired by false and defamatory remarks." *Lewis v. Reader's Dig. Ass'n, Inc.*, 512 P.2d 702, 705 (Mont. 1973).

The elements of an action to redress those rights under Montana law are "a false and unprivileged publication by writing, printing, effigy, or other fixed representation that exposes any person to hatred, contempt, ridicule, or obloquy or causes a person to be shunned or avoided or that has a tendency to injure a person in the person's occupation." Mont. Code Ann. § 27-1-802.

### A. Mr. Ainuu's Defamatory Publications Were False and Defamatory Statements of Fact.

Mr. Talbot has more than adequately pled that Mr. Ainuu made a false publication that exposed him to hatred, contempt, ridicule, or obloquy or caused him to be shunned or avoided or that injured him in his occupation.

More specifically, Mr. Talbot alleges in his Complaint that Mr. Ainuu posted on Instagram that Mr. Talbot had approached him in Bozeman, "tried to fight [Mr. Ainuu] after saying racist things," "initiated a fight," and was one of "the racists in outdoor industry." Compl. at ¶¶

22

65-66, 81. He also published numerous other supplemental posts further implying that Mr. Talbot had made racist statements accompanied by threats of violence towards Mr. Ainuu. Compl. at ¶¶ 68, 72, 81.

The Complaint further alleges facts that demonstrate that Mr. Talbot was exposed to hatred, contempt, ridicule, or obloquy or caused him to be shunned or avoided or injured Mr. Talbot in his occupation. Those facts include the comments of Mr. Ainuu's Instagram followers, that Mr. Talbot was terminated from his position at Outdoor Research as a direct result of Mr. Ainuu's Instagram campaign, and that Mr. Talbot has been unable to secure employment since and because of Mr. Ainuu's Instagram campaign. Compl. at ¶¶ 69-78, 80, 82.

The Defendants claim, however, that his Instagram posts cannot legally be considered "false" because the Defendant's statements that Mr. Talbot "tried to fight [Mr. Ainuu] after saying racist things" and "initiated a fight [with Mr. Ainuu]" are statements of opinion that can never be actionable as defamatory.

Whether a statement is one of fact or opinion depends on if the statement contains "a provable false factual connotation." *Roots v. Mont.*

23

*Hum. Rights Network*, 913 P.2d 638, 640 (Mont. 1996). In this case, Mr. Ainuu's statements that Mr. Talbot "tried to fight [him] after saying racist things" are provably false–as alleged in the Complaint, Mr. Ainuu has already proven his own statement false when he admitted to Outdoor Research's HR Director that he "could not point to any racist or offensive statement" made to him by Mr. Talbot. Compl. at ¶¶ 75-76. The Defendants cannot reasonably claim that a factual allegation that Mr. Ainuu made, which he later admitted to be false, is not provably false.

B. <u>Even if Mr. Ainuu's Statements Were "Opinion," They Were Based on Undisclosed and Incomplete Defamatory Facts and Are Thus Actionable.</u>

If the Court were to consider Mr. Ainuu's statements to be "opinion," it is clear from the Complaint that they are properly considered "mixed opinion," as opposed to "pure opinion," and are thus actionable.

The United States Supreme Court has made clear that there is not "a wholesale exemption [from defamation liability] for anything that might be labeled 'opinion.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1,

24

18 (1990).[3] That is because such an interpretation would "ignore the fact that expressions of 'opinion' may often imply the assertion of objective fact." *Id.* at 18. Explaining itself further, the Court cited the Restatement (Second) of Torts, § 566, comment a (1977), for the rule that, if the facts upon which a speaker bases his opinion "are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact" and thus be actionable defamation. *Id.* at 19.

Indeed, the illustrations from § 566 of the Restatement demonstrate how different variations of a speaker's conclusion can lead to different results.

Illustration 3 reads: "A writes to B about his neighbor C: 'I think he must be an alcoholic.' A jury might find that this not just an expression

---

[3] North Face argues that *Milkovich* stands for the proposition that opinions relating to matters of public concern will receive full constitutional protection. Doc. 26 at 18. Interestingly, North Face omits the key language from that case clearly stating that opinions do not receive a wholesale exemption from defamation and that opinions that imply the existence of undisclosed defamatory facts are indeed actionable as mixed opinion.

25

of opinion but that it implied that A knew undisclosed facts that would justify his opinion." Restatement (Second) of Torts § 566.

Illustration 4 reads: "A writes to B about his neighbor C: 'He moved in six months ago. He works downtown, and I have seen him during that time only twice, in his backyard around 5:30 seated in a deck chair with a portable radio listening to a news broadcast, and with a drink in his hand. I think he must be an alcoholic.' The statement indicates the facts on which the expression of opinion was based and does not imply others. These facts are not defamatory and A is not liable for defamation." *Id.*

According to the Restatement, this distinction between opinion based on fully disclosed facts (pure opinion) and one based on undisclosed facts (mixed opinion) is significant:

> The distinction between the two types of expression of opinion, as explained in Comment b, therefore becomes constitutionally significant. The requirement that a plaintiff prove that the defendant published a defamatory statement of fact about him that was false can be complied with by proving the publication of an expression of opinion of the mixed type, if the comment is reasonably understood as implying the existence of undisclosed facts about the plaintiff that must be defamatory in character in order to justify the opinion. A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and

26

unreasonable the opinion may be or how derogatory it is. **But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. <u>The difference lies in the effect upon the recipient of the communication.</u>** In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and **if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.** The defendant cannot insist that the undisclosed facts were not defamatory but that he unreasonably formed the derogatory opinion from them. This is like the case of a communication subject to more than one meaning. As stated in § 563, **the meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express.**

*Id.* at comment c.

The Montana Supreme Court explicitly adopted *Milkovich* and the Restatement in *Hale,* 986 Mont. at 419, holding that "if an opinion is not based on disclosed facts, and as a result creates the reasonable inference that the opinion is based on undisclosed defamatory facts, such an opinion is not afforded constitutional protection."

The Complaint in this matter clearly states that Mr. Ainuu posted to Instagram that Mr. Talbot "tried to fight [him] after saying racist

27

things," while failing to articulate what Mr. Ainuu's statement was based upon, namely what Mr. Talbot specifically said to him.[4]

The Defendants attempt to argue, however, that those statements cannot be considered defamatory given "the totality of the circumstances." They claim that a reasonable audience would not take Mr. Ainuu's statements as facts because they were made online, or because his race and ethnicity make him especially sensitive to racism the average person would not see, or that the use of emojis make it clear that he didn't mean to be taken seriously, or that the statements were made in the heat of the moment. None of those arguments are supported by the allegations in the Complaint and should not be taken seriously.

---

[4] To the extent the Defendant claims that his vague description of Mr. Talbot "asking questions–very directly–about diversity" was the fact upon which he based his opinion, such a disclosure is still woefully "incomplete" in that it still fails to adequately disclose what questions Mr. Talbot said or did not say about diversity and the recipients of that information clearly came to the reasonable, but false, conclusion that Mr. Talbot must have said something racist. *See Milkovich*, 497 U.S. at 18-19 ("[e]ven if the speaker states the facts upon which he bases his opinion, **if those facts are either incorrect or incomplete, or if his assessment of them is erroneous**, the statement may still imply a false assertion of fact.")

The reality is that Mr. Ainuu's Instagram followers who viewed his Instagram posts, made over the course of weeks, drew the reasonable, but false, conclusion that Mr. Ainuu was justified in his statement based on assumed but undisclosed facts of what actually transpired. They concluded that Mr. Talbot was "an aggressive white racist," "questioned [Mr. Ainuu's] right to be there," made it difficult for Mr. Ainuu to live in Bozeman because he is "a person of color," that Mr. Talbot engaged in "bigotry and hatred," and that he "assaulted [a person] of color in [a] small town[]." Compl. at ¶ 69.

Further, as a result of the reasonable, but false, conclusions that Mr. Ainuu's Instagram followers made from his dangerously vague and incomplete false accusations against Mr. Talbot, those followers began a pressure campaign against Mr. Talbot's employer and a competitor of North Face, Outdoor Research, who came to a similarly reasonable, but false, conclusion that Mr. Talbot engaged in discriminatory conduct. This is aptly demonstrated by the fact that Outdoor Research felt the need to post the following on Instagram: "For those that have messaged our social accounts, emailed us, or contacted customer service, you are heard. OR

29

does not support discriminatory conduct based on race or any other reason, and we take these matters very seriously. We hope to get the chance to speak to Manoah directly about what transpired." Compl. at ¶ 70.

Courts throughout the country have routinely held that accusations that someone engaged in specific racist conduct or speech, where those accusations imply the existence of undisclosed defamatory facts, can be actionable defamation on the grounds that it is mixed opinion. *See La Liberte v. Reid,* 966 F.3d 79 (2d Cir. 2020) (accusation that someone engaged in concrete, racist conduct can be proven either true or false and is thus an actionable claim of defamation); *Davis v. Cornely*, 2021 WL 4805119 (N.D. Ohio Oct. 14, 2021) (plaintiff stated a claim for defamation where the defendant accused him of making racist and threatening remarks); *Jorjani v. N.J. Institute of Tech.,* 2019 WL 1125594 at *4 (D.N.J. March 12, 2019) ("if the statement falsely implies someone engaged in specific acts (**e.g., made racist statements or refused to employ a certain race**), it may be defamatory") (emphasis added); *O'Brien v. City of Saginaw*, 2011 WL 8143 (E.D. Mich. 2011) (denying

30

defendant's motion to dismiss on the grounds that the defamatory accusation of racism implied the existence of undisclosed defamatory facts); *Puchalski v. Sch. Dist. of Springfield,* 161 F.Supp.2d 395 (E.D. Pa. 2001) (stating that someone made a racist remark is capable of defamatory meaning and actionable); *see also Cooper v. Templeton,* 629 F.Supp.3d 223 (S.D.N.Y 2022) (recognizing that a statement that someone is racist based on undisclosed facts may be actionable defamation but finding that the undisclosed facts were well known to the public as the incident giving rise to the opinion made international news).

Conversely, the overwhelming majority of cases cited by the Defendants are easily distinguishable in that the statement at issue was not actionable defamation on the grounds that the speaker either did not imply the existence of undisclosed facts upon which the opinion was based, the speaker actually disclosed the detailed facts upon which the

31

opinion was based, or the facts were already well known to the public because of significant news coverage.[5]

The Defendants similarly attempt to claim that Mr. Ainuu's statements that Mr. Talbot "tried to fight [Mr. Ainuu]," and "initiated a

---

[5] *Rapaport v. Barstool Sports, Inc,* 2021 WL 1178240 (S.D.N.Y, March 29, 2021) (the speaker's statements are not mixed opinion because they do not imply existence of undisclosed facts); *Nelsen v. Southern Poverty Law Center,* 2019 WL 12288374 (W.D. Mo., July 31, 2019) (statements in an article that someone was a neo-Nazi, anti-immigrant, and racist were not based on undisclosed facts, but were based on statements made by the plaintiff which were quoted by the defendant in the same article); *Cummings v. City of New York,* 2020 WL 882335 (S.D.N.Y. February 24, 2020) (statement in news article that the plaintiff was racist not actionable because the defendant disclosed the specific facts upon which it based its statement); *Ward v. Zelikovsky*, 643 A.2d 972 (N.J. 1994) (alleged defamatory statement held to be non-actionable because it did not imply that statement was based on undisclosed facts); *Brimelow v. New York Times Co.* 2020 WL 7405261 (S.D.N.Y, December 16, 2020) (one statement by the defendant implied the existence of non-disclosed facts and was thus actionable, while another statement was not actionable because it disclosed the facts upon which the defendant's opinion was based); *Stevens v. Tillman,* 855 F.2d 394 (7th Cir. 1988) (defendant's statement was a non-actionable statement of opinion where the facts upon which the opinion was based were fully and specifically disclosed); *Edelman v. Croonquist,* 2010 WL 1816180 (D.N.J. May 4, 2010) (defendant's statements of opinion were non-actionable as he had disclosed the specific factual basis upon which his opinions were based).

32

fight [with Mr. Ainuu]" are protected opinion "given the highly-charged environment in which Talbot's nonverbal conduct took place, as explained in [The North Face's brief] and illustrated by *Sandmann v. New York Times*." Manoah Ainuu's Br. Supporting Mot. to Dismiss and Special Mot. for Expedited Relief, at p. 6.

In that case, the plaintiff Nicholas Sandmann was a student at Covington Catholic High School and attended the March for Life event in Washington, D.C. *Sandmann v. New York Times Company*, 78 F.4th 319, 322-23 (6th Cir. 2023). At the same time and place, there was an unrelated political demonstration, the Indigenous Peoples March, attended by Nathan Phillips and significantly covered by the media. *Id.* At one point, Phillips stood face to face with Sandmann and began to play his drum and sing. *Id.* at 322. The video of the encounter went viral, and several news organizations reported on statements made by Phillips that Sandmann had "blocked" him, did not "allow" him to retreat, or "decided" he would not move aside and "positioned himself" to stop Phillips. *Id.*

In the ensuing defamation case brought by Sandmann, the Court distinguished between "pure opinion" and "mixed opinion," and held that

33

Phillps's statements were protected pure opinion because they were not based on undisclosed facts. *Id*. at 333. Rather, "the statements appeared in stories that provided multiple versions and descriptions of the events, putting a reasonable reader on notice that Phillips's statements were merely one perspective among many. The online articles at issue embedded or linked to some version of the video, effectively disclosing the facts upon which Phillip's opinion was based; readers were able to determine for themselves whether they interpreted the encounter as Sandmann deciding to block Phillips, positioning himself to stop him, or not allowing him to retreat." *Id.*

Conversely, in the case before the Court, the interaction between Mr. Ainuu and Mr. Talbot was not in "the highly charged environment" of thousands of people at competing political demonstrations in Washington D.C., but rather a one-on-one conversation on a street in Bozeman, Montana. Additionally, there were neither news articles from major media outlets describing the interaction, nor was there a viral video of the interaction. The only description was provided by Mr. Ainuu and that description created the reasonable, but false, inference that Mr.

34

Talbot not only directed racist statements towards Mr. Ainuu, but also that he assaulted him. Therefore, Mr. Talbot has an actionable claim against for Mr. Ainuu's false and defamatory statements that he "tried to fight [Mr. Ainuu]," and "initiated a fight [with Mr. Ainuu]." *See Quigley v. Rosenthal*, 43 F.Supp.2d 1163, 1178-79 (D. Colo. 1999) (statement that plaintiff "attempted to intimidate or threaten" defendants implied undisclosed defamatory facts and was thus "capable of being proven true or false).

Thus, given the standard set forth in *Milkovich* and the Restatement, explicitly adopted by the Montana Supreme Court in *Hale,* and the cases cited herein, because the recipients of Mr. Ainuu's Instagram posts drew the reasonable conclusion that his defamatory statements expressed in his posts must have been based on some undisclosed, vile, racist, and violent conduct and speech, Mr. Talbot has adequately pled a claim of defamation.[6]

---

[6] Of course, Mr. Ainuu could have avoided potential liability by specifically stating in his post what it was that Mr. Talbot said to him to

## IV.   MR. TALBOT HAS ADEQUATELY PLED FACTS THAT SUPPORTS HIS CLAIMS FOR TORTIOUS INTERFERENCE AND PUNITIVE DAMAGES

The Defendants also ask this Court to dismiss Mr. Talbot's claim for tortious interference on the grounds that he cannot satisfy the "wrongful conduct" element without stating a claim for defamation. As articulated above, Mr. Talbot has adequately stated a claim for defamation and thus the Court should deny the Defendants' Motion to Dismiss Count II of his Complaint.

Similarly, the Defendants seeks dismissal of Mr. Talbot's request for punitive damages on the grounds that he has failed to set forth a

---

cause him to claim that he had "said racist things," because such clarification would have given the recipient the opportunity to make the independent and fully formed judgment as to whether Mr. Ainuu's statement was or was not reasonable. For example, if Mr. Ainuu had posted that "Mr. Talbot tried to fight me after making the racist statement that Magic Johnson was a better basketball player than Larry Bird," there would be no cause of action, even if Mr. Talbot had never said such a thing. Why? Because it leaves nothing to the recipient's reasonable exercise of imagination and the factual statement upon which Mr. Ainuu relies for his opinion, while it may even be false, is not defamatory and would not lead a reasonable recipient to believe that Mr. Talbot "said racist things" of otherwise engaged in racist conduct directed at Mr. Ainuu.

36

cognizable defamation claim and, further, that punitive damages are disallowed under Washington law.

To the contrary, because Mr. Talbot has set forth a cognizable defamation claim, and because punitive damages are allowed under Montana law, a jury should decide whether to award them.

## V.   MR. TALBOT HAS ADEQUATELY PLED FACTS SUPPORTING A CLAIM AGAINST NORTH FACE FOR VICARIOUS LIABILITY

North Face argues that it cannot be held responsible for the actions of their sponsored athletes because they are not employees, but rather independent contractors. That is irrelevant. North Face vested Mr. Ainuu with apparent agency, and all corporations are liable for the defamatory statements of their actual or apparent agents, regardless of their status as contractors, when "conduct [is] of the same general nature as that authorized, or [it is] incidental to the conduct authorized." *Keller v. Safeway Stores*, 108 P.2d 605, 610 (Mont. 1940) (defamatory statements by an agent bind the company if they are incidental to the agent's employment); *see Am. Soc. of Mech. Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 566 (1982) ("if an agent is guilty of defamation, the principal is liable so long as the agent was apparently authorized to make the

defamatory statement * * * Finally, a principal is responsible if an agent acting with apparent authority tortiously injures the business relations of a third person.").

In *Keller,* the Montana Supreme Court adopted the Restatement (First) of the Law of Agency § 229 (1933) and held that the proper inquiry to determine whether a principal can be held liable for the defamatory statements of its agent depends on "(a) Whether or not the act is one commonly done by such servants; (b) the time, place and purpose of the act; (f) whether or not the master has reason to expect that such an act will be done; and (i) the extent of departure from the normal method of accomplishing an authorized result." *Id* at 611.[7]

As alleged in the Complaint, in April of 2020, North Face-sponsored skier Vasu Sojitra ("Sojitra") attacked the directors, producers, and sponsors of the 2019 film "Himalayan Ice: Adventures in India's Most Remote Valley," as exhibiting "white savior complex," despite many stars in the film being native to the Himalayas. Compl. at ¶¶ 24-27. The

---

[7] While the Restatement sets forth a list of considerations from (a) to (j), the court limited its inquiry to sections (a), (b), (f), and (i).

38

attacks garnered significant media coverage, to the benefit of Sojitra and North Face, and it was consistent with North Face's directive to its sponsored athletes and employees that they should bring social justice activism "not only within the Company, but within the communities where we live and work." Compl. at ¶¶ 16-17.

Sojitra's attacks also benefited North Face because it injured the reputation of several of its direct competitors, La Sportiva and Petzl. Compl. at ¶¶ 26-27. Yet, despite receiving complaints about Sojitra's unjustified attack, North Face showed its apparent approval of Sojitra's conduct by taking no action against him. Compl. at ¶ 30.

Mr. Ainuu also took previous action to fulfill North Face's mission to bring social justice "not only within the Company, but within the communities where we live and work." Compl. at ¶¶ 16-17. In February of 2020, Mr. Ainuu accused La Sportiva-sponsored climber Ari Novak ("Novak") of engaging in racist conduct because Novak had stopped an apparently intoxicated Mr. Ainuu from taking a 16-year-old girl night climbing at the Michigan Ice Festival. Compl. at ¶¶ 16-17. Again, North Face received notice of this incident when Novak informed North Face

Global Senior Athlete Coordinator Dave Burleson of Mr. Ainuu's conduct, but North Face showed its apparent approval of Mr. Ainuu's conduct by taking no action against him. Compl. at ¶ 52.

Following the same pattern of conduct as was known and encouraged by North Face, Mr. Ainuu manufactured a conflict with Mr. Talbot, used the significant public profile that came with being a North Face-sponsored athlete to spread, through his North Face-branded Instagram account, a viral campaign that Mr. Talbot "tried to fight [him] after saying racist things." Mr. Ainuu viewed his statements as promoting North Face's mission to bring social justice "not only within the Company, but within the communities where we live and work" and used the controversy he created to further attack Outdoor Research, Mr. Talbot's employer and a North Face competitor. Compl. at ¶¶ 65-81. When Dave Burleson, North Face's senior executive in charge of sponsored athletes, received notice of Mr. Ainuu's post, he reposted it on his own Instagram page. Compl. at ¶ 67.

Tellingly, the acts commonly done by North Face-sponsored athletes like Mr. Ainuu and Sujitra are very much comparable to North

40

SER-139

Face's action to use its own public platform to attack Facebook for what North Face believed was the promotion of racist information. Compl. at ¶ 18.

In sum, Mr. Ainuu's attacks on Mr. Talbot, and the resultant social media pressure campaign he led against North Face's competitor Outdoor Research, are the latest in a common pattern of behavior by North Face's sponsored athletes and North Face itself. They engage in this activity knowing that it will benefit North Face's brand, that it is consistent with North Face's stated mission and actions to bring social justice "not only within the Company, but within the communities where we live and work," that North Face itself engages in such action through officially authorized action, and that conduct such as Mr. Ainuu's attacks on Mr. Talbot and Outdoor Research is approved of and even promoted by North Face.

Consequently, Mr. Talbot has adequately pled that Mr. Ainuu was acting within the scope of his apparent authority and that North Face may be liable for his actions, which include defamation and tortious interference.

41

## VI.   CONCLUSION

For the reason stated herein, the Court should deny the

Defendants' Motions to Dismiss.

Respectfully Submitted,

/s/ Matthew Monforton

Nicholas R. Barry*
Ian Prior*
AMERICA FIRST LEGAL FOUNDATION
611 Pennsylvania Avenue S.E. No. 231
Washington, D.C. 20003
Phone: (202) 964-3721
nicholas.barry@aflegal.org
ian.prior@aflegal.org
*(pro hac vice granted)

Matthew Monforton
MONFORTON LAW OFFICES, PLLC
32 Kelly Court
Bozeman, Montana 59718
Phone: (406) 570-2949
Fax: (406) 551-6919
matthewmonforton@yahoo.com

42

**CERTIFICATE OF COMPLIANCE PURSUANT TO L. R. 7.1(d)(2)(E)**

I hereby certify that this document, excluding caption, tables, and certificate of compliance, contains 6282 words, as determined by the word processing software used to prepare this document, specifically Microsoft Word 2007.

DATED: January 25, 2024                    Respectfully submitted,


                                           /s/ Matthew G. Monforton
                                           Matthew G. Monforton
                                           Attorney for Plaintiffs

43

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY this 25th day of January, 2023, that a copy of the foregoing will be delivered this day via the Court's ECF system to counsel for Defendants.

DATED: January 25, 2024          Respectfully submitted,

                                 /s/ Matthew G. Monforton
                                 Matthew G. Monforton
                                 Attorney for Plaintiffs

44

MELOY LAW FIRM

Peter Michael Meloy
P.O. Box 1241
Helena, MT 49624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

BALLARD SPAHR LLP

Leita Walker
Isabella Salomão Nascimento
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Email:walkerl@ballardspahr.com
Email:salomaonascimentoi@ballardspahr.com

Seth D. Berlin
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Email: berlins@ballardspahr.com

*Attorneys for Defendant VF Outdoor, LLC d/b/a The North Face*

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

---

| | |
|---|---|
| **JOHNATHAN TALBOT,** | |
| **Plaintiff**, | |
| **v.** | **Case No. 2:23-cv-00066-BMM** |
| **MANOAH AINUU, *et al.*,** | |
| **Defendants**. | |

---

## REPLY BRIEF IN SUPPORT OF COMBINED MOTION TO DISMISS
## AND SPECIAL MOTION FOR EXPEDITED RELIEF
## BY DEFENDANT VF OUTDOOR, LLC d/b/a THE NORTH FACE

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

ARGUMENT ......................................................................................... 2

I.    WASHINGTON LAW, INCLUDING ITS ANTI-SLAPP
      STATUTE, APPLIES.................................................................... 2

II.   TALBOT FAILS TO STATE A CLAIM FOR DEFAMATION
      AGAINST TNF ........................................................................... 6

      A.    TNF Cannot Be Vicariously Liable for the Personal Speech
            of an Independent Contractor.............................................. 6

      B.    The Challenged Statements Are Protected Opinion ............ 8

CONCLUSION ......................................................................................14

i

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*American Society of Mechanical Engineers v. Hydrolevel Corp.*,
    456 U.S. 556 (1982)............................................................................7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).......................................................................7, 8

*Buckles v. BH Flowtest*,
    2020 MT 291, 402 Mont. 145, 476 P.3d 422 ..................................2, 3

*Cane v. O'Neill*,
    2022 U.S. Dist. LEXIS 163463 (D. Mont. Mar. 31, 2022) ...................1

*Clifford v. Trump*,
    339 F. Supp. 3d 915 (C.D. Cal. 2018) ................................................4

*Clifford v. Trump*,
    818 F. App'x 746 (9th Cir. 2020) ......................................................3

*Connick v. Myers*,
    461 U.S. 138 (1983)...........................................................................5

*Cooper v. Franklin Templeton*,
    629 F. Supp. 3d 223 (S.D.N.Y. 2022) ..............................................10

*Daniels v. Loop Interactive Grp.*,
    2015 Cal. App. Unpub. LEXIS 114 (Jan. 9, 2015)............................12

*Davis v. Cornely*,
    2021 U.S. Dist. LEXIS 198245 (N.D. Ohio Oct. 13, 2021)..............11

*Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*,
    2008 U.S. Dist. LEXIS 105088 (D. Haw. Dec. 31, 2008) ...............12

*Garnett v. Remedi Seniorcare of Va.*,
    892 F.3d 140 (4th Cir. 2018) .............................................................8

*Herring Networks v. Maddow*,
    8 F.4th 1148 (9th Cir. 2021) ............................................................10

*Hyland v. Wonder*,
   972 F.2d 1129 (9th Cir. 1992) ................................................................5

*Jorjani v. N.J. Inst. of Tech.*,
   2019 U.S. Dist. LEXIS 39026 (D.N.J. Mar. 11, 2019) ......................10

*Kamelgard v. Macura*,
   585 F.3d 334 (7th Cir. 2009) ................................................................4

*Keisel v. Westbrook*,
   2023 UT App. 163 ...................................................................8, 9, 11

*Keller v. Safeway Stores*,
   111 Mont. 28, 108 P. 2d 605 (1940)..................................................6, 7

*Knievel v. ESPN*,
   223 F. Supp. 2d 1173 (D. Mont. 2002).........................................2, 3, 10

*Lauf v. Selene Fin.*,
   2023 U.S. Dist. LEXIS 108331 (D. Mont. June 22, 2023) ..................1

*Lloyd v. Facebook*,
   2022 U.S. Dist. LEXIS 180710 (N.D. Cal. Oct. 3, 2022) ...................4

*Lokhova v. Halper*,
   441 F. Supp. 3d 238 (E.D. Va. 2020) ...................................................8

*O'Brien v. City of Saginaw*,
   2011 U.S. Dist. LEXIS 200 (E.D. Mich. Jan. 3, 2011) ......................11

*Olthaus v. Niesen*,
   2023-Ohio-4710 (Ct. App. 2023) .........................................................9

*Partington v. Bugliosi*,
   56 F.3d 1147 (9th Cir. 1995) .............................................................2, 3

*Project Veritas v. CNN*,
   591 F. Supp. 3d 1322 (N.D. Ga. 2022)..................................................4

*Puchalski v. Sch. Dist. of Springfield*,
   161 F. Supp. 2d 395 (E.D. Pa. 2001)...............................................10, 11

iii

*Rapaport v. Barstool Sports*,
2024 U.S. App. LEXIS 556 (2d Cir. Jan. 9, 2024)..............................................10

*Ratner v. Kohler*,
2018 U.S. Dist. LEXIS 30761 (D. Haw. Feb. 26, 2018)....................................4

*Robertson v. Ziplocal*,
2012 U.S. Dist. LEXIS 138566 (D. Mont. Sept. 26, 2012)................................6

*Roots v. Montana Human Rights Network*,
275 Mont. 408, 913 P.2d 638 (1996)................................................................11

*Sandmann v. New York Times Co.*,
78 F.4th 319 (2023) ...........................................................................................13

**Statutes & Other Authorities**

§ 27-1-802, MCA ..................................................................................................6

Fed. R. Evid. 201 ..................................................................................................4

Montana Const. art. II, § 7 ....................................................................................2

RCW 4.105.090....................................................................................................14

*Restatement (Second) of Conflict of Laws* § 6 ................................................2, 3

*Restatement (Second) of Conflict of Laws* § 145 ...............................................3

*Restatement (Second) of Conflict of Laws* § 146 ...............................................3

*Restatement (Second) of Conflict of Laws* § 150 ...............................................3

U.S. Const. amend. I ......................................................................................2, 3, 5

iv

Plaintiff Johnathan Talbot's Opposition, ECF No. 34 ("Opp."), fails to address, and therefore concedes, a number of arguments raised by Defendant VF Outdoor, LLC d/b/a The North Face ("TNF"):

- On **defamation**, he fails to address TNF's arguments that (a) it did not "publish" the Challenged Statements and (b) the actual publisher, Manoah Ainuu, is not a TNF employee. *Compare* TNF's Opening Mem., ECF No. 26 ("Mem."), at 13-14 & n.4 *with* Opp. at 37-41.

- On **tortious interference**, he ignores TNF's argument that he failed to adequately plead causation. *Compare* Mem. at 26-27 *with* Opp. at 36.

- On **punitive damages**—to the extent they are permitted at all—he neither contests that he must plausibly plead actual malice, nor argues that he did so. *Compare* Mem. at 27 & n.8 *with* Opp. at 37.

- And on TNF's request for **dismissal with prejudice**, he neither requests leave to amend nor addresses the futility of doing so. *Compare* Mem. at 28 *with* Opp. 7-42.

On each of these issues, "by failing to respond to [TNF's] argument on the merits, [Talbot] has admitted the argument is well-taken," *see Lauf v. Selene Fin.*, 2023 U.S. Dist. LEXIS 108331, at *10 (D. Mont. June 22, 2023), and waived his right to argue otherwise, *see Cane v. O'Neill*, 2022 U.S. Dist. LEXIS 163463, at *32 (D. Mont. Mar. 31, 2022).

Accordingly, Talbot has conceded away his tortious interference and punitive damages claims entirely. As for his defamation claim, TNF is not vicariously liable for Ainuu's posts under an agency theory, and even if it were, his statements constitute non-actionable opinion under federal, Washington, *and*

1

Montana law. TNF respectfully requests that the Court dismiss this case with prejudice and, under Washington's Anti-SLAPP Act, award TNF its fees and costs.

## ARGUMENT

## I. WASHINGTON LAW, INCLUDING ITS ANTI-SLAPP STATUTE, APPLIES.

Talbot's arguments that Washington law, including its Anti-SLAPP Act, does not govern the state law questions here are unavailing.

***First***, Talbot claims that Article II, Section 7 of Montana's Constitution is a "statutory directive … concerning the choice of law" under *Restatement (Second) of Conflict of Laws* ("*Restatement*") Section 6(1), and requires a jury to decide choice of law questions in defamation cases. *See* Opp. at 11-12. But, the Montana Supreme Court has already confirmed that "[t]here is no statutory directive regarding choice of law in Montana for issues sounding in tort," *Buckles v. BH Flowtest*, 2020 MT 291, ¶ 12, 402 Mont. 145, 476 P.3d 422; *see also Knievel v. ESPN*, 223 F. Supp. 2d 1173, 1182 (D. Mont. 2002), *aff'd*, 393 F.3d 1068 (9th Cir. 2005) (recognizing Article II, Section 7 contemplates that preliminary questions of law "must [still] be determined by the Court").

Moreover, tasking a jury with deciding all issues in a defamation case, including choice-of-law, is absurd and would contravene the First Amendment, which requires courts to decide certain preliminary constitutional questions, such as whether a challenged statement is fact or opinion. *See Partington v. Bugliosi*, 56

2

F.3d 1147, 1153 (9th Cir. 1995); *see also Knievel*, 223 F. Supp. 2d at 1182

(Montana Constitution "must yield to the First Amendment").

   ***Second***, Talbot relies on other general provisions of the *Restatement*, Opp. at

15 (citing §§ 6(1), 6(2), 145, 146), instead of Section 150 which governs multistate

defamation cases. But Montana's Supreme Court has unambiguously instructed

courts to consult "the *specific section of the Restatement that is applicable to the*

*case*." *Buckles*, 2020 MT 291, ¶ 11 (emphasis added). Section 150 directs that, in a

multistate defamation case, the "state of most significant relationship will usually

be the state where the person was domiciled at the time." *Restatement* § 150(2).

Talbot ignores cases like *Clifford v. Trump*, 818 F. App'x 746 (9th Cir. 2020),

which affirmed a ruling that, under Section 150's "most significant relationship"

test, the law of plaintiff's domicile, including its anti-SLAPP statute, governed a

multistate defamation case challenging a tweet.

   Instead, Talbot argues that Montana has the most significant relationship

because he previously lived there, Ainuu lives and posted from there, and Ainuu

"intentionally directed" his posts there. Opp. at 16-17. His contentions are

undermined by his own Complaint.

   Talbot pleads that he is a Washington resident and moved there for a job

with Outdoor Research ("OR"), a Washington company. Compl. ¶ 8. OR sent him

to Bozeman, and after the incident, promptly recalled Talbot to Washington, firing

him there. *Id.* ¶¶ 54, 70, 74, 77-78. He alleges the crux of his injury is being fired by his Washington employer in Washington. *Id.* ¶¶ 6, 54-56, 74, 77-78, 82, 91, 94-98, 106, 109, 111-21; Opp. at 18 (claiming posts "result[ed] in" Talbot "being fired from the job for which he left Montana"); *id.* at 7, 9, 23 (each focusing on loss of employment in Washington). Today, Talbot continues to reside in Washington, where he purchased a house and collects unemployment.[1] *See Kamelgard v. Macura*, 585 F.3d 334, 341-42 (7th Cir. 2009) (defamation injury principally occurs "where the victim works and lives").

Meanwhile, Ainuu's location when he posted to Instagram is of little significance because what matters is "where plaintiff was injured, that is, [his] domicile." *Project Veritas v. CNN*, 591 F. Supp. 3d 1322, 1328-29 (N.D. Ga. 2022) (cleaned up); *see also Clifford v. Trump*, 339 F. Supp. 3d 915, 921-22 (C.D. Cal. 2018) (omitting any discussion of defendant's location when publishing tweet and rejecting request to apply law of defendant's domicile); *Ratner v. Kohler*, 2018 U.S. Dist. LEXIS 30761, at *12 (D. Haw. Feb. 26, 2018) (applying law of plaintiff's domicile, including anti-SLAPP statute, despite defendant's different location when publishing).

---

[1] *See* GoFundMe, *Help John Talbot* (Aug. 25, 2023), https://www.gofundme.com/f/help-john-talbot. The Court may take judicial notice of Talbot's statements about this case on this publicly accessible website. *See* Fed. R. Evid. 201; *Lloyd v. Facebook*, 2022 U.S. Dist. LEXIS 180710, at *6 (N.D. Cal. Oct. 3, 2022).

4

Meanwhile, Talbot's assertion that Ainuu directed his Instagram posts "to a Montana audience" ignores Talbot's own allegations that Ainuu was "directing those posts to" OR in Washington. Opp. at 9; Compl. ¶¶ 65 ("Hey yo, Outdoor Research…"), 66(a) ("@outdoorresearch John … is not a good representation of your great brand"), 66(b) (tagging @outdoorresearch), 68(a) (same), 68(d) (same), 80 (same), 68(b) (encouraging viewers to "reshare" and "tag OR").

***Third***, Talbot's attempt to escape application of Washington's Anti-SLAPP Act on grounds that "Ainuu's speech is not 'on a matter of public concern'" is similarly without merit. Opp. at 19-20 (contending Ainuu was airing only a "personal grievance," not "engag[ing] in a serious discussion" about "the issue of race"). The First Amendment does not demand so much or protect so little. *See Hyland v. Wonder*, 972 F.2d 1129, 1137 (9th Cir. 1992) (holding that only "some part" of a challenged statement must be of public concern) (citing *Connick v. Myers*, 461 U.S. 138, 149 (1983)).

Further, this was not a purely "personal grievance." Ainuu's posts involved allegations of racism in the outdoor gear industry, *see Connick*, 461 U.S. at 148 n.8; events that took place in public, with multiple witnesses and the bartender intervening; and social media posts calling for a national brand to hold its employee accountable. *See* Compl. ¶¶ 60, 65, 66(a)-(b), 68(a)-(d), 80. Talbot cannot credibly claim that TNF is liable for Ainuu's speech because it aligns with

5

TNF's purported nationwide social justice initiative, while simultaneously contending that the posts involved a purely private matter.

Given Talbot's own allegations, Washington law, including its Anti-SLAPP Act, governs.

## II.   TALBOT FAILS TO STATE A CLAIM FOR DEFAMATION AGAINST TNF.

### A.   TNF Cannot Be Vicariously Liable for the Personal Speech of an Independent Contractor.

Talbot's concessions that TNF did not publish the Challenged Speech and that Ainuu is not its employee are fatal to his defamation claim because, even if Montana law applied, publication is required, § 27-1-802, MCA, and employers are "not liable for the torts of their independent contractors." *Robertson v. Ziplocal*, 2012 U.S. Dist. LEXIS 138566, at *5 (D. Mont. Sept. 26, 2012).[2]

Talbot strains to salvage his claim against TNF, arguing that, in posting, Ainuu was acting as TNF's apparent agent, based upon its past embrace of social causes and its failure to object to prior speech by its brand ambassadors. Opp. at 37-38. Neither case he cites supports his expansive claim. In *Keller v. Safeway Stores*, 111 Mont. 28, 36, 108 P. 2d 605, 610 (1940), the individual in question

---

[2] Although Talbot generically asserts that Dave Burleson "republished" one of Ainuu's posts, Opp. at 9, he fails to respond to case law holding that reposting, without commentary, is not republication as a matter of law. *See* Mem. at 14 n.4. This argument, too, is thus conceded.

6

"was the manager," *i.e.*, an employee, "on the date of the slander." And *American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 560-61 (1982), involved activity by leaders of a formal ASME subcommittee plainly acting on behalf of the organization.

In contrast, Talbot alleges no facts to plausibly support his contention that Ainuu was acting as TNF's agent when he made late-night, emoji-laden posts about an interaction at a bar. *See* Mem. at 17-18. Talbot does not and cannot allege that TNF was even aware of Ainuu's posts before he published them, let alone that it authorized what Talbot calls "the rantings of an intoxicated man-child." *See* GoFundMe, n.1 *supra*.

Instead, Talbot's theory hinges entirely on the misguided notion that, because both Ainuu and TNF support social justice, and because Ainuu's postings were about race, TNF is liable for them. Not so. As a matter of law, such "parallel conduct," without more, "does not establish concerted action," let alone apparent agency. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007). Talbot also alleges a "pattern of conduct," comprised of two instances of TNF's *inaction* when sponsored athletes previously expressed personal views. *See* Opp. at 38-40. But silence is neither endorsement nor a grant of apparent authority. Because that silence signifies only that personal "speech interests deserve respect," TNF simply is not "liable for every tweet issued by one of its employees or agents." Mem. at

7

13-18 (quoting *Garnett v. Remedi Seniorcare of Va.*, 892 F.3d 140, 144 (4th Cir. 2018); *Lokhova v. Halper*, 441 F. Supp. 3d 238, 264 (E.D. Va. 2020), *aff'd*, 995 F.3d 134 (4th Cir. 2021)). Talbot fails to address *Twombly*, *Garnett*, and *Lokhova*, or explain how his boundless theory of agency liability comports with them.

### B.    The Challenged Statements Are Protected Opinion.

Talbot mischaracterizes TNF's arguments as asserting that statements regarding racism are "categorically protected" or "can never be actionable as defamatory." Opp. at 7, 23. In fact, TNF argues only that *this* content (unverifiable, subjective conclusions regarding Talbot's biases, motives, and demeanor) in *this* context (late-night, emoji-laden Instagram posts) were not actionable statements of fact. *See* Mem. at 20-23. Talbot's arguments sidestep the actual content and context of Ainuu's posts, as well as applicable federal and state case law.

Even since TNF filed its opening brief, courts have continued to reaffirm that similar statements are protected opinion. In *Keisel v. Westbrook*, 2023 UT App. 163, for example, NBA star Russell Westbrook accused a Utah Jazz fan of saying something "racial" to him during a game. *Id*. ¶ 1. The Court concluded that, *regardless* of what the fan said or whether Westbrook linked what was said to his accusation of racism, Westbrook's statements were not actionable. *Id*. ¶¶ 37-38. It explained that what is racist depends on one's political and social views, so such

statements are "not capable of being proven true or false" and "a court is 'not in a position to give its imprimatur to one view or the other.'" *Id.* ¶ 40.

Similarly, in *Olthaus v. Niesen*, 2023-Ohio-4710 (Ct. App. 2023), a police officer sued over social media accusations that he was a white supremacist and had supposedly flashed a "white power" hand sign. The appellate court affirmed dismissal of the case, finding that such speech was "plainly subjective," "value-based" and "non-verifiab[le]," and that the ordinary reader of such terms would understand them to "lack[] precise meaning." *Id.* ¶ 16; *id*. (Plaintiff "muster[ed] no argument for how someone would plausibly go about proving or disproving one's white supremacist bona fides."). The court explained that viewers' interpretation of the hand sign, and the intent behind it, were likewise "subjective" and "not susceptible" to "verification." *Id*.

So too for how Ainuu perceived Talbot's statements and body language in the bar. Trying to make the posts sound factual, Talbot claims Ainuu accused him of "assault." Opp. at 35. But that term does not appear in Ainuu's posts. Rather, they are filled with loose, figurative, and imprecise terms like "squared up," "got right in my face," and "an invitation to fight." Even had Ainuu included a factual-sounding assertion like "assault," the context makes plain that his posts are properly understood as opinion. In yet another decision since TNF's opening brief, the Second Circuit held that, even theoretically verifiable statements—plaintiff had

9

herpes, was a stalker, and had committed domestic abuse—were, in context, non-actionable opinion because they were made in a forum known for personal viewpoints (Twitter), and readers would understand them as part of "the emotional aftermath of a [situation] when animosity would be expected to persist." *Rapaport v. Barstool Sports*, 2024 U.S. App. LEXIS 556, at *11(2d Cir. Jan. 9, 2024); *see also Herring Networks v. Maddow*, 8 F.4th 1148, 1154-57 (9th Cir. 2021) (network "literally is paid Russian propaganda" was, in context, opinion) (cited in Mem. at 19, 22, 28; ignored by Talbot); *Knievel*, 393 F.3d at 1070, 1078 (suggesting that Knievel was a "pimp" and his wife was a prostitute were, in context, opinion).

In arguing otherwise, Talbot brazenly mischaracterizes the cases he cites. *See* Opp. at 30 (citing *Cooper v. Franklin Templeton*, 629 F. Supp. 3d 223, 235 (S.D.N.Y. 2022) ("To the extent [the statements] can be read together as calling Plaintiff a racist, or characterizing her conduct … as racist, the statement is inactionable" because "[i]t is well-established that an accusation of bigotry is a protected statement of opinion") (collecting cases), *aff'd*, 1012 U.S. App. LEXIS 14244 (2d Cir. June 8, 2023); *Jorjani v. N.J. Inst. of Tech.*, 2019 U.S. Dist. LEXIS 39026, at *4-7, 13-17, 19-20 (D.N.J. Mar. 11, 2019) (statements calling plaintiff a racist and questioning his fitness to teach were "unverifiable opinions"); *Puchalski v. Sch. Dist. of Springfield*, 161 F. Supp. 2d 395, 408 (E.D. Pa. 2001) (holding that, while a false accusation of making "a specific racist remark" could theoretically be

actionable, in the totality of the circumstances, statement was protected opinion); *O'Brien v. City of Saginaw*, 2011 U.S. Dist. LEXIS 200, at *12 (E.D. Mich. Jan. 3, 2011) ("[O]ne cannot prove a person is a racist or is not a racist, or that the person hates children or likes children.")).[3]

 The three additional arguments Talbot advances are equally meritless. ***First,*** he contends that Ainuu's statements contain "a provable false factual connotation." Opp. at 23-24. But the single case he cites, *Roots v. Montana Human Rights Network*, 275 Mont. 408, 913 P.2d 638, 639-41 (1996), arose from statements involving specific, identifiable conduct, namely, being a "Ku Klux Klan organizer," which the plaintiff could rebut with evidence that he had never joined the group or engaged in organizing activities. In contrast, Ainuu's statements were statements of pure opinion. *See Keisel*, 2023 UT App. 163, ¶ 39 (distinguishing "between an allegation of racism generally (which would not be actionable) and an allegation based on more particular conduct (which could be)").[4]

---

[3] Talbot's reliance on *Davis v. Cornely*, 2021 U.S. Dist. LEXIS 198245 (N.D. Ohio Oct. 13, 2021), is even further afield. There, the court held it could exercise supplemental jurisdiction over defendant's defamation counterclaim, without addressing whether that claim was viable or involved protected opinion. *Id.* at *11.

[4] Because statements of pure opinion are, by definition, neither true nor false, Talbot's assertion that Ainuu "admitted" to OR that Talbot did not say or do anything overtly racist is irrelevant. Regardless, Talbot's allegation is flatly inconsistent with his admissions that (a) OR terminated him after speaking with Ainuu, Compl. ¶¶ 72, 77-78, and (b) the company "conclu[ded] that [he] engaged in discriminatory conduct," Opp. at 29.

11

**Second,** Talbot cherry-picks third-party comments made in response to Ainuu's posts and argues they should inform the Court's adjudication as a matter of law about how a reasonable reader would understand them. Opp. at 29. But, courts routinely reject the claim that *individual* reader comments establish how a *reasonable* reader would interpret challenged speech. *See, e.g.*, *Daniels v. Loop Interactive Grp.*, 2015 Cal. App. Unpub. LEXIS 114, at *20 (Jan. 9, 2015) (comments posted to online version of article "are not indicative" of what "the average reader understood"); *Doe v. Kamehameha Sch./Bernice Pauahi Bishop Est.*, 2008 U.S. Dist. LEXIS 105088, at *9-11 (D. Haw. Dec. 31, 2008) (declining to consider anonymous online comments), *aff'd*, 2009 U.S Dist. LEXIS 9067 (D. Haw. Feb. 6, 2009).

**Third,** Talbot pivots, essentially conceding the Challenged Statements are opinion, but asserting they are "mixed" rather than "pure" opinion and that Ainuu failed to sufficiently disclose the facts upon which his opinion was based. Opp. at 24. Even if the Court were to depart from the overwhelming body of law holding that allegations of racism are pure opinion, and required Ainuu to disclose facts upon which his subjective perception was based, he *did* so. Specifically, Ainuu's posts recounted that:

- Talbot approached him and "started asking questions—very directly—about diversity." Compl. ¶ 65; *see also* Opp. at 28 n.4.

12

- When Ainuu tried to answer Talbot's questions, Talbot "kept cutting [him] off, didn't want to hear what" Ainuu had to say. Compl. ¶ 65.

- Ainuu then started to "correct [Talbot] and direct him and educate" him, but he "got very defensive." *Id.*

- Ainuu responded with, "I told you the truth, don't cut me off while I'm talking if you're asking. You're not listening." *Id.*

- Ainuu then told Talbot he was "racist and entitled," ended the conversation, and walked into the bar to get away. *Id.* ¶ 58.

- Talbot, however, followed him inside and went straight up to Ainuu. *Id.* ¶ 65.

- When Talbot insisted on shaking Ainuu's hand, Ainuu suggested instead that Talbot buy him a beer as an apology but Talbot again got defensive, claiming that he "didn't do anything wrong." *Id.*

- Talbot then "squared up to" Ainuu, "got right in [his] face like this" (demonstrating), and was trying "to fight" him. *Id.* ¶¶ 65, 66(b).

Because Ainuu disclosed the facts on which his opinions were based, readers could draw their own conclusions about whether Talbot's behavior was racially charged and physically menacing. They are therefore non-actionable as a matter of law. *See* Opp. at 35 n.6 (conceding that such disclosures preclude liability).[5]

---

[5] Talbot misreads *Sandmann v. New York Times Co.*, 78 F.4th 319 (2023), as involving opinion based on disclosed facts. Opp. at 33-34. The Court ruled the "blocking" statements were "pure opinion" because they expressed a "subjective understanding of the situation and of Sandmann's intent, an understanding formed by the pair's proximity, the other students' movement, and the lack of communication." *Id.* at 331-33 (explaining statements were "contextual and subjective, *not* 'a conclusion that follows incontrovertibly from asserted facts'").

13

## <u>CONCLUSION</u>

For the foregoing reasons, including because Talbot offers no response to

TNF's arguments that amendment would be futile, Mem. at 28, TNF respectfully

requests that the Court dismiss the Complaint with prejudice and award its

attorneys' fees and costs pursuant to RCW 4.105.090.

*Signatures on following page*

14

Respectfully submitted this 30th day of January, 2024.

By: */s/ Peter Michael Meloy*

Peter Michael Meloy
**MELOY LAW FIRM**
P.O. Box 1241
Helena, MT 59624
Telephone: (406) 442-8670
Email: mike@meloylawfirm.com

By: */s/ Leita Walker*

Leita Walker*
Isabella Salomão Nascimento*
**BALLARD SPAHR LLP**
2000 IDS Center, 80 S Eighth St.
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211
Facsimile: (612) 371-3207
Email:walkerl@ballardspahr.com
Email:salomaonascimentoi@ballardspahr.com

Seth D. Berlin*
**BALLARD SPAHR LLP**
1909 K St., NW
12th Floor
Washington, DC 20006
Telephone: (202) 661-2200
Facsimile: (202) 661-2299
Email: berlins@ballardspahr.com

*Admitted *pro hac vice*

*Attorneys for Defendant VF Outdoor, LLC d/b/a The North Face*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing **Reply Brief in support of Combined Motion to Dismiss and Special Motion for Expedited Relief** complies with Local Rule 7.1, containing 3,249 words, excluding only those items listed in the rule.

<u>/s/ *Leita Walker*   </u>
Leita Walker

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on 30 January 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record pursuant to the Local Rules.

<u>/s/ *Leita Walker*   </u>
Leita Walker

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF MONTANA

 3                  BUTTE DIVISION

 4

 5   JOHNATHAN TALBOT,              )
                                    )
 6              Plaintiff,          )   Civil Docket
                                    )   No. CV-23-66-BU-BMM
 7        vs.                       )
                                    )
 8   MONOAH AINUU, and THE NORTH    )   Court of Appeals
     FACE APPAREL CORP., a          )   No. 24-2135, 24-2038,
 9   Delaware Company.              )   24-2144
                                    )
10              Defendants.         )
     _____)

11

12          Transcript of Motion Hearing

13

14        Mike Mansfield Federal Courthouse
               400 N. Main, Suite 273
15               Butte, MT 59701
             Thursday, February 1, 2024
16            9:56 a.m. to 11:05 a.m.

17

18     BEFORE THE HONORABLE BRIAN MORRIS

19   UNITED STATES CHIEF DISTRICT COURT JUDGE

20

21            Yvette Heinze, RPR, CSR
            United States Court Reporter
22        Missouri River Federal Courthouse
              125 Central Avenue West
23             Great Falls, MT 59404
           yvette_heinze@mtd.uscourts.gov
24                (406) 454-7805

25     Proceedings recorded by machine shorthand
     Transcript produced by computer-assisted transcription
```

2

1                          **APPEARANCES**

2    PRESENT ON BEHALF OF THE PLAINTIFF:

3                    Nicolas Barry
                     AMERICA FIRST LEGAL FOUNDATION
4                    611 Pennsylvania Avenue, SE#231
                     Washington , DC 20003

5
                     Matthew Monforton
6                    MONFORTON LAW OFFICES
                     32 Kelly Court
7                    Bozeman, MT 59718

8

9    PRESENT ON BEHALF OF THE DEFENDANT,
     MANOAH AINUU:
10
                     Jeffrey J. Tierney
11                   GOETZ, BALDWIN & GEDDES, PC
                     35 North Grand
12                   PO Box 6580
                     Bozeman, MT 59771-6580
13
                     Peter M. Meloy
14                   MELOY LAW FIRM
                     PO BOX 1241
15                   80 South Warren
                     Helena, MT 59624
16

17
     PRESENT ON BEHALF OF THE DEFENDANT,
18   THE NORTH FACE APPAREL CORP.:

19                   Leita Walker
                     BALLARD SPAHR LLP
20                   80 S 8th Street, Suite 2000
                     Minneapolis, MN 55402
21

22
     ALSO PRESENT:
23
                     Manoah Ainuu, defendant
24

25

3

PROCEEDINGS

1
2      (Open court.)
3           THE COURT:  Madam Clerk, please call the next case on
4      the Court's calendar.
5           THE CLERK:  Now is the time set for a motion hearing
6      in Civil Case 23-66-Butte-BMM, Talbot v Ainuu, et al.
7           THE COURT:  Good morning, Mr. Monforton.
8           MR. MONFORTON:  Good morning, Your Honor.
9           THE COURT:  And this is Mr. Barry.
10          MR. MONFORTON:  It's my pleasure to introduce to the
11     Court my cocounsel Nicholas Barry.
12          THE COURT:  Good morning, Mr. Barry.
13          Good morning, Mr. Meloy.
14          MR. MELOY:  Good morning, Your Honor.  Leita Walker
15     for The North Face.
16          THE COURT:  Good morning, Ms. Walker.
17          MR. MELOY:  And you know Mr. Tierney.
18          THE COURT:  Good morning, Mr. Tierney.
19          MR. TIERNEY:  Good morning.
20          THE COURT:  All right.  There's a motion filed by the
21     defendants to dismiss.  Who is going to argue first?
22          MS. WALKER:  I will, Your Honor.
23          THE COURT:  Go ahead.
24          MS. WALKER:  Good morning, Your Honor.  My name is
25     Leita Walker.  I'm with the law firm of Ballard Spahr.  And

4

1    along with Mike Meloy, I represent The North Face.

2            I'm not sure how much time the Court has allotted,

3    but I would like to reserve a few minutes for rebuttal.  I

4    think my remarks --

5            THE COURT:  We're not that formal here.  You will

6    have time to rebut, I'm sure.

7            MS. WALKER:  Okay.  Thank you, Your Honor.

8            So to begin, the briefing on TNF's motion to dismiss

9    has taken several issues off the table.  The plaintiff,

10   Johnathan Talbot, concedes explicitly or through silence that

11   the other defendant, Manoah Ainuu, is not an employee of TNF.

12   He concedes that TNF did not publish or republish the Instagram

13   posts that are at issue.  He concedes that if his defamation

14   claim fails, his tortious interference and punitive damages

15   claims fail along with it.

16           And he concedes that, regardless, those tagalong

17   claims fail because he has not adequately pleaded causation for

18   tortious interference.  And because even if Montana law

19   applies, such that punitive damages are theoretically

20   available, he has not pleaded nor could he show actual malice

21   on the part of TNF.

22           THE COURT:  Could you be more precise as to which

23   ones he's conceded and which ones he's remained silent about

24   and implicitly conceded?

25           MS. WALKER:  Silence on all of those, Your Honor.

1         THE COURT:  Silent.  So the concession is implicit.

2         MS. WALKER:  The concession is implicit, and he's

3 waived it through silence.

4         THE COURT:  All right.

5         MS. WALKER:  So what that leaves, Your Honor, is for

6 the Court, with regard to TNF, to decide whether, despite

7 learning of Ainuu's posts the same time everyone else did, the

8 next morning when they woke up and saw them on Instagram, if

9 they can be liable for those posts?  And the answer to that is,

10 no, as to TNF, for two reasons.

11         First, there is no vicarious liability for

12 Mr. Ainuu's very personal late night speech about an incident

13 at a Bozeman bar, especially because that speech did not

14 mention TNF, did not tag TNF, and did not reference TNF's

15 products and services.

16         THE COURT:  What was the contractual relationship

17 between TNF and Mr. Ainuu?

18         MS. WALKER:  He's an independent contractor.

19         THE COURT:  So tell me about this sponsorship.  What

20 does that entail?

21         MS. WALKER:  The sponsorship agreement is not part of

22 the record before the Court at this moment.  But like you can

23 imagine, I think, he's a social media influencer.  TNF has

24 several of those.  There's a website referenced in the

25 pleadings where you can see those, and --

6

1          THE COURT:  Okay.  I understand what a social media
2    influencer is.  What do you mean they have some?  On their
3    payroll or through independent contracts?  What's the
4    relationship between --
5          MS. WALKER:  There's an independent contract.
6    There's a contract between Mr. Ainuu and TNF.  He is --
7          THE COURT:  To do what?
8          MS. WALKER:  To promote its products and services.
9          THE COURT:  To promote his products?
10         MS. WALKER:  TNF's.
11         THE COURT:  Okay.
12         MS. WALKER:  Correct.
13         THE COURT:  Mr. Ainuu is a climber, I understand.
14         MS. WALKER:  He is a mountain climber.  That's
15    correct.
16         THE COURT:  So the idea is that he will go on the
17    internet, social media, and say, "I went climbing today with
18    The North Face jacket.  It was wonderful."  That sort of thing.
19         MS. WALKER:  Correct.  Correct.  He uses TNF gear.
20    And occasionally, although his social media presence involves a
21    lot of content that doesn't involve TNF, and actually sometimes
22    refers to other brands, even competitors of TNF, occasionally
23    he posts about his experience, his positive experience with TNF
24    products and services.
25         THE COURT:  Okay.  So the TNF employee did post -- or

1   repost or somehow amplified Mr. Ainuu's post?

2            MS. WALKER:  Correct.  A TNF employee, whose last

3   name is Burelson, did repost some of Mr. Ainuu's posts.

4            THE COURT:  Okay.

5            MS. WALKER:  We address that particularly in

6   footnote 4 of our opening brief.  The case law is very good

7   that a mere repost -- and in this case there was no commentary.

8   It was just a repost without anything original added.  That is

9   not a publication by Mr. Burelson.

10            It also was not within the scope of his employment.

11   It was on the personal -- his personal Instagram page.  It was

12   also posted late night.  And we'll get to this, but we --

13            THE COURT:  So this is a little bit new territory.

14   Formerly, you know, if Mr. Ainuu posted this in the weekly

15   paper of some small town, and then the employee comes along and

16   reposts it in the New York Times, or some nationwide

17   publication, maybe there's some amplification.

18            What does it mean -- Mr. Ainuu posted on his social

19   media account, and then Mr. Burelson reposted.  Is that a

20   change in the audience?  Is that a change in the number of

21   consumers of that material?

22            MS. WALKER:  No.  That's not a republication.  And

23   the *Jankovic* case and also the *Lokhova* cases address this.

24   *Lokhova* involves something very similar where a post was made,

25   and then it was retweeted, I believe, by the defendant.  And

1 the judge says that's not a new publication for purposes of the

2 single publication rule, which I believe you are alluding to.

3   And so for a host of reasons, Burelson didn't

4 republish this.  Even if he did republish it, it wasn't in the

5 scope of his employment for TNF.  And even if it was a

6 republication within the scope of his opinion, he didn't say

7 anything.

8   And to the extent viewed most favorably toward the

9 plaintiff, this was some sort of endorsement by Burelson of

10 Manoah's -- excuse me -- Mr. Ainuu's opinion.  It would also be

11 Mr. Burelson's opinion, and I'll talk, obviously, in a few

12 minutes about the opinion doctrine.

13   THE COURT:  All right.  What about, plaintiffs argue

14 that TNF gave apparent authority to Mr. Ainuu to make these

15 allegedly defamatory statements.  How do you respond?

16   MS. WALKER:  They did not.  I think that is not a

17 plausible allegation if you look at the nature of the post.

18 And the only -- they cite two cases, which we distinguish in

19 our reply brief for the apparent authority point.  One of those

20 cases involved an actual manager of a retail store.  The other

21 cases involved leaders on the board of the defendant who was

22 clearly acting within the scope of their leadership capacity.

23 So those cases are really not on point here.

24   And so what the plaintiff turns to is to say, Well,

25 The North Face has made it part of its brand image to be woke

1 and progressive and anti-racist.  And Manoah is a sponsored
2 athlete and so because -- I keep saying Manoah because I'm used
3 to saying it -- Mr. Ainuu.  And because his posts were about
4 racism, there's this sort of parallel conduct.  And, ipso
5 facto, he was acting as an agent for The North Face with regard
6 to these particular posts.

7 And that just isn't the law, and the *Twombly* case
8 speaks to parallel conduct, albeit in the antitrust context,
9 with this notion that just because two people are doing the
10 same thing at the same time, there's been a meeting of the
11 minds, is not the law.

12 And the other basis Mr. Talbot has for asserting that
13 this was part of an agency relationship is what he calls a
14 pattern of conduct, involving TNF's silence, where social media
15 influencers are sponsored athletes, did things that potentially
16 had some racial overtones.

17 Again, there were two instances.  One involved a
18 social media influencer who took offense at a film about
19 mountain climbing and believed it kind conveyed this white
20 savior, white messiah complex, and spoke out about that and
21 created some controversy within the mountain climbing world.
22 And The North Face didn't stop it.  They let that social media
23 influencer have their say.

24 Another --
25 THE COURT:  So these independent contractors who are

1  these social influencers, are there any restrictions in the

2  contract with TNF about what content they will post or won't

3  post?

4      MS. WALKER:  Well, again, the contract is not in the

5  record at this point or before the Court.  I have read it.

6  And, yes, there are restrictions.

7      THE COURT:  Okay.  One of the other claims that

8  plaintiff argues is that Mr. Ainuu previously made allegations

9  about another person exhibiting racist behavior.

10      MS. WALKER:  Right.  And that's the second example in

11  this pattern of conduct.

12      And, again, The North Face did not respond to that.

13  Mr. Ainuu is his own person, with his own career, with his own

14  fans, with his own social media presence.  The vast majority of

15  the time he's posting personal views on that social media

16  account.  And, occasionally, pursuant to his independent

17  contract agreement, he posts about The North Face.  Those other

18  comments involving racism did not involve The North Face.  So

19  The North Face did not put a stop to it.  They didn't condone

20  it.  They just simply said nothing.

21      And that is completely consistent with The North

22  Face's view that its employee, whether it's Mr. Burelson and

23  its social media influencers, in this case Mr. Ainuu, do not

24  forfeit all right to speak freely on personal issues that

25  concern them just because they are a sponsored athlete of The

1    North Face.

2            And the case law really supports that, in particular

3    the *Lokhova* case, and one other we cite in our brief alongside

4    it, that says companies do not have to police and sensor,

5    essentially, all personal commentary by their employees and

6    agents or risk liability for what those agents say on their

7    personal time.

8            THE COURT:  What was the nature of the statements in

9    *Lokhova*?

10            MS. WALKER:  In *Lokhova*, CNN or MSNBC,

11   sometime-contributor had made statements on Twitter.  And like

12   Mr. Ainuu, in his social media profile, had identified himself

13   as a contributor to the defendant, but also as many other

14   things and referenced many other companies.  Very similar facts

15   that we recite in our opening brief.

16            And the plaintiff in that case tried to hold the news

17   organization libel for what this person said on social media

18   because he was a sometime-contributor in the *Lokhova* case.  And

19   both the District Court opinion and the Fourth Circuit opinion

20   are very helpful here; found that, A, there was no agency

21   agreement, this was not in the scope of it; and, B, even if

22   there had been, the news organization was not liable for what

23   this person said on Twitter.

24            THE COURT:  All right.  Let's go back to the

25   beginning, then, about the -- your views on choice of law

1　and -- well, first, choice of law.  Montana or Washington?

2　　　　　MS. WALKER:  We strongly believe Washington law

3　applies here, Your Honor.

4　　　　　I want to state at the outset that for purposes of

5　the merits, on both the agency question and the opinion

6　defense, it really doesn't matter whether you apply Washington

7　or Montana law.  There are also governing Ninth Circuit

8　principles that apply on the opinion defense which is a

9　constitutional defense.

10　　　　　And so The North Face and Mr. Ainuu on the opinion

11　defense win this case regardless of whether Washington or

12　Montana law applies.

13　　　　　THE COURT:  Right.  But if he doesn't win and we

14　apply Washington law, there's this anti-SLAPP statute.

15　　　　　MS. WALKER:  Correct.  Washington law is different

16　than Montana law in two respects that are relevant here today.

17　One is, Washington law, unlike Montana, does not allow punitive

18　damages under any circumstances.  Montana law, consistent with

19　the First Amendment, would allow them if there's a showing of

20　actual malice, which there is not.

21　　　　　More importantly, Washington has an anti-SLAPP

22　statute.  The standard on a motion to dismiss is the same as

23　Rule 12, substantively, the only difference is that if the

24　defendants win here, under Washington's anti-SLAPP law, they

25　would be entitled to fees.

1    And so while you could decide the merits without
2    reaching the choice of law issue, we do ask you to reach the
3    choice of law issue for a very pragmatic reason, which is the
4    issue of fees tends to be what puts a stop to these cases.  We
5    hope it puts a stop to them before they're filed because that
6    deterrent effect of fees discourages frivolous politically
7    motivated lawsuits.

8    But we litigate -- my firm litigates anti-SLAPP cases
9    across the country.  And what we also see is that after a
10   successful motion to dismiss, the threat of fees can bring the
11   parties to the settlement table.  And the plaintiff will choose
12   not to appeal, and the defendants will choose not to seek their
13   fees, and the case ends.  So that's why we ask that you reach
14   that issue today.

15   THE COURT:  Where did the publication take place?

16   MS. WALKER:  The publication took place on the
17   internet, which means it does not have a particular location.

18   But if you want to think about where it was directed,
19   which is what the case law talks about and what Section 150 of
20   the restatement talks about, it really was directed to the
21   state of Washington where Mr. Talbot's employer is located.

22   And Mr. Talbot really concedes this.  I mean, he
23   talks about how -- I mean, explicitly, Mr. Ainuu's posts say,
24   "Hey, Outdoor Research.  Hey, OR.  You know, get a handle on
25   your employee."  And calls for OR to discipline him and calls

1   for people who see the post to contact OR about what Mr. Ainuu
2   perceived as his racist conduct.

3           And so that is really the question under the
4   significant relationship test is not where was Mr. Ainuu
5   sitting when he posted to Instagram, which of course was in
6   Bozeman, but where was the speech directed?

7           THE COURT:  Plaintiff argues that the effect of the
8   speech, besides on the employer, the damage to his reputation
9   occurred in Montana where he lived previously.

10          MS. WALKER:  He does argue that.  But the
11  presumption, Your Honor, under Section 150, is that in a
12  multistate defamation case like this -- and it's multistate
13  because it was on the internet.  Right?  It wasn't in the
14  Bozeman newspaper.  The presumption, and it's a strong one, is
15  that the state of his domicile is the state of the governing
16  law.  And another case on that is *Clifford v Trump*.

17          Now, he says, "I just moved there.  A lot of my
18  friends are still in Montana."  And that is one factor.
19  Section 150 identifies four factors that can be used to
20  overcome the presumption, but it is just one of four factors.

21          And, again, the other factors look to, for example,
22  where did he feel his special damages?  General damages in a
23  reputation case are just general harm to a reputation.  Special
24  damages are things like lost profits arising from his
25  termination.  Those special damages were felt in Washington.

1    So if you look at those four factors that in some
2 rare cases can be used to overcome the presumption, two are
3 fairly neutral, and two still favor the application of
4 Washington.
5    THE COURT:  How long had Mr. Talbot lived in
6 Washington when this happened?
7    MS. WALKER:  To be quite honest, I'm not sure that is
8 pleaded in the complaint or the attached declaration, but I'm
9 sure his counsel can answer that.
10    THE COURT:  All right.  So if I were to apply
11 Washington law, then why wouldn't the anti-SLAPP statute apply?
12    MS. WALKER:  Very simply because this was speech on a
13 matter of public concern, Your Honor, and that is really the
14 only --
15    THE COURT:  What's the public concern?  Is Mr. Talbot
16 a public figure?
17    MS. WALKER:  Mr. Talbot -- well, that's not the
18 grounds for asserting it's a matter of public concern.  The
19 grounds for asserting it's a matter of public concern is that
20 this was an allegation of racism, and it's an allegation of
21 racism that arose out of an incident that happened in a very
22 public place, and it was directed in a very public way to a
23 very public company.
24    THE COURT:  I don't do social media, but it sounds to
25 me, under that standard, every day there would be thousands of

1    defamation cases arising on the internet because we have people
2    accusing each other of terrible things.  We have all of these
3    different forums.

4         How do I sort out what rises to the level of a matter
5    of public interest versus private disputes, name-calling,
6    things of that nature?

7         MS. WALKER:  Yeah, I agree with you.  Defamation on
8    the internet is rampant.  And most cases simply are not brought
9    because the defamation is confronted with counter-speech and/or
10   it goes away, and plaintiffs don't see the point in feeding the
11   fire and making it even more public than it already is.  But,
12   of course, people defame each other on the internet all the
13   time.

14        This is a matter of public concern under the *Connick*
15   case, which is a US Supreme Court case.  I would point you
16   to -- I think it's footnote 8 in the *Connick* case that says
17   discussions of race are inherently a matter of public concern.

18        And what I think is really telling here is that
19   Mr. Talbot's entire premise for arguing that TNF is vicariously
20   liable for Mr. Ainuu's speech is his view that TNF has engaged
21   in a social justice mission, that on a nationwide basis they
22   have taken a stance against racism, that they produce videos
23   that are antiracist.  And for him to use that to link this
24   speech to TNF and then to turn around and say that racism is
25   not a matter of public concern, I think is very disingenuous.

1        But the case law is fairly legion on allegations like
2   this being a matter of public concern, and I would just --
3        THE COURT:  Besides *Connick*, which cases do you think
4   support that?
5        MS. WALKER:  Let me find it.  *Connick* is the Supreme
6   Court case that I mentioned.  Again, I believe that's
7   footnote 8, and it would be the cases cited at page 10 of our
8   opening brief, including the Ninth Circuit case *Makaeff v Trump*
9   *University*.  *Clifford v Trump*, which I mentioned a minute ago
10  also governs not what is a -- that governs a handful of things,
11  and it's an important case for this Court.  *Clifford v Trump*
12  governs what is an opinion, which choice of law controls, which
13  state choice of law controls, and also what is a matter of
14  public concern, *Jha v Khan* out of state of Washington.
15        THE COURT:  All right.  I want to turn now to the
16  question about whether these statements were matters of opinion
17  or assertions of fact.
18        MS. WALKER:  So, Your Honor, the touchstone of what
19  is opinion versus fact is how the reasonable reader, or in this
20  case, perhaps the reasonable viewer would have interpreted what
21  Mr. Ainuu said.  And don't lose sight of that.  Think about the
22  person seeing it, you know, on their computer, and how they
23  would have interpreted what he said.
24        It doesn't matter what Mr. Ainuu meant or believed or
25  what, according to the plaintiff, he later recanted, if we want

1 to use that word. It is what the reasonable reader perceived
2 and whether they perceived it as a statement of fact or a
3 statement of opinion.

4 And the Supreme Court and the Ninth Circuit have said
5 that in deciding what the reasonable reader, how they
6 interpreted it, you should consider the content of the
7 statements themselves. First of all, do they have verifiable
8 component to them? Does it contain a statement of fact? And
9 the -- I'm blank on the name of the case for the moment, but
10 the case they cite is a good example of this, where it involved
11 allegations that the plaintiff was a KKK organizer. Right?
12 Not that he was a racist, but that he actually was a member of
13 that group and organized meetings for them and recruited
14 members. Right? That's a statement of fact. Statements of
15 racism are not statements of fact.

16 The other thing about the content is the type of
17 language used. Is it loose? Is it figurative? Does it
18 include emojis? Is it hyperbolic?

19 And then the second factor in thinking about what the
20 reasonable reader believes goes to context. Right? So was
21 this on the front page of the New York Times, or was this on
22 talk radio? Was this on the free-wheeling world of social
23 media? Was it posted at 9:00 a.m. by someone who comes across
24 as very composed, or was it posted late night, clearly by
25 someone who had just come home from a bar.

1    THE COURT:  Well, it was also posted after that.
2  Right?  And there were follow-ups?
3    MS. WALKER:  There were some follow-up posts, yes.
4    THE COURT:  One of them in particular I want to ask
5  you about, Document 1-11, page 3 of 4.
6    Now, most of the comments, like you say, that
7  involve -- could be perceived as opinions.  You were
8  aggressive.  You're racist.  Whatever it might be.  But there's
9  a post here in particular on page 3, Document 1-11, "Happy
10  Fourth of July.  Remember when Johnathan, your director of
11  gloves, assaulted me last month."
12    Is that a statement of fact?
13    MS. WALKER:  We would argue not in context,
14  Your Honor.  There were prior statements about Mr. Talbot being
15  racist, saying racist things, and wanting to fight.  And there
16  are plenty of cases.
17    And I would point you to the *Knievel* case.  I would
18  point you to *Clifford v Trump*.  I think I have one
19  more where -- oh, the *Barstool* case, which is cited in our
20  reply brief, where, read in a vacuum, the statements could be
21  perceived as statements of facts.
22    So in the *Knievel* case, ESPN posted a photograph of
23  Evel Knievel with his wife and another woman at some sort of
24  gala and said, "Even after all of these years, Evel Knievel is
25  still a pimp."  Being a pimp is a criminal allegation.  Right?

1   And could be perceived as factual.  But the court said in this
2   context it's not.
3         In the *Barstool* case, there was a Twitter war between
4   two sort of shock-jock DJs.  And one said about the other, "He
5   has herpes, he's a stalker, and he harassed his girlfriend."
6   Those things are verifiable statements of fact.  But the court
7   said, in this context -- right? -- talk radio, a Twitter war,
8   no reasonable reader -- again, coming back to that
9   touchstone -- would have thought that this was anything more
10  than hyperbolic opinion.
11        In the *Trump* case, *Clifford v Trump*, a former sexual
12  partner of his came forward, and he accused her of running a
13  con job -- right? -- extorting him, basically lying, also
14  verifiable just like *Milkovich* in some ways, said a statement
15  of lying is actual because it's factual.  But the court in
16  *Clifford v Trump* said, no, not in this context.
17        And then, lastly, the *Sandmann* case, which I would
18  encourage you to read precisely on these allegations of how
19  Talbot wanted to fight.  In *Sandmann*, a Native American elder
20  named Nathan Philips said that a white teenager from a high
21  school in Kentucky blocked him on the national mall.  And the
22  court said blocked is a matter of perception.  It sounds
23  factual.  It sounds sensory.  It sounds like something you can
24  see, but it's very personal.  And it went to how the Native
25  American elder perceived that situation based on his lived

1 experience in that moment. And we think the fight statements
2 and the one you just mentioned are very similar to the *Sandmann*
3 case.

4 No reasonable reader, based on everything Mr. Ainuu
5 said about the incident that night, would have perceived his
6 impression as anything more than an impression.

7 THE COURT: All right. Anything else?

8 MS. WALKER: Your Honor, we think this is a case of
9 pure opinion, and there is a distinction in the case law
10 between pure opinion, which isn't verifiable to begin with, and
11 for which no disclosed facts are necessary. And we think both
12 defendants, TNF and Mr. Ainuu, can win on that ground.

13 But even if you were to find, as the plaintiff
14 argues, that Mr. Ainuu should have disclosed facts to support
15 the opinion, because this is a mixed opinion case, which is a
16 term of art, our reply -- bullet points toward the end, the
17 many, many, many facts Mr. Ainuu disclosed that would allow the
18 reader to reach their own conclusion about whether his opinion
19 was legitimate, and that is really all that's required.

20 Lastly, Your Honor, the plaintiff has not quibbled
21 with our argument that if this case is dismissed, it should be
22 dismissed with prejudice. He has also not come forward with
23 any allegations about how he could amend his complaint in a way
24 that would not be futile.

25 So if you dismiss, we ask that you dismiss under

1    Washington law, and that you do so with prejudice.  Thank you.

2            THE COURT:  Thank you.

3            Mr. Tierney.

4            MR. TIERNEY:  Good morning, Your Honor.

5            THE COURT:  Good morning.

6            MR. TIERNEY:  To begin, I just wanted to briefly make

7    an introduction.  Mr. Ainuu is with us today in the gallery.

8            THE COURT:  Welcome.

9            MR. TIERNEY:  Your Honor, I think with respect to the

10   issues that are germane to Mr. Ainuu, his position, and The

11   North Face's position are on all fours.  So I don't intend to

12   take a whole lot of your time, and I'm not sure it's necessary

13   for me to retread all of the issues.

14           THE COURT:  If you want to make any particular points

15   that weren't addressed, go ahead.

16           MR. TIERNEY:  Okay.  There are a couple that I'd like

17   to make.  First of all, with respect to the choice of law

18   issue, I wanted to add to Ms. Walker's presentation, which I

19   agree with, by directing the Court's attention to the *Hanley*

20   decision, a Ninth Circuit case cited in Mr. Ainuu's reply.

21   That case discussed specifically the Section 150 of the

22   Restatement (Second) of conflicts of law and the presumption in

23   favor of the plaintiff's domicile.

24           And the Ninth Circuit in that case held that the

25   location of the defendant and the place where the harm emanated

23

 1   were effectively the weakest considerations, and it shouldn't

 2   be allowed to overcome the presumption.

 3          THE COURT:  What do plaintiffs allege is the time of

 4   Mr. Talbot's domicile in Washington?

 5          MR. TIERNEY:  Sorry?  The time?

 6          THE COURT:  How long was he domiciled in Washington?

 7          MR. TIERNEY:  I don't know the answer to that,

 8   Your Honor.

 9          THE COURT:  Any question of fact after -- had he just

10   moved there that week? that month? that year?  Do you know?

11          MR. TIERNEY:  I think he had moved there recently.  I

12   think that his complaint --

13          THE COURT:  What do you mean by "recently"?

14          MR. TIERNEY:  Within a matter of weeks or months.  I

15   don't know the details.

16          However, I think the submissions to the Court that

17   are within the Rule 12 record make very clear that it was a

18   move that was for the purposes of permanent relocation in

19   conjunction with a new job opportunity.  So there's clearly

20   intent to establish a new domicile in Washington, irrespective

21   of how long he had been there at the time.

22          THE COURT:  Okay.  Go ahead.

23          MR. TIERNEY:  Related to that, Your Honor, and this

24   question of how to weigh and whether the Court can and should

25   weigh Mr. Talbot's claim subjectively, greater ties to Montana

1  and the claimed reputational injury there, I simply want to
2  observe that I have serious doubts about whether that's within
3  the Rule 12 record at all.  I believe the only citation on that
4  point is to Mr. Talbot's declaration, which is almost entirely
5  about his relocation to Washington and his new job there.

6         It says very little, if anything, about his ties to
7  Bozeman, any injury there, or that this case is about any
8  general reputational injury in Bozeman.  I would respectfully
9  submit that those are post hoc rationalizations to try to
10 change the choice of law analysis.

11        The only other observation that I wanted to make,
12 Your Honor, to offer the Court with respect to the analysis of
13 matters of opinion versus fact, I wanted to point out one
14 additional example that I think is pretty probative and
15 helpful.  That's the *Cochran v New York Post* decision that's
16 discussed in *Knievel*.  The Ninth Circuit cited that for the
17 proposition that statements that are apparent fact or that
18 might be couched as statements of fact, often can prove to be
19 statements of opinion in appropriate context, which was
20 Mr. Walker's point.

21        The Cochran in that case was, of course, the
22 sometimes controversial but always entertaining,
23 Johnny Cochran, who was accused by the New York Post columnist
24 of engaging in unethical conduct.  The Court analyzed the
25 context of the statement, looked at the loose, figurative,

1  often insulting language used by the columnist and concluded

2  that it wasn't actually charging a violation of the attorney's

3  ethical obligations.  Instead, it was simply an opinion

4  criticizing him for his handling of the OJ Simpson trial.

5          If Your Honor has any other questions, specific to

6  Mr. Ainuu, I would be happy to answer them.  Otherwise --

7          THE COURT:  What about the -- how do you respond to

8  the one statement I cited to Ms. Walker about this alleged

9  assault?

10         MR. TIERNEY:  I share Ms. Walker's view on that, and

11 I think the *Sandmann* decision squarely addresses that.  It's

12 one of those statements that, in a vacuum, might look factual,

13 but in context it's clearly a statement of Mr. Ainuu's

14 subjective impressions of Mr. Talbot's conduct, his motivation,

15 his behavior.  It's an evaluative assessment, not an accusation

16 of fact.

17         THE COURT:  All right.  Anything else, Mr. Tierney?

18         MR. TIERNEY:  Thank you, Your Honor.

19         THE COURT:  Thank you.

20         Mr. Barry.

21         MR. BARRY:  Your Honor, may it please the Court,

22 Nicholas Barry on behalf of the plaintiff.

23         I want to start by saying that it's disappointing to

24 be here because our client did have serious reputational harm,

25 and I want to begin with the idea that what he's seeking here

1 is justice for the reputational harm that he suffered at the

2 hands of Defendant Ainuu and The North Face.

3 And I think Your Honor was correct early on pointing

4 out the relationship between Defendant Ainuu and The North

5 Face, and the purpose of that relationship, and what he's meant

6 to be doing.

7 And The North Face has a very clear motive to go out

8 and to create issues. And what Defendant Ainuu was looking to

9 do was --

10 THE COURT: Create what kind of issues?

11 MR. BARRY: To create issues related to race, like we

12 allege in the complaint related to --

13 THE COURT: What's the motive for doing that?

14 MR. BARRY: Sorry?

15 THE COURT: You said they have a clear motive to do

16 that. What's the motive?

17 MR. BARRY: I think it's to expand their brand. I

18 think it is part of their branding. It's the reason they went

19 after Facebook on their advertising. It's the reason that

20 they've supported --

21 THE COURT: They went after Facebook on their

22 advertising?

23 MR. BARRY: So in our complaint, we point out the

24 time that The North Face stopped advertising on Facebook,

25 highlighting that until Facebook took action to stop racist

1   posts and violent posts from appearing on Facebook, they would
2   no longer advertise there.  And so they're using this as a
3   wedge issue to drive business.

4         And what Defendant Ainuu was looking to do here was
5   simply to create a viral moment that would be beneficial to him
6   personally.

7         THE COURT:  What is Facebook doing by posting those
8   things?  Aren't they doing the same thing?  They're trying to
9   drive business, get more views, more advertisements?  Isn't
10   that the way the web works?

11         MR. BARRY:  I guess I don't understand the question.

12         THE COURT:  Well, you said that North Face stopped
13   advertising on Facebook because Facebook was not pulling what
14   North Face perceived to be racist, derogatory postings.  And
15   you said the goal of North Face was to generate more publicity,
16   more looks for them, more revenue for them.

17         Isn't Facebook doing the same thing by not taking
18   those things down, by allowing that or promoting that kind of
19   conduct?

20         Where does the Court come in here?  This is all kind
21   of the wild west on the internet.

22         MR. BARRY:  And that's the problem.  I do think that
23   that is the exact problem.  When you have someone who has, what
24   might be called internet clout, with 15- to 20,000 followers
25   going out -- singling out an individual in Bozeman, Montana, in

1    front of a bar, and then making up allegations that this person
2    made racist statements and tried to assault him, posting them
3    online --

4          THE COURT:  Hold on.  You say make -- are there any
5    witnesses to this encounter besides the two principals?

6          MR. BARRY:  Not that I'm aware of.

7          THE COURT:  Okay.  So when you say, "he made it up,"
8    that's Mr. Talbot's view.  We have two people arguing about
9    what happened.

10         MR. BARRY:  Well, it's not just Mr. Talbot's view.
11    Outdoor Research conducted an investigation into what occurred,
12    and they talked to Defendant Ainuu, where he admitted to
13    Outdoor Research that Mr. Talbot did not in fact make any
14    racist statements.

15         THE COURT:  Why did Outdoor Research terminate
16    Mr. Talbot?

17         MR. BARRY:  They terminated Mr. Talbot because of the
18    reputational harm that he suffered, and they were going to
19    suffer the same reputational harm.

20         THE COURT:  But you didn't sue Outdoor Research.

21         MR. BARRY:  Say that again?

22         THE COURT:  You didn't sue Outdoor Research.

23         MR. BARRY:  I don't believe we have a claim against
24    Outdoor Research.  They didn't cause any reputational harm to
25    Mr. Talbot.

29

1          THE COURT:  Well, but they terminated his employment
2   based on what you said was conduct that didn't happen.
3          MR. BARRY:  Okay.  I mean, they're free to terminate
4   employees at will.  It's not a --
5          THE COURT:  So it gets back to this freedom for all
6   these companies to advertise where they want, or not where they
7   want, post what they want, not post what they want.  Where do
8   we draw these lines?  How does the Court come in and referee
9   these kinds of disputes and decide:  That's out of bounds,
10  that's too much, versus, boys will be boys, that's the
11  internet, get thicker skin?
12         MR. BARRY:  Right.  And I do think that that is a
13  difficult line to draw, but we can look at the *Barstool* case,
14  for example, where we had two public figures who were known for
15  their kind of shock-jock tendencies going at each other.  And
16  the Court said, Look, that's obviously not a problem.
17         And that's not even comparable at all here to
18  Johnathan Talbot, who is just an individual working a life with
19  a family.  He's not a shock-jock.  He's not famous.  He's not a
20  public figure.  He's not President Trump.  He's not
21  Johnny Cochran.  He's nobody.  And he becomes the focus of this
22  intense attack by Defendant Ainuu, who did make claims and
23  statements of fact.
24         THE COURT:  What?
25         MR. BARRY:  Well, that he was assaulted, or that he

1 | was attacked by Johnathan Talbot, as the Court pointed out
2 | or --
3 |          THE COURT:  Assault -- I mean, there were no --
4 | assault is a reasonable apprehension of bodily harm.
5 |          MR. BARRY:  And it's a crime, and we can prove it.
6 | Right?  You can prove if someone --
7 |          THE COURT:  But he didn't -- is there an allegation
8 | by Mr. Ainuu that Mr. Talbot actually punched him or struck
9 | him?
10 |          MR. BARRY:  No.
11 |          THE COURT:  So assault could also be
12 | reasonable apprehension of bodily harm.  "I was scared.  I
13 | thought the guy was going to hit me."  Is that a matter of
14 | opinion or a matter of fact?
15 |          MR. BARRY:  Well, I think it depends.  Right?  Like
16 | we talked about, you have pure opinion where the facts are
17 | fully disclosed.  And, here, the facts were not fully disclosed
18 | as to the incident that happened.
19 |          And we can look to the responses of Defendant Ainuu's
20 | social media followers for what they perceived the unstated
21 | facts to be, and that's the problem here is the mixed opinion
22 | part when you get down to it.
23 |          Now, I do think that there is legitimate statements
24 | of facts that were made going back to the assault and going to
25 | this "He made racist statements to me."  I think you can show

1 whether someone did or did not make racial statements.

2         THE COURT: How? There's two people who are going to

3 say: Yes, he did. No, I didn't.

4         MR. BARRY: Because we allege that Defendant Ainuu

5 already admitted that Johnathan Talbot did not, in fact, make

6 racist statements.

7         THE COURT: All right. Where did Mr. Ainuu admit

8 that?

9         MR. BARRY: When he was talking to Outdoor Research

10 during their investigation.

11         THE COURT: Okay. So we got ahead of ourselves.

12 Let's start first at the choice of law.

13         MR. BARRY: Sure.

14         THE COURT: Why does Montana law apply here?

15         MR. BARRY: I think Montana law applies for a couple

16 of reasons. First, looking at --

17         THE COURT: My understanding is that Mr. Talbot has

18 chosen to move to Washington state, take a job with a company

19 located in Washington state. Is that correct?

20         MR. BARRY: That is correct. He did do that.

21         THE COURT: All right. And that company chose to

22 terminate his employment based upon these postings; correct?

23         MR. BARRY: Correct.

24         THE COURT: And that termination took place in

25 Washington.

1      MR. BARRY:  It did.

2      THE COURT:  And that termination was part of the

3 reputational harm you've alleged.

4      MR. BARRY:  It is part of the reputational harm.

5      THE COURT:  So why should Montana law apply here?

6      MR. BARRY:  So two reasons:  The first reason is

7 Section 61 of the restatement, that you follow the statutory

8 directive of the state on choice of law.  And, here, that would

9 be the Montana Constitution that says in all suits for slander,

10 the jury, under the direction of the court, shall determine the

11 law and the facts, and so --

12      THE COURT:  Right.  If I apply Montana law, that's

13 the case.  But why should I apply Montana law here?

14      MR. BARRY:  Because the restatement starts there

15 first and says the first place you should look -- is there a

16 statutory directive on which law should apply, and I'm

17 saying that --

18      THE COURT:  Montana laws says if the court has

19 jurisdiction.  Right?  That's the standard, not that I should

20 necessarily exercise jurisdiction.

21      MR. BARRY:  Now, do you mean jurisdiction as --

22      THE COURT:  I'm sorry.  I misspoke.

23      The Montana law you described says if Montana court

24 is resolving a dispute like this, here's the law -- here's the

25 Montana law that applies to defamation.  Right?

1    MR. BARRY:  Well, I don't think the choice of law is
2    outside the question of what the law is to determine the law.
3    I don't think that's a separate -- that's a whole separate
4    thing.  It's still a question of law that the jury gets to
5    determine.

6    THE COURT:  What's the Montana law that you think
7    tips the balance in favor of Montana law applying?

8    MR. BARRY:  So that would go, I think, to the 6(2)
9    considerations that we talked about -- or that the other folks
10   talked about briefly.  And that would be all of the facts that
11   the Court pointed out, that the defamation happened here.  You
12   know, they can say that it happened online, but the fact is it
13   happened in a bar as alleged.  He went around telling people at
14   the bar, "That guy over there called me a racist and tried to
15   fight me."  To the point the bartender went over to Mr. Talbot
16   and said, "Hey, is everything okay?  What's going on?"

17   THE COURT:  Wait a minute.  Wait a minute.  Who said,
18   "That guy called me a racist and tried to fight me"?
19   Mr. Talbot or Mr. Ainuu?

20   MR. BARRY:  Defendant Ainuu said those things at the
21   bar to the point --

22   THE COURT:  That he called him a racist?  I thought
23   Mr. Ainuu called Mr. Talbot a racist.

24   MR. BARRY:  Yes.  Sorry, if I misspoke.
25   Defendant Ainuu was going around the bar alleging that

1  Mr. Talbot said racist things and was trying to fight him and
2  that other people should --
3        THE COURT:  Now you can be subject to a defamation
4  suit on what happens inside a bar?
5        MR. BARRY:  I'm just saying with -- the facts here
6  that happened, we can't look at it so narrowly as we have this
7  one fact.  Is that sufficient?  We have this other fact.  Is
8  that sufficient?  I think it's the totality of the
9  circumstances.
10       THE COURT:  Do any of the statements at the bar have
11 anything to do with Mr. Talbot's termination?
12       MR. BARRY:  Yes, because he went and put it online
13 and then got all of his followers to do it.
14       THE COURT:  Right.  It's the putting online, not what
15 he said to people in the bar, isn't it?
16       MR. BARRY:  I think that that is the substantial
17 portion of the harm and where it comes from, yes.
18       THE COURT:  Putting it online?
19       MR. BARRY:  Yeah.  But, again, you know, defendant --
20 or Johnathan Talbot was a long-time Bozeman resident.  His
21 reputation is here.
22       THE COURT:  How long?
23       MR. BARRY:  Years.  He worked in Bozeman for years.
24       THE COURT:  How old is Mr. Talbot?
25       MR. BARRY:  Say that again?

1      THE COURT:  How old is he?

2      MR. BARRY:  In his late 30s.

3      THE COURT:  How long did he work in Bozeman?  You

4  said years.  Ten years?  Five years?

5      MR. BARRY:  Probably five to seven years.  He was in

6  Ohio before that.  And then he was in Washington for mere weeks

7  before he got terminated.

8      THE COURT:  Okay.  So he didn't grow up in Montana?

9      MR. BARRY:  I don't believe he grew up in Montana.

10  No, but he does have a family in Bozeman.  His ex-wife and his

11  children are there.  That's where he made his life, if you

12  will, as an adult.

13      And the reputational harm does extend to Bozeman

14  because if you get terminated from your job, for whatever

15  reason, you have -- we all have networks of people we can reach

16  out to to find a new job.  And when your reputation has been so

17  destroyed -- and his network of people in Bozeman, they are not

18  going to talk to him anymore.  They don't want anything to do

19  with this.  It's so public.  Everybody knows what happened, and

20  that's where the reputational harm has really injured him,

21  moving beyond the initial harm that he suffered.

22      And so I think looking at the restatement and the

23  things that they lay out, the concerns that they lay out, are

24  really what it is.

25      And comment E of Section 150, since the defendants

1  point to 150 for multistate defamation, and essentially say

2  that domicile is the only consideration that really matters, I

3  think comment E of Section 150 really does injustice to that.

4  It says, The state where the defamatory communication caused

5  the plaintiff the greatest injury to his reputation.  And as I

6  just said, that is Bozeman.  That's where his network of people

7  to get another job reside, and that's where his reputation has

8  been most harmed.

9          It says --

10          THE COURT:  Well, so his profession is working in the

11  outdoor clothing industry.

12          MR. BARRY:  That's what he's done for most of his

13  career, yes.

14          THE COURT:  So what employers in the outdoor clothing

15  industry are located in Bozeman?

16          MR. BARRY:  There's a lot.  I mean, I could go pull

17  his declaration for where he worked previous, but...

18          THE COURT:  Okay.

19          MR. BARRY:  And then there's --

20          THE COURT:  But are there any factories in Bozeman

21  producing outdoor clothing?  Any wholesalers producing

22  outdoor clothing?

23          MR. BARRY:  He didn't -- I mean, he wasn't that type

24  of employee.

25          THE COURT:  Right.  So these companies have agents

1    all over the country in places where outdoor recreation is

2    popular.

3              MR. BARRY:  Sure, just like law firms have, you know,

4    offices all over the place.  But if my reputation is harmed

5    where my network is in Nashville, and I can't get anyone in

6    Nashville to offer me a job, it doesn't matter that --

7              THE COURT:  What's your best case for the idea that

8    Montana should be the choice of law here?

9              MR. BARRY:  Well, everything we just talked about.

10   The incident occurred in Bozeman.  The relationship --

11             THE COURT:  I said what case law do you think --

12             MR. BARRY:  Oh, what case law.

13             THE COURT:  -- that strongly supports your view?

14             MR. BARRY:  Give me one second, Your Honor.

15             So I think it's the *Phillip*s case that looks at

16   Section 6(2), and -- excuse me, I'm getting over a cold -- and

17   then Montana Constitution, Article VII, *Lee v Traxler*, which

18   cites to that as well.  I think those are probably the

19   strongest cases.

20             THE COURT:  What were the facts in *Lee v Traxler*?

21             MR. BARRY:  In *Lee v Traxler*, the court -- I'm

22   blanking on the facts, but they -- they held that the

23   statements were not false and, therefore, there was no

24   liability.  But I don't remember the facts off the top of my

25   head.

1      THE COURT:  Okay.  So but *Lee v Traxler*.

2      MR. BARRY:  Yeah, it walks through --

3      THE COURT:  All right.  I'll look at it.

4      MR. BARRY:  -- the choice of law question --

5      THE COURT:  Okay.

6      MR. BARRY:  -- in some detail.

7      THE COURT:  Okay.  So let's turn then to -- I know

8  we've touched on it briefly.  What is North Face's obligation

9  here?  Because it starts talking about the -- they pulled out

10  of Facebook, and they were trying to increase their market

11  share by choosing to support one viewpoint over another.

12      MR. BARRY:  Sure.  So you --

13      THE COURT:  How were they responsible?  Mr. Burelson,

14  he didn't post it on a North Face website, did he?

15      MR. BARRY:  Not on a North Face website.  But it is

16  curious, Mr. Burelson is the global senior athlete coordinator

17  for North Face who manages the -- manages the climbers that

18  they have sponsored, as I understand it.

19          And he was put on notice of other instances of

20  Defendant Ainuu's conduct, and we have the declaration of

21  Ari Novak that describes how Defendant Ainuu's conduct

22  substantially changed after he became a North Face climber.

23          And so, you know, it's our position that this is

24  encouraged by North Face, and if North Face --

25      THE COURT:  To make provocative statements?

1    MR. BARRY:  To make provacative statements, to make

2 issues out of things, to look for opportunities to raise, you

3 know, these viral moments so that you can promote the --

4    THE COURT:  What's your basis for that claim?

5    MR. BARRY:  Well, the history of North Face's public

6 statements, and the history of Defendant Ainuu's conduct that

7 North Face is aware of, through Dave Burelson, who is supposed

8 to be managing, as I understand, the sponsored climbers.

9    So there's a direct connection there.  And we haven't

10 had discovery on this topic or issue to be able to really get

11 into it.  All we've been able to do is find the public

12 statements.  Your Honor asked about the contract between them.

13 We don't even have that.  You know, we haven't been entitled to

14 obtain any of that information.

15    But given the history of North Face and their public

16 facing statements and the background facts that we've been able

17 to dig up from another climber, Ari Novak, who by the way was

18 good friends with Defendant Ainuu.  He rented his basement

19 apartment out to him.  You know, he helped -- as far as I can

20 tell, he helped get him into the climbing world.

21    And even he was subject to Defendant Ainuu's "You're

22 a racist" comment because he wouldn't let Defendant Ainuu, in

23 an intoxicated state, go night climbing with a 16-year-old

24 girl.  And when Defendant Novak put a stop to it, he was

25 accused of being a racist.  And he let Dave Burelson know about

1  this.

2          So you have all of these incidents, and we can't take
3  them one at a time and just -- it's the totality of the
4  circumstances.  We're talking about context, as defense counsel
5  has said.  Yes, let's look at the context and all of these
6  instances over time.

7          And there's a clear correlation or connection between
8  North Face's purpose and then what their sponsored climbers are
9  doing, and it's our position that it's because North Face is
10 encouraging their sponsored climbers to do these things.  And
11 they should be responsible for the harm that that causes if, in
12 fact, they are encouraging their climbers to take these steps.

13         THE COURT:  So I'm trying -- struggling with the
14 business model where you're encouraging your employees to make
15 statements that might open you up to liability.

16         MR. BARRY:  I'm with you.  I think it's a bad
17 business decision, but I'm not the one who gets to make the
18 business decisions.

19         THE COURT:  So the defendants argue that the alleged
20 facts here are not provably false.  How do you respond to that?

21         MR. BARRY:  Well, I think the -- so two things:
22 First, the alleged facts that Mr. Talbot made racist comments
23 is provably false, and we've alleged in our complaint, again,
24 that Defendant Ainuu admitted David -- that he did not make
25 those statements.  And, two, that he tried to fight him and

41

1    assault him is also provably false.

2            THE COURT:  That he what?

3            MR. BARRY:  That he -- that Johnathan Talbot tried to

4    assault Defendant Ainuu is also provably false.

5            THE COURT:  As we said before, though, assault is

6    reasonable apprehension of bodily harm or attack.  Assault is

7    you came up and accosted me and were verbally threatening me.

8    I could have reasonable apprehension of bodily harm under those

9    circumstances.

10            MR. BARRY:  Exactly.  I mean, that's what you go to

11   court for when someone is charged with assault.  Right?  You

12   have to prove up the allegations.  I mean, it's provable.

13   That's the question.  Is there provable facts.  It is provable.

14            THE COURT:  There's a whole bunch of case law, most

15   point -- it cuts both ways, but most of them say allegations to

16   racism are difficult to support a defamation claim.  And this

17   is the *Dodge* case, *Stevens v Tillman*, from the Seventh Circuit;

18   *Skidmore v Gilbert*, *Rapaport v Barstool* case.  Which cases do

19   you think are most similar here to the facts?

20            MR. BARRY:  Well, I don't know that any of them are

21   similar to the facts here because all of those cases are

22   distinguishable on several grounds.  The first one is that --

23   you know, like the *Sandmann* case that they point to.  You know,

24   all of the facts were disclosed in that case.  There were

25   videos from multiple angles.  There was no -- there was nothing

42

1  left, and that goes to the mixed opinion question.  Right?  So
2  there was nothing left.
3          THE COURT:  *Sandmann*?
4          MR. BARRY:  The *Sandmann*.
5          THE COURT:  Right.  So, here, we have two people who
6  are going to testify:  "Yes, I did."  "No, I didn't."  "Yes, he
7  did".  "I did not."
8          How is the jury supposed to sort this out?
9          MR. BARRY:  Well, the jury makes credibility
10 determinations and decides who they're going to believe.
11 That's what they get to do.  Right?  They get to decide the
12 facts.  And you put the facts in front of the jury, and they
13 decide them.
14         We've alleged here that our client was defamed, that
15 he was subject to defamation, that there's no privileged --
16 it's not a privileged communication, and the jury gets to
17 decide the facts on it.
18         THE COURT:  *Starks v Tula Life*, District of Nebraska,
19 not the most notable court in the world:
20         "In this case, Starks alleges, and the Court assumes,
21 that the statements imply that Starks is a racist and made
22 hateful and racist remarks.  These assertions are not
23 actionable because an ordinary reader would not conclude that
24 these statements implied a factual assertion about Starks
25 capable of being proven true or false."

1         How does that differ from here?

2         MR. BARRY:  Well, here, we can look at what actually

3 happened on Instagram with the people who heard the statements.

4 And, you know, they want to look at a reasonable observer.

5 Well, we have reasonable observers, people on Instagram who

6 looked at it.

7         THE COURT:  *Rapaport v Barstool*, those were

8 statements that -- we had all of the statements.  There's no

9 dispute about what happened.

10         MR. BARRY:  Right.

11         THE COURT:  "No reasonable reader could find that the

12 statements alleging racism or fraud were conveying facts about

13 Rapaport, as opposed to reflecting the opinion."

14         MR. BARRY:  Right.  And, again, you look at the

15 context of it.  Let's go back to the context.  Who were the

16 people in *Rapaport v Barstool*?  They are two shock-jocks saying

17 things to each other.  It's not an individual person who is

18 just a private person that's getting, you know, attacked online

19 by someone with, you know, 20,000 Instagram followers.  It's

20 not the same situation.

21         And the followers clearly understood that

22 Johnathan Talbot apparently did something horrible for

23 Defendant Ainuu to make these comments online, and they

24 presumed that because there's unstated facts that are -- and

25 that's the mixed opinion followup.

44

1          THE COURT:  How do you know that?  You are making a

2     number of assertions here.  How are they supported by any

3     facts?  People are assuming he did terrible things.  How do we

4     know this?

5          MR. BARRY:  That's the problem is that there's --

6     that's the whole mixed opinion question.  Right?  When there's

7     unstated facts and people assume that you did horrible things,

8     that's where you get into mixed opinion, and it is defamatory,

9     and you can take that to a jury.  That's where we're at here.

10          And all of those other cases, Your Honor, are cited,

11    and we go through them in a footnote in our response brief.

12    They're distinguishable.  Either the facts are all disclosed,

13    it's public figures, or the facts are publicly known already.

14    Right?  So everyone knows all the facts about President Trump.

15          THE COURT:  But the facts are disclosed.  My role is

16    to assume the facts you allege are true.  And even if true, how

17    do they rise to the level of defamation, go beyond a matter of

18    opinion?

19          MR. BARRY:  So I may be misunderstanding the framing.

20    Are we in the -- like, I see this as two issues.  Right?

21    There's the statement of facts, and then there's the mixed

22    opinion.  So in the mixed opinion world, we've alleged the

23    responses --

24          THE COURT:  Hold on.  You said, for example, the

25    *Barstool* case.  All the facts were disclosed.  We have a video.

45

1    We have the statements that were on the internet.  Everyone
2    knows what the facts were.
3                MR. BARRY:  Right.
4                THE COURT:  From those facts, we can say, as a matter
5    of law, there's no defamation because this is opinion.
6                MR. BARRY:  I think what they say is that there's no
7    defamation there because all of the facts to the reader were
8    disclosed.  Right?  That's the difference.  It's not that some
9    type of defamation didn't occur.  I mean, maybe -- but not
10   legal defamation.  Because all the facts were disclosed, and
11   the reader could make up their --
12               THE COURT:  Not legal defamation?
13               MR. BARRY:  -- own mind about it.  Well, I -- I
14   mean -- I don't mean the defined -- like, the defined term in
15   Montana law or in the law about defamation.  I just mean, you
16   know, colloquially, we'd say you were defamed if someone said X
17   about you, but, you know -- and like the example that the
18   restatement gives.  Right?  It says A tells B, his neighbor,
19   that he thinks C is an alcoholic.  Right?  And the restatement
20   says that could be defamation, just that statement.  I think C
21   is an alcoholic.  I told that to B.  I think C is an alcoholic.
22   That's no different than here because there's unstated facts
23   that B is going to assume that causes harm to C's reputation.
24   And that's what we've alleged here.
25               THE COURT:  Does it matter as to how many people read

1   it?  If I am trying to be a social influencer, I have no

2   followers, and I make statements that no one reads, even though

3   they are potentially defamatory, could someone come and

4   challenge them and say they harmed them?

5          MR. BARRY:  Well, there might not be an injury there.

6   Right?  But here there's a clear injury.  So, yeah, maybe

7   there's an injury problem there in that situation.

8          But, here, we have provided the Court with examples

9   of the responses from Defendant Ainuu's followers.  You know,

10  they were repeatedly contacting Outdoor Research to have him

11  fired.  They were making statements that clearly they

12  understood that something horrible must have happened, and they

13  assumed that.  And that's what a reasonable person would assume

14  based on the statements Defendant Ainuu made online.  And

15  there's where we get into mixed opinion, and that's where it is

16  defamatory, and that's where we can prove it up to a jury that

17  these statements left it open to cause harm to Johnathan

18  Talbot.  I mean -- so that's the mixed opinion.

19         THE COURT:  So let's go back to the beginning.

20  Ms. Walker argued in the beginning that they have challenged a

21  certain number of factors and that you implicitly conceded

22  those facts because you did not challenge them.

23         First one was the plaintiff concedes that the

24  defendant was not an employee of TNF.  I think everyone agrees

25  about that fact.

47

1       MR. BARRY:  Right, not an employee as far as we're
2  aware.
3       THE COURT:  All right.  And that North Face did not
4  publish the claims.
5       MR. BARRY:  I think Dave Burelson did publish the
6  claims.  Now, whether that's The North Face publishing the
7  claims...
8       THE COURT:  So are you arguing The North Face did or
9  not?
10      MR. BARRY:  I do think that Dave Burelson, as the
11 global senior advisor -- or the global senior person over their
12 climbers, I think his publication even on his personal account
13 is going to be seen as supportive.
14      And, again, this is contextual with Dave Burelson
15 because he has a history and a background with the climbers,
16 and in his -- given that total context, without going through
17 all the points again, it's that total context that gives it --
18 that he's speaking on behalf of North Face, as their global
19 senior.
20      And I agree with the case that, you know, this idea
21 that corporations should not be worried about every single
22 employee's social media post, lest they be held accountable.
23 Yes, that makes sense.  But given the context here that we've
24 alleged that this was North Face's business position, like,
25 this was within the scope of his employment, then, yes, I do

48

1  think that Dave Burelson can be seen as republishing under the

2  case law.

3          And it's contextual based.  It's not just so simple

4  as this one simple fact of this retweet with no comment.  It's

5  everything that leads up to that retweet -- or that sharing or

6  whatever it's called on Instagram.

7          THE COURT:  All right.  So I think the other claim

8  was that if the defamation claim fails, the tortious

9  interference claim fails.

10          MR. BARRY:  Agree with that.  There would be no

11  unlawful conduct.

12          THE COURT:  All right.

13          MR. BARRY:  And then there was the tortious

14  interference causation.  I think it's pretty clear that we

15  believe that tortious interference caused harm to our client,

16  and we've made that argument in our briefing, in our complaint.

17          And then there was the punitive damages that we

18  haven't alleged actual malice, but I think we have clearly

19  alleged actual malice and argued for it, given that --

20          THE COURT:  Actual malice on behalf of North Face or

21  Mr. Ainuu?

22          MR. BARRY:  On behalf of Defendant Ainuu.

23          THE COURT:  Not North Face?

24          MR. BARRY:  I mean, aside -- yes, not on behalf of

25  North Face.

1          THE COURT:  All right.  Thank you.  Anything else?

2          MR. BARRY:  Nothing else, Your Honor.  Thank you.

3          THE COURT:  Mr. Monforton, anything you want to add?

4          MR. MONFORTON:  Nothing, Your Honor.  Thank you.

5          THE COURT:  Brief rebuttal, Ms. Walker and

6 Mr. Tierney.

7          MS. WALKER:  Thank you, Your Honor.  This may seem a

8 little scattershot, but I want to clear up some of the facts

9 and then address a couple points of law.

10          The first mistake being mine.  I mentioned the

11 *Lokhova* case and said it was CNN or MSNBC.  It was NBC

12 Universal.  The *Lokhova* case is mentioned at page 17.

13          THE COURT:  I am not quite sure what all of those

14 are, but I'll figure it out.

15          MS. WALKER:  It goes directly to the issue of

16 vicarious liability and the fact that no organization can be

17 liable for speech like Mr. Ainuu's here or the speech of --

18          THE COURT:  I understand the general principle.

19 Mr. Barry, he argues that in the context of this case, there is

20 some knowledge because North Face has this diversity effort

21 where they're trying to expand their market share by appealing

22 to people of color who engage in outdoor activities.

23          In that context and given Mr. Burelson's relationship

24 with Mr. Ainuu, and his knowledge of these incidents, there is

25 some implicit, if not explicit, agency between the two.

1      MS. WALKER:  Right.  It boils down to what *Twombly*
2  refers to as parallel conduct, that TNF is interested in being
3  antiracist, and Mr. Ainuu is interested in being antiracist.
4  And, therefore, there must have been a meeting of the minds and
5  some conspiracy.  And *Twombly* says, no, that's not the case.
6  They just both happen to be interested in the same thing, but
7  that doesn't --

8      THE COURT:  What were the facts in *Twombly*?

9      MS. WALKER:  *Twombly* was an antitrust case and dealt
10  with whether parallel conduct created a conspiracy or an
11  agreement.

12      So, yes, it's a CF cite, probably not a C cite in the
13  world of Bluebooking, but it goes to the same issue.  And the
14  really on-point case is the *Lokhova* case, which I wanted to
15  clear up.  It's on page 17 of our opening brief.  I would
16  encourage you to look closely at both the district opinion and
17  the Fourth Circuit opinion.

18      Another factual issue I want to clear up, Mr. Barry
19  said that Outdoor Research terminated Mr. Talbot because of
20  reputational risk.  That is rampant speculation.  There's no
21  plausible basis for them to allege that.  And, in fact, what
22  they allege in the complaint -- and I can give you the
23  paragraph --

24      THE COURT:  The reputational risk would have been to
25  Outdoor Research.

1              MS. WALKER:  That seems to be what he's saying.  But
2     what Mr. Talbot alleges in the complaint, at page 77
3     through 78 -- and he actually quotes what he received from
4     Outdoor Research when he was fired.  He was fired for showing
5     poor judgment in his actions in Bozeman, both prior to and
6     during the incident at the bar.
7              So the notion that he was terminated because Outdoor
8     Research believed what Mr. Ainuu said or was worried about
9     reputational risk is just not substantiated by what is in the
10    complaint, and it's just Mr. Barry's speculation here today.
11             A third factual issue, you asked Mr. Barry if there
12    were witnesses to this event, and he said no.  We're getting a
13    bit beyond the pleadings here, Your Honor, but there were many
14    witnesses to the event.
15             It is in the record that Mr. Talbot was at the
16    Crystal in Bozeman after a dinner with work colleagues.  There
17    were people on the sidewalk when the interaction with Mr. Ainuu
18    and Mr. Talbot began.  They moved into the bar.  There were
19    people who witnessed the events.  The facts will show that a
20    bartender actually broke up the confrontation.  So there are
21    many witnesses to this event.
22             Moving for a minute to a couple of legal arguments,
23    you are asking about this assault allegation, and you have
24    rightly said that assault is the reasonable apprehension of
25    bodily harm.  And I would point you to page 12 and 13 of our

1 reply brief, where we disclose the many factual allegations

2 that Mr. Ainuu disclosed in his Instagram post before he

3 reached his ultimate conclusion that Mr. Talbot is racist and

4 was trying to fight him.

5    And one of those allegations, it's actually the last

6 bullet on page 13, is that Talbot squared up to Ainuu and got

7 right in his face.  Those are allegations that Mr. Talbot does

8 not dispute are false.  And that, coupled with the rest of the

9 interactions that night, not only support the opinion -- and,

10 again, we do believe it's an opinion, whether he used the word

11 "fight" or "assault," we do believe that's his opinion and

12 perception, similar to how saying that Mr. Sandmann blocked him

13 was the opinion of the Native America elder.

14    But even if you want to -- so we think it's pure

15 opinion.  Maybe it's mixed opinion, in which case he disclosed

16 the underlying facts, as shown on page 13.

17    But, Your Honor, at this point -- and we haven't

18 briefed the issue of truth, but even if you find that this was

19 a factual statement, it is a true statement.  Because he got up

20 in his face, and he squared up to him, and they don't dispute

21 anywhere in their complaint that those are accurate statements,

22 and that is assault.

23    THE COURT:  I think I understand what squared up

24 means.  But how do we decide whether someone is trying to fight

25 you?  How close were they?

1          MS. WALKER:  Exactly.  That's why it's opinion.

2          THE COURT:  All right.  All right.

3          MS. WALKER:  I am just reading my chicken scratch

4    here, Your Honor.

5          When you read the *Sandmann* opinion, I would encourage

6    you to look at how the Fourth Circuit in that case talked about

7    what the Native American elder said and how they viewed that as

8    pure opinion.

9          Toward the end of opinion, they go into a bit of

10   dicta about how the news coverage unfolded and how the news

11   media, because this is what they do, gave Mr. Phillips' point

12   and gave Mr. Sandmann's point and showed some video, and it

13   talks about the context of all of that.  But that discussion of

14   context does not erase the fact that when the court looked at

15   what Mr. Phillips, the Native American man perceived and what

16   he said, that that was pure opinion, just like Mr. Ainuu's

17   statements are pure opinion that don't require the disclosure

18   of facts.

19         And then, finally, on the Burelson issue, Your Honor,

20   take a look again at the *Jankovic* cases.  Mr. Burelson did not

21   republish Mr. Ainuu's tweet.  And the *Jankovic* case draws an

22   analogy between the days of the internet and, you know, how we

23   used to communicate.

24         And the thinking is if you write an opinion in this

25   case, Your Honor, the Court will publish it.  And I can print

1    it, and I can hand it to Mr. Tierney.  That's not me

2    republishing it.  That's just me giving him something.  That's

3    just me making it available to someone else.

4         And the *Jankovic* court said the same thing about

5    reposting on the internet.  It's published, and then you just

6    tell someone else about it.  And it's analogous to that idea of

7    handing it to someone.  It's not a republication.

8         And for many other reasons in our brief, what

9    Mr. Burelson did was not within the scope of his employment in

10   any event.

11        So unless you have other questions, that's all I

12   have.

13        THE COURT:  No.  Thank you, Ms. Walker.

14        Mr. Tierney, anything you need to add?

15        MR. TIERNEY:  I'll be very, very brief.

16        THE COURT:  All right.

17        MR. TIERNEY:  Your Honor, just one final point.  I

18   wanted to address Mr. Talbot's repeated reliance on responses

19   from other users on Instagram to try to prove the defamatory

20   character of Mr. Ainuu's comments and to try to establish that

21   they are not opinion.

22        During your colloquy with Mr. Barry, he repeatedly

23   responded, Look at this response.  Look at what these people

24   said.  They clearly interpreted this as asserting facts.  So a

25   reasonable reader must have interpreted it that way.

1        First of all, I would posit that inferring that your

2 average Instagram reader is necessarily a reasonable person or

3 a reasonable reader is a questionable assumption, and there's

4 legal authority for that. I'd direct Your Honor to page 17 of

5 The North Face's reply which offers some cases saying that

6 unanimous online comments and response to defamatory speech are

7 not cognizable.

8        THE COURT: Before you sit down, Mr. Barry argued

9 that Mr. Ainuu has admitted to people that some of these

10 statements or some of the conduct didn't actually happen.

11 What's your response?

12        MR. TIERNEY: I think that's a related issue. It's a

13 proffer of subjective proof on an objective issue. I think we

14 address that in our reply belief, Mr. Ainuu's reply brief.

15 It's what a reasonable person would expect, whether they would

16 interpret it has conveying false facts. His subjective

17 impressions and beliefs and the subjective impressions of the

18 audience are irrelevant.

19        THE COURT: All right. Thank you, Mr. Tierney.

20        MR. TIERNEY: Thank you, Judge.

21        THE COURT: All right. Anything else, Mr. Barry?

22        MR. BARRY: No, Your Honor.

23        THE COURT: Ms. Walker?

24        MS. WALKER: No, Your Honor. Thank you.

25        THE COURT: Mr. Meloy, anything you need to add?

1    MR. MELOY:  I would love to, Your Honor, but I think
2 we're done.  Thank you.
3    THE COURT:  I think so too.
4    All right.  This matter is submitted.  I will have an
5 opinion out as soon as possible.  Thank you for your time.
6    (The proceedings concluded at 11:05 a.m.)
7
8                        --o0o--
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REPORTER'S CERTIFICATE

REPORTER'S CERTIFICATE

1       I, Yvette Heinze, a Registered Professional

2 Reporter and Certified Shorthand Reporter, certify that the

3 foregoing transcript is a true and correct record of the

4 proceedings given at the time and place hereinbefore mentioned;

5 that the proceedings were reported by me in machine shorthand

6 and thereafter reduced to typewriting using computer-assisted

7 transcription; that after being reduced to typewriting, a

8 certified copy of this transcript will be filed electronically

9 with the Court.

10      I further certify that I am not attorney for, nor employed

11 by, nor related to any of the parties or attorneys to this

12 action, nor financially interested in this action.

13      IN WITNESS WHEREOF, I have set my hand at Great Falls,

14 Montana, this 29th day of April, 2024.

/s/ Yvette Heinze
_____
Yvette Heinze
United States Court Reporter

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. All of the participants in this case are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Leita Walker*
Leita Walker